FILED

2010 JAN 11 P 1: 25

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHLAN DISTRICT OF CALIFORNIA

E-filing

CRB

0121

1  Christopher Sproul (State Bar No. 126398)
   Jodene Isaacs (State Bar No. 226895)
2  ENVIRONMENTAL ADVOCATES
   5135 Anza Street
3  San Francisco, California 94121
   Telephone: (415) 533-3376, (510) 847-3467
4  Facsimile: (415) 358-5695
   Email: csproul@enviroadvocates.com
5  Email: jisaacs@enviroadvocates.com

6

7  William Verick (State Bar No. 140972)
   Klamath Environmental Law Center
   Fredric Evenson (State Bar No. 198059)
8  Law Offices of Fredric Evenson
   424 First Street
9  Eureka, California 95501
   Telephone: (707) 268-8900
10 Facsimile: (707) 268-8901
   Email: wverick@igc.org, ecorights@earthlink.net
11

12 Attorneys for Plaintiff
   ECOLOGICAL RIGHTS FOUNDATION

13

14                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA

15 ECOLOGICAL RIGHTS FOUNDATION,        Civil No. _____

16
                    Plaintiff,
17
                v.                        COMPLAINT FOR DECLARATORY
18                                         AND INJUNCTIVE RELIEF AND CIVIL
   PACIFIC GAS AND ELECTRIC COMPANY,      PENALTIES
19              Defendant.
                                          DEMAND FOR JURY TRIAL
20
                                          (Clean Water Act,
21                                         33 U.S.C. §§ 1251 et seq.)

22

23

24

25

26

27

28

1    Plaintiff Ecological Rights Foundation ("ERF") alleges as follows:

2    **I.    INTRODUCTION AND JURISDICTION**

3    1.    Plaintiff brings this action under Clean Water Act ("CWA") section 505(a)(1), 33

4    U.S.C. § 1365(a)(1), which authorizes citizens to bring civil actions against any person who is

5    alleged to be in violation of an effluent standard or limitation established under the CWA.

6    2.    This Court has subject matter jurisdiction over the claims for CWA violations set

7    forth in this Complaint pursuant to CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1), and 28 U.S.C.

8    section 1331 (an action for declaratory, injunctive and other relief arising under the laws of the

9    United States).

10    3.    This complaint seeks relief for alleged unlawful discharge of pollutants from Pacific

11    Gas & Electric Company ("PG&E")'s corporation yards and service centers located at various

12    locations throughout Northern California (collectively, the "Facilities"), into waters of the United

13    States in violation of the CWA. A list of the Facilities at issue can be found in Exhibit 1 to the

14    Notice Letter attached to this complaint.

15    4.    On November 8, 2009, ERF served a 60-Day Notice Letter ("Notice Letter") on

16    PG&E regarding PG&E's violations of the CWA, and of Plaintiff's intention to file suit against

17    PG&E. Copies of said Notice Letter were also sent to the Administrator of the United States

18    Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region IX, the

19    Executive Director of the State Water Resources Control Board ("State Board"), and the Executive

20    Officer of the Regional Water Quality Control Board, North Coast Region ("Regional Board") as

21    required by the CWA, 33 U.S.C. § 1365(b)(1)(A). A copy of this Notice Letter is attached to this

22    Complaint.

23    5.    Neither the EPA nor the State of California has commenced or is diligently

24    prosecuting an action to redress the violations of the CWA alleged in the Notice Letter. Claims for

25    civil penalties asserted in this action are not barred by any prior administrative penalty under CWA

26    section 309(g), 33 U.S.C. § 1319(g).

27    6.    This Court has personal jurisdiction over PG&E. PG&E is a California corporation

28    doing business in California, including within the United States Northern District of California.

**1** II.  **VENUE**

**2**      7.      Venue in the Northern District of California is proper pursuant to CWA section

**3** 505(c)(1), 33 U.S.C. § 1365(c)(1), because the actions that gave rise to this case occurred within the

**4** Northern District of California and PG&E's offices are located in the Northern District of

**5** California.

**6** III.  **INTRADISTRICT ASSIGNMENT**

**7**      8.      Intradistrict assignment of this matter to the San Francisco Division of the Court is

**8** appropriate pursuant to Civil Local Rule 3-2(c) in that some of the actions that gave rise to this case

**9** occurred in San Francisco and San Mateo counties. Defendant's principal place of business is in the

**10** City of San Francisco as are some of Plaintiff's counsel and many of Plaintiff's members. Thus, it

**11** would be most convenient for the parties if this case were assigned to the San Francisco Division of

**12** the Court.

**13** IV.  **THE PARTIES**

**14**      9.      ERF is a non-profit public interest organization public benefit corporation with

**15** offices in Garberville, California and members throughout California. Among other advocacy

**16** activities, ERF focuses on protecting surface waters from pollution and degradation. ERF represents

**17** citizens who are striving to protect waterways from pollution and secure the multitude of public and

**18** private benefits that follow from clean, vibrant waters: safe drinking water, abundant and diverse

**19** wildlife populations, healthy recreational opportunities, and economic prosperity from commercial

**20** fishing and other commercial activities that depend on clean water. ERF's members use waters into

**21** which PG&E has discharged contaminated storm water runoff from its corporation yards and service

**22** centers, including San Francisco Bay, its tributaries, and adjacent wetlands for recreation, fishing,

**23** wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation. ERF

**24** members are concerned about water quality and are being adversely affected by PG&E's discharges

**25** to waters of the United States alleged herein

**26**      10.      PG&E is a corporation organized under the laws of the State of California with its

**27** corporate headquarters located in San Francisco, California.

**28** V.  **STATUTORY BACKGROUND**

COMPLAINT                                                                                          Page 2

**Clean Water Act**

11. CWA section 301(a), 33 U.S.C. §1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA sections. Among other things, CWA section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

12. CWA section 402(p) requires that NPDES permits be issued for storm water discharges associated with industrial activities.

13. CWA section 402(b) allows each state to administer its own EPA-approved permit program for discharges. In California, the State Board and its nine Regional Boards have approval from EPA to administer an NPDES permit program for the State. The State Board and its nine Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

14. EPA regulations require the submission of an application for an NPDES permit by any person who discharges pollutants and does not have an effective permit to discharge pollutants to waters of the United States. 40 C.F.R. § 122.21(a).

15. CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1); *see* 33 U.S.C. § 1362(5).

16. CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33 U.S.C. § 1365(a). CWA violators are also subject to an assessment of civil penalties of up to $32,500 for all violations occurring on or after March 15, 2004. CWA section 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1 - 19.4.

**The General Industrial Storm Water Permit**

17. In California, the State Board has elected to issue a single, statewide general permit applicable to all storm water discharges associated with industrial activity. The General Permit is an NPDES permit pursuant to CWA section 402(p), 33 U.S.C. § 1342(p).

COMPLAINT                                                                 Page 3

1　To discharge storm water lawfully in California, industrial dischargers must secure coverage

2　under the General Permit and comply with its terms or obtain and comply with an individual

3　NPDES permit.

4　18.　The General Permit expressly applies to facilities classified as Standard

5　Industrial Classifications ("SIC") for motor freight transportation and storage, industrial and

6　commercial machinery, and transportation equipment.

7　19.　The General Permit also applies to facilities containing the following:

8　"material handling sites, sites used for the storage and maintenance of material handling

9　equipment, shipping and receiving areas, storage areas (including tank farms) for raw

10　materials... intermediate and finished products... and areas where industrial activity has taken

11　place in the past and significant materials remain." *See* General Permit, Attachment 4, ¶ 9.

12　Significant materials are defined to include "raw materials; fuels; materials such as solvents,

13　detergents, and plastic pellets; finished materials such as metallic products; raw materials

14　used in food processing or production; hazardous substances designated under section

15　101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act;

16　any chemical the facility is required to report pursuant to section 313 of title III of SARA;

17　fertilizers; pesticides; and waste products such as ashes, slag, and sludge that have the

18　potential to be released with storm water discharges. 40 C.F.R. § 122.26(b)(12). General

19　Permit, Attachment 4, ¶ 6.

20　20.　The General Permit contains certain absolute prohibitions. Discharge

21　Prohibition A(1) of the General Permit prohibits the direct or indirect discharge of materials

22　other than storm water ("non-storm water discharges"), which are not otherwise authorized

23　by an NPDES permit, to the waters of the United States. Discharge Prohibition A(2) of the

24　General Permit prohibits storm water discharges that cause or threaten to cause pollution,

25　contamination, or nuisance. Receiving Water Limitation C(1) of the General Permit

26　prohibits discharges that adversely impact human health or the environment. Receiving

27　Water Limitation C(2) of the General Permit prohibits discharges that cause or contribute to

28　an exceedance of any applicable water quality standard contained in a Statewide Water

1   Quality Control Plan or the applicable Regional Board's Basin Plan.

2       21.    In addition to absolute prohibitions, the General Permit contains a variety of

3   substantive and procedural provisions with which dischargers must comply. At a minimum,

4   dischargers must employ measures to reduce or eliminate storm water pollution that

5   constitute the Best Available Technology Economically Achievable ("BAT") and the Best

6   Conventional Pollutant Control Technology ("BCT"). Effluent Limitation B(3), General

7   Permit.

8   **VI.    STATEMENT OF FACTS**

9       22.    PG&E is an electrical utility that, *inter alia*, supplies electricity and natural

10   gas to much of Northern California.

11      23.    PG&E distributes electricity via an electrical grid, the wires for which are suspended

12   by power poles that are treated with an oil-pentachlorophenol mixture.

13      24.    To provide service and maintenance on its electric and gas distribution system,

14   PG&E operates and maintains numerous corporation yards and service centers throughout its service

15   territory.

16      25.    PG&E's routinely stores transportation equipment and industrial and

17   commercial machinery outdoors and uncovered at the Facilities.

18      26.    Other materials used or stored at PG&E's Facilities include new and used

19   wooden utility poles, electrical generators, and other equipment and parts used to transport,

20   install. and maintain PG&E's electric and gas distribution system.

21      27.    The industrial materials stored, and the pollutants generated, at the Facilities

22   are exposed to storm water and non-storm water flows.

23      28.    The wooden poles stored by PG&E at the Facilities have been variously

24   treated with creosote, chemonite, chromated copper arsenate ("CCA"), and/or

25   pentachlorophenol. Creosote is manufactured from coal and, according to the federal Agency

26   for Toxic Substances and Disease Registry (part of the federal Department of Health &

27   Human Services): "About 300 chemicals have been identified in coal tar creosote. but there

28   may be as many as 10,000 other chemicals in this mixture." The most toxic of the chemicals

COMPLAINT                                    Page 5

1  identified in creosote are polycycilc aromatic hydrocarbons ("PAHs"), phenol and cresols.
2  Chemonite is a trade name for ammoniacal copper zinc arsenate, which means it contains
3  ammonia, copper, zinc and arsenic. CCA is a mixture of copper, chromium and arsenic.
4  Perhaps the most toxic component of CCA is hexavalent chromium ("chrome VI"), which
5  when inhaled is an extremely potent carcinogen. Arsenic, which is present in both chemonite
6  and CCA is both a carcinogen and a teratogen. Pentachlorophenol is a fungicide. As an
7  active ingredient it is dissolved into a carrier before being applied to power poles. The most
8  common carriers for pentachlorophenol are oil (the vast majority of the stored poles are
9  treated with pentachlorophenol dissolved in oil), liquified natural gas and methylene
10 chloride. Because of the way it is manufactured, pentachlorophenol is necessarily and
11 invariably contaminated with a suite of similar, but even more toxic chemicals. These
12 contaminants include, polychlorinated dibenzo-pdioxins and polychlorinated dibenzofurans
13 (hereinafter "dioxins") and hexachlorobenzene. The wood preservatives used to treat the
14 stored poles are washed off the poles by rainwater and transported from the Facilities into
15 surface waters via storm water runoff.

16      29.     The pollutants that PG&E's Facilities release into the immediate environment,
17 include among others: dust, debris and excessive total suspended solids; various petroleum
18 hydrocarbons petroleum products including oil, gasoline, grease, diesel fuel, battery fluids,
19 anti-freeze and hydraulic fluids;, and pH levels above of environmentally safe amounts. All
20 of these substances are "significant materials" within the meaning of the General Permit.

21      30.     The Facilities also release toxic pollutants into storm water and the
22 environment generated from stored utility poles. These pollutants include ("PAHs"), phenol
23 and cresols, ammonia, copper, zinc, arsenic, chrome VI, pentachlorophenol dioxins, and
24 hexachlorobenzene.

25      31.     Due to PG&E's lack of effective pollution prevention measures, its failure to
26 implement effective best management practices, and its failure to implement an effective
27 monitoring and reporting program, storm water from the Facilities becomes polluted with
28 numerous pollutants described above. This polluted storm water is discharged into waters of

COMPLAINT                                                                          Page 6

1  the United States: (1) via storm drains on and around the Facilities, or (2) via storm water

2  flows directly off of the Facilities into waters of the United States.

3      32.    PG&E has not filed a Notice of Intent ("NOI") to comply with the terms of the

4  General Permit. Nor does PG&E have any individual NPDES permits authorizing its discharges of

5  contaminated storm water from the Facilities described in Exhibit 1 to the attached Notice Letter.

6  PG&E currently has no NPDES permit authorizing discharges of storm water or any other

7  wastewater associated with its industrial activities for any of the Facilities described in Exhibit 1.

8  **VII.    CLAIMS**

9

10  **FIRST CLAIM FOR RELIEF**
   **Discharges of Contaminated Storm Water in Without NPDES Permit Authorization**
   **(Violations of 33 U.S.C. §§ 1311 (a))**
11

12     33.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as

13  though fully set forth herein.

14     34.    CWA section 301(a), 33 U.S.C. §1311(a), prohibits the discharge of any

15  pollutant into waters of the United States unless authorized by the terms of an NPDES permit

16  issued pursuant to CWA section 402, 33 U.S.C. § 1342.

17     35.    PG&E has not obtained an NPDES permit authorization for storm water

18  discharges from the Facilities into waters of the United States.

19     36.    Since at least November 8, 2004, PG&E has been discharging polluted storm

20  water from the Facilities in violation without NPDES permit authorization during every

21  significant rain event (i.e., all rainfall events generating 0.1 inches or more of rain) in

22  violation of CWA section 301(a), 33 U.S.C. § 1311(a).

23     37.    PG&E will continue to be in violation of CWA section 301(a)'s discharge

24  prohibition each day it discharges storm water from the Facilities without obtaining an

25  NPDES permit.

26     38.    Each day since November 8, 2004 that PG&E has discharged pollutants in

27  storm water without an NPDES permit is a separate and distinct violation of CWA section

28  301(a), 33 U.S.C. § 1311(a).

COMPLAINT                                                                    Page 7

**1**       39.     By committing the acts and omissions alleged above, PG&E is subject to an

**2**   assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C.

**3**   §§1319(d) and 1365.

**4**       40.     An action for injunctive relief is authorized by CWA section 505(a), 33

**5**   U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will

**6**   irreparably harm plaintiff and plaintiff's members, for which harm they have no plain,

**7**   speedy or adequate remedy at law.

**8**

**9**                             **SECOND CLAIM FOR RELIEF**

**10**              **Duty to Apply for Coverage under General Permit**
         **(Violation of 40 C.F.R. § 122.21(a), 33 U.S.C. §§ 1311)**

**11**       41.     Plaintiffs incorporate the allegations contained in all preceding paragraphs as

**12**   though fully set forth herein.

**13**       42.     Since at least November 8, 2004, PG&E has failed to submit an application

**14**   for NPDES permit authorization to discharge storm water from it Facilities in violation of 40

**15**   C.F.R. § 122.21(a).

**16**       43.   Every day since at least June 12, 2004 that PG&E has failed to apply for NPDES

**17**   permit authorization for storm water discharges from the Facilities constitutes a separate and

**18**   distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

**19**       44.   By committing the acts and omissions alleged above, PG&E is subject to an

**20**   assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§

**21**   1319(d) and 1365.

**22**       45.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. §

**23**   1365(a). Continuing commission of the acts and omissions alleged above will irreparably

**24**   harm plaintiff and plaintiff's members, for which harm they have no plain, speedy or

**25**   adequate remedy at law.

**26**   **VIII.   RELIEF REQUESTED**

**27**       46.     Wherefore, ECOLOGICAL RIGHTS FOUNDATION respectfully requests

**28**   this Court to grant the following relief:

1   a.   Declare Defendant to have violated and to be in violation of CWA

2 section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from its Facilities without

3 NPDES permit authorization;

4   b.   Enjoin Defendant from discharging pollutants from its Facilities to

5 storm drains or any waters of the United States;

6   c.   Order Defendant to restore all receiving waters damaged by

7 Defendant's illegal discharges of pollutants from the Facilities;

8   d.   Order Defendant to apply for coverage under the General Permit for

9 all of the Facilities and immediately begin complying with all of the General Permit's

10 substantive and procedural requirements;

11   e.   Order Defendant to pay civil penalties of up to $32,500 for all

12 violations in accord with CWA section 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1 -

13 19.4;

14   f.   Award plaintiff its costs (including reasonable attorney, witness, and

15 consultant fees) as authorized by the CWA, 33 U.S.C. § 1365(d);

16   g.   Award such other relief as this Court may deem appropriate.

17 **IX.**   **DEMAND FOR JURY**

18   Pursuant to Federal Rule of Civil Procedure 38(b), ERF demands a jury trial in this

19 matter.

20 **X.**   **DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS**

21   Based on ERF's knowledge to date, pursuant to Civil Local Rule 3-16, the

22 undersigned certifies that, as of this date, other than the named parties, there is no such

23 interest to report.

24

25

26

27

28

COMPLAINT   Page 9

Dated: January 11, 2010

Respectfully Submitted,

By: *Christopher a. Sproul*

_____

Christopher Sproul
Attorney for Plaintiff
ECOLOGICAL RIGHTS
FOUNDATION

# EXHIBIT 1



**ENVIRONMENTAL**
**LAW CENTER**

November 3, 2009

*VIA CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*

| Linda Y.H. Cheng |
| Agent for Service of Process |
| Pacific Gas & Electric Company |
| 77 Beale Street, 32nd Floor |
| San Francisco, CA 94105 |
| Peter A. Darbee, President and CEO |
| Pacific Gas & Electric Company |
| One Market Spear Tower, Suite 2400 |
| San Francisco, CA 94105 |

**Re:  Notice of Violation and Intent to File Suit Under the Clean Water Act and Resource Recover and Conservation Act.**

Greetings:

I am writing on behalf of Ecological Rights Foundation ("ERF") to give notice that ERF intends to file a civil action against Pacific Gas and Electric Company (hereinafter "PG&E" or "You") for Your violations of the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA") at PG&E's corporation yards and service centers ("the Facilities") located throughout Northern California. This letter provides you notice of PG&E's unlawful discharge of pollutants from these thirty (30) Facilities into waters of the United States and the ongoing and continuous violations of the substantive and procedural requirements of the Clean Water Act and National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("General Permit" or "State Board General Permit").
[1] This letter further provides you notice of the imminent and substantial endangerment to

---

[1] The General Permit expired in 2002, but has been administratively extended until a new permit can be adopted. A draft permit was circulated in 2005 but has not yet been adopted by the State Water Resources Control Board. Should the Draft Permit be finalized during the pendency of this Notice, this Notice is intended to apply to any future permit that has provisions at least as strict as those in the current General Permit.

Citizen Suit Notice Letter
November 3, 2009
Page 2 of 20

human health and the environment caused by the handling, storage, treatment, transportation, or disposal of solid wastes at the Facilities in violation of RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B). A complete list of the Facilities at issue in this letter is located in Exhibit 1.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), 33 U.S.C. § 1365(a), a citizen must give notice of his/her intent to file suit. Section 7002(b)(2)(A) of RCRA, 42 U.S.C. 6972 (b)(2)(A), requires that notice of intent to sue be given 90 days prior to initiation of a civil action under section 7002(a)(1)(B), 42 U.S.C. § 6972 (a)(1)(B). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur. As required by the CWA and RCRA, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred and which are continuing to occur at PG&E's Facilities.

It is unlawful to discharge pollutants to waters of the United States without an NPDES permit or in violation of the terms and conditions of an NPDES permit. Based on information available to ERF, PG&E has not filed a Notice of Intent ("NOI") to be covered by the General Permit for any of the Facilities listed in Exhibit 1. Thus, Your Facilities lack NPDES permit authorization for discharges of pollutants into waters of the United States. ERF believes that Your Facilities have violated and are in violation of the General Permit and of the CWA's prohibition on the unpermitted discharge of pollutants. In addition, ERF believes that Your Facilities have violated and are in violation of RCRA as the discharges from Your Facilities pose an imminent and substantial endangerment to health or the environment in violation of 42 U.S.C. § 6972(a)(1)(B). Consequently, You are hereby placed on formal notice from ERF that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent To File Suit, ERF intends to file suit in federal court against You under CWA section 505(a), 33 U.S.C. § 1365(a), for violations of the CWA. After the expiration of ninety (90) days from the date of this Notice of Violation and Intent To File Suit, ERF intends to file suit in federal court against You under RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972 (a)(1)(B) for violations of RCRA.

## I.    The Noticing Party

ERF is organized under the laws of the State of California. ERF's main office is at 867 "B" Redwood Drive, Garberville, California, 95542. ERF's telephone number is (707) 923-4372. To further its environmental advocacy goals, ERF actively seeks federal and state agency implementation of state and federal water quality related laws, and as necessary, directly initiates enforcement actions on behalf of itself and its members. ERF's members use and enjoy the waters into which PG&E discharges and the environment affected by PG&E's unlawful solid waste practices described herein for various recreational, educational, and spiritual purposes.

## II. The Noticed Party

PG&E is an electrical utility that supplies electricity to much of Northern California. PG&E operates and maintains the Facilities to which this Notice Letter pertains.

## III. Regulatory Background

### A. Clean Water Act

Under the CWA, the discharge of any pollutant is unlawful except in compliance with specified CWA provisions. *See* 33 U.S.C. §1311(a). The CWA and its implementing regulations require any person who discharges or proposes to discharge pollutants into waters of the United States in California to submit a National Pollutant Discharge Elimination System ("NPDES") permit application to the State Water Resources Control Board ("State Board"). 40 C.F.R. § 122.21(a) ["Duty to Apply"], §122.26(a)(ii) ["Permit Requirement"]; 33 U.S.C. § 1342(p)(2)(b). Further, dischargers of storm water associated with industrial activity are required to obtain either an individual NPDES permit or seek coverage under the State Board General Permit. *See* 40 C.F.R. § 122.26(c)(1). The General Permit requires existing facilities subject to its terms, such as the Facilities, to file a NOI for coverage under the General Permit by March 30, 1992 and to thereafter comply with its procedural and substantive requirements. Any violation of the General Permit or its terms is a violation of the CWA.

PG&E has not filed an NOI to comply with the terms of the General Permit. Nor does PG&E have any individual NPDES permits for its discharges of contaminated storm water from the Facilities described in Exhibit 1. PG&E currently has no NPDES permit authorizing discharges of storm water or any other wastewater associated with its industrial activities for any of the Facilities described in Exhibit 1.

The Facilities are subject to the terms of the General Permit. Among others, the General Permit expressly applies to facilities classified as Standard Industrial Classifications ("SIC") for motor freight transportation and storage, industrial and commercial machinery, and transportation equipment. PG&E's Facilities qualify as such facilities.

Furthermore, the requirement to obtain coverage under the General Permit applies to the following: "material handling sites, sites used for the storage and maintenance of material handling equipment... shipping and receiving areas, storage areas (including tank farms) for raw materials... intermediate and finished products... and areas where industrial activity has taken place in the past and significant materials remain." *See* General Permit, Attachment 4, ¶ 9. Significant materials are defined to include "raw materials; fuels; materials such as solvents, detergents, and plastic pellets; finished materials such as metallic products; raw materials used in food processing or production;

hazardous substances designated under section 101(14) of the Comprehensive
Environmental Response, Compensation, and Liability Act; any chemical the facility is
required to report pursuant to section 313 of title III of SARA; fertilizers; pesticides; and
waste products such as ashes, slag, and sludge that have the potential to be released with
storm water discharges. 40 C.F.R. §122.26(b)(12). General Permit, Attachment 4, ¶ 6.
The Facilities are currently used for the storage of a wide range of objects, including
working vehicles, new and used wooden utility poles, and electrical generators and other
equipment and parts used in the installation and upkeep of electric and gas distribution
lines.

According to site investigations conducted by ERF, pollutants found in Your
storm water generated by industrial activities at the Facilities include but are not limited
to the following: various petroleum hydrocarbons, pentachlorophenol, dioxins, furans,
various metals, excessive total suspended solids, and pH levels falling outside of
environmentally safe levels. All of these substances are "significant materials" within the
meaning of the General Permit.

## B.    Resource Conservation and Recovery Act

RCRA section 7002(a)(1)(B) prohibits the creation of an imminent and substantial
endangerment to human health and the environment, 42 U.S.C. §6972(a)(1)(B). As
discussed more fully below, PG&E is in violation of RCRA for the creation of an
imminent and substantial endangerment to human health and the environment through the
continued presence and release of toxic pollutants at the Facilities.

## IV.    The Industrial Activities at the Facilities Alleged to Constitute Violations and the Alleged Violations

Operations at PG&E's Facilities occur outdoors and are exposed to rainfall,
including vehicle and equipment operation, vehicle maintenance, and vehicle storage.
PG&E also stores and maintains equipment used in the installation and repair of its
electrical and natural gas transmission and distribution systems at these Facilities. Many
of the Facilities store utility poles treated with pentachlorophenol. These Facilities also
store and maintain equipment used in the installation and upkeep of utility poles.

Outdoor service vehicles track dust, particulate matter, and other contaminants to
areas on and off the premises at the Facilities. These vehicles also expose many other
sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery
fluids, and hydraulic fluids. Other equipment used and stored at the Facilities includes
equipment used in welding and equipment used to transport, install, and maintain utility
poles. The utility poles used by PG&E are made of wood and contain the wood
preservative pentachlorophenol. Thus, many of the Facilities contain materials which
contain pentachlorophenol as well as several other chemicals that are present in
pentachlorophenol-containing mixtures, including polychlorinated dibenzo-p-dioxins and
polychlorinated dibenzofurans (hereinafter "dioxins") and hexachlorobenzene.

As a result of the numerous pollutant-generating activities at the Facilities that occur outdoors and that are exposed to rainfall, contaminated storm water runs off Your Facilities and discharges into receiving waters throughout California. Pursuant to the General Permit, these contaminated storm water discharges obligate PG&E to develop, implement, and update and revise a Storm Water Pollution Prevention Plan ("SWPPP") for each of the Facilities which minimizes the discharge of pollutants to a level commensurate with application of the Best Available Technology Economically Achievable ("BAT") and the Best Conventional Pollutant Control Technology ("BCT"). In addition, the SWPPPs and Your implementation of the SWPPPs must prevent Your discharges from causing or contributing to violations of applicable Water Quality Standards. Each Facility must also monitor and sample its storm water discharges, and meet various other limitations on its storm water discharges.

As further described below, information available to ERF indicates that You have failed to develop, implement, and revise an adequate SWPPP for each of the Facilities and have consequently discharged from each of the Facilities storm water polluted to levels exceeding BAT and BCT levels of control and which have caused violations of applicable Water Quality Standards. We believe that You further have failed to adequately monitor and sample Your storm water discharges and meet various other limitations imposed by the General Permit on Your storm water discharges. These actions all constitute violations of CWA effluent limitations.

## A. Discharges without NPDES Permit Authorization

40 C.F.R. section 122.21(a) provides that "Any person who discharges pollutants ... and does not have an effective permit . . . must submit a complete application" for an NPDES permit.[2] PG&E has a duty to apply for an NPDES permit to regulate the discharge of pollutants from the Facilities.

PG&E has not applied for NPDES permit coverage for the discharges of industrial pollutants from the Facilities. You have discharged and are continuing to discharge pollutants to waters of the United States from the various driveways leading into and out of the Facilities, various culverts and other surface channels at and adjacent to the Facilities, the drop inlets and storm drain systems used to convey storm water away from the Facilities, and from sheet flow off of other portions of the Facilities. By way of example, on October 13, 2009 ERF sampled storm water runoff from Your facility located at 25051 O'Neil Avenue, Hayward, California ("the Hayward Facility") that You discharged to the waterway immediately adjacent to this facility. ERF's sampling indicated that your storm water discharge from the Hayward Facility on this date contained the following pollutants: TPH as gasoline, TPH as diesel, TPH as motor oil, TPH as mineral spirits, pentachlorophenol, dioxins, and furans, barium, copper, lead, zinc, elevated total suspended solids, pH levels falling outside of environmentally safe levels. Based on our sampling of discharges from the Hayward Facility and observations

---

[2] This requirement to apply for an NPDES permit does not apply in certain narrow circumstances that are not applicable to these Facilities.

of storm water discharges from sites similar to the Facilities, ERF alleges and puts You on notice that each day that You discharged storm water from the Facilities, Your storm water has contained various pollutants including various petroleum hydrocarbons, pentachlorophenol, dioxins, furans, various metals, excessive total suspended solids, and pH levels falling outside of environmentally safe levels. While You should be aware of each day that You have discharged storm water from the Facilities (as the General Permit requires You to monitor such discharges), ERF alleges and puts You on notice that You have discharged storm water containing excessive levels of pollutants from the Facilities to waters of the United States during at least every significant local rain event over 0.1 inches in the last five years. Significant local rain events are reflected in the rain gauge data available at http://cdec.water.ca.gov and http://lwf.ncdc.noaa.gov/oa/ncdc.html.

Each day that PG&E has failed and continued to fail to apply for an NPDES permit for the discharges from the Facilities in violation of 40 C.F.R. section 122.21(a) constitutes a separate day of violation of the CWA. These violations are ongoing as You continue to fail to apply for the required NPDES Permit(s). You are subject to civil penalties for violations of the General Permit and the CWA within the past five (5) years.

## B. Discharges in Violation of The Clean Water Act For Failure To Have An NPDES Permit

PG&E has violated and continues to violate CWA section 301(a), which prohibits the discharge of any pollutant into navigable waters, except in compliance with provisions of the Act. 33 U.S.C. § 1311(a). Specifically, CWA 301(a) prohibits the discharge of pollutants without an NPDES permit. 33 U.S.C. §1342(a)(1). You have discharged and are continuing to discharge pollutants to waters of the United States from the various driveways leading into and out of the Facilities, various culverts and other surface channels at and adjacent to the Facilities, the drop inlets and storm drain systems used to convey storm water away from the Facilities, and from sheet flow off of other portions of the Facilities. Based on our sampling of discharges from the Hayward Facility and observations of storm water discharges from sites similar to the Facilities, ERF alleges and puts You on notice that each day that You discharged storm water from the Facilities, Your storm water has contained various pollutants including various petroleum hydrocarbons, pentachlorophenol, dioxins, furans, various metals, excessive total suspended solids, and pH levels falling outside of environmentally safe levels. While You should be aware of each day that You have discharged storm water from the Facilities (as the General Permit requires You to monitor such discharges), ERF alleges and puts You on notice that You have discharged storm water containing excessive levels of pollutants from the Facilities to waters of the United States during at least every significant local rain event over 0.1 inches in the last five years. Significant local rain events are reflected in the rain gauge data available at http://cdec.water.ca.gov and http://lwf.ncdc.noaa.gov/oa/ncdc.html.

ERF believes that You have discharged pollutants directly and indirectly to waters of the United States without NPDES permit authorization for at least the last five years, and continue to discharge pollutants without an NPDES permit in violation of the

Citizen Suit Notice Letter
November 3, 2009
Page 7 of 20

CWA. Each discharge of pollutants from the Facilities to waters of the United States
without NPDES permit authorization constitutes a separate CWA violation. Your
violations will continue each day pollutants are discharged without a permit in violation
of CWA requirements. You are subject to civil penalties for violations of the General
Permit and the CWA within the past five (5) years.

### C. Discharges in Violation of the General Permit

The CWA provides that "the discharge of any pollutant by any person shall be
unlawful" unless the discharger is in compliance with the terms of a NPDES permit.
CWA section 301(a), 33 U.S.C. § 1311(a); *see also* CWA section 402(p), 33 U.S.C. §
1342(p) (requiring NPDES permit issuance for the discharge of storm water associated
with industrial activities). Your Facilities discharge storm water associated with the
industrial activities described above which is contaminated with pollutants. The General
Permit only authorizes such discharges conditioned on compliance with the terms of the
General Permit. Each of these permit terms constitutes an "effluent limitation" within the
meaning of CWA section 505(f), 33 U.S.C. § 1365(f). Information available to ERF
indicates that the Facilities' storm water discharges have violated several of these permit
terms, thereby violating CWA effluent limitations. ERF further alleges that even if
PG&E sends one or more NOIs to the State Board and acquires NPDES permit
authorization under the General Permit, the violations of the General Permit described
herein will remain on-going as PG&E has not met the General Permit's requirements.

### 1. Discharges in Excess of BAT/BCT Levels

The Effluent Limitations of the General Permit, ¶ E.3, prohibit Your Facilities
from discharging pollutants above the level commensurate with application of BAT and
BCT. EPA and the State Board have published Benchmark Values set at the maximum
level of pollutant loading generally expected if an industrial facility is employing BAT
and BCT.[3] ERF believes that Your Facilities have failed to employ measures that
constitute BAT and BCT for corporation yard and electrical service facilities, such as
moving polluting generating activities under cover or indoors; capturing and effectively
filtering or otherwise treating all storm water prior to discharge, routing storm sewer
discharges to publicly owned treatment works (following treatment necessary to meet
pretreatment standards); using regenerative sweepers and periodically power washing the
Facilities to reduce the build-up of pollutants on-site; washing tires or employing other
measures to prevent off-site tracking of pollutants; and other like measures for reducing
storm water pollutant discharges to the limits of available, economically achievable,
technology.

---

[3] These Benchmark Values are reproduced on the State Board's website at:
http://www.swrcb.ca.gov/water_issues/programs/stormwater/docs/smanlrdc.pdf
(note: State Board Benchmark Values are set forth in this State Board document as Table A and EPA
Benchmark Values are set forth in this State Board document as Attachment 3, Table B).

Citizen Suit Notice Letter
November 3, 2009
Page 8 of 20

Based on our sampling of discharges from the Hayward Facility and observations of storm water discharges from sites similar to the Facilities, ERF alleges and puts You on notice that each day that You discharged storm water from the Facilities, Your storm water has contained various pollutants including various petroleum hydrocarbons, pentachlorophenol, dioxins, furans, various metals, excessive total suspended solids, and pH levels falling outside of environmentally safe levels. While You should be aware of each day that You have discharged storm water from the Facilities (as the General Permit requires You to monitor such discharges), ERF alleges and puts You on notice that You have discharged storm water containing excessive levels of pollutants from the Facilities to waters of the United States during at least every significant local rain event over 0.1 inches in the last five years. Significant local rain events are reflected in the rain gauge data available at http://cdec.water.ca.gov and http://lwf.ncdc.noaa.gov/oa/ncdc.html.

ERF alleges that Your unlawful discharges of storm water from the Facilities with levels of pollutants exceeding BAT and BCT levels of control continue to occur presently during all significant rain events. Each discharge of storm water and non-storm water from Your Facilities after the effective date of the BAT and BCT requirements constitutes a separate violation of the General Permit and the CWA. You are subject to civil penalties for violations of the General Permit and the CWA within the past five (5) years.

PG&E's continued discharge of storm water containing levels of pollutants above BAT- and BCT-based levels of control necessarily means that You have not developed and/or implemented sufficient BMPs at Your Facilities to prevent storm water flows from coming into contact with the sources of contaminants at the Facilities or otherwise to control the discharge of pollutants from the Facility. Accordingly, PG&E has not developed and/or implemented an adequate SWPPP or Monitoring and Reporting Program ("MRP") at the Facilities.

### 2. *Discharges that Have Impaired Receiving Waters*

The Discharge Prohibitions of the General Permit, ¶ A.2, prohibit storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. The Discharge Prohibitions of the General Permit, ¶ A.2, prohibit storm water discharges to surface or groundwater that adversely impact human health or the environment. The Receiving Water Limitations of the General Permit, ¶ C.2, prohibit storm water discharges that cause or contribute to an exceedance of applicable Water Quality Standards. Applicable Water Quality Standards are set forth in the California Toxics Rule ("CTR")[4] and the applicable Basin Plan for each region.[5]

---

[4] The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble accompanying the CTR promulgation set forth at 65 Fed. Reg. 31682.

[5] The Basin Plan for each watershed region is published by the California Regional Water Quality Control Boards and can be found at the respective websites:
http://www.waterboards.ca.gov/northcoast/water_issues/programs/basin_plan/
http://www.waterboards.ca.gov/sanfranciscobay/basin_planning.shtml

ERF alleges and puts You on notice that Your storm water discharges from the Facilities have caused or contributed to exceedances of the Water Quality Standards set forth in the applicable Basin Plans and CTR. Based on site investigations and sampling, ERF believes and alleges that the pollutants contained in Your storm water include, among other pollutants, various petroleum hydrocarbons, pentachlorophenol, dioxins, furans, various metals, excessive total suspended solids, and pH levels falling outside of environmentally safe levels. ERF believes that the levels of pollutants in PG&E's storm water discharges have caused pollution, contamination, or nuisance in violation of the Discharge Prohibitions of the General Permit, ¶ A.2., and have adversely impacted the environment in violation of the Receiving Water Limitations of the General Permit, ¶ C.1. Moreover, ERF believes that the discharge of these pollutants has caused or contributed to receiving waters from attaining one or more applicable Water Quality Standards in violation of the Receiving Water Limitations of the General Permit, ¶ C.1.

ERF alleges and puts PG&E on notice that each day that PG&E discharged storm water from the Facilities, Your storm water contained levels of pollutants that caused or contributed to exceedance of one or more of the applicable Water Quality Standards. While PG&E should be aware of each day that PG&E has discharged storm water from the Facilities (as the General Permit requires PG&E to monitor such discharges), ERF alleges and puts PG&E on notice that PG&E discharged storm water from the Facilities during at least every significant local rain event over 0.1 inches that have caused or contributed to Water Quality Standards not being met in the applicable receiving waters over the last five years. Significant local rain events in the last five (5) years are otherwise available at http://cdec.water.ca.gov and http://lwf.ncdc.noaa.gov/oa/ncdc.html.

PG&E's unlawful discharges from these Facilities continue to occur presently during all significant rain events. Each discharge from Your Facilities that causes or contributes to an exceedance of an applicable Water Quality Standard constitutes a separate violation of the General Permit and the CWA. You are subject to penalties for violations of the General Permit and the CWA within the past five (5) years.

### 3. Violation of General Permit Conditions Related to Development and Implementation of an Adequate Storm Water Pollution Prevention Plan

The General Permit, Section A: Storm Water Pollution Prevention Plan Requirements, ¶ 1 requires dischargers covered by the General Permit and commencing industrial activities before October 1, 1992 to develop and implement an adequate

---

http://www.waterboards.ca.gov/centralcoast/publications_forms/publications/basin_plan/index.shtml
http://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/
http://www.waterboards.ca.gov/centralvalley/water_issues/basin_plans/
http://www.waterboards.ca.gov/lahontan/water_issues/programs/basin_plan/index.shtml
http://www.waterboards.ca.gov/coloradoriver/water_issues/programs/basin_planning/
http://www.waterboards.ca.gov/santaana/water_issues/programs/basin_plan/index.shtml
http://www.waterboards.ca.gov/sandiego/water_issues/programs/basin_plan/index.shtml

SWPPP by October 1, 1992. Section A ¶ 1 of the General Permit also requires dischargers to make all necessary revisions to existing SWPPPs promptly, and in any case no later than August 1, 1997.

The SWPPP must include, among other requirements, the following: (a) identification of all the members of a storm water pollution prevention team responsible for developing and implementing the SWPPP, General Permit Section A, ¶ 3; (b) a site map showing the storm water conveyance system and areas of actual and potential pollutant contact and all areas of on-going industrial activity, General Permit Section A, ¶ 4; (c) a list of significant materials handled and stored at the site including quantities and frequencies, General Permit Section A, ¶ 5; (d) a description of all potential pollutant sources, industrial processes, material handling and storage, dust and particulate generating activities, significant spills and leaks, non-storm water discharges, and potential soil erosion activity, General Permit Section A, ¶ 6; (e) an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective must be included, General Permit Section A, ¶¶ 7, 8; (f) specification of Best Management Practices ("BMPs") designed to reduce pollutant discharge to BAT and BCT levels, including BMPs already existing and BMPs to be adopted or implemented in the future, General Permit Section A, ¶ 8; (g) a comprehensive site compliance evaluation completed each reporting year, and revisions to the SWPPP as necessary after the evaluation has been completed, General Permit Section A, ¶ 9.; and (h) revisions to the SWPPP within 90 days after a facility manager determines that the SWPPP is in violation of any requirements of the General Permit, General Permit Section A, ¶ 10.d. Facility operators are required to at all times properly operate and maintain any facilities and systems of treatment and control (and related appurtenances) which have been installed or used to achieve compliance with the conditions of the General Permit and the requirements of the SWPPP, General Permit Section C, ¶ 5.

PG&E has failed to adopt SWPPPs for the Facilities meeting these requirements. PG&E's failure to prepare adequate SWPPPs and/or to revise the SWPPPs in all the above respects constitute violations of the General Permit, Section A, ¶ 8. PG&E will continue to be in violation every day that You fail to develop and implement adequate SWPPPs for each of its Facilities. PG&E is subject to penalties for violations of the General Permit and the CWA occurring within the past five (5) years.

### *4. Failure to Develop and Implement an Adequate Monitoring and Reporting Program and Perform Annual Comprehensive Site Compliance Evaluations as Required by the General Permit.*

Section B, ¶1 and Provision E, ¶3 of the General Permit require facility operators to develop and to implement an adequate monitoring and reporting program by October 1, 1992 or when industrial activities begin at a facility. Section B, ¶2 of the General Permit, indicates that the MRP must ensure that storm water discharges comply with the

Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the General Permit. Facility operators must ensure that their MRP practices reduce or prevent pollutants in storm water and authorized non-storm water discharges as well as evaluate and revise their practices to meet changing conditions at the facility. Section B, ¶2 of the General Permit. This may include revising the SWPPP as required by Section A of the General Permit. *Id.* The MRP must measure the effectiveness of the BMPs used to prevent or reduce pollutants in storm water and authorized non-storm water discharges, and facility operators must revise the MRP whenever appropriate. *Id.* Facility operators are also required to provide an explanation of monitoring methods describing how the facility's monitoring program will satisfy these objectives. Section B, ¶10.

Pursuant to the monitoring and reporting requirements of the General Permit, facility operators must conduct and record visual observations of all drainage locations at the facility for authorized non-storm water, unauthorized non-storm water, and storm water discharges. Facility operators must also implement responsive measures to eliminate unauthorized non-storm water discharges and reduce or prevent pollutants from contacting non-storm water discharges and to reduce or prevent pollutants in storm water discharges. Section B, ¶¶3,4, 7. Facility operators must document the presence of any floating or suspended material, oil and grease, discolorations, turbidity, odor, and the source of any pollutants. Section B, ¶¶3,4. Facility operators must maintain records of observation dates, locations observed, observations, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges. *Id.* These observations must be made during the wet and dry seasons. Section B, ¶3 of the General Permit also requires facility operators to conduct quarterly visual observations of all drainage areas within their facilities for the presence of authorized and unauthorized non-storm water discharges. Section B. ¶4 requires facility operators to observe one storm event per month during the wet season (October 1-May 30) and record their observations of the storm water discharges. Facility operators must complete the monthly storm water observations in the first hour of discharge on a day preceded by three working days without storm water discharges. Section B, ¶4(a),(b).

In addition to conducting visual observations, facility operators are required to collect and sample storm water samples during the first hour of discharge from the first storm event of the wet season and at least one other storm event in the wet season. Section B, ¶ 5(a). Facility operators may only take storm water samples on days preceded by at least three working days without storm water discharge. Section B, ¶ 5(b). Facility operators that do not collect samples from the first storm event of the wet season are required to explain in the Annual Report why the first storm event was not sampled. Section B, ¶5(a). Facility operators must indicate whether storm water is stored or temporarily contained on site. *Id.* Stored or contained storm water must be sampled at the time the stored or contained storm water is released. *Id.* Facility operators must analyze the storm water samples for TSS, pH, specific conductance, TOC or oil and grease, toxic chemicals and other pollutants that are likely to be present in the discharges, and any other analytical parameters required by the Regional Board or listed in the General Permit under Table D. If either sample collection or monthly visual observations

of storm water discharges occur more than one hour after discharge begins, facility
operators must explain in the Annual Report why the sampling occurred more than one
hour after discharges began. Section B, ¶8)(b).

To achieve the objectives of the monitoring program, facility operators must
comply with certain procedural requirements, including explaining monitoring methods;
providing a description of the visual observation and sampling methods, location, and
frequency; and identifying the analytical methods and corresponding method of detection
limits used to detect pollutants in storm water discharges. Section B, ¶10. Facility
operators must retain records of all storm water monitoring information and copies of all
reports for at least five years. Section B, ¶13. Facility operators must submit an Annual
Report by July 1 each year to the Regional Water Board that includes a summary of
visual observations and sampling results, laboratory reports, the Annual Comprehensive
Site Compliance Evaluation Report, an explanation of why a facility did not implement
any required activities, and records specified in Section B, ¶13. Section B, ¶14.

PG&E has been operating with an inadequately developed and/or inadequately
implemented MRP at each of its Facilities in violation of the substantive and procedural
requirements set forth above. PG&E's monitoring program has not ensured that storm
water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations,
and Receiving Water Limitations of the General Permit as required by General Permit
sections B(2) and B(10). The monitoring program has not resulted in practices at each
Facility that adequately reduce or prevent pollutants in storm water as required by
General Permit sections B(2) and (4). PG&E's MRPs have not effectively identified
compliance problems at the Facility or resulted in effective revision of the SWPPP to
address such pollution problems as required by General Permit sections B(2) and (4).

PG&E has not submitted annual reports to the applicable Regional Board in the
last five years. PG&E has failed to sample storm water from all discharge points at the
Facilities, including gaps in berms or other locations. PG&E has failed to analyze its
discharges for all toxic chemicals and other pollutants likely to be present in each
Facility's storm water discharges in significant amounts. PG&E has failed to complete
all required visual observations. Accordingly, PG&E has violated the monitoring and
reporting provisions as specified by General Permit sections B(3)-(8), (13), and (14)
every day for the last five years.

As a result of PG&E's failure to adequately develop and/or implement an
adequate MRP at the Facilities, PG&E has been in daily and continuous violation of the
General Permit and the CWA on each and every day for the last five years. These
violations are ongoing. PG&E will continue to be in violation of the monitoring and
reporting requirements every day it fails to adequately develop and implement an
effective MRP at the Facility. PG&E is subject to penalties for each violation of the
General Permit and the CWA occurring for the last five years.

## D. Discharges in Violation of RCRA

This notice of intention to file citizen suit under RCRA pertains to each Facility listed in Exhibit 1 that currently or previously stored new utility poles awaiting placement or older poles awaiting disposal (or collectively "Poles") that have been treated with pentachlorophenol mixtures. PG&E knows at which of its Facilities it has stored such Poles and the locations at the Facilities where it stores such Poles.

Disposal of solid waste from the Poles causes an imminent and substantial endangerment to health and the environment. Waste from the Poles is disposed when the oil-pentachlorophenol mixture used to treat the Poles spills, leaks, discharges and drips from the Poles and is released into the environment. This toxic mixture contaminates the surface areas, storm drains and/or water bodies adjoining or near the Poles and the Facilities at which PG&E stores these Poles. Additional sources of wastes that are heavily contaminated with dioxins, hexachlorobenzene, and pentachlorophenol being disposed of, released or further distributed to the environment from the Poles are as follows: (1), when PG&E and/or its agents make contact with the Poles, wood chips are frequently dislodged from the Poles and fall to the ground and are then spread around the Facilities or tracked off of the Facilities by vehicles or in storm water (2), when PG&E and/or its agents prepare the Poles for field placement and drill holes in, or saw into, the Poles thus generating sawdust which is released onto the Facilities or tracked off of the Facilities by vehicles or in storm water, or (3) when PG&E and/or its agents prepare the Poles for disposal and generate sawdust by cutting the Poles which is released onto the Facilities or tracked off of the Facilities by vehicles or in storm water

Disposal of these chemicals into the environment causes an imminent and substantial endangerment to health and the environment. The chemicals in the pentachlorophenol containing wood treatment mixture are highly toxic and are known to the State of California, the federal government and the World Health Organization to cause cancer, immunotoxicity, birth defects and other reproductive toxicity. Currently existing published, peer reviewed literature shows that pentachlorophenol is routinely contaminated with dioxins and hexachlorobenzene. Dioxins and hexachlorobenzene are manufacturing impurities that are found in virtually all samples of technical grade pentachlorophenol, which is widely used to treat power Poles to this day. For example, a study published by the California State Water Resources Control Board (that focused on contamination at power pole-treatment sites) analyzed concentrations of several dioxins congeners in commercial chlorophenol products. This study found that where pentachlorophenol concentrations where 170,000 parts per million, the penta, hexa, hepta and octa congeners of polychlorinated dibenzo-p-dioxins were found at levels of between 11 and 216,000 parts per million, depending on the congener, and the tetra, penta, hexa, hepta and octa congeners of polychlorinated dibenzofurans were found at levels of between 840 and 18,000 parts per million, once again, depending on the congener. Hence, any disposal of pentachlorophenol from the Poles can reasonably be expected to also include the disposal of dioxins and hexachlorobenzene contaminants.

In assessing cancer hazard from dioxins, it is safe to rely on a linear, no-threshold model for genotoxic chemicals. A linear no-threshold model for cancer risk assessment is a standard toxicological method used to assess cancer risk. For example, under the

California Code of Regulations, the California Office of Environmental Health Hazard
Assessment ("OEHHA") assumes that "the absence of a carcinogenic threshold dose
shall be assumed and no-threshold models shall be utilized" when assessing cancer risk
from a particular carcinogen. OEHHA has determined that, in the absence of convincing
data which shows a threshold below which there is no risk of cancer, it is standard
toxicological practice to assume no threshold exists for cancer hazard. Under the linear
no-threshold model, exposure to extremely low levels of a carcinogen increases the
quantitative risk of contracting cancer, even if that risk is very small. Based on currently
existing published, peer reviewed studies, there is no significant evidence to show that
there is a threshold below which there is no cancer risk from exposure to certain dioxins.
Data exists which demonstrates biological effects of dioxins in the nanogram and
picogram range, i.e., at levels substantially below those previously found to be toxic for
these chemicals.

Based on a review of current, published, peer reviewed literature, dioxins and
hexachlorobenzene, when discharged into an aquatic environment, can be ingested and
concentrated in the fatty tissues of aquatic organisms. This literature demonstrates that
dioxins and hexachlorobenzene bio-accumulate and bio-magnify in organisms. These
chemicals degrade very slowly and they bind to fatty substances. What this means is that
if a fish eats many microscopic organisms, each of which have ingested a low level of
dioxins and hexachlorobenzene, the dioxins and hexachlorobenzene from each
microscopic organism will remain in the fatty tissues and fluids of the fish, resulting in a
much greater concentration of these chemicals in the fish. Similarly, any fish that feeds
on fish that have eaten microscopic organisms that have ingested dioxins and
hexachlorobenzene will have even greater concentrations of these chemicals in its fatty
tissues and fluids. This same bio-magnifying process applies up any food chain,
especially resulting in high concentrations of these chemicals in the fatty tissues and
fluids of animals at the top of an aquatic food chain, such as osprey, bald eagles, salmon,
raccoons, bear, seals, whales and humans. This bio-magnified amount concentrated in
fatty tissues and fluids is commonly referred to as the "body burden" of these chemicals.

Dioxins and hexachlorobenzene are part of a class of compounds that the
scientific community identifies as "dioxin-like" compounds. These chemicals are called
dioxin-like compounds because they tend to affect organisms in the same way as does the
most potent toxic chemical of this class, 2,3,7,8 tetrachlorodibienzo-p-dioxin, but have
different potencies for causing toxicological effects. It is the generally accepted practice
within the scientific community to assess the toxicological effects of dioxins and
hexachlorobenzene based on their relative potencies compared to the potency of 2,3,7,8
tetrachlorodibenzo-p-dioxin. These relative potencies have been set by various
organizations including the World Health Organization ("WHO").

An extensive body of literature on the carcinogenicity and developmental,
reproductive and immunotoxicity of dioxins and related compounds in laboratory studies
exists. These studies provide adequate evidence that 2,3,7,8 tetrachlorodibenzo-p-dioxin
is a carcinogen in laboratory animals based on long-term bioassays conducted in both
sexes of rats and mice. All studies have produced positive results, leading to the

Citizen Suit Notice Letter
November 3, 2009
Page 15 of 20

conclusion that tetrachlorodibenzo-p-dioxin is a multistage carcinogen increasing the
incidence of tumors at sites distant from the site of treatment and at doses well below the
maximum tolerated dose. 2,3,7,8 tetrachlorodibenzo-p-dioxin has been shown to be a
carcinogen in hamsters, which are relatively resistant to the effects of dioxin-like
compounds. Recent data have shown 2,3,7,8 tetrachlorodibenzo-p-dioxin to be a liver
carcinogen in small fish.

Recent peer reviewed studies of human populations exposed to dioxins and
related compounds has strengthened the inference, based on all the evidence from
mechanistic, animal, and epidemiological studies that these compounds are appropriately
characterized as human carcinogens. Recently, the International Agency for Research on
Cancer ("IARC"), the cancer research arm of the World Health Organization, has
upgraded its assessment of 2,3,7,8 tetrachlorodibenzo-p-dioxin to the status of being
known to cause cancer in humans. The IARC did this as part of a broadly and
extensively peer reviewed process.

Dioxins and hexachlorobenzene can cause developmental and reproductive
toxicity in both animals and humans. The potential for dioxins and related compounds to
cause reproductive and developmental toxicity in animals has been recognized for many
years and there is extensive, peer reviewed literature regarding these effects.

A wide variety of developmental events, crossing three vertebrate classes and
several species within each class, can be perturbed by dioxins and dioxin-like
compounds, suggesting that dioxins have the potential to disrupt a large number of
critical developmental events at specific developmental stages. Some of these changes
can disrupt organ system structure and irreversibly impair organ function. A general
finding in fish, bird, and mammalian species is that the embryo or fetus is more sensitive
to dioxins-induced mortality than the adult. In mammals, postnatal functional alterations
involving learning behavior and the developing reproductive system are sensitive to
prenatal dioxin exposure at low levels (in the parts per billion range or lower). The
developing immune system is also highly sensitive to extremely low dioxins levels.
Alterations in developing systems and diminished prenatal viability and growth have
been observed at maternal dioxins body burdens and/or daily dioxins doses during
gestation above 100 nanograms per kilogram of body weight in virtually every species
tested. These doses of dioxins are not maternally toxic. Higher dose levels can be
demonstrated to result in prenatal mortality.

Individual species vary in their sensitivity to any particular dioxins effect. The
evidence available to date indicates that humans most likely fall in the middle of the
range of sensitivity for individual effects among animals. In dioxins-exposed men, subtle
changes in biochemistry and physiology, such as enzyme induction, altered levels of
circulating reproductive hormones, or reduced glucose tolerance, have been detected in a
limited number of available studies. These findings, coupled with knowledge derived
from animal experiments, suggest the potential for adverse impacts on human metabolism
and developmental and/or reproductive biology and, perhaps other effects in the range of
current human exposures at nanograms per kilogram (parts per trillion) levels. As body

burdens of dioxins-like compounds increase, the probability and the severity, as well as the spectrum of human noncancer effects most likely increase. Hence, any additional increase in body burden of dioxins-like compounds increases the risk of harmful toxicological effects.

The immune system is a particularly vulnerable target for the toxicity of dioxin-like compounds, including dioxins and hexachlorobenzene. The ability of an animal to resist and/or control viral, bacterial, parasitic, and neoplastic diseases is determined by both nonspecific and specific immunological functions, which can be adversely affected by very low levels of dioxins-like compounds in body tissues.

Evidence has accumulated to demonstrate that the immune system is a target for toxicity of dioxins and structurally related compounds. The evidence has derived from numerous studies in various animal species. Animal studies suggest that some immunotoxic responses may be evoked at very low levels of dioxin exposure, which indicates the potential for similar risk to humans.

In summary, exposure to dioxins and hexachlorobenzene can increase the body burden of these chemicals, particularly in species like humans who are at the top of long food chains. Any increase in body burdens of these chemicals increases the human risk of several toxic end points including cancer, developmental toxicity, reproductive toxicity, and possibly immunotoxicity. Because of the present high body burdens of these compounds in humans and wildlife, any increment in dosage will generate an increased risk of toxicity in humans. Because there is such a wide range of species of animals for which exposure to dioxins-like compounds has been shown to disrupt prenatal development and to cause embryo/fetal mortality, exposure to dioxins and hexachlorobenzene is likely to increase the risk of embryo/fetal mortality in both fish, birds and marine mammals. Exposure to dioxins and hexachlorobenzene can increase the risk that wildlife, including fish, birds, and mammals will suffer decreased immune system function, and thus bear an increased risk that they will contract, or succumb to viral, bacterial, parasitic, and neoplastic infections and diseases. As body burdens of these chemicals increase, so does the risk that all of the above mentioned species will suffer the above referenced toxic endpoints.

Because the toxic chemicals in the pentachlorophenol mixture used to treat Your Poles are so long lived and because they bio-accumulate and biomagnify in living organisms, many species, including fish, birds, and mammals, including humans, that participate in the food chain downstream of PG&E's Poles, bear an increased risk of suffering the toxic endpoints discussed above.

ERF alleges that PG&E has and continues to cause an imminent and substantial endangerment to health and the environment of each Facilities' locality with each discharge of storm water from the Facilities containing dioxins, hexachlorobenzene and pentachlorophenol. ERF further alleges that PG&E has and continues to cause an imminent and substantial endangerment to health and the environment of each Facilities' locality each day that dioxins, hexachlorobenzene and pentachlorophenol are tracked out

Citizen Suit Notice Letter
November 3, 2009
Page 17 of 20

of the Facilities onto adjacent public streets by vehicle or equipment tires. Accordingly,
PG&E has been violating this RCRA provision continuously for at least the past five
years. Thus, the dates of violations to which this Notice pertains are each and every
single day dating back five years from the date of this letter. ERF further puts PG&E on
notice that these violations will continue on every day into the future until PG&E ceases
discharging storm water or tracking particulate matter containing dioxins,
hexachlorobenzene and pentachlorophenol from its Facilities and removes the dioxins,
hexachlorobenzene and pentachlorophenol from the environment that it has released from
the Facilities.

## VI. COUNSEL

ERF has retained legal counsel to represent it in this matter. Please direct all
communications to:

| Christopher Sproul | William Verick | David Williams |
|---|---|---|
| Jodene Isaacs | Fredric Evenson | Brian Acree |
| Environmental Advocates | 424 First Street | 370 Grand Avenue, Suite 5 |
| 5135 Anza Street | Eureka, CA 95501 | Oakland, CA 94610 |
| San Francisco, CA 94121 | (707) 268-8900 | (510) 271-0826 |
| (415) 533-3376 | | |

## VII. REMEDIES

ERF will seek declaratory and injunctive relief preventing further CWA violations
pursuant to CWA sections 505(a) and (d), 33 U.S.C. §1365(a) and such other relief as
permitted by law. In addition, ERF will seek civil penalties pursuant to CWA section
309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. section 19.4, against You in this action of up
to $32,500 for Your CWA violations. *See* 69 Fed. Reg. 7121 (Feb. 13, 2004). ERF will
seek to recover attorneys, experts' fees and costs in accord with CWA section 505(d), 33
U.S.C. § 1365(d).

ERF intends to seek injunctive relief preventing further violations of RCRA
pursuant to Section 7002(a), 42 U.S.C. § 6972(a), and such other relief as is permitted by
law.

In addition to the violations set forth above, this notice covers all ongoing
violations of the CWA and RCRA and violations evidenced by information which
becomes available to ERF after the date of this Notice of Intent to File Suit.

ERF believes this Notice of Violations and Intent to Sue sufficiently states
grounds for filing suit. ERF intends, at the close of the 60-day notice period or thereafter,
to file a citizen suit under CWA section 505(a) against You for the above-referenced
violations. At the close of the 90-day notice period or thereafter, ERF intends to amend
its CWA complaint to add violations pursuant to RCRA section 7002(a)(1)(B).

Citizen Suit Notice Letter
November 3, 2009
Page 18 of 19

ERF would be happy to discuss effective remedies for the violations referenced in this Notice. If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate these discussions immediately so that a resolution may be reached before the end of the 60-day notice period (for ERF's alleged CWA violations) and 90-day notice period (for ERF's alleged RCRA violations). Although ERF is always interested in avoiding unnecessary litigation, in order to preserve its remedies, ERF will not delay filing a complaint if a satisfactory remedy has not been reached by the time the applicable notice periods have expired.

Cordially,

William Verick

Cc:

| Lisa Jackson, Administrator U.S. Environmental Protection Agency 1200 Pennsylvania Avenue, N.W. Washington, D.C. 20460 | Eric Holder, U.S. Attorney General U.S. Department of Justice 950 Pennsylvania Avenue, N.W. Washington, D.C. 20530-0001 |
| --- | --- |
| Laura Yoshii, Acting Regional Administrator U.S. EPA - Region 9 75 Hawthorne Street San Francisco, CA 94105 | Dorothy R. Rice, Executive Director State Water Resources Control Board 1001 I Street Sacramento, CA 95814 |
| Catherine Kuhlman, Executive Officer Regional Water Quality Control Board North Coast Region 5550 Skylane Blvd., Suite A Santa Rosa, CA 95403 | Bruce Wolf, Executive Officer Regional Water Quality Control Board San Francisco Bay Region 1515 Clay Street, Suite 1400 Oakland, CA 94612 |
| Pamela Creedon, Executive Officer Regional Water Quality Control Board Central Valley Region, Redding Office 415 Knollcrest Drive Redding, CA 96002 | Pamela Creedon, Executive Officer Regional Water Quality Control Board Central Valley Region, Sacramento Office 11020 Sun Center Drive, #200 Rancho Cordova, CA 95670-6114 |
| Pamela Creedon, Executive Officer Regional Water Quality Control Board Central Valley Region, Fresno Office 1685 E Street Fresno, CA 93706 | Roger W. Briggs, Executive Officer Regional Water Quality Control Board Central Coast Region 895 Aerovista Place, Suite 101 San Luis Obispo, CA 93401 |

**Exhibit 1**
**Pacific Gas and Electric Corporation Yards in Northern California**

| #  | Facility Address |
|----|------------------|
| 1  | 25051 O'Neil Ave, Hayward, CA |
| 2  | 450 Eastmoor Ave, Daly City, CA |
| 3  | 4525 Hollis St, Oakland, CA |
| 4  | 24300 Clawiter Rd, Hayward, CA |
| 5  | 275 Industrial Rd, San Carlos, CA |
| 6  | 66 Ranch Dr, Milpitas, CA |
| 7  | 100 Metcalf Rd, San Jose, CA |
| 8  | 10900 N. Blaney Ave, Cupertino, CA |
| 9  | 308 Stockton Ave, San Jose, CA |
| 10 | 1030 Detroit Ave, Concord, CA |
| 11 | 3797 1st St, Livermore, CA |
| 12 | 158 Peabody Rd, Vacaville, CA |
| 13 | 316 L Street, Davis, CA |
| 14 | 4040 West Lane, Stockton, CA |
| 15 | 343 Sacramento St, Auburn, CA |
| 16 | 4636 Missouri Flat Rd, Placerville, CA |
| 17 | 560 W 15th St, Merced, CA |
| 18 | 8058 Union Dr, Dinuba, CA |
| 19 | 18 7th St, Marysville, CA |
| 20 | 2311 Garden Rd, Monterey, CA |
| 21 | 5555 Florin Perkins Rd, Sacramento, CA |
| 22 | 2555 Myrtle Ave, Eureka, CA |
| 23 | 3600 Meadow View Dr, Redding, CA |
| 24 | 811 West J St, Oakdale, CA |
| 25 | 4201 Arrow St, Bakersfield, CA |
| 26 | 310 East Wood St, Willows, CA |
| 27 | 309 Merced St, Newman, CA |
| 28 | 1524 N Carpenter Rd, Modesto, CA |
| 29 | 3930 Sierra College Blvd, Loomis, CA |
| 30 | 1099 W. 14th Street, Eureka, CA |