Christopher A. Sproul (Bar No. 126398)
Jodene Isaacs (Bar No. 226895)
Brian Orion (Bar No. 239460)
Environmental Advocates
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Email:  csproul@enviroadvocates.com, jisaacs@enviroadvocates.com,
borion@enviroadvocates.com

William Verick (Bar No. 140972)
Klamath Environmental Law Center
Fredric Evenson (Bar No. 198059)
Law Offices of Fredric Evenson
424 First Street
Eureka, California 95501
Telephone: (707) 268-8900
Facsimile: (707) 268-8901
Email: wverick@igc.org, ecorights@earthlink.net

Attorneys for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION | ) Case No. CV-10-00121 RS |
| Plaintiff, | ) |
| | ) PLAINTIFF'S OPPOSITION TO |
| v. | ) DEFENDANT'S MOTION TO |
| | ) DISMISS PLAINTIFF'S COMPLAINT |
| PACIFIC GAS AND ELECTRIC COMPANY, | ) FOR LACK OF SUBJECT MATTER |
| | ) JURISDICTION AND FAILURE TO |
| Defendant. | ) STATE A CLAIM; [Proposed] ORDER |
| | ) |
| | ) Date: April 29, 2010 |
| | ) Time: 1:30 p.m. |

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................................1

II.  FACTUAL BACKGROUND...............................................................................................2

III.  STATUTORY AND REGULATORY BACKGROUND.......................................................5

    A.  Clean Water Act.......................................................................................................5

    B.  The General Industrial Storm Water Permit................................................................6

IV.  ARGUMENT....................................................................................................................8

    A.  Legal Standard...........................................................................................................8

    B.  CWA Section 301(a) Regulates All Discharges of Polluted Storm Water...................8

        1.  The CWA's Plain Meaning Is that CWA Section 402(p) Creates No Presently Effective Exemption from CWA Section 301(a) for any Storm Water Discharges............................................................................................................9

        2.  The CWA's Legislative History Indicates that CWA Section 402(p) Creates No Presently Effective Exemption from CWA Section 301(a) for any Storm Water Discharges. .........................................................................................13

        3.  EPA Has Acknowledged that CWA Section 402(p) Does Not Currently Exempt Storm Water Discharges from NPDES Regulation................................16

    C.  Storm Water Discharges from PG&E's Corporate Yards Are Subject to Regulation Under CWA Section 402(p).......................................................................................17

V.  CONCLUSION.................................................................................................................22

## TABLE OF AUTHORITIES

Am. Mining Congress v. Envtl. Protection Agency,
    965 F.2d 759 (9th Cir.
1992)..................................................................................................5, 15, 16, 18

Cahill v. Liberty Mut. Ins. Co.,
    80 F.3d 336 (9th Cir. 1996)........................................................ 8

Chang v. Chen,
    80 F.3d 1293, 1296 (9th Cir. 1996)..........................................8

Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,
    467 U.S. 837 (1986)..................................................................11

Conley v. Gibson,
    355 U.S. 41 (1957)....................................................................8

Defenders of Wildlife v. Browner,
    191 F.3d 1159 (9th Cir. 1999)...............................................15

Environmental Defense Center v. Environmental Protection Agency,
    344 F.3d 840 (9th Cir. 2001).........................................11, 15, 16, 21

EPA v. California ex rel. State Water Res. Control Bd.,
    426 U.S. 200 (1976)..................................................................12

EPIC v. Pacific Lumber Co.,
    301 F. Supp. 2d 1102 (N.D. Cal. 2004)....................5, 6, 7, 9, 10, 13, 16, 21

Good Samaritan Hosp. v. Shalala,
    508 U.S. 402 (1993)..................................................................11

League of Wilderness Defenders v. Forsgren,
    309 F.3d 1181 (9th Cir. 2002)..............................................9, 12

Lewis v. Telephone Employees Credit Union,
    87 F.3d 1537 (9th Cir.1996)....................................................8

Navarro v. Block,
    250 F.3d 729 (9th Cir. 2001)...................................................8

NRDC v. Costle,
    568 F.2d 1369 (D.C. Cir. 1977)..........................................6, 9, 15

NRDC v. EPA,
    966 F.2d 1292 (9th Cir. 1992)............................................15, 18

Polich v. Burlington N., Inc.,
    942 F.2d 1467, 1472 (9th Cir. 1991)......................................8

Sierra Club, Lone Star Chapter v. Cedar Point Oil,
    73 F.3d 546 (5th Cir. 1996)......................................................12

United States v. Frezzo Bros. Inc.,

461 F. Supp. 266 (E.D. Pa. 1978)......................................................12

Van Buskirk v. Cable News Network, Inc.,
    284 F.3d 977 (9th Cir. 2002)......................................................8

Weinberger v. Romero-Barcelo,
    456 U.S. 305 (1982)......................................................12

Zimmerman v. Oregon DOJ,
    170 F.3d 1169 (9th Cir. 1999)......................................................11

**<u>Statutes</u>**

CWA § 101(a), 33 U.S.C. § 1251(a)......................................................5

CWA §§ 301-307, 33 U.S.C. §§ 1311-1317......................................................5

CWA § 301(a), 33 U.S.C. § 1311(a)................................1, 2, 5, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18

CWA § 301(b)(1)(A), 33 U.S.C. § 1311(b)(1)(A)......................................................12

CWA § 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B)......................................6, 7, 15, 18, 21

CWA § 402(p)(2)(E), 33 U.S.C. § 1342(p)(2)(E)......................................6, 18, 21, 22

CWA § 402(p)(6), 33 U.S.C. § 1342(p)(6)......................................6, 10, 11, 14, 15, 16

CWA § 502(6), 33 U.S.C. § 1362(6)......................................................5

CWA § 502(7); 33 U.S.C. § 1362(7)......................................................5

CWA § 502(11), 33 U.S.C. § 1362(11)......................................................5

CWA § 502(14), 33 U.S.C. § 1362(14)......................................................5, 16

**<u>Regulations</u>**

40 C.F.R. § 122.2......................................................5

40 C.F.R. § 122.26(a)(9)(i)(C)......................................................21

40 C.F.R. § 122.26(a)(9)(i)(D)......................................................21

40 C.F.R. § 122.26(b)(14)......................................................18, 19

Federal Rule of Civil Procedure 12(b)(6)......................................................1, 8

**<u>Federal Register</u>**

39 Fed. Reg. 26,061 (July 16, 1974)......................................................7

55 Fed. Reg. 47,990 (Nov. 16, 1990)......................................................6

60 Fed. Reg. 40230, 40231 (Aug. 7, 1995)......................................................17

64 Fed. Reg. 68,722 (Dec. 8, 1999)......................................................................................6

**<u>Legislative History</u>**

H.R. Rep. No. 99-189 (July 2, 1985)...................................................................................18

H.R. Conf. Rep. No. 1004 (Oct. 15, 1999....................................................................14, 18

132 Cong. Rec. S 32400 (Oct. 16, 1986).......................................................................13, 14

133 Cong. Rec. H 1006 (Jan. 8, 1987)...............................................................................13

133 Cong. Rec. H. 991 (Jan 8, 1987)..........................................................................14, 18

133 Cong. Rec. S 1280 (Jan. 14, 1987) .............................................................................13

138 Cong. Rec. H 9789 (Sept. 29, 1992).............................................................................14

1   *I. INTRODUCTION*

2       Ecological Rights Foundation ("ERF") has brought this action against Pacific Gas and

3   Electric Company ("PG&E") pursuant to the Clean Water Act ("CWA")'s citizen suit provision.[1]

4   ERF seeks redress for PG&E's discharge of polluted storm water from numerous PG&E service

5   centers in Northern California into regional waters.  PG&E has filed a motion under Federal Rule

6   of Civil Procedure ("FRCP") 12(b)(6) requesting dismissal of the case.  Defendant's Motion To

7   Dismiss Plaintiff's Complaint for Lack of Subject Matter Jurisdiction and Failure To State a

8   Claim (Docket Doc. No. 15) ("PG&E Motion").  The PG&E Motion, which fails to cite to a

9   single case interpreting the relevant CWA provisions and ignores applicable legal precedent,

10  lacks merit and should be denied.

11      CWA section 301(a), 33 U.S.C. § 1311(a), broadly forbids the discharge of pollutants

12  from any "point source" into waterways without a National Pollutant Discharge Elimination

13  System ("NPDES") permit.  PG&E's service centers discharge polluted storm water runoff into

14  several waterways from point sources.  PG&E lacks NPDES permit authorization for these

15  discharges.

16      The PG&E Motion incorrectly argues that CWA section 402(p), 33 U.S.C. § 1342(p)  and

17  accompanying EPA regulations exempt PG&E's discharges of polluted storm water from CWA

18  section 301(a)'s prohibition on discharge without NPDES permit authorization.  Properly read,

19  CWA section 402(p)(1) created a temporary moratorium on the issuance of NPDES permits for

20  certain storm water discharges *that expired in 1994.*  As ERF's claims concern PG&E's

21  discharges of storm water during *only the last five years* (the applicable CWA statute of

22  limitations period), CWA section 402(p)(1)'s temporary permitting moratorium is of no

23  relevance to this case.  Moreover, properly read, CWA section 402(p)(1) only excused EPA from

24  the administrative burden of issuing certain NPDES permits from 1987 to 1994, but did not make

25  lawful the unpermitted discharge of polluted storm water from point sources in contravention of

26  _____

27      [1]  CWA § 505, 33 U.S.C. § 1365.  Case law and EPA documents often cite the statutes at
    large section numbers of the CWA rather than the CWA's United States Code codification.  All
28  initial citations to the CWA herein include both; thereafter citations are only to the statutes at-
    large sections.

-1-

CWA section 301(a). In sum, the discharge of polluted storm water runoff from PG&E's service centers has always been contrary to CWA section 301(a)'s prohibition on unpermitted discharge, or alternatively, has been contrary to this prohibition at least since 1994.

Additionally, even if CWA section 402(p)(1) were construed as exempting certain storm water discharges from NPDES regulation, PG&E's discharges are not of the type exempted. CWA section 402(p)(2) provides that storm water discharges from "industrial activities" or from any source specifically designated for regulation by EPA or relevant State agencies are *not* subject to CWA section 402(p)(1)'s permitting moratorium. PG&E's service centers conduct the sort of "industrial activity" that subjects them to NPDES permitting regulation under CWA section 402(p)(2) and accompanying EPA regulations. Alternatively, PG&E's service centers are the types of facilities specifically designated for NPDES permitting regulation by the applicable California State agency.

In sum, PG&E's discharges of polluted storm water from its service centers without NPDES permit authorization violates CWA section 301(a). Nothing in CWA section 402(p) negates PG&E's obligation to obtain NPDES permit authorization for these storm water discharges.

## I. *FACTUAL BACKGROUND*[2]

PG&E is a utility company that supplies electricity and natural gas to much of Northern California. Complaint, ¶ 22, First Amended Complaint, ¶ 29. PG&E owns and operates thirty

---

[2] The facts set forth herein are those plead in ERF's existing Complaint, its proposed First Amended Complaint, or both. ERF's proposed First Amended Complaint pleads certain facts more specifically that should be seen as already raised by ERF's original complaint, albeit in less specific fashion. ERF today filed a motion for leave to file this First Amended Complaint (Docket Doc. No. 24). While the existing Complaint is the only one presently filed, it is proper for the Court to consider the factual allegations of ERF's proposed First Amended Complaint in ruling on PG&E's Motion. As discussed in the Argument section below, the Court should only grant PG&E's Rule 12(b) Motion if two conditions are met: (1) the Complaint fails to state facts sufficient to support a legally viable claim and (2) it is apparent that the Complaint's deficiencies cannot be corrected by amendment. If the Court were to find the original Complaint insufficiently specific on facts needed to support ERF's claims, the Court should proceed to consider whether the proposed First Amended Complaint would correct any such shortcomings and thus establish that via amendment to its complaint, ERF could sufficiently plead a legally viable claim.

1  corporation yards and service centers ("the Facilities") located throughout the region.  Complaint,

2  Exhibit 1, First Amended Complaint, Exhibit B.  At these Facilities, PG&E stores and maintains

3  its vehicle fleet and equipment that it uses to service its electrical and natural gas service grid.

4  As part of maintenance on its vehicles and equipment at the Facilities, PG&E adds fuels to

5  vehicles and equipment, changes vehicle and equipment fluids, performs mechanical repairs on

6  vehicles and equipment, cleans parts, paints vehicles and equipment, stores vehicles and

7  equipment waiting for repair or maintenance, stores related materials and waste materials, such

8  as oil, fuel, batteries, tires, or oil filters, and washes vehicles and equipment.  *See* Complaint, ¶¶

9  24-26, First Amended Complaint, ¶¶ 31-32.

10  PG&E also fabricates parts and supplies needed to maintain its utility grid.  As part of

11  this fabrication activity, PG&E does metal work on parts and supplies that, on information and

12  belief, ERF alleges includes grinding, welding, sawing, cutting, surface treatment (including

13  metal finishing, coating, polishing, rinsing, and abrasive cleaning; and parts and tools cleaning

14  (including sandblasting, metal surface cleaning, and removal of applied chemicals).  *See*

15  Complaint, ¶¶ 24-26, First Amended Complaint, ¶ 33.

16  PG&E also uses the Facilities to store a wide range of objects including new and used

17  wooden utility poles, piles of aggregates such as sand, gravel, and soil, piles of used concrete and

18  asphalt, piles of contaminated soil awaiting disposal, electrical generators, transformers, cables,

19  metal pipes, plastic pipes, and other equipment and parts used in the installation and maintenance

20  of PG&E's utility poles, electric transmission lines, and natural gas distribution systems.  *See*

21  Complaint, ¶¶ 24-26, First Amended Complaint, ¶ 33.

22  Finally,  PG&E performs recycling activities at the Facilities that includes recycling of

23  utility poles, various metal pieces and parts, and various other bulk materials.  First Amended

24  Complaint, ¶ 35

25  PG&E performs some of the vehicle and equipment maintenance and storage and metal

26  work at the Facilities outdoors where rainfall and storm water runoff comes into contact with

27  these activities.  Complaint, ¶ 27, First Amended Complaint, ¶¶ 32-35.  In addition, PG&E stores

28  the objects listed above outdoors where rainfall and storm water runoff comes into contact with

1   these objects.  Complaint, ¶ 27, First Amended Complaint, ¶ 34.

2       PG&E's service vehicle traffic at the Facilities tracks dust, particulate matter, and other

3   contaminants to areas on and off the premises at the Facilities.  PG&E's service vehicles, both

4   while parked at the Facilities and when being driven on and off the Facilities, also serve as the

5   source of the release of many other pollutants to the Facilities' premises, including various

6   petroleum hydrocarbons such as gasoline and diesel fuel, anti-freeze, battery fluids, hydraulic

7   fluids, and various metals including copper, lead, and zinc.  As noted, PG&E also stores various

8   equipment, raw materials and supplies at the Facilities used for various maintenance and

9   fabrication tasks related to PG&E's repair and maintenance of its electrical and natural gas grids,

10  including utility poles and wood parts such as pole cross-arms treated with various wood

11  preservatives such as pentachlorophenol, creosote, chromated copper arsenate ("CCA"), and

12  chemonite.  This equipment, raw materials and supplies serve as additional sources of pollutant

13  release to the Facilities' premises, including pentachlorophenol, polychlorinated

14  dibenzo-p-dioxins and polychlorinated dibenzofurans ("dioxins"), hexachlorobenzene, polycyclic

15  aromatic hydrocarbons (PAHs), creosote, phenol and cresols, ammonia, arsenic, chromium

16  (including hexavalent chromium), various petroleum hydrocarbons such as gasoline and diesel

17  fuel, various metals including copper, lead, barium, and zinc, elevated total suspended solids,

18  elevated chemical oxygen demand, and pH exceeding environmentally safe ranges.  *See*

19  Complaint, ¶ 28, First Amended Complaint, ¶¶ 34, 37.

20      Rainfall onto and storm water runoff from the Facilities' premises picks up these various

21  pollutants and transports them via storm drains and other conveyances off-site into various

22  Northern California water bodies.[3]  First Amended Complaint, Exhibit B.  Vehicles exiting

23  PG&E's Facilities also track the pollutants generated by PG&E's activities into public roadways

24  where rainfall later washes them into storm drains and other conveyances.  *Id.*

25

26

27  _____

28      [3] A list of waterways into which PG&E discharges pollutants from the Facilities is
    attached as Exhibit A.

## III. *STATUTORY AND REGULATORY BACKGROUND*

### A. *Clean Water Act*

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a). "Built on a 'fundamental premise' that the unauthorized 'discharge of any pollutant by any person shall be unlawful,' the CWA 'establishes a comprehensive statutory system for controlling water pollution.'" *EPIC v. Pacific Lumber Co.*, 301 F. Supp. 2d 1102, 1105 (N.D. Cal. 2004) (citations omitted). The CWA seeks to accomplish its objectives principally by regulating "point source" discharges of pollutants[4] to waters of the United States.[5] The CWA prohibits the discharge of any pollutant from a point source except as authorized by an NPDES permit. *See* CWA § 301(a), 33 U.S.C. § 1311(a), CWA § 402; 33 U.S.C. § 1342. The CWA generally requires that NPDES permits contain numerical "effluent limitations" on the amounts of specified pollutants that may be discharged. CWA § 402(a)(1), 33 U.S.C. § 1342(a)(1). The CWA generally requires these effluent limitations to be set equal to the pollutant reduction attainable with various technologies or to the level needed to ensure attainment of water quality standards. *See, e.g.*, CWA §§ 301-307, 33 U.S.C. §§ 1311-1317; CWA § 502(11), 33 U.S.C. § 1362(11); *see Am. Mining Congress v. Envtl. Protection Agency*, 965 F.2d 759, 761-62 (9th Cir. 1992) ("*AMC*").

Polluted storm water runoff into the nation's waters are a significant source of environmental pollution. *See id*. at 762. After enactment of the CWA in 1972, EPA

---

[4] A "point source" is "any discernible, confined and discrete conveyance [such as a pipe, ditch, channel, or conduit], from which pollutants are or may be discharged." CWA § 502(14), 33 U.S.C. § 1362(14). The term "pollutant" broadly includes a long list of substances, including industrial, municipal, and agricultural wastes. CWA § 502(6), 33 U.S.C. § 1362(6).

[5] CWA section 301(a) regulates discharges into "navigable waters," which the CWA further defines as "the waters of the United States, including the territorial seas." CWA § 502(7); 33 U.S.C. § 1362(7). EPA regulations further define waters of the United States to include, *inter alia*, "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide" and all tributaries to such waters. 40 C.F.R. § 122.2.

promulgated regulations that would have exempted uncontaminated storm water discharges from CWA regulation.  The D.C. Circuit vacated these regulations, holding that EPA lacked authority under the CWA to exempt any point sources from CWA NPDES regulation. *NRDC v. Costle,* 568 F.2d 1369, 1377 (D.C. Cir. 1977).

In 1987, Congress enacted the Water Quality Act which amended the CWA to add CWA section 402(p).  CWA section 402(p) sets deadlines for EPA to issue NPDES permits regulating storm water discharges.  CWA subsection 402(p)(1) established a moratorium until October 1, 1994 on EPA issuance of NPDES permits for some storm water discharges.  CWA section 402(p)(2) specifically excluded from this moratorium five categories of storm water discharges, including "discharge[s] associated with industrial activity." and "discharge[s] for which the [EPA] Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States."  CWA § 402(p)(2)(B) & (E), 33 U.S.C. § 1342(p)(2)(B) & (E). CWA subsection 402(p)(B)(6) further required EPA by October 1993 to issue regulations designating storm water discharges "to be regulated to protect water quality" that had been covered by CWA subsection 402(p)(1)'s NPDES permit moratorium.  CWA subsection 402(p)(B)(6) also required EPA by October 1993 to establish a comprehensive program to regulate such designated sources.

In response to the Water Quality Act, EPA promulgated regulations governing the issuance of NPDES permits to storm water dischargers falling within CWA subsection 402(p)(2)'s list of non-exempt storm water discharges in 1990 ("the Phase I Regulations").  *See* 55 Fed. Reg. 47,990 (Nov. 16, 1990); *EPIC,* 301 F. Supp. 2d at 1107.  In 1999, in accord with CWA subsection 402(p)(6)'s mandate, EPA issued additional regulations governing the issuance of NPDES permits to facilities that had not been on the CWA subsection 402(p)(2) list of non-exempt facilities ("the Phase II Regulations").  *See* 64 Fed. Reg. 68,722 (Dec. 8, 1999); *EPIC,* 301 F. Supp. 2d at 1107.

**B.  *The General Industrial Storm Water Permit***

The CWA authorizes EPA to grant authority to the states to issue NPDES permits in lieu

-6-

of EPA-issued permits.  CWA § 402(a)-(b), 33 U.S.C. § 1342(a)-(b).  EPA delegated its NPDES permit-issuing authority to the California State Water Resources Control Board ("State Board") on May 14, 1973.  *See* 39 Fed. Reg. 26,061 (July 16, 1974); *EPIC*, 301 F. Supp. 2d at 1105.  In California, the State Board has elected to issue a single, statewide general permit applicable to all storm water discharges associated with industrial activity, General Permit No. CAS000001, California State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("the General Permit").[6]  The General Permit is an NPDES permit pursuant to CWA section 402(p).  To discharge storm water lawfully in California, industrial dischargers must secure coverage under the General Permit and comply with its terms or obtain and comply with an individual NPDES permit.

The State Board has determined that facilities within eleven enumerated categories of industrial activity should apply for authorization to discharge under the General Permit.  General Permit, Fact Sheet at III; *see also* General Permit, Attachment 1 (Isaacs Decl., Ex. 1).  The State Board has expressly stated that the requirement to seek General Permit authorization applies to facilities where these industrial activities occur, regardless of whether the activity is primary or auxiliary to the facility operator's function.  General Permit, Fact Sheet at II (Isaacs Decl., Ex. 1)  EPA has also issued a general NPDES permit regulating storm water discharges associated with industrial activity, the EPA Multi-Sector General Permit ("MSGP").[7]  The MSGP only applies in states that have not issued their own storm water general permits and thus does not apply in California.  EPA has issued guidance documents or "Fact Sheets" accompanying the MSGP, however, that elucidate EPA's views on what are industrial facilities subject to NPDES storm water permitting requirements under CWA section 402(p)(2)(B).

---

[6] The State Board has published the General Permit on the internet at: http://www.swrcb.ca.gov/water_issues/programs/stormwater/docs/induspmt.pdf.  ERF has attached a copy of the General Permit as Exhibit 1 to the Declaration of Jodene Isaacs.

[7] The MSGP is published on EPA's website at: http://cfpub.epa.gov/NPDES/stormwater/msgp.cfm.

**IV.  *ARGUMENT***

    **A.  *Legal Standard***

A motion to dismiss under FRCP 12(b)(6) tests the legal sufficiency of a claim, not its merits.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Accordingly, the courts look only to the face of the complaint to decide a motion to dismiss, presume all allegations in the complaint to be true, and draw all inferences from the complaint in the plaintiff's favor.  *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).  Under FRCP 12(b)(6), "unless it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief," a motion to dismiss must be denied.  *Lewis v. Tel. Employees Credit Union*, 87 F.3d 1537, 1545 (9th Cir. 1996) (citation omitted); *see also Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  If it appears that a plaintiff could amend an inadequate complaint to properly state a claim, then leave to amend must be granted and dismissal denied. *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996); *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991).

For the reasons argued below, ERF's original complaint alleges sufficient facts to support its claims that PG&E's discharges of storm water from the Facilities has violated CWA section 301(a)'s prohibition on discharge without NPDES permit authorization and PG&E's duty to apply for an NPDES permit.  Alternatively, ERF's proposed First Amended Complaint includes sufficient additional facts to support its claims.  ERF should be granted leave to file this First Amended Complaint and PG&E's Motion should be denied given that amendment to the Complaint will address any pleading deficiencies in the Complaint.

    **B.  *CWA Section 301(a) Regulates All Discharges of Polluted Storm Water*.**

As noted, CWA section 301(a) broadly forbids the discharge of pollutants from any "point source" into waterways without an NPDES permit.  PG&E's Facilities discharge polluted storm water runoff into several waterways from point sources.  PG&E lacks NPDES permit authorization for these discharges, making them thus illegal under the CWA.  The PG&E Motion argues that CWA section 402(p), 33 U.S.C. § 1342(p), and accompanying EPA regulations exempt PG&E's discharges of polluted storm water from CWA section 301(a)'s prohibition on

1    discharge without NPDES permit authorization.  For the reasons outlined below, this is incorrect

2    and the Motion should be denied.

3    **1.   *The CWA's Plain Meaning Is that CWA Section 402(p) Creates No Presently***

4    ***Effective Exemption from CWA Section 301(a) for any Storm Water***

5    ***Discharges.***

6          CWA section 301(a) has a facially plain directive that except as authorized by specific

7    CWA sections, including an NPDES permit issued pursuant to CWA section's 402 (33 U.S.C. §

8    1342),[8] the discharge of pollutants shall be unlawful:

9          Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and
       1344  of this title, the discharge of any pollutant by any person shall be unlawful.
10

11   *See EPIC*, 301 F. Supp. 2d at 1113 ("[T]he amended CWA *absolutely* prohibits the discharge of

12   *any pollutant* by any person, *unless* the discharge is made *according to the terms of an NPDES*

13   *permit.*") (emphasis original) (internal citations omitted).  On the statute's face, any point source

14   discharge of storm water to waters of the United States falls within this prohibition.  *Costle*, 568

15   F.2d at 1383 ("We find a plain Congressional intent to require [NPDES] permits in any situation

16   of pollution from point sources"); *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181,

17   1190 (9th Cir. 2002); *AMC*, 965 F.2d at 772.  Furthermore, on its face, CWA section 402(p) does

18   not carve out any exception to CWA section 301(a)'s prohibition on unauthorized discharge of

19   polluted storm water from any point source.  Instead, CWA section 402(p) creates a *temporary*

20   moratorium for the EPA from having any duty to issue NPDES permits for certain discharges

21   "comprised entirely of storm water":

22         (1) Prior to October 1, 1994, the Administrator or the State (in the case of a permit
       program approved under this section) shall not require a permit under this section for
23       discharges composed entirely of stormwater.[9]

24

25         [8]  33 U.S.C. § 1342.
26

27         [9]  As discussed in Section C. of this Memorandum below, CWA section 402(p)(2)
     establishes several exceptions to CWA section 402(p)(1)'s permitting moratorium.  Discharges
28   from PG&E's Facilities are within these exceptions, an alternative basis for finding that PG&E's
     storm water discharges at issue in this case must acquire NPDES permit authorization.

This provision has three facially plain meanings.  One, whatever exemption from CWA NPDES permit requirements are created by CWA subsection 402(p)(1) *expired in 1994* and is no longer of any effect.  After 1994, EPA's duty to issue NPDES permits to all storm water dischargers has resumed.  Two, CWA subsection 402(p)(1) only mandated that NPDES permits not be required from certain point source dischargers of storm water prior to October 1994; it did not mandate that such storm water discharges would not be subject to CWA section 301(a)'s prohibition on unpermitted discharge.  Three, only discharges "composed entirely of storm water" are exempted from NPDES permitting obligations.

PG&E might on reply seek to argue that CWA subsection 402(p)(6) alters the plain facial meaning of CWA section 402(p)(1), but this would be incorrect.  CWA subsection 402(p)(2) sets forth a list of storm water discharges that fall outside of CWA subsection 402(p)(1)'s permitting moratorium.  CWA subsection 402(p)(6) then further provides that EPA can issue regulations which designate stormwater discharges "other than those [listed in CWA subsection 402(p)(2)], to be regulated to protect water quality."  This subsection (p)(6) further mandates that EPA "shall establish a comprehensive program to regulate such designated sources."  This provision does not state, on its face, that EPA has discretion to exempt point source storm water dischargers from NPDES regulation.  Instead, this provision only mandates that EPA identify all point source storm water dischargers that discharge pollutants, hence threaten water quality, and create a "comprehensive" program that addresses all such point sources.  *See EPIC*, 301 F. Supp. 2d at 1112.

In *EPIC*, Judge Patel of this Court noted that EPA's preamble to EPA's Phase II regulations expressly states:

> EPA and authorized States continue to exercise the authority to designate remaining *unregulated discharges* composed entirely of stormwater for regulation on a case-by-case basis. . . .  In [the Phase II rule], . . . individual instances of stormwater discharge might warrant special regulatory attention, but do not fall neatly into a discrete, predetermined category.

*Id*. (emphasis original).  Judge Patel went on to note that "the Ninth Circuit has adopted this interpretation of the relevant regulations, noting that the Phase II provisions merely 'preserve[] [the] authority for EPA and authorized States to designate *currently unregulated* stormwater

1    discharges.'" *Id.* (*citing Envt. Def. Ctr. v. Envtl. Protection Agency*, 344 F.3d 840 (9th Cir.

2    2001)). Judge Patel concluded that CWA section 402(p) generally and CWA subsection

3    402(p)(6) in particular thus "leave wholly unmodified the terms of the CWA--and the

4    NPDES–with regard to *regulated sources*." *Id.* (emphasis added). Judge Patel therefore held

5    that all point sources of pollutants, including point source storm water discharges, were plainly

6    subject to CWA section 301(a)'s prohibition on discharge without an NPDES permit prior to

7    enactment of CWA section 402(p), were thus not "unregulated," and thus remain subject to

8    CWA section 301(a)'s regulatory requirements in a manner unaffected by CWA section 402(p)

9    generally and CWA subsection 402(p)(6) in particular. *Id.*

10         In interpreting CWA sections 301(a) and 402(p), the Court must stop its inquiry at the

11    plain meaning of the statutory language in issue and give effect to these provisions' above-

12    discussed plain facial meanings. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409

13    (1993) ("The starting point in interpreting a statute is its language, for 'if the intent of Congress

14    is clear, that is the end of the matter.'") (internal citations omitted); *see also Chevron U.S.A. Inc.*

15    *v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *Zimmerman v. Or. Dept. of Justice*,

16    170 F.3d 1169, 1173 (9th Cir. 1999) (In interpreting statutes, courts must "look[] first to the

17    words that Congress used.").

18         Accordingly, the Court must reject PG&E's arguments and find that ERF has pled a

19    viable claim for PG&E's unauthorized discharges from the Facilities for three reasons. One,

20    ERF's claims concern storm water discharges post-1994 only, e.g., during the last five years,[10]

21    the time past which CWA subsection 402(p)(1) provides any conceivable moratorium from

22    CWA section 301(a) regulation of storm water discharges. Two, CWA subsection 402(p)(1) did

23    not, in any case, state that storm water discharges such as those from the Facilities could be

24    exempt from CWA section 301(a)'s prohibition on unauthorized discharge from a point source,

25    only that EPA temporarily could not require certain storm water dischargers to apply for NPDES

26    permits regulation, only the obligation to obtain an NPDES permit. Pursuant to CWA section

27

28

      [10] *See* Complaint, Ex. 1 at 6 (Notice Letter)

402(p), before 1994, EPA might not require permits for certain storm water discharges, but such discharges would still be unauthorized under the plain meaning of CWA section 301(a), hence actionable.

Case law has made plain that in situations where EPA has not issued NPDES permits, CWA section 301(a)'s prohibition on unpermitted discharge still apply.  *League of Wilderness Defenders*, 309 F.3d at 1188 n.6 (noting the Supreme Court in *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982), upheld a ruling that aircraft were point sources requiring permits to discharge "regardless of the fact that EPA had not yet promulgated rules to govern the issuance of NPDES permits for the particular type of discharge at issue."); *see also Sierra Club, Lone Star Chapter v. Cedar Point Oil*, 73 F.3d 546, 561 (5th Cir. 1996) ("a citizen may bring an action against a person allegedly discharging a pollutant without a permit, even if the discharger's illegal behavior results from EPA's failure or refusal to issue the necessary permit"); *United States v. Frezzo Bros. Inc.*, 461 F. Supp. 266, 269 (E.D. Pa. 1978) ("because the defendants admit that they never obtained or applied for a permit, any discharge of pollutants by them would be unlawful under Section 301(a), even though no effluent standards are applicable to them"), *cf. EPA v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 204-05 (1976) (even when EPA has not issued an NPDES permit, dischargers are still obligated to comply with the "effluent limitations" established pursuant to CWA section 301(b)).[11]  It follows that by merely suspending the obligation to seek and obtain an NPDES permit, Congress would not necessarily be exempting point source dischargers of storm water from CWA section 301(a)'s prohibition on discharge of pollutants from point sources.

Three, PG&E's discharges are not comprised entirely of storm water.  Instead, as alleged,

---

[11]  The CWA requires point sources other than publicly owned treatment works to achieve effluent limitations requiring application of the "best practicable control technology currently available" by July 1, 1977, and application of the "best available technology economically achievable" by July 1, 1983.  CWA §§ 301(b)(1)(A), (2)(A), 33 U.S.C. §§ 1311(b)(1)(A), (2)(A).  EPA in issuing NPDES permits is required to include effluent limitations reflecting CWA section 301(b)'s requirements, after which point compliance with an NPDES permit is deemed compliance with these effluent limitations.  CWA § 402(k), 33 U.S.C. § 1342(k).  But if EPA has not issued an NPDES permit to a given discharger, that discharger is still obligated to comply with the effluent limitations.

1    the storm water runoff from the Facilities co-mingles with various pollutants present at the

2    Facilities prior to the runoff's discharge into waters of the United States.  Complaint, ¶¶ 27-31;

3    First Amended Complaint, ¶¶ 38-41, 44; *see EPIC*, 301 F. Supp. 2d at 1111 ("EPIC's complaint

4    alleges that PALCO's Bear Creek drainage system utilizes a number of 'point sources' . . . to

5    redirect stormwater *and pollutants* (i.e., something not 'composed entirely of stormwater') into

6    Bear Creek. . . . On its face, then, EPIC's complaint does not satisfy the 'entirely of stormwater'

7    element of section 402(p)'s 'general rule' for exemption from permitting") (emphasis original).

8              **2.   *The CWA's Legislative History Indicates that CWA Section 402(p) Creates No***

9                   ***Presently Effective Exemption from CWA Section 301(a) for any Storm Water***

10                  ***Discharges.***

11            While the Court should deny PG&E's motion on the plain facial meaning of CWA

12   sections 301(a) and 402(p) alone, the legislative history of the Water Quality Act, which enacted

13   CWA section 402(p), further underscores that Congress did not intend any exemption for CWA

14   regulation of storm water discharges to extend past October 1994, if such exemption ever existed

15   at all.  Instead, Congress enacted CWA section 402(p)'s temporary moratorium on NPDES

16   permits for certain storm water discharges merely to give EPA more time to develop a storm

17   water program and issue NPDES permits for storm water in an orderly sequence with permits

18   issued to the highest priority dischargers first.

19            In the Senate debate for the Water Quality Act, Senator Durenberger made plain:

20        The [CWA] required all point sources including stormwater discharges, to apply for
         NPDES permits . . . by 1973.  Despite this clear directive, EPA has failed to require most
21       stormwater point sources to apply for permits which would control the pollutants in their
         discharge . . . . [Under the Water Quality Act] *after October 1, 1992,[12] all remaining,*
22       *unpermitted storm water point sources will return to current law status and will be*
         *required to obtain permits under section 402 of the Clean Water Act*."

23

24   *See* 132 Cong. Rec. S 32400 (Oct. 16, 1986); 133 Cong. Rec. S 1280 (Jan. 14, 1987) (emphasis

25   added); *see also* 133 Cong. Rec. H 1006 (Jan. 8, 1987) ("The provision in the bill establishes an

26   orderly procedure which will enable the major contributors of pollutants to be addressed first,

27

28   _____

              [12]  Congress later amended this date to be October 1994.

and *all discharges* to be ultimately addressed in a manner which will not completely overwhelm EPA's capabilities") (emphasis added); H.R. Rep. No. 99-189 at 62 (July 2, 1985) ("[we] believe that storm water associated with industrial areas must be regulated by permit"); H.R. Conf. Rep. No. 1004 at 157 (Oct. 15, 1999) ("The permit requirements of the Clean Water Act respecting [industrial] stormwater discharges are not affected by this amendment"); 133 Cong. Rec. H. 991 (Jan 8, 1987) (Statement of Rep. Strangeland) ("[The 1987 amendments] do[] not provide a specific permit exemption for stormwater discharges associated with industrial activity").[13]

In 1992 amendments to the Water Quality Act,[14] Congress reemphasized that CWA section 402(p)'s limited storm water permitting moratorium did not alter the CWA's mandate for all storm water point sources to obtain NPDES permits.  In the House debate, the legislation's sponsor Congressman Hammerschmidt explained:

> EPA has missed its target deadlines and is only now beginning to implement storm water regulations for industries and large cities.  EPA and the States are simply not ready to move ahead on storm water regulations for smaller cities - that is, cities under 100,000 population - and for countless other dischargers.  Unfortunately, the statutory moratorium on storm water permitting for small towns and other lower priority dischargers expires on October 1 of this year - literally only days away.  *When this moratorium expires, small towns, nonindustrial concerns such as parking lot owners, and even private homeowners, could be in violation of the act unless Congress moves to extend the deadline.*  And that is precisely what my bill does - nothing more, nothing less.

138 Cong. Rec. H 9789 (Sept. 29, 1992) (emphasis added).  It is clear from this legislative history that Congress intended CWA section 301(a)'s prohibition on unpermitted point source discharges to have independent effect upon the expiration of the CWA subsection 402(p)(1)

---

[13]  Additionally, after describing the Water Quality Act's requirements that EPA issue NPDES permits right away to "Phase I" municipalities with populations of 100,000 or more, Senator Stafford emphasized that "[f]inally, after October 1, 1992, EPA and the States *must issue permits for the remaining municipal separate storm sewer systems* [i.e., those municipal systems exempt from Phase I regulation pursuant to CWA section 402(p)(1) and (2)]." 132 Cong. Rec. S 32381 (Oct. 16, 1986) (emphasis added).  This further indicates Congress's intent that CWA section 402(p)(1) enacted only a *temporary* moratorium on NPDES permitting for storm water discharges not falling within CWA section 402(p)(2) and did *not* intend CWA section 402(p)(6) to grant EPA any authority to exempt storm water point source dischargers from the obligation to obtain an NPDES permit after October 1994.

[14]  These amendments extended CWA section 401(p)(1)'s permit moratorium from October 1992 to October 1994.

permitting moratorium, regardless of EPA's actions or inactions under CWA section 402(p)(6).

Ninth Circuit precedent further supports that Congress did not intend CWA section 402(p) to exempt any storm water discharges from CWA section 301(a) regulation past October 1994 or grant EPA the authority to so exempt any storm water discharges.  The Ninth Circuit has had four opportunities to review EPA regulatory decisions made pursuant to CWA section 402(p).  In all four decisions, the Ninth Circuit reconfirmed its adherence to the seminal ruling in *NRDC v. Castle* that the CWA section 301(a)'s broad prohibition on the discharge of pollutants from a point source into the waters of the United States without an NPDES permit applies to storm water discharges and that EPA cannot exempt storm water discharges from this prohibition.  *NRDC v. EPA*,  966 F.2d 1292, 1306 (9th Cir. 1992) (relying on *NRDC v. Castle* in holding that "if construction activity is industrial in nature, and EPA concedes that it is, EPA is not free to create exemptions from permitting requirements for such activity"); *EDC*, 344 F.3d at 841("Storm sewers are established point sources subject to NPDES permitting requirements. *NRDC v. Castle*, 568 F.2d 1369, 1379 [D.C. Cir. 1977] [holding unlawful EPA's exemption of stormwater discharges from NPDES permitting requirements]"); *AMC*, 965 F.2d at 772 ("The CWA requires EPA to regulate, through the issuance of NPDES permits, *all discharges* of pollutants to the nation's waters") (citing *NRDC v. Castle*); *see also Defenders of Wildlife v. Browner*, 191 F.3d at 1163 (no mention that Section 402(p) superceded *NRDC v. Castle*).  None of the Ninth Circuit decisions suggest that CWA section 402(p) altered *NRDC v. Castle's* holding.

In *AMC*, the Ninth Circuit held that storm water discharges from inactive mines were still subject to CWA section 301(a) and required to obtain NPDES permits even if EPA had not classified them as industrial discharges:

> The NPDES permit program of the CWA, see CWA §§ 301(a), 402(a), 33 U.S.C. §§ 1311(a), 1342(a), regulates point source discharges of pollutants from inactive mines regardless of whether EPA classifies such discharges as "associated with industrial activity" under CWA § 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B).

*AMC*, 965 F.2d at 767.  Similarly, the discharges from PG&E's Facilities would be subject to CWA section 301(a) regulation and the obligation to obtain NPDES authorization, even if PG&E

were correct that they are not from "industrial facilities."  *See EPIC*, 301 F. Supp. 2d at 1113

("Where PALCO's Bear Creek runoff system utilizes the kind of conduits and channels embraced

by section 502(14) . . . the pollution sources are definitively 'point sources'; "[n]either section

402(p) nor the rest of the 1987 amendments to the CWA alter [the] driving CWA principle" that

all discharges of pollutants must be in compliance with an NPDES permit).

In *EDC*, the Ninth Circuit further made plain that CWA section 301(a) regulated all point

source discharges of storm water prior to the enactment of CWA section 402(p)'s temporary

moratorium on NPDES permitting for some point source discharges:

> [A]s respondent-intervenor NRDC notes, the mere existence of the § 402(p)(1) permitting
> moratorium, designed to apply only to Phase II dischargers, necessarily implies that EPA
> has the authority to require permits from these sources after the 1994 expiration of the
> moratorium.  Since there would have been no need to establish a permitting moratorium
> for these sources if the sources could never be subject to permitting requirements,
> petitioners' interpretation violates the bedrock principle that statutes not be interpreted to
> render any provision superfluous.

*EDC*, 344 F.3d at 844; *see also id*. at 846.  In *EDC*, the Ninth Circuit upheld EPA's decision not

to designate certain storm water discharges under EPA's Phase II regulations promulgated

pursuant to CWA section 402(p)(6).  In so doing, however, the Ninth Circuit did not suggest that

any point sources within those categories were not subject to CWA section 301(a)'s prohibition

on unpermitted discharge.  The Ninth Circuit simply agreed with EPA that regulation of "Group

A" discharges under CWA subsection 402(p)(6) could be addressed on local or regional bases

rather than on a nationwide basis.  *EDC*, 344 F.3d at 859.

Thus, applicable legislative history and case law makes plain that Congress at least

intended all point source storm water discharges to revert back to being subject to CWA section

301(a)'s prohibition on unpermitted discharge after the October 1994 expiration of CWA

subsection 402(p)(1)'s temporary permitting moratorium.

### 3.  *EPA Has Acknowledged that CWA Section 402(p) Does Not Currently Exempt Storm Water Discharges from NPDES Regulation.*

EPA has acknowledged that Congress' permitting moratorium in CWA subsection

402(p)(1) expired in October 1994, meaning that after this date all point source storm water

discharges are subject to CWA section 301(a)'s prohibition on discharge without NPDES permit

authorization.  An EPA Guidance Memorandum states that, at after this date, "the Agency and approved NPDES States are unable to waive the statutory requirement that point source discharges of pollutants to waters of the United States need an NPDES permit." *Policy for End of Moratorium for Storm Water Permitting – October 1, 1994* at 3 (Oct. 18, 1994)[15]; *Id*. at 4 ("citizen suits can be brought against operators of phase II point source discharges composed entirely of storm water to waters of the U.S. that are not authorized by an NPDES permit after October 1, 1994").  Likewise, in response to comments on the Final Interim Phase II Discharge Rule issued August 7, 1995, EPA again made clear that CWA section 402(p) does not exempt any storm water discharges after October 1, 1994:

> [C]ommenters argued that 402(p) does not require permits for all discharges of storm water after October 1, 1994, rather it prohibits the need for such permits before this date. EPA disagrees.  CWA Section 301(a) states that it is illegal to discharge pollutants to waters of the U.S. except in compliance with Section 402.  The current regulations under Section 402 establish a permit program for point source discharges.  In the 1987 amendments to the CWA, Congress added Section 402(p) to ensure the orderly evolution of the NPDES storm water program.  *Section 402(p)(1) did not alter the basic underlying prohibition in Section 301(a) as it applied to storm water discharges. Section 402(p)(1) did, however, establish temporary relief from permitting requirements for certain storm water discharges for a specified period of time.*

60 Fed. Reg. 40230, 40231 (Aug. 7, 1995) (emphasis added). "If Congress had not intended unregulated phase II sources to be liable for violations of section [1311(a)] on October 1, 1992, there would have been no need to amend section [CWA section 402(p)(1)] at all." *Id*.  Thus, EPA has acknowledged that CWA section 402(p) did not grant EPA authority to exempt storm water discharges from NPDES permitting requirements past 1994.

**C.  *Storm Water Discharges from PG&E's Corporate Yards Are Subject to Regulation Under CWA Section 402(p).***

CWA subsection 402(p)(2), *inter alia*, excluded two types of storm water discharges from CWA subsection 402(p)(1)'s seven year NPDES permitting moratorium:

(B)     a discharge associated with industrial activity . . . .

(E)     A discharge for which the Administrator or the State, as the case may be,

---

[15]  EPA has published this document on the internet at:
http://www.epa.gov/npdes/pubs/owm0141.pdf).  It also attached as Exhibit 5 to the Isaacs Decl.

determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

The storm water discharges from PG&E's Facilities are both types of discharge and thus *not* subject to CWA subsection 402(p)(1)'s NPDES permitting moratorium, i.e., have always been subject to CWA section 301(a)'s prohibition on unpermitted discharge.

As the Ninth Circuit has pointed out, "The language [in CWA section 402(p)(2)] 'discharges associated with industrial activity' is very broad." *NRDC v. EPA*, 966 F.2d at 1304. "It is not necessary that storm water be contaminated or come into direct contact with pollutants: only association with any type industrial activity is necessary." *Id.* "If an activity is industrial in nature, EPA is not free to create exemptions for permitting requirements for such activity." *Id.* at 1306; *see also AMC*, 965 F.2d at 772 ("In the [1987 Water Quality Act], Congress provided a temporary [permitting] exemption for some sources of storm water discharge, but not for discharges associated with industrial activity," and that the "legislative history" does not suggest that Congress intended to limit administrative burdens "with respect to industrial dischargers"); H.R. Rep. No. 99-189 at 62 (July 2, 1985) ("[we] believe that storm water associated with industrial areas must be regulated by permit"); H.R. Conf. Rep. No. 1004 at 157 (Oct. 15, 1999) ("The permit requirements of the Clean Water Act respecting [industrial] stormwater discharges are not affected by this amendment"); 133 Cong. Rec. H. 991 (Jan 8, 1987) (Statement of Rep. Strangeland) ("[The 1987 amendments] do[] not provide a specific permit exemption for stormwater discharges associated with industrial activity").

EPA's Phase I Regulations defined discharges associated with industrial activity as "the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant." 40 C.F.R. § 122.26(b)(14). The EPA regulations do not further directly define "industrial plant," but they do list several categories of industrial facilities that "are considered to be engaging in 'industrial activity.'" These categories include, *inter alia*, "(vi) Facilities involved in the recycling of materials" and classified as Standard Industrial Classification 5093, "(viii) Transportation facilities classified as Standard Industrial Classifications 40, 41, 42 (except

4221–25), 43, 44, 45, and 5171 which have vehicle maintenance shops [or] equipment cleaning operations . . . ." and "(xi) [various light industry facilities] under Standard Industrial Classifications 20, 21, 22, 23, 2434, 25, 265, 267, 27, 283, 285, 30, 31 (except 311), 323, 34 (except 3441), 35, 36, 37 (except 373), 38, 39, and 4221–25." The regulations add that for such categories, industrial facilities include, *inter alia*:

> immediate access roads and rail lines used or traveled by carriers of raw materials, manufactured products, waste material, or by-products used or created by the facility; material handling sites; sites used for the storage and maintenance of material handling equipment; sites used for residual treatment, storage, or disposal; shipping and receiving areas . . . storage areas (including tank farms) for raw materials, and intermediate and final products . . . .

*Id*.

ERF has alleged that PG&E performs recycling activities at the Facilities that includes recycling of utility poles, various metal pieces and parts, and various other bulk materials. First Amended Complaint, ¶ 35. This is the type of activity covered by Standard Industrial Classification ("SIC") Code 5093,[16] which broadly includes assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials.[17] ERF has further alleged that PG&E performs vehicle maintenance and equipment cleaning operations at the Facilities. This is the type of activity covered by SIC Code 4226, which covers motor vehicle maintenance at facilities which are deemed to be "Special Warehousing and Storage, Not Elsewhere Classified (Establishments primarily engaged in the warehousing and storage of special products, not elsewhere classified)" or by SIC Code 4231, which covers motor vehicle maintenance at facilities which are deemed to be "Terminal and Joint Terminal Maintenance Facilities for Motor Freight Transportation (Establishments primarily engaged in the operation of terminal facilities used by

---

[16] The U.S. Department of Labor ("DOL") publishes SIC Codes. DOL publishes these on the internet at: http://www.osha.gov/pls/imis/sicsearch.html.

[17] The State Board and EPA's further descriptions of this activity in the General Permit and guidance documents further underscore that PG&E's facilities are conducting, at least in part, the sort of recycling activity the agencies believe to be industrial. *See* General Permit, Attachment 1, ¶ 6; *see also* EPA Industrial Fact Sheet Series for Activities Covered By EPA's MSGP, Sector N: Scrap Recycling and Waste Recycling Facilities, published by EPA at http://www.epa.gov/npdes/pubs/sector_n_scraprecycling.pdf. (Isaacs Decl., Ex. 4)

highway-type property carrying vehicles.  Also included are terminals which provide

maintenance and service for motor vehicles).”[18]  Complaint, ¶¶  24-26; First Amended

Complaint, ¶¶  31-32.  ERF has also alleged that PG&E also fabricates parts and supplies needed

to maintain its utility grid at the Facilities.  As part of this fabrication activity, PG&E does metal

work on parts and supplies that, on information and belief, ERF alleges includes grinding,

welding, sawing, cutting, surface treatment (including metal finishing, coating, polishing, rinsing,

and abrasive cleaning; and parts and tools cleaning (including sandblasting, metal surface

cleaning, and removal of applied chemicals).  *See* Complaint, ¶¶  24-26; First Amended

Complaint, ¶ 33.  This is the type of activity covered by SIC Codes 3444, 3452, 3449, 3494,

3496, 3498, 3499, i.e., which are SIC Codes for certain light industry--Sector AA: Fabricated

Metal Products--within category (xi) in the EPA regulations.[19]  40 C.F.R. § 122.26(14)(xi).

Finally, ERF has alleged that PG&E also uses the Facilities to store a wide range of objects

including new and used wooden utility poles, piles of aggregates such as sand, gravel, and soil,

piles of used concrete and asphalt, piles of contaminated soil awaiting disposal, electrical

generators, transformers, cables, metal pipes, plastic pipes, and other equipment and parts used in

the installation and maintenance of PG&E's utility poles, electric transmission lines, and natural

gas distribution systems.  *See* Complaint, ¶¶ 24-26; First Amended Complaint, ¶ 34.  This makes

the PG&E Facilities “sites used for the storage and maintenance of material handling

equipment,” sites that include “shipping and receiving areas” and sites that include “storage areas

[18] The State Board and EPA’s further descriptions of this activity in the General Permit
and guidance documents further underscore that PG&E’s facilities are conducting, at least in
part, the sort of motor vehicle maintenance activity the agencies believe to be industrial.  *See*
General Permit, Attachment 1, ¶  8; *see also* EPA Industrial Fact Sheet Series for Activities
Covered By EPA's MSGP, Sector P: Land Transportation and Warehousing Facilities, published
by EPA at http://www.epa.gov/npdes/pubs/sector_p_transportationfacilities.pdf (Isaacs Decl.,
Ex. 2).

[19] The State Board and EPA’s further descriptions of this activity in the General Permit
and guidance documents further underscore that PG&E’s facilities are conducting, at least in
part, the sort of metal working activity the agencies believe to be industrial.  *See* General Permit,
Attachment 1, ¶ 10; *see also* EPA Industrial Fact Sheet Series for Activities Covered By EPA's
MSGP, Sector AA: Fabricated Metal Products Facilities, published by EPA at
http://www.epa.gov/npdes/pubs/sector_aa_fabmetal.pdf (Isaacs Decl., Ex. 3).

1    for raw materials" within the meaning of 40 C.F.R. § 122.26(14).

2            PG&E might seek to argue that its Facilities should not be deemed to industrial facilities

3    within the meaning of EPA regulations because the primary activities at the Facilities are not

4    recycling, transportation, metal fabricating, or other light industry such that the Facilities should

5    not be seen as falling within the SIC Codes specified in EPA's Phase I regulations.  The State

6    Board, however, has made plain in the General Permit that "industrial facilities" that are subject

7    to NPDES regulation and that must seek General Permit authorization to discharge storm water

8    include any sites where any of these industrial activities occur, *regardless of whether the activity*

9    *is primary or auxiliary to the facility operator's function*.  General Permit, Fact Sheet at II.  The

10   Court should deem this General Permit recitation either to be a properly authoritative definition

11   by California's State Board, which has NPDES administrative authority in California, of an

12   "industrial facility" within the meaning of CWA subsection 402(p)(2)(B) *or* as the State Board's

13   exercise of its authority under CWA subsection 402(p)(2)(E) and EPA regulations, 40 C.F.R. §

14   122.26(a)(9)(i)(C), (D), to designate storm water sources subject to NPDES regulation.

15           CWA subsection 402(p)(2)(E) grants broad authority both to EPA *and* to States such as

16   California with EPA-approved NPDES programs to designate additional sources of storm water

17   runoff as requiring NPDES permits *besides those otherwise listed in CWA subsection*

18   *402(p)(2)(A)-(D)*.  *See EPIC*, 301 F. Supp. 2d at 1112 (observing that the EPA preamble to

19   EPA's Phase II regulations states that EPA and States with EPA-approved NPDES programs

20   have the authority to designate additional storm water dischargers besides those otherwise listed

21   in CWA subsections 402(p)(2)(A)-(D) as subject to NPDES permit regulation and agreeing that

22   the preamble interpretation is correct as in accord with the Ninth Circuit's holding in

23   *Environmental Defense Center,* 344 F.3d at 840).  EPA regulations, 40 C.F.R. §

24   122.26(a)(9)(i)(C), (D), further provide the States with such authority.  The State Board has

25   exercised its authority under CWA subsection 402(p)(2)(E) and 40 C.F.R. § 122.26(a)(9)(i)(C),

26   (D) in providing in the General Permit that any facility where, even on an auxiliary basis,

27   recycling, vehicle maintenance, or metal fabrication is conducted must acquire NPDES permit

28   authorization to discharge polluted storm water.

1    In sum, ERF has properly pled that the PG&E Facilities are *not* the types of facilities for

2  which there is any conceivable argument of exemption from NPDES permit regulation under

3  CWA subsection 402(p)(1).  ERF has alleged that PG&E conducts recycling, vehicle

4  maintenance, and/or metal fabrication at the Facilities, making them subject to NPDES

5  regulation under CWA subsection 402(p)(2) either as "industrial facilities" or as facilities

6  designated by the State Board pursuant to CWA subsection 402(p)(2)(E) as forbidden from

7  discharging polluted storm water without NPDES permit authorization.

8  **V.  *CONCLUSION***

9    PG&E's discharge of polluted storm water from the Facilities at issue in this case are

10  prohibited unless authorized by an NPDES permit either because *all* discharges of polluted storm

11  water from point sources is unlawful without NPDES permit authorization or because PG&E's

12  Facilities are properly deemed the type of Facilities that the State Board has determined must

13  acquire General Permit authorization to discharge storm water.  PG&E lacks NPDES permit

14  authorization for discharges from the Facilities.  Accordingly, PG&E's storm water discharges at

15  issue in this case violate the CWA, as ERF's claims properly allege.  For these reasons, PG&E's

16  Motion should be denied.

17                                    Respectfully Submitted,

18

19  DATED:  April 8, 2010                    *Christopher a. Sproul*

20                                    Attorney for Plaintiff
                                      Ecological Rights Foundation

21

22

23

24

25

26

27

28