1   S. WAYNE ROSENBAUM CA Bar No. 182456
        srosenbaum@foley.com
2   **FOLEY & LARDNER LLP**
    ATTORNEYS AT LAW
    402 WEST BROADWAY, SUITE 2100
3   SAN DIEGO, CA 92101-3542
    TELEPHONE:     619.234.6655
    FACSIMILE:     619.234.3510
4
    RUSSELL B. SELMAN IL Bar # 6195396, *pro hoc vice*
5       rselman@foley.com
    BRADLEY S. ROCHLEN IL Bar # 6244780, *pro hoc vice*
        brochlen@foley.com
6   J. MICHAEL SHOWALTER, IL Bar #6301455, *pro hoc vice*
        mshowalter@foley.com
7   **FOLEY & LARDNER LLP**
    ATTORNEYS AT LAW
    321 NORTH CLARK STREET, SUITE 2800
8   CHICAGO, IL 60654-5313
    TELEPHONE:     312.832.4500
    FACSIMILE:     312.832.4700
9
    Attorneys for Defendant Pacific Gas & Electric Company
10
                    **UNITED STATES DISTRICT COURT**
11
                  **NORTHERN DISTRICT OF CALIFORNIA**
12
13  Ecological Rights Foundation              | Case No:  3:CV 10-00121 RS
14                       Plaintiff,           | **DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM AND PROPOSED ORDER**
15            v.
16  Pacific Gas & Electric Company
17                       Defendant.
18                                            | Judge:     Judge Richard G. Seeborg
                                              | Date Complaint Filed:  August 23, 2010
19
20                                            | Hearing Date: September 30, 2010
                                              | Time:           1:30 p.m.
21
22      **To:**    Christopher A. Sproul
23                 Environmental Advocates
                   5135 Anza Street
24                 San Francisco, CA 94121
                   E-mail:  csproul@enviroadvocates.com
25
26                 William Verick
                   Klamath Environmental Law Center
27                 424 First Street
                   Eureka, CA 95501
28                 E-mail:  wverick@igc.org

# TABLE OF CONTENTS

I.     Statement of the Motion................................................................................. 1

II.    Background and Procedural History................................................................ 2

III.   ERF's Allegations ......................................................................................... 2

IV.    Analysis......................................................................................................... 5

    A.   Standard of Review............................................................................... 5

    B.   Congress chose not to regulate the storm water discharges at issue under CWA. . 6

        1.   PG&E's Operations Do Not Conduct "Industrial Activities" as the term has been interpreted by regulatory authorities. .......................................... 9

            a)   The facilities here have the industrial code related to PG&E's operations because all activities conducted are "auxiliary" to PG&E's larger operations. ........................................... 10

            b)   The involved facilities have PG&E's Corporate SIC Code, and Not One Selected by ERF. ................................................ 11

                (1)   The Facilities are not "transportation" facilities. .............. 12

                (2)   The facilities are not "recycling" facilities. ...................... 13

                (3)   The Facilities are not "light industry" facilities. ............... 13

            c)   Storage of "industrial materials" does not provide a separate basis requiring an NPDES permit. ........................................... 14

        2.   CWA does not require regulation of every storm water discharge.......... 14

    C.   ERF's Second Claim for Relief Must Be Dismissed Because there Is No  Separate Violation of CWA for Failure to Apply for a Permit........................................... 19

    D.   ERF's RCRA Claim Must Be Dismissed Because ERF's RCRA Pleadings are Insufficient to Withstand a Motion to Dismiss.................................................... 21

V.     Conclusion .................................................................................................. 24

# **TABLE OF AUTHORITIES**

**FEDERAL CASES**

*American Mining Congress v. EPA*,
    965 F.2d 759 (9th Cir. 1992) ........................................................7, 15

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) .................................................... *passim*

*Bd. of Trustees of Painesville Twp. v. City of Painesville, Ohio*,
    200 F.3d 396 (6th Cir. 1999) ...............................................19

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 127 S.Ct. 1955 (2007)........................................6, 21

*Burlington Northern & Santa Fe Ry v. Grant*,
    505 F.3d 1013 (10th Cir. 2007) ............................................23

*Cal. Dep't of Toxic Substances & Control v. Interstate Non-Ferrous Corp.*,
    298 F. Supp. 2d 930 (E.D. Cal. 2003)....................................23

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council*,
    467 U.S. 837 (1984)...........................................................18

*Conservation Law Found. v. Hannaford Bros. Co.*,
    327 F.Supp. 2d 325 (D. Vt. 2004) *aff'd* 139 Fed. Appx. 338 (2nd Cir. 2005) ............... *passim*

*Cordiano v. Metacon Gun Club, Inc.*,
    575 F.3d 199 (2d Cir. 2009)................................................22

*Cox v. City of Dallas, Tex.*,
    256 F.3d 281 (5th Cir. 2001) ..............................................23

*Env'l Protection Info. Center v. Pac. Lumber Co.*,
    301 F. Supp. 2d 1102 (N.D. Cal. 2004) .......................... *passim*

*Envt'l Defense Center v. EPA*,
    344 F.3d 832 (9th Cir. 2003) ...............................................6

*Hallstrom v. Tillamook County*,
    493 U.S. 20 (1989).............................................................23

*Interfaith Community Organization v. Honeywell Int'l, Inc.*,
    399 F.3d 248 (3d Cir. 2005).................................................23

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*,
    309 F.3d 1181 (9th Cir. 2002) ............................................18

*Lujan v. Nat'l Wildlife Fed'n*,
 497 U.S. 871 (1990)..................................................................................17

*McGinley v. Houston*,
 361 F.3d 1328 (11th Cir. 2004) ............................................................18

*Me. People's Alliance v. Mallinckrodt, Inc.*,
 471 F.3d 277 (1st Cir. 2006) .................................................................23

*Morris v. City of Santa Cruz*,
 No. C93-20496, 1994 WL 514032 (N.D. Cal. Sept. 6, 1994) ................18

*NASD Dispute Resolution, Inc. v. Jud. Council of Cal.*,
 488 F.3d 1065 (9th Cir. 2007) ..............................................................18

*Northwest Envtl. Def. Ctr. v. Brown*,
 Case No. 07-35266, 2010 U.S. App. LEXIS 17129 (9th Cir. Aug. 17, 2010) ............... *passim*

*NRDC v. Costle*,
 568 F.2d 1369 (D.C. Cir. 1977)..............................................................15

*Parker v. Scrap Metal Processors, Inc.*,
 386 F.3d 993 (11th Cir. 2004) ...............................................................23

*Safe Air for Everyone v. Meyer LLC*,
 373 F.3d 1035 (9th Cir. 2004) ......................................................... 21-23

*Service Oil v. EPA*,
 590 F.3d 545 (8th Cir. 2009) ............................................................ 19-20

*Sycamore Indus. Park Assoc. v. Ericsson Inc.*,
 546 F.3d 847 (7th Cir. 2008) .................................................................23

*Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*,
 368 F.3d 1053 (9th Cir. 2004) ..................................................................5

*U.S. v. ILCO, Inc.*,
 996 F.2d 1126 (11th Cir. 1993) .............................................................21

*United States v. Ensminger*,
 567 F.3d 587 (9th Cir. 2009) .................................................................18

*United States v. Mead Corp.*,
 533 U.S. 218 (2001)................................................................................18

*United Technologies Corp. v. EPA*,
 821 F.2d 714 (D.C. Cir. 1987)...............................................................21

*Waltman v. King William County Sch. Bd.*,
 Civ. No. 3:10CV72-HEH, 2010 U.S. Dist. LEXIS 24093 (E.D. Va. Mar. 16, 2010) ....... 17-18

iii

**FEDERAL STATUTES**

33 U.S.C. § 1251 ................................................................................................ 2-3

33 U.S.C. § 1311 ............................................................................................. 6, 19-20

33 U.S.C. § 1319 ..................................................................................................20

33 U.S.C. § 1342 ............................................................................................. *passim*

33 U.S.C. § 1365 ................................................................................................4, 19

42 U.S.C. § 6902 ..................................................................................................21

42 U.S.C. § 6903 ..................................................................................................22

42 U.S.C. § 6921 ..................................................................................................21

42 U.S.C. § 6939 ..................................................................................................21

42 U.S.C. § 6972 ......................................................................................... 4-5, 21, 24

49 U.S.C. § 5101 ..................................................................................................24

49 U.S.C. § 5122 ..................................................................................................24

**RULES**

Federal Rule of Civil Procedure Rule 12 ................................................................1, 6

**REGULATIONS**

40 C.F.R. § 122.3 ..................................................................................................16

40 C.F.R. § 122.21 ........................................................................................... 4, 19-20

40 C.F.R. § 122.26 ............................................................................................10, 18

40 C.F.R. § 261.2 ..................................................................................................22

55 Fed. Reg. 47,990 (Nov. 16, 1990)......................................................................16

64 Fed. Reg. 68,722 (Dec. 8, 1999)........................................................................16

64 Fed. Reg. 68,779 (Dec. 8, 1999)..........................................................................9

**Notice:**  Please take notice that on Thursday, September 30, 2010 at 1:30 p.m. or as soon thereafter as counsel may be heard, we shall appear before the Honorable Richard Seeborg in Courtroom 3, 17th Floor, 4500 Golden Gate, San Francisco, CA 94102 and present the attached DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM, at which time and place you may appear if you so desire.

By this Motion, Defendant Pacific Gas & Electric Company seeks an order dismissing all of Plaintiff's claims with prejudice, and any such other relief as the Court determines equitable and proper.

## I.     STATEMENT OF THE MOTION

Defendant, Pacific Gas & Electric Company ("PG&E"), through its attorneys, Foley & Lardner LLP, respectfully moves this Court to dismiss the Complaint of Plaintiff, Ecological Rights Foundation ("ERF"), pursuant to Federal Rule of Civil Procedure Rule 12(b)(1) because the Court lacks subject matter jurisdiction due to fatal deficiencies in the Third Amended Complaint ("Complaint") and Rule 12(b)(6) because the Complaint fails to state a claim for which relief can be granted.  For the reasons outlined herein, PG&E moves to dismiss ERF's Complaint on the grounds that:

1.     ERF's First Count fails to state a claim for which relief can be granted because: (a) no permit is required for any of the service centers under the CWA; and (b) ERF's allegations that various ancillary activities occur at service centers do not transform them into metal fabrication, transportation, or recycling facilities for the purposes of the CWA.

2.     ERF's Second Count fails to state a claim for which relief can be granted for the same reasons as the first count, and additionally because the CWA does not permit "failure to file permit" claims.

3.     ERF's Third Count fails to state a claim for which relief can be granted as ERF has failed to allege what "solid waste" PG&E released, that any substance has been "discarded" or that it poses an "imminent and substantial risk" to ERF's

1    members as required by RCRA.

2    In support of its Motion, PG&E states the following:

3  **II.    BACKGROUND AND PROCEDURAL HISTORY**

4    On January 11, 2010, ERF filed a Complaint against PG&E for alleged violations of the

5  Clean Water Act ("CWA") , 33 U.S.C. § 1251 *et seq.*  PG&E responded to that Complaint by

6  filing a Motion to Dismiss.  (*See* Doc. No. 15.)

7    In April and May, 2010, ERF either moved, or sought stipulation, to file two more

8  Complaints, motivated in part to cure defects PG&E identified in its Motion to Dismiss and to

9  add a count under the Resource Conservation and Recovery Act ("RCRA"). (*See* Doc. Nos. 24 &

10  33.)  Because ERF knew at that time it intended to file a Third Amended Complaint, the parties

11  agreed that PG&E need not respond to either of these pleadings.  (*See* Doc. No. 33.)

12    On August 5, 2010, after a Court Order directed them to do so, ERF filed its Stipulation

13  to File a Third Amended Complaint.  (Doc. No. 54.)  The Court granted the Stipulation, and

14  ERF's Third Amended Complaint was filed on August 23, 2010.  (Doc. No. 66.)

15  **III.    ERF'S ALLEGATIONS**

16    ERF's Third Amended Complaint contains two CWA counts and one alleging a violation

17  of RCRA.  ERF alleges that PG&E owns and operates 31 "corporation yards and service centers"

18  "[t]o provide service and maintenance on its electric and gas distribution system."  (Compl. ¶

19  32*.[1])  ERF alleges that storm water is discharged from "corporation yards and service centers"

20  and that PG&E "routinely conducts numerous industrial activities" at these facilities, including:

21    • Storage and maintenance of vehicles and equipment, wrongly ascribed by ERF as

22    "within the SIC Codes 4226 and 4231" related to "transportation."[2]  (*Id.* ¶ 33*.)

23  ───────────────────

24  [1]    ERF's Third Amended Complaint contains two sets of paragraphs numbered 29-34.  In an effort to avoid confusion, the second set of paragraphs – under the headings **The Resource**

25  **Conservation and Recovery Act** and **STATEMENT OF FACTS** will be referred to herein by the number ERF gives to them with the addition of an asterisk following the number, i.e.

26  "Paragraph 29*."

27  [2]    Standard Industrial Classification Codes ("SIC Code") are at the heart of this case.  SIC Codes, established by the United States Department of Labor in 1937, are maintained by the Occupational Safety and Health Administration ("OSHA") and are used to classify various

28  industries.  Much of the SIC Code Manual can be found online at
http://www.osha.gov/pls/imis/sic_manual.html (last visited August 25, 2010).  The Preface to the

ERF alleges that these "Transportation Category" "industrial activities" conducted by PG&E include: (1) storage and maintenance of PG&E's service vehicle fleet; (2) vehicle and equipment fluid changes; (3) mechanical repairs; (4) parts cleaning; (5) sanding; (6) refinishing; (7) painting and/or fueling; (8) storage of vehicles and equipment waiting for repair or maintenance; (9) storage of the related materials and waste materials such as oil, fuel, batteries, tires, or oil filters; and (10) vehicle and equipment washing."  (*Id.*)

- "Light industrial activities" including metal preparation, surface treatment, and parts coating, and parts and tools cleaning, wrongly ascribed by ERF as "within the SIC Codes 3444, 3452, 3449, 3494, 3496, 3498, and 3499."  (*Id.* ¶ 34*.) "Light industry category" "industrial activities" alleged to occur include: (1) metal preparation; (2) surface treatment; and (3) parts and tool cleaning.  (*Id.* ¶ 34.)  "Recycling" "industrial activities" include "processing, reclaiming, and wholesale distribution of scrap and waste materials."  (*Id.* ¶ 36.)

- "Recycling activities" including processing, reclaiming, and wholesale distribution of scrap and waste materials, including scrap metals and wooden poles "associated with PG&E's electricity and natural gas transportation and distribution systems," wrongly ascribed as "within the SIC Code 5093."  (*Id.* ¶ 36.)

- "Stor[age] of a wide range of industrial materials and equipment at the Facilities" including storage of wooden poles, piles of construction aggregate, piles of used concrete and asphalt, piles of contaminated soil awaiting disposal, electrical generators, transformers, and other parts, all "out of doors" and "exposed to storm water flows."  (*Id.* ¶ 35.)

ERF alleges that PG&E was required under the CWA, to secure National Pollution

---

Manual is available only in book form.  Individual SIC Codes can be located through use of this manual.  Where they are referenced herein, they are referred to as "SIC Code" followed by the Code number.  The Preface, and print-outs of pages illustrating the various SIC Codes discussed herein, are attached collectively as Exhibit 2 to the Showalter Declaration filed herewith.

Discharge Elimination System Permits ("NPDES") for these facilities because the above activities are "industrial activities" as the term is defined by relevant federal and California state authorities, and such permits are required for all storm water discharges where "industrial activities" take place. (*See* Compl. ¶¶ 17-22, discussing 33 U.S.C. § 1342(p)(2)(B).) Such permits are implemented by the California Water Resources Control Board, and are known as "General Permits."[3] (*See id.* ¶¶ 25-33.) Parties acknowledge their adherence to the General Permit by filing an application called a Notice of Intent ("NOI"). (*Id.* ¶ 46.)

Because ERF alleges that PG&E has not submitted NOIs for these facilities, ERF has filed a citizen enforcement action under 33 U.S.C. § 1365(a)(1) seeking injunctive relief and civil penalties. (*Id.* ¶¶ 23-24.) ERF's Second Count is premised on ERF's supposition that PG&E's failure to apply for a permit constituted a separate violation of the CWA and federal regulations included at 40 C.F.R. § 122.21(a) over and above PG&E's alleged failure to have a permit. (*See id.* ¶¶ 55-59.)

ERF's Third Count is for violation of RCRA. (*See* Compl. ¶ 29, 60-62.) To wit, Paragraph 29, the only paragraph in the factual recitation directly applicable to RCRA, provides:

> 29.     Section 7002 of the RCRA prohibits any past or present generator, past or present transporter, or past or present owner of a treatment, storage, or disposal facility, from contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to human health or the environment. RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B).

The two paragraphs in the RCRA count, Paragraphs 61 and 62, state:

> 61.     Through its ownership and operation of the

---

[3]     Copies of the General Permit have been filed repeatedly throughout this litigation, most notably with ERF's Motion for Partial Summary Judgment (Doc. No. 49) and its Renewed Motion for Partial Summary Judgment (Doc. No. 55.) For ease of reference, the General Permit is attached to the Showalter Declaration filed herewith as Exhibit 1.

Facilities, PG&E is a past and present generator of solid waste.

PG&E has contributed and is contributing to the past and present

handling, storage, treatment, transportation and disposal of solid

waste at the Facilities in a manner that is presenting imminent and

substantial endangerment to health and the environment.

      62.     An action for relief under the RCRA is authorized

by Section 7002 of the RCRA, 42 U.S.C. § 6972(a)(1)(B).

PG&E's acts and omissions will irreparably harm Plaintiff.

Nowhere in the Complaint does ERF provide any facts to support these conclusory legal allegations.

# IV.   <u>ANALYSIS</u>

Despite adhering to overly broad and conclusory pleading standards, ERF's Complaint still fails to state a claim upon which relief can be granted.  Moreover, this Court lacks subject matter jurisdiction to hear this case because the CWA does not regulate the type of facilities operated by PG&E under either an NPDES permit or California's General Permit.

ERF's pleading failures are not mere drafting mistakes.  Nor are they flaws that can be fixed upon re-drafting.  Indeed, the PG&E facilities cited by ERF are simply, as a matter of law, not subject to the permitting requirements of the CWA.  Thus, ERF's First and Second claims must fail, and these claims be dismissed with prejudice as there is no way to plead around this deficiency.  *See Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004).

ERF's RCRA claim consists of nothing more than conclusory allegations which fail to present a claim for which relief can be granted.  Notably, the RCRA claim fails on the grounds that ERF only makes conclusory assertions that "solid wastes" are "discarded" by PG&E.  Bare claims setting forth legal elements cannot withstand a motion to dismiss  Accordingly, for the reasons set forth in greater detail below, ERF's RCRA claim should be dismissed.

## A.    **Standard of Review**

To survive a motion to dismiss, a complaint must contain sufficient factual matter to state

a facially plausible claim for relief.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Federal Rule of Civil Procedure 12(b)(6) permits dismissal when the plaintiffs have failed to allege "enough facts to state a claim for relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964 (2007).  While courts construe the complaint in the light most favorable to the plaintiff, accepting all factual allegations as true, in reviewing a Rule 12(b)(6) motion to dismiss, "a plaintiff must provide more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id*.  The complaint must contain direct allegations respecting all the material elements to sustain a recovery under a viable legal theory, and the Court need not accept legal allegations as true.  *Id.*

## B.   Congress chose not to regulate the storm water discharges at issue under CWA.

ERF's First Count alleging a violation of the Clean Water Act should be dismissed; it fails to allege a plausible claim for which relief can be granted because Congress, and relevant federal and state environmental authorities, do not require a permit for the types PG&E facilities at issue.  While the Clean Water Act on its face "prohibits the discharge of any pollutant from a point source except as authorized by a NPDES permit,"  33 U.S.C. §§ 1311(a), 1342, *see* Compl. ¶ 48, when dealing with storm water this "general" CWA language is qualified by a need to show that a discharge originated at an "industrial" facility.  *Envt'l Defense Center v. EPA*, 344 F.3d 832, 841-43 (9th Cir. 2003).  Because ERF cannot establish that the PG&E facilities conduct "industrial activity" as defined by the CWA, Count I must fail.

Congress specifically addressed which storm water discharges would be subject to regulation and neither the EPA nor a private litigant, such as ERF, can change which categories of facilities are required to have permits under the CWA.  Section 402(p) of the CWA governs the NPDES permitting program for storm water discharges.  33 U.S.C. § 1342(p); *see, id.* at 841-43 ("Sections 402(p)(2) and 402(p)(3) [of the CWA] mandate NPDES permits for storm water discharges "associated with industrial activity," discharges from large and medium-sized municipal storm sewer systems, and **certain other discharges**."  (emphasis added)).  Section 402(p)(2) enumerates five categories of storm water discharges subject to the permitting

1    program, including, in pertinent part the following:

2                   (B)  A discharge associated with industrial activity.

3                   …

4                   (E) A discharge for which the Administrator [the EPA] or

5            the State, as the case may be determines that the storm water

6            discharge contributes to a violation of a water quality standard or is

7            a significant contributor of pollutants to waters of the United

8            States.

9        33 U.S.C. § 1342(p)(2).

10       Section 402(p) is fatal to ERF's CWA claim.  Section 402(p) gives discretion to EPA to

11   exclude from the permitting process de minimus sources of stormwater pollution.  *See Northwest*

12   *Envtl. Def. Ctr. v. Brown*, Case No. 07-35266, 2010 U.S. App. LEXIS 17129, at *55 (9th Cir.

13   Aug. 17, 2010).  Under Section 402(p), Congress left the majority of storm water discharges

14   from point sources unregulated by the CWA, and directed the EPA to regulate only specified

15   categories of such discharges, including, among others, those "associated with industrial

16   activity," as that term is defined by EPA-promulgated regulations.  *See* 33 U.S.C. § 1342(p)(4);

17   *American Mining Congress v. EPA*, 965 F.2d 759, 765 (9th Cir. 1992)("We find that Congress

18   left it up to EPA to define a 'discharge associated with industrial activity'").  Congress also

19   directed the EPA to identify other sources of storm water discharges that warrant regulation,

20   granting it "discretion to develop a program that distinguishes between those storm water

21   discharges that require regulation and those that do not."  *Conservation Law Found. v.*

22   *Hannaford Bros. Co.*, 327 F.Supp. 2d 325, 330 (D. Vt. 2004) *aff'd* 139 Fed. Appx. 338 (2nd Cir.

23   2005).  In short, "Section 402 cannot be interpreted to require NPDES permits for all storm water

24   discharges notwithstanding regulations or individual determinations issued (or not issued) by

25   EPA or authorized state agencies."  *Id.*

26       As ERF admits, *see* Complaint ¶ 34, California has expressly addressed and adopted a

27   program which complies with federal guidelines for storm water management.  The "authorized

28   state agency" under this program is the California Water Resources Control Board.  "Storm

7

water associated with industrial activity" is defined by it in the General Permit as "the discharge from any conveyance which is used for collecting and conveying storm water and which is directly related to manufacturing, processing, or raw materials storage areas at an industrial plant. The term does not include discharges from facilities or activities excluded from the NPDES program."   (See General Permit, Attachment 4 ¶ 9.)  The same agency defines "industrial activity" for the purposes of the NPDES Program in Attachment 1 to the General Permit which is entitled "<u>FACILITIES COVERED BY THIS GENERAL PERMIT</u>."  (*Id.*) These "industrial activities" include:

(1) "RECYCLING FACILITIES: SICs 5015 and 5093" (Attachment 1 ¶ 6);

(2) "TRANSPORTATION FACILITIES: SICs 40, 41, 42 (except 4221-25), 43, 44, 45, and 5171 which have vehicle maintenance shops, equipment cleaning operations, or airport deicing operations" (*Id.* ¶ 8); and

(10) "MANUFACTURING FACILITIES WHERE INDUSTRIAL MATERIALS, EQUIPMENT, OR ACTIVITIES ARE <u>EXPOSED TO STORM WATER</u>: SICs 20, 21, 22, 23, 2434, 25, 265, 267, 27, 283, 285, 30, 31 (except 311), 323, 34 (except 3441), 35, 36, 37 (except 373), 38, 39, and 4221-4225." (*Id.* ¶ 10.)

There is no dispute that the involved facilities do not fall into any of these categories, under the plain language of the SIC Codes.  ERF admits that "PG&E operates and maintains numerous corporation yards and service centers" for the primary purpose of "provid[ing] service and maintenance on its electric and gas distribution system.  (Compl. ¶ 32*.)  It is undisputed that such energy-related facilities are not listed as facility types requiring permits.[4]  ERF cannot escape this fact through selective pleading.

ERF alleges that the various PG&E facilities discussed in the Complaint have discharges

---

[4]      As ERF notes in Paragraph 25 of the Complaint, the General Permit issued by the California State Water Resources Control Board ("State Board") requires a General Permit for ten classes of facilities.  (*See* General Permit, Attachment 1.)  Importantly, energy-related facilities are included in this list only as to steam electric power generating facilities, discussed in Paragraph 7 of the Attachment, instead of the inclusion of *all* Group 49 SIC Codes being included.  The Attachment's exclusion of these SIC Codes demonstrates an intent by federal and state authorities to exclude the SIC Code-related facilities from regulation.

1    "associated with industrial activity" by virtue of vague allegations that certain "industrial

2    activities" occur at the facilities.  (*See* Compl. ¶¶ 33*, 35, 36.)  ERF's allegation that PG&E's

3    facilities engage in "industrial activity" at the facilities, however, misses the fundamental

4    purpose of SIC Codes, which is to classify businesses by industry types.  All operations which

5    support a business's primary purpose are given the same SIC Code (which is, as alleged in the

6    Complaint, a code within Group 49 for distribution of electricity and gas).

7               **1.     PG&E's Operations Do Not Conduct "Industrial Activities" as the**

8                        **term has been interpreted by regulatory authorities.**

9               In contrast to ERF's pleading, facilities are not assigned SIC codes based on individual

10   tasks, or even tasks which are "routinely conducted."  Instead, the General Permit defines

11   "facility" in a singular manner – "a collection of industrial processes discharging storm water

12   associated with industrial activity within the property or operational unit."  (General Permit at

13   78.)  The individual processes relate to one another, and enable the facility to serve the shared

14   goal of the business of which it is a part.  EPA regulatory materials confirm this understanding:

15               By relying on SIC codes [in establishing the regulatory regime

16               under the CWA], a classification system created to identify

17               industries rather than environmental impacts from these

18               industries['] discharges, some types of storm water discharges that

19               might otherwise be considered 'industrial' were not included in the

20               existing NPDES storm water program.

21   64 Fed. Reg. 68,722, 68,779 (Dec. 8, 1999).

22               Guidance documents issued by EPA support that "industrial activity" is company

23   specific, and determined based on the main function of a facility, and not the sum-total of all

24   ancillary tasks ever conducted at it.  *See, e.g.* EPA Industrial Fact Sheet Series for Activities

25   Covered by EPA's Multi-Sector General Permit ("MSGP")[5] (providing that the industry sectors

26

27   _____
     [5]      Located at http://cfpub1.epa.gov/npdes/stormwater/swsectors.cfm (last checked August

28   24, 2010).  A print-out of this web page is attached as Exhibit 4 to the Showalter Declaration
     filed herewith.

                                                    9

included in a permit are established to "group similar facilities by the nature of industrial activity, type of materials handled, and material management practices employed." The sectors are based on the definition of 'storm water discharge associated with industrial activity' found at 40 CFR § 122.26 (b)(14)(i)-(ix), (xi). Most sectors are described by a facility's Standard Industrial Classification (SIC) code.").[6]

California state agencies have confirmed their understanding that auxiliary facilities supporting major operations receive the SIC Code to be associated with the main establishment, except as otherwise provided in the SIC Code. The application notes to the General Permit emphasize that "Most facilities have only one code . . . ." (*See* General Permit, Attachment 3, Page 3, Section III, Part D.) An internal California State Water Resources Control Board memorandum provides that:

> Auxiliary establishments [such as the service centers are alleged to be] are . . . those primarily engaged in performing management or support services for other establishments of the same enterprise . . . . [T]hey do not receive a different SIC Code than the "operating establishment."[7]

> **a)** **The facilities here have the industrial code related to PG&E's operations because all activities conducted are "auxiliary" to PG&E's larger operations.**

SIC codes identify the "primary" purpose of an establishment. (*See generally* SIC Code Preface.) According to ERF, the purpose of the "corporation yards and service centers" is "to

---

[6]     *See also* 40 C.F.R. Subchapter N (providing effluent guidelines and standards based on industry classification, and not discrete task); Environmental Protection Agency Effluent Limitation Guidelines, Industrial Regulations, located at http://www.epa.gov/guide/industry.html (last visited August 24, 2010). A print-out of this webpage is attached as Exhibit 5 to the Showalter Declaration filed herewith.

[7]     *See* Memorandum dated January 31, 1992 on "Industrial Storm water Discharges – Use of SIC Codes" from Elizabeth Miller Jennings, Senior Staff Counsel, Office of the Chief Counsel, State Water Resources Control Board to Archie Matthews, State of California Division of Water Quality, State of California, at 2 ["Jennings Memorandum"], attached to the Showalter Declaration filed herewith as Exhibit 3.

10

1   provide service and maintenance on its electric and gas distribution system."  (Compl. ¶ 32*.)

2   Thus, the facilities fall into SIC Category 49, the explanatory note for which states:

3           This . . . group includes establishments engaged in the generation,

4           transmission, and/or distribution of electricity or gas or steam.

5           Such establishments may be combinations of any of the above

6           three services and also include other types of services, such as

7           **transportation**, communications, or refrigeration . . . .

8   (SIC Code 49) (emphasis added); SIC Code Manual at 15 (examples (3) – (5).)

9           ERF's laundry list of  activities which occur at the site – *e.g.*, maintaining power trucks,

10  "processing, reclaiming, and wholesale distribution of scrap and waste materials, including . . .

11  wooden utility poles associated with PG&E's electricity and natural gas transmission and

12  distribution systems," and storage of "electrical generators, transformers, cables, and metal

13  pipes . . . and other equipment and parts used in the installation and maintenance of PG&E's

14  utility poles, electric transmission lines, and natural gas distribution systems," (*See* Compl. ¶¶

15  33* – 36) – entirely consists of "auxiliary" activities to PG&E's core business and facility

16  function described in Paragraph 32* of the Complaint.[8]

17          b)       **The involved facilities have PG&E's Corporate SIC Code, and**

18                   **Not One Selected by ERF.**

19          As ERF admits in Paragraph 32 of the Complaint, the purpose of all of the actions

20  occurring at the involved facilities is to support PG&E's provision of electric and gas services.

21  (*See* Compl. ¶ 32*.)  Because ERF cannot allege that PG&E is primarily engaged in the

22  "auxiliary," ERF takes the novel approach of alleging that the facilities "routinely engage" in

23

24  [8]      The preface to the general permit uses the example of a school bus yard owned by a

25  school as an example where the *facility*-specific SIC code (in that case, transportation) would
     differ from that of the larger establishment (in that case, education) even though the school bus
     yard could be said to be "auxiliary" to the larger establishment's function.  (*See* General Permit

26  at 2.)  As the School Bus SIC Code is written (*see* Code 4151), "auxiliary" bus yards have their
     own code, even when attached to a larger educational establishment.  *See also* Jennings

27  Memorandum at 4.  This contrasts to ERF's allegations in the Complaint where the service
     centers are a necessary part of PG&E's larger business of providing electricity and gas to

28  consumers as detailed in SIC Code Group 49.

activities which "are within" other SIC Codes.  (*See, e.g.*, Compl. ¶¶ 33*, 34*, 36.)  This is not how Congress or the EPA define "industrial activity."  As the Ninth Circuit emphasized in *Northwest Envtl. Def. Ctr. v. Brown*, Case No. 07-35266, 2010 U.S. App. LEXIS 17129, at *47-48 (9th Cir. Aug. 17, 2010), industries "'associated with industrial activity' regulation are defined in accordance with Standard Industrial Classifications ('SIC')."  For the reasons further set forth below, ERF cannot demonstrate that its allegations establish that the facilities are covered by these various SIC Codes, and thereby cannot establish that the facilities are required to have an NPDES permit.

In contrast to ERF's allegations, the involved Facilities are neither "transportation facilities" nor "recycling facilities" for the purposes of the General Permit.  ERF argues that, *some* of the activities at *some* of the Locations allegedly fall into SIC codes which include "industrial activities" as the term is defined under EPA regulations, the facilities must be permitted.  This argument is flawed.

**(1)** <u>The Facilities are not "transportation" facilities</u>.

The facilities are not "transportation" facilities.  ERF alleges that PG&E "routinely conducts" activities associated with vehicle and equipment maintenance and repair and are thus governed by SIC codes 4226 and 4241.  (*Id.* at ¶ 33*.)  SIC code 4226 is titled "Special Warehousing and Storage, Not Elsewhere Classified."  The stated definition is "Establishments **primarily engaged** in the warehousing and storage of special products . . . such as . . . automobiles (dead storage only)."   SIC Code 4226 (emphasis added).  ERF has not alleged that PG&E is "primarily engaged" in dead storage of automobiles and thus, this SIC code does not apply.  As the Ninth Circuit emphasized in *Brown*, discrete or ancillary tasks are not "primary" uses – the business purpose of the facility is "primary."  *See Brown*, 2010 U.S. App. LEXIS at 17129, at *48-49.

Similarly, SIC code 4231 is titled "Terminal and Joint Terminal Maintenance Facilities for Motor Freight Transportation."  The stated definition is "Establishments **primarily engaged** in the operation of terminal facilities used by highway-type property carrying vehicles.  Also included are terminals which provide maintenance and service for motor vehicles. . . ."  SIC

1   Code 4231 (emphasis added).  ERF has not alleged that the facilities are in any way terminal

2   facilities, further invalidating the use of this SIC code.  This understanding is confirmed by

3   California regulatory materials.  "[A] fleet of trucks which transports goods . . . locally for a

4   business whose primary business is the sale of those goods, rather than transportation, **would not**

5   **be found in the transportation code**." [9]

6          Accordingly, ERF cannot establish that the facilities should be classified under SIC

7   Codes 4226 or 4231, thus requiring them to have an NPDES permit.

8                        **(2)**     The facilities are not "recycling" facilities**.**

9          ERF's assertion that the facilities are involved in "recycling" so that the General Permit's

10  "recycling" category is triggered is also incorrect.  Paragraph 36 of the Complaint alleges that

11  PG&E "routinely conducts activities at the Facilities that fall within the General Permit's

12  Recycling category of industrial activity," and that these activities "are within SIC Code 5093."

13  (*Id.*)  SIC Code 5093 is titled, "Scrap and Waste Material" and is defined as "Establishments

14  **primarily engaged** in . . . wholesale distribution of scrap and waste materials."  *Id.* (emphasis

15  added).  ERF alleges no facts supporting the contention that PG&E is in the business of

16  "wholesale distribution" of scrap or waste material.  Thus, ERF cannot establish that the facilities

17  should be classified under SIC Code 5093, thus requiring them to have an NPDES permit.

18                       **(3)**     The Facilities are not "light industry" facilities**.**

19         ERF's allegations that the service centers should be classified as "light industry" facilities

20  are similarly wrong.  ERF alleges "on information and belief" that PG&E "routinely conducts"

21  light industrial activities at the facilities and are thus governed by SIC codes 3444, 3452, 3449,

22  3494, 3496, 3498, and 3499.  (Compl. ¶ 34*.)  Each of these SIC codes relates to facilities which

23  are "primarily engaged" in the mechanical or chemical transformation of materials or substances

24  into new products.  *See* SIC Codes 3444, 3452, 3449, 3494, 3496, 3498, and 3499.  ERF neither

25  alleges that PG&E's facilities are primarily engaged in manufacturing nor that any

26  transformation of materials or substances into new products occur at the facilities.

27

28  [9]      *See* Jennings Memorandum at 2 (emphasis added).

13

1    For the reasons demonstrated above and as ERF alleges, the facilities are primarily

2  engaged in PG&E's core business of providing electric and gas service to California consumers.

3  Even accepting ERF's allegations that a limited amount of "light industry" work occurs at the

4  facilities (and are conducted solely for the purpose of supporting PG&E's provision of electric

5  and gas service), ERF has simply not alleged facts demonstrating that any of the "light industry"

6  SIC Codes are applicable.

7                    c)    **Storage of "industrial materials" does not provide a separate**

8                          **basis requiring an NPDES permit.**

9    As discussed above, nowhere in the Complaint does ERF identify a category of facility

10 that requires PG&E to file an NOI for NPDES coverage for its facilities.  Indeed, based upon the

11 description in the Complaint, Paragraphs 30 through 38, PG&E's facilities are clearly not

12 covered in the ten categories listed in the General Permit.  (*See* General Permit, Attachment 1.)

13 The service centers, as SIC Group 49 facilities, are not subject to permitting.

14    ERF's allegations contained in Paragraph 35 of the Complaint, which relate to the storage

15 of "industrial material and equipment" at the Facilities, are relevant only to the extent that the

16 service centers fall into one of *other* the specific categories listed on Attachment 1 to the General

17 Permit.  "Storm Water Associated with Industrial Activity," as used in the General Permit  "does

18 not include discharges from facilities or activities excluded from the NPDES

19 program . . . ."  (*See* General Permit, Attachment 4.)  What this means is simple: if the facilities

20 do not fall into one of the ten categories listed in Attachment 1 to the General Permit, the

21 facilities are not required to have an NPDES permit whether or not "industrial equipment" or

22 "industrial materials" are allegedly present.

23    Accordingly, for the reasons outlined above, ERF's allegations that PG&E is required to

24 have an NPDES permit by virtue of  certain storage or presence of materials at the facilities fails

25 because ERF has not established that the facilities conduct "industrial activities" in the terms of

26 the General Permit.  (*Compare* Compl. ¶¶ 32-37 with General Permit, Attachment 1 ¶¶ 1-10.)

27            **2.    CWA does not require regulation of every storm water discharge.**

28    ERF's Complaint is a backdoor attack on the EPA and its Congressionally-mandated duty

14

to regulate industrial storm water discharges under the CWA.  EPA is tasked by CWA § 402(p), with crafting regulations to cover certain categories of industrial storm water discharges.  *Am. Min. Congress*, 965 F.2d at 764-66.  ERF does not approve of the regulations that EPA has devised, submitted for public comment, and implemented.  ERF is attempting to re-write those regulations to require *every* storm water discharge (as opposed to all pollutant discharges) be covered by a NPDES permit.  That is simply not the state of the law and ERF's attempts to re-write the regulations are an improper attempt to use the CWA's citizen suit provision to collaterally attack a decision delegated to EPA's authority.

The plain language of Section 301 of the CWA provides that "Except in compliance with this section, and sections [including Section 402] of this title, the discharge of any pollutant by any person shall be unlawful."  To support this, in opposition to PG&E's prior motion to dismiss, ERF cited the 1977 decision of *NRDC v. Castle*, 568 F.2d 1369, 1383 (D.C. Cir. 1977), for the proposition that "We find a plain Congressional intent to require [NPDES] permits in any situation of pollution from point sources."  *Id.*  (Doc. No. 26 at 14.)

Post-*Castle*, the CWA was amended by the Water Quality Act ("WQA") in 1987 negating the ruling and its progeny.  The WQA added Section 402(p), which governed the formulation and implementation of regulations aimed at curbing the discharge of pollutants in storm water systems.  Due to the sheer number of point sources involved – over a million – the process was prioritized and problems perceived to be more serious were handled first.  The WQA was, in part, a reaction to decisions like *Castle*, which provided that Congress had intended that NPDES permits be issued in for every possible point source.[10]

---

[10]     *See* Statement of Representative Hammerschmidt regarding WQA:

> The new language will properly reduce the universe of permits required for storm water from millions to thousands without reducing the protection of the environment.  We established a mechanism that will require permits only where necessary – rather than in every instance.  Without these changes, local, State, and Federal officials would be inundated with an enormous permitting workload even though most of the discharges would not have significant environmental impacts.

133 Cong. Rec. H168, H170 (daily ed. Jan. 8, 1987).

ERF's claims in this case would render much of Section 402(p) meaningless. As an initial matter, there are "exceptions" to Section 301(a)'s blanket prohibition of pollutant discharge. For example, 40 C.F.R. § 122.3 contains a list of exceptions, and Section 402 itself contains exceptions for agricultural and oil, gas, and mining-related discharges. *See* 33 U.S.C. § 1342. Thus, the key question in this case, which is discussed in detail above, is whether the facilities listed in Exhibit 1 to ERF's Complaint conduct "industrial activity" as the term is used in CWA Section 402(p) and regulations promulgated under it. The key question is not, as ERF would have it, whether ERF has identified enough statutory "tick-boxes" to shoehorn its dissatisfaction with how EPA and California officials have regulated the facilities into a private civil action intended to compel ERF's preferred result without the participation or expertise of the relevant agencies, i.e. the EPA and the California Water Resources Control Board.

The crux of ERF's first CWA claim is that neither PG&E, EPA, nor any other entity has the ability to waive or otherwise change the underlying requirement to have a valid industrial NPDES permit if they are alleged to do *any* activities which could be classified into one of the categories of activities which require an NPDES permit. In this regard, *Conservation Law Found. v. Hannaford Bros. Construction*, 327 F. Supp. 2d 325, 332 (D. Vt. 2004), *aff'd* 139 Fed. App'x 338 (2d Cir. 2005), a case involving runoff from a large parking lot, is instructive. As here, plaintiffs in *Hannaford* argued that, upon expiration of the permit moratorium, the non-Phase I parking lot discharge became subject once again to the broader discharge prohibition.[11]

In *Hannaford*, the Court acknowledged the five-year gap between the expiration of the moratorium and the implementation of the "Phase II" rules, and held that when the "Phase II

---

[11] Case law discussing Section 402(p) includes various references to "Phase I" and "Phase II" regulations. What these terms relate to is clear: Section 402(p)(2) sets forth five categories of discharges which require an NPDES permit, and also includes a catch-all provision at the end. For these discharges, EPA has issues two batches of regulations. *See* 55 Fed. Reg. 47,990 (Nov. 16, 1990); 64 Fed. Reg. 68,722 (Dec. 8, 1999). The first set, issued in 1990, are referred to as "Phase I" regulations; the second set, issued in 1999, are referred to as "Phase II" regulations. Both sets of these regulations have, in large part, been upheld by the Ninth Circuit. *See generally Env'l Protection Info. Center v. Pac. Lumber Co.*, 301 F. Supp. 2d 1102, 1106-07 (N.D. Cal. 2004). The parties' dispute in this case centers around whether activity such as that conducted at the Locations which is included in neither "Phase I" nor "Phase II" regulations falls into the catch-all found in Section 402(p)(6).

regulations went into effect, a storm water discharge left unregulated fell into compliance with Section 402(p), unless EPA or an authorized state agency later exercised its residual designation authority to require an NPDES permit for that discharge." *Hannaford*, 327 F. Supp. 2d at 332; *see also Rosemere*, 2005 U.S. Dist. LEXIS 43011, at \*16; *Waltman v. King William County Sch. Bd.*, Civ. No. 3:10CV72-HEH, 2010 U.S. Dist. LEXIS 24093, \*11-12 (E.D. Va. Mar. 16, 2010).

As Judge Hudson recently noted in *Waltman***,** "had Congress intended to mandate NPDES permits for all Phase II discharges, it knew how to say so and would have done so." Accordingly, the Clean Water Act "does not require the EPA to regulate all storm water discharges, nor does it require EPA to use NPDES permits to regulate those discharges EPA does not designate for regulation." When the "Phase II regulations went into effect, a storm water discharge left unregulated fell into compliance with § 402(p) unless EPA or an authorized state agency later exercised its residual designation authority to require an NPDES permit for that discharge." *Id.* at \*11-12 (internal citation omitted).

In reality, ERF's claims in this case are essentially better addressed to regulators who have exclusive jurisdiction over disputes about enforcement priorities, and their choice post-WQA to effectuate Congress' intent and regulate in their Phase II regulations those facilities which *regulators* believed posed a real threat to human health and the environment.  As the Ninth Circuit recently noted, "It is within the discretion of EPA to promulgate Phase II regulations requiring, or not requiring, permits for such discharges." *Northwest Envtl. Def. Ctr. v. Brown*, Case No. 07-35266, 2010 U.S. App. LEXIS 17129, at \*45 (9th Cir. Aug. 17, 2010). While it is true that these agencies need not be sued in citizen suits like this one, the real allegations in this case are that no permitting regulations applicable to the facilities have been implemented.  It is clear that "programmatic" challenges to the manner which agencies function are not within the Court's discretion. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990).  Federal courts cannot be made to exercise, on the agency's behalf, the "residual authority" to regulate a polluting discharge despite EPA's rules. *See Hannaford*, 327 F. Supp. 2d at 334 ("Nowhere does the CWA provide the district courts with this authority.").

Rather "residual designation authority is explicitly vested in EPA and authorized state

DEFENDANT'S MOTION TO DISMISS ERF'S THIRD AMENDED COMPLAINT
CASE NO. 3:CV 10-00121 RS

1   agencies."  33 U.S.C. § 1342(p)(2)(E), (p)(6).  The contours of this authority are set out in 40

2   C.F.R. § 122.26 (discussing factors including the size of the discharge, the quantity and nature of

3   pollutants, and the location of the proposed discharge).  District courts lack the institutional

4   capability to determine whether a storm water discharge "contributes to a violation of a water

5   quality standard or is a significant contributor of pollutants to waters of the United States." 33

6   U.S.C.A. § 1342(p)(2)(E).  If this Court were to make such a determination, it would improperly

7   assume control over the administration of NPDES permitting by EPA and California regulators.

8   *See Morris v. City of Santa Cruz*, No. C93-20496, 1994 WL 514032 at *2 (N.D. Cal. Sept. 6,

9   1994) (holding that CWA does not give district courts the authority to exercise residual

10  designation authority pursuant to § 402(p)(2)(E)).

11      The major case ERF could cite for the flawed premise that the facilities must be

12  permitted – *Env'l Protection Info. Center v. Pac. Lumber Co.*, 301 F. Supp. 2d 1102, 1113 n.8

13  (N.D. Cal. 2004) – errs because the Court expresses a willingness to step in and remedy what it

14  believed was an error on the part of EPA, i.e. EPA's explicit choice not to promulgate

15  regulations which related to certain point sources, even though the point sources conducted

16  "industrial activity."[12]  In this sense, *Env'l Protection Information Center* is in error, and should

17  be disregarded because it is clear that EPA, and not the Court, should be given first opportunity

18  to interpret its own regulations.[13]  Accordingly, PG&E's Motion should be granted, ERF's First

19  Count should be dismissed with prejudice.

20

21  [12]     In this regard, *Env'l Protection Info. Center* is at odds with *Hannaford*, *Rosemore*, and
    *Waltman*, the other cases which have evaluated this issue at length.  "[A] district court opinion
22  does not have binding precedential effect," *NASD Dispute Resolution, Inc. v. Jud. Council of
    Cal.*, 488 F.3d 1065, 1069 (9th Cir. 2007); *United States v. Ensminger*, 567 F.3d 587, 591 (9th
    Cir. 2009) (citing *McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) for the proposition
23  that "The general rule is that a district judge's decision neither binds another district judge nor
    binds him, although a judge ought to give great weight to his own prior decisions.").

24

25  [13]     It is well-settled that considerable weight should be accorded to an executive
    department's construction of a statutory scheme it is entrusted to administer.  *United States v.
26  Mead Corp.*, 533 U.S. 218, 227-28 (2001) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def.
    Council*, 467 U.S. 837, 844 (1984)).  The "fair measure" of deference to an agency administering
27  its own statute includes the degree of the agency's care, its consistency in administering the
    statute, formality, and relative expertness, and the persuasiveness of the agency's position.  *Id.* at
    228; *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d
28  1181, 1189 (9th Cir. 2002).  EPA's interpretation of the regulation at issue is logical, reasonable
    and harmonizes the application of both statutes.

1

2

### C.   ERF's Second Claim for Relief Must Be Dismissed Because there Is No Separate Violation of CWA for Failure to Apply for a Permit.

3   Plaintiff's Second Claim for Relief alleges that "[e]very day since . . . November 8, 2004

4   that PG&E has failed to apply for NPDES permit authorization for storm water discharges from

5   the Facilities constitutes  a separate and distinct" violation of 40 C.F.R. § 122.21(a), which ERF

6   contends is actionable under CWA Sections 1311(a) and 1342.  (Compl. ¶¶ 55-59.)

7   For the reasons stated above, no permit was required for the discharges at issue.  Even if

8   the discharges at issue required a permit, the CWA and case law establish that there is no private

9   right of action or separate claim for relief under the CWA for a failure to apply for an NPDES

10   permit.  *See* 33 U.S.C. § 1365(a), (f);  *Service Oil v. EPA*, 590 F.3d 545, 551 (8th Cir. 2009);

11   *Pac. Lumber Co.*, 469 F. Supp. 2d at 826-27.

12   Specifically, the CWA only confers citizens with authority to sue private defendants for

13   violations of "an effluent standard or limitation," and specifies the exclusive statutory and

14   regulatory violations upon which a citizen suit may be based.  33 U.S.C. § 1365(a), (f).  "Federal

15   Courts may not imply a private right of action under any provision of the Clean Water Act not

16   expressly referenced in the statute's citizen suit provision."  *Bd. of Trustees of Painesville Twp.*

17   *v. City of Painesville, Ohio*, 200 F.3d 396, 399 (6th Cir. 1999) (citing *Middlesex County*

18   *Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14-15 (1981)).  Here, ERF bases its

19   claim for relief on 40 C.F.R. § 122.21(a), which it contends sets forth the duty to apply for a

20   permit.  (Compl. ¶ 57.)  That provision is not included among the enumerated statutory or

21   regulatory bases for a citizen suit, nor is it referenced in Sections 1311(a) or 1342, the two

22   provisions of the CWA that ERF contends furnish it with a right to pursue a separate "failure-to-

23   apply" claim.  33 U.S.C. § 1365(f); *id.* at §§ 1311(a), 1342.

24   Consistent with the foregoing, courts have rejected the proposition that failing to apply

25   for and obtain a permit furnishes a separate claim for an unpermitted discharge.  In *Service Oil*,

26   for instance, the court reversed civil penalties assessed by the EPA that were based solely on a

27   "failure to apply for and obtain an NPDES permit."  *Service Oil*, 590 F.3d at 548.  Just as ERF

28   does here, EPA asserted that the defendant's failure to apply for a storm water discharge permit

19

as required by 40 C.F.R. § 122.21 was a separate and distinct violation of the CWA, warranting penalties above and beyond those that could be assessed for discharges alone. *See id*. In reversing the penalties, the court explained that the CWA only authorized the EPA to assess penalties "for violations of specific statutory provisions [enumerated in 33 U.S.C. § 1319(g)(1)[14]] related to the core prohibition against discharging without a permit, or contrary to the terms of a permit. The agency *may not impose those penalties for violations of other Clean Water Act regulatory requirements. . . .*" *Id*. at 550 (emphasis added). The court found nothing in the statute supporting a separate claim for failing to apply for a permit, and further explained that CWA Sections 1311 and 1342—which ERF relies on here—"confirm[] that the . . . authority to assess monetary penalties . . . is limited to unlawful discharges of pollutants." *Id*. at 550-51.[15]

Similarly, in *Pacific Lumber*, private plaintiffs sued for unpermitted discharges under Section 1311(a), but also brought a second set of claims under Section 1342 "for failing to apply for and obtain" coverage under California's general permit for industrial storm water and an NPDES permit. *Pacific Lumber*, 468 F. Supp. 2d at 818. Like ERF here, the plaintiffs in *Pacific Lumber* contended that defendant had committed a separate and "individual violation for each day [defendant] was without a permit," thus inflating the number of violations from thirteen (one for each discharge) to over 8,500. *Id*. Plaintiff sought summary judgment on the Section 1342 claims on the basis that the defendant admitted that it had no NPDES permit during the relevant period. *Id*. at 824-27. The court denied summary judgment, explaining that Section 1342 "does not employ the language of [a] duty [to apply], rather it proscribes a timeline for the filing of applications where appropriate." *Id*. at 826. Section 1342 "confers no independent cause of action" other than for noncompliance with an existing NPDES permit. *Id*. at 827.

---

[14]     Section 1319(g)(1) is a parallel to the citizen-suit provision that authorizes EPA to sue for violations of specifically enumerated provisions of the CWA, including, among others, Sections 1311(a) and 1342. 33 U.S.C. § 1319(g)(1).

[15]     As the court in *Service Oil* explained, by its express terms, Section 1311(a) only prohibits the "discharge" of pollutants, except in compliance with other specified provisions of the CWA, including Section 1342. *See Service Oil*, 590 F.3d at 550-51; 33 U.S.C. § 1311(a). Section 1342 implements the permitting program, but affords no claim for relief "until a permit issues." *Service Oil*, 590 F.3d at 551; *see also Pacific Lumber*, 468 F. Supp. 2d at 827.

1   Thus, ERF's Second Claim for Relief fails as a matter of law and should be dismissed.

2   **D.     ERF's RCRA Claim Must Be Dismissed Because ERF's RCRA Pleadings**

3   **are Insufficient to Withstand a Motion to Dismiss.**

4   ERF's Third Count also should be dismissed for failure to state a claim.  Subtitle C of the

5   Resource Conservation and Recovery Act ("RCRA"), codified at 42 U.S.C. § 6921-6939e,

6   establishes "a 'cradle-to-grave' regulatory structure overseeing the safe treatment, storage, and

7   disposal of hazardous waste."  *United Technologies Corp. v. EPA*, 821 F.2d 714, 716 (D.C. Cir.

8   1987).  RCRA was intended by Congress to "minimize[e] the generation of hazardous waste and

9   the land disposal of hazardous waste" by "encouraging process substitution, materials recovery,

10  [and] properly conducted recycling and reuse . . . . "  42 U.S.C. § 6902(a)(6).  Indeed, the

11  essential purpose of the statute is to regulate discarded waste that has "'served [its] intended

12  purpose and [is] no longer wanted by the consumer.'"  *U.S. v. ILCO, Inc.*, 996 F.2d 1126, 1132

13  (11th Cir. 1993) (quoting H.R. Rep. No. 1491, 94th Cong. 2nd Sess. 4 (1976) *reprinted in* 1976

14  U.S.C.C.A.N. 6238, 6240); *see also  Safe Air for Everyone v. Meyer LLC*, 373 F.3d 1035, 1041

15  (9th Cir. 2004) (stating that Congress enacted RCRA to stem "'the 'rising tide' in scrap,

16  discarded, and waste materials'" and "'to provide for proper and economical solid waste disposal

17  practices.'") (quoting *Am. Mining Cong. v. EPA*, 824 F.2d 1177, 1179 (D.C. Cir. 1987)).

18  ERF's RCRA claim must fail.  To prevail under RCRA's citizen-suit provision, ERF

19  must prove that a solid waste[16] "may present an imminent and substantial endangerment to health

20  or the environment."  *See* 42 U.S.C. § 6972(a)(1)(B).  ERF's three paragraphs containing RCRA

21  allegations are nothing more than bare-bones recitations of the applicable law and are, by

22  themselves, insufficient to withstand a motion to dismiss.  To survive a motion to dismiss, a

23  party must provide more than "labels and conclusions, and a formulaic recitation of the elements

24  of a cause of action" and provide the grounds of its entitlement to relief.  *Bell Atlantic v.*

25  *Twombly*, 550 U.S. 544, 555 (2007).  Thus, "[w]hile legal conclusions can provide the

26  framework of a complaint, they must be supported by factual allegations."  *Ashcroft v. Iqbal*, 129

27

---

28  [16]     ERF does not allege that the materials at issue are "hazardous waste."  Therefore, the
case turns on whether the materials are "solid waste" under the meaning of RCRA.

1  S. Ct. 1937, 1950 (2009).  Those factual allegations, "accepted as true," must "'state a claim to

2  relief that is plausible on its face.'" *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 570)).

3  Regarding RCRA, the Third Amended Complaint only provides a "formulaic recitation

4  of a [RCRA] cause of action."  To wit, while ERF's Complaint lists a host of types of materials,

5  *see* Compl. ¶¶ 35 ("PG&E . . . stores a wide range of industrial materials and equipment at the

6  Facilities.  This includes new and used wooden utility poles, piles of aggregates . . . piles of

7  contaminated soil awaiting disposal, electrical generators, transformers, cables, metal pipes,

8  plastic pipes . . . . ") and 39 (discussing various industrial substances), the Complaint never sets

9  forth which among these could constitute "solid waste."  Additionally, of these, the Complaint

10  never indicates which "materials" were "discarded" or what "substantial and imminent harm"

11  they pose to ERF.

12  RCRA defines "solid waste" to mean "[a]ny garbage, refuse, sludge from a waste

13  treatment plant, water supply treatment plant, or air pollution control facility and other discarded

14  material, including solid, liquid, semisolid, or contained gaseous material resulting from

15  industrial, commercial, mining, and agricultural operations . . . ." 42 U.S.C. § 6903(27).  It is

16  settled law that useful products "put to [their] ordinary, intended use," are not "solid waste," as

17  defined by RCRA.  *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 208-09 (2d Cir. 2009)

18  ("'a military munition is not a solid waste when . . . [used] for its intended purpose'") (quoting

19  40 C.F.R. § 266.202(a)); *see Safe Air*, 373 F.3d at 1044-45 (beneficial agricultural residue not a

20  solid waste); 40 C.F.R. § 261.2(c)(1)(B)(ii) ("commercial chemical products . . . are not solid

21  wastes if they are applied to the land and that is their ordinary manner of use").  The potential

22  items or substances at issue – wooden utility poles, piles of aggregate, electrical generators,

23  transformers, cables, metal and plastic pipes, etc. – are used by PG&E in support of its business.

24  Thus, listing them in a scattershot manner throughout this Complaint amounts to a legal "so

25  what" and is insufficient to set forth a valid RCRA cause of action.[17]

26  _____

27  [17]  ERF's Third Amended Complaint does reference "piles of contaminated soil awaiting disposal."  (*See* Compl. ¶ 35.)  RCRA includes a statutory notice provision, and the April 9, 2010

28  Notice Letter provides no notice that ERF is intending to pursue a RCRA cause of action based on solid waste in the form of "piles of contaminated soil awaiting disposal."  At the pleading stage, no claim outside of those listed in the Notice Letter can be considered.  *See, e.g.,*

1    Similarly, ERF never alleges which among this field of "solid wastes" are alleged to have

2    ever been "discarded."  While RCRA itself does not define the term "discarded material," the

3    Ninth Circuit has previously used a dictionary definition to define the term "discard" as meaning

4    "cast aside; reject; abandon; give up."  *Safe Air*, 373 F.3d at 1041 (quoting 1 The New Shorter

5    Oxford English Dictionary 684 (4th ed. 1993)).  To provide sufficient notice for this claim to

6    proceed, ERF needs to have alleged how some "solid waste" was "discarded" in such a manner

7    that PG&E has taken some conscious action to put them into the waste stream.  That it has not

8    provides a second reason why this claim must fail.  RCRA simply does not govern ordinary

9    wear-and-tear of useful products.  *See, e.g., Sycamore Indus. Park Assoc. v. Ericsson Inc.*, 546

10   F.3d  847, 853-54 (7th Cir. 2008) ("The vast majority of courts that have considered this issue

11   read RCRA to require affirmative action rather than merely passive conduct.").

12   Finally, ERF never pleads what "imminent and substantial endangerment" allegedly

13   flows from PG&E's actions or inactions.  "Imminency" "does not require a showing that actual

14   harm will occur immediately," but does require a demonstration that "the risk of threatened harm

15   is present."  *See Burlington Northern & Santa Fe Ry v. Grant*, 505 F.3d 1013, 1020 (10th Cir.

16   2007).  Similarly, while the word "substantial" is not defined in RCRA or its legislative history,

17   relevant case law under RCRA has held that an endangerment is "substantial" under RCRA

18   when it is "serious."  *Interfaith Community Organization v. Honeywell Int'l, Inc.*, 399 F.3d 248,

19   258 (3d Cir. 2005); *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1015 (11th Cir. 2004);

20   *Cox v. City of Dallas, Tex.*, 256 F.3d 281, 300 (5th Cir. 2001).  Relief is not available "if the risk

21   of harm is remote in time, completely speculative in nature, or *de minimis* in degree."  *Me.*

22   *People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 289 (1st Cir. 2006); *see also Cal. Dep't of*

23   *Toxic Substances & Control v. Interstate Non-Ferrous Corp.*, 298 F. Supp. 2d 930, 980 (E.D.

24   Cal. 2003).  ERF never alleges to whom the RCRA-related risk is "imminent"  or "substantial."

25   To wit, nowhere in the Third Amended Complaint does ERF allege that its Members visit

26   PG&E's facilities.  ERF's "off-site" statements similarly show no plausible basis for an

27

28   *Hallstrom v. Tillamook County*, 493 U.S. 20, 31 (1989).

1    "imminent and substantial" RCRA claim.[18]   At best, ERF alleges a *de minimis* violation which is

2    not actionable under 42 U.S.C. § 6972(a)(1)(B).

3            ERF's RCRA count entirely consists of conclusory assertions which are entitled to no

4    assumption of truth.  In *Iqbal*, the Court indicated that "a court considering a motion to dismiss

5    can choose to begin by identifying pleadings that, because they are no more than conclusions, are

6    not entitled to the assumption of truth.  While legal conclusions can provide the framework of a

7    complaint, they must be supported by factual allegations."  *Iqbal*, 129 S. Ct. at 1950.  Because

8    ERF has utterly failed to plead sufficient facts regarding virtually every required element of its

9    RCRA claim, the claim should be dismissed.

10   **V.        <u>CONCLUSION</u>**

11           WHEREFORE, PG&E requests this Court enter PG&E's Proposed Order dismiss the

12   Complaint with prejudice for lack of subject matter jurisdiction and for failure to state a claim for

13   any and all of the reasons stated herein.

---

18       ERF's Notice Letter contains a limited discussion that "wood chips" or "sawdust" from
chemically poles might be "tracked off of the facilities by vehicles" or "in storm water."  (*See*
Doc. No. 54-2 at 13.).  Even assuming that these "wood chips" or "sawdust" are the "solid
wastes" to which the Third Amended Complaint is referring, neither is actionable as a violation
of RCRA.  To the extent ERF's RCRA allegations are based on utility pole-related sawdust
being carried from the facilities in storm water, their claim is under CWA, not RCRA  Similarly,
the U.S. Department of Transportation ("USDOT") and California Department of Toxic
Substances and Control ("DTSC") both heavily regulate the transfer of waste materials from
facilities such as those listed in Exhibit 1 to the Complaint.  Under federal law, 49 U.S.C. §
5101-*ff*, not RCRA, is designed "to protect against the risks to life, property and the
environment that are inherent in the transportation" of waste materials, including those causing
"imminent hazards."  *See* 49 U.S.C. § 5122 (permitting the Secretary of the DOT to bring a civil
action to mitigate potential "imminent hazards" posed by the transportation of waste to human
health and the environment).

Dated:  August 25, 2010

**FOLEY & LARDNER LLP**
S. WAYNE ROSENBAUM
RUSSELL B. SELMAN
BRADLEY S. ROCHLEN
J. MICHAEL SHOWALTER

By:  /s/ Bradley S. Rochlen
          Attorneys for Defendant Pacific Gas &
          Electric Company

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANT'S MOTION TO DISMISS ERF'S THIRD AMENDED COMPLAINT
CASE NO. 3:CV 10-00121 RS

S. WAYNE ROSENBAUM CA Bar No. 182456
    srosenbaum@foley.com
**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 2100
SAN DIEGO, CA 92101-3542
TELEPHONE:    619.234.6655
FACSIMILE:    619.234.3510

RUSSELL B. SELMAN IL Bar # 6195396, *pro hoc vice*
    rselman@foley.com
BRADLEY S. ROCHLEN IL Bar # 6244780, *pro hoc vice*
    brochlen@foley.com
J. MICHAEL SHOWALTER IL Bar # 6301455, *pro hoc vice*
    mshowalter@foley.com
**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
321 NORTH CLARK STREET, SUITE 2800
CHICAGO, IL 60654-5313
TELEPHONE:    312.832.4500
FACSIMILE:    312.832.4700

Attorneys for Defendant Pacific Gas & Electric Company

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ecological Rights Foundation | Case No:  CV 10-00121 RS |
| Plaintiff, | **CERTIFICATE OF SERVICE** |
| v. | Judge:       Richard Seeborg |
| Pacific Gas & Electric Company | Date Complaint Filed:  August 23, 2010 |
| Defendant. | |

I hereby certify that on August 25, 2010, I served the following documents:

      1.    DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED

           COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION AND

           FAILURE TO STATE A CLAIM AND PROPOSED ORDER; and

      2.    DECLARATION OF J. MICHAEL SHOWALTER IN SUPPORT OF PG&E'S

           MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT.

On all counsel of record by way of filing them with the Court's CM/ECF system.

Dated:  August 25, 2010

**FOLEY & LARDNER LLP**
S. WAYNE ROSENBAUM
RUSSELL B. SELMAN
BRADLEY S. ROCHLEN
J. MICHAEL SHOWALTER

By:  /s/ J. Michael Showalter
         Attorneys for Defendant Pacific Gas &
         Electric Company

CERTIFICATE OF SERVICE
CASE NO. CV 10-00121 RS