**\*\*E-filed 2/4/11\*\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ECOLOGICAL RIGHTS FOUNDATION,

Plaintiff,

v.

PACIFIC GAS AND ELECTRIC COMPANY

Defendant.

No. C 10-0121 RS

**ORDER RE MOTION TO DISMISS**

## I. INTRODUCTION

Pacific Gas and Electric Company ("PG&E") operates 31 "corporation yards and service centers" in Northern California, at which it allegedly stores vehicles, equipment, materials and supplies, and carries out various activities in support of its primary business as a provider of electricity and natural gas. Plaintiff Ecological Rights Foundation ("ERF") contends that activities conducted at these facilities, and the materials stored there, contaminate storm water that is discharged from the sites. ERF brings suit under the Clean Water Act to force PG&E to obtain permits for these facilities pursuant to the National Pollution Discharge Elimination System ("NPDES"), which PG&E admittedly has never done.

PG&E moves to dismiss, contending that the facilities do not require permits under the Clean Water Act and the NPDES. Because PG&E has not established as a matter of law that it is not obligated to obtain the permits, that aspect of its motion to dismiss will be denied. ERF's additional count under the Resource Conservation and Recovery Act ("RCRA"), however, will be dismissed with leave to amend, because the complaint as currently pleaded fails to state a sufficient factual basis for the claim.

## II.  LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a claim may be dismissed because of a "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. *Marceau v. Blackfeet Hous. Auth.*, 540 F.3d 916, 919 (9th Cir. 2008); *Vignolo v. Miller*, 120 F.3d 1075, 1077 (9th Cir. 1999). The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1056-57 (9th Cir. 2008); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Although they may provide the framework of a complaint, legal conclusions are not accepted as true and "[t]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009); see also *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).[1]

---

[1] Citing a maxim that originated in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), ERF argues that its complaint is not subject to dismissal "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief." In *Twombly*, however, the Supreme Court concluded that this "famous observation" from *Conley*, "has earned its retirement" and is "best forgotten." *Twombly*, 550 U.S. at 563.

2

## III. DISCUSSION

A. <u>First Claim for Relief—Clean Water Act §301(a)—discharging without permits</u>

1. *The Regulatory Scheme*

Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a), generally prohibits the discharge of pollutants from any "point source" into waterways without an NPDES permit.[2] PG&E does not dispute, at least for purposes of this motion, that the facilities at issue comprise point sources. In section 402(p) of the Clean Water Act, Congress provided that the permitting process for storm water discharges would be implemented in phases over time. *See generally*, *Environmental Defense Center, Inc. v. U.S. E.P.A.*, 344 F.3d 832, 841-843 (9th Cir. 2003) (describing history of EPA's implementation of "Phase I" and "Phase II" regulations under section 402(p)). While the parties dispute whether categories of point sources that are not expressly addressed in section 402(p) and its implementing regulations are thereby exempt from the permit requirements, that question need not be addressed here because it is incontrovertible that permits *are* required under section 402(p) for any "discharge associated with industrial activity." *See* section 402(p)(2)(A), (3)(A), and (4)(A); *see also*, *Natural Resources Defense Council, Inc. v. U.S. E.P.A.*, 966 F.2d 1292 (9th Cir. 1992) (reviewing EPA's regulations applicable to "industrial activity" sources) ("*NRDC*"). PG&E, as addressed more fully below, has failed to show that its service yards fall outside "industrial activity" under EPA regulations.[3]

Section 402(p) does not define the phrase "discharge associated with industrial activity" or the term "industrial activity." In invalidating an attempt by the EPA to exclude "light industry"

---

[2] A point source is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

[3] If at some future point in the proceedings PG&E were to establish that EPA regulations do *not* in fact require a permit for its service yards, then and only then would it become necessary to decide ERFs arguments that the EPA lacks the authority to exempt point sources such as these from the permit requirements, and that any failure by the EPA to implement appropriate regulations does not otherwise absolve persons from complying with Section 301(a).

from the permitting requirements, the Ninth Circuit characterized the language as "very broad." *NRDC*, 966 F.2d at 1304.  EPA's current implementing regulation provides a detailed definition of "discharge associated with industrial activity" that describes discharges from an "industrial plant" or "industrial facility."  40 C.F.R. § 122.26(b)(14).  The regulation then provides that, "facilities are considered to be engaging in 'industrial activity'" if they are "classified as" any one of a number of specified "Standard Industrial Classifications."  Accordingly, the primary question here is whether PG&E's 31 "corporation yards and service centers" should be "classified as" any of the Standard Industrial Classifications listed in 40 C.F.R. § 122.26(b)(14).

### 2. *Standard Industrial Classification Codes*

The Standard Industrial Classification Manual (1987) is published by the Office of Management and Budget.  Its introduction explains that:

> The Standard Industrial Classification (SIC) was developed for use in the classifications of establishments by type of activity in which they are engaged; for purposes of facilitating the collection, tabulation, presentation, and analysis of data relating to establishments; and for promoting uniformity and comparability in the presentation of statistical data collected by various agencies of the United States Government, State agencies, trade associations and private research organizations.

The Manual defines "establishment" as "an economic unit, generally at a single physical location, where business is conducted or where services are performed."  The term "establishment" is distinguished from "enterprise (company)," which "may consist of one or more establishments."  The Manual further explains that "auxiliaries" are establishments that primarily provide management or support services for other establishments that are part of the same enterprise.  Auxiliaries that are not treated as separate establishments are assigned SIC codes, "on the basis of the primary activity of the operating establishments they serve."

The Manual suggests that where an auxiliary "is located physically separate from the establishment or establishment served" it is to be "treated as a separate establishment."  Elsewhere, however, the Manual lists examples of auxiliary establishments such as warehouses, automotive repair and storage facilities that likely are quite often located at a geographic distance from the

4

1  establishments they serve. The Manual also provides for the sub-classification of auxiliaries by an
2  additional one digit code that follows that of the primary establishment. Accordingly, it is not
3  entirely clear from the Manual when geographically separate facilities that provide support services
4  to other establishments within the same enterprise should be classified according to the primary
5  activities taking place at those facilities and when they should not.[4]

### 3. *Classification of the PG&E facilities in dispute*

The parties are in agreement that PG&E's primary business is to provide electricity and natural gas to business, private, and governmental customers. Viewed as an "enterprise" under the SIC, there is no dispute that PG&E is classified in Group 49, which "includes establishments engaged in the generation, transmission, and/or distribution of electricity or gas or steam," SIC Code 49, explanatory note. ERF acknowledges that Group 49 codes are not among those listed in 40 C.F.R. § 122.26(b)(14), and that therefore, if Group 49 applies to the 31 sites in issue, they do not qualify as facilities that are "considered to be engaging in 'industrial activity'" under the regulation.

ERF argues, however, that the activities carried out at the 31 sites plainly are "industrial" in nature, and it identifies numerous other SIC codes, which *are* among those listed in the regulation, that it contends can and should be applied. While PG&E strenuously argues it would be incorrect to assign separate classifications to its service facilities, for purpose of this motion it does not seriously dispute that at least some codes listed in the regulation might apply were each of the 31 sites to be treated as a separate establishment under the SIC.[5] Accordingly, the question boils down to whether as a matter of law the sites must be classified only under the Group 49 code applicable to PG&E's

---

[4] The considerations relevant to deciding whether an auxiliary should be treated separately or not would seem to be highly dependent on the purposes for which the classification is being undertaken. The Manual presents the SIC as a system designed for statistical data collection and analysis by governmental and private entities largely in the economic context, As such, even if the Manual set out the rules more clearly, they might not be well-suited for determining whether or not a particular facility is engaged in "industrial activity" for purposes of the Clean Water Act.

[5] PG&E suggests that the complaint's allegations regarding the activities that take place on the sites are somewhat conclusory, but the facts alleged are sufficient to preclude dismissal on that basis.

enterprise as a whole, or whether there is at least a legal and/or factual possibility that one or more other codes may apply.

At this juncture, PG&E has failed to establish that the facilities can be properly classified only under Group 49. PG&E asserts that section 402(p) of the Clean Water Act is fatal to ERF's claim, but as noted above, that section in fact requires permits for any "discharge associated with industrial activity," and nothing in the section itself would exempt "industrial activity" at a particular site, merely because it is owned and operated by an entity that is engaged in some larger business beyond "industrial activity" *per se.* Furthermore, the implementing regulation, 40 C.F.R. § 122.26(b)(14), provides that plants or facilities "classified as" particular SIC codes are "considered to be engaging in 'industrial activity,'" but it nowhere sets out any rules governing when, if ever, a particular plant or facility must be assigned the code of a larger entity rather than being given its own. As discussed, the SIC Manual itself expressly states that geographically separate sites are to be treated as distinct establishments, although it also contains implications to the contrary.[6] Thus, even to the extent that the regulation could be deemed to have incorporated the rules in the SIC Manual by reference, neither Section 402(p) nor 40 C.F.R. § 122.26(b)(14), plainly and unambiguously requires that the 31 PG&E facilities at issue be classified under SIC Group 49.

While ERF likely will not quarrel with this conclusion, its contention that the EPA lacks authority to exempt point sources like PG&E's service yards from the permit requirements bears brief discussion, because the issue may come up again in further proceedings. In opposing this motion, ERF relied heavily on *Northwest Environmental Defense Center v. Brown*, 617 F.3d 1176 (9th Cir. 2010) and other cases to similar effect. In *Brown*, the court held that the EPA could not lawfully adopt a regulation that purported to exempt a particular category of point sources from the permitting requirement, where there was no real dispute that it otherwise would meet the statutory

---

[6] PG&E also relies on materials such as an internal state agency memorandum and EPA commentary to argue that the regulatory authorities recognize that EPA's decision to invoke the SIC in 40 C.F.R. § 122.26(b)(14) has the effect of leaving some facilities outside of the permit requirements. None of those materials, of course, have the force of law such that they independently require PG&E's service yards to be classified as Group 49, nor do they otherwise compel a conclusion as a matter of law that the statute or regulation requires that result.

6

definition of point source. 617 F.3d at 1191. At this point, ERF's reliance on *Brown* and similar cases is, at a minimum, premature. Although PG&E has argued that neither the statute nor the regulation require it to apply for permits for its service yards, EPA has not promulgated any regulation purporting to exempt them from the permit requirement. Rather, it appears that the EPA has simply not provided clear regulatory guidance as to whether or not sites such as the service yards should be included within the "industrial plants" or "industrial facilities" that it *has* concluded should be "considered to be engaging in 'industrial activity.'" Nevertheless, to the extent that 40 C.F.R. § 122.26(b)(14) arguably is susceptible to an interpretation that it exempts certain facilities that plainly comprise point source "discharge[s] associated with industrial activity," *Brown* would stand as a caution against adopting such an interpretation.[7]

Because PG&E has failed to show that its service yards must be classified as Group 49 by virtue of the provisions of either the Clean Water Act or its implementing regulations, its motion to dismiss ERF's first claim for relief must be denied. This conclusion does not necessarily preclude the Court from reaching a contrary determination at some future stage of the proceeding, either because of a more developed factual record, or on a different showing as to the legal principles applicable to the classification scheme, or both.

B.  <u>Second Claim for Relief—Clean Water Act §402(p)—failure to apply for permits</u>

ERF's second claim for relief asserts that PG&E's failure to apply for permits for the sites at issue constitutes a "separate and distinct" violation of the Clean Water Act and regulations thereunder each day. PG&E contends no such separate claim or private right of action is cognizable.

ERF acknowledges that the second claim for relief is not viable should PG&E prevail in its contention that the first claim fails because its service yards need not have NPDES permits. Additionally, should ERF prevail on its first claim for relief, it does not presently appear that it

---

[7] In analyzing whether the EPA actually exceeded its authority, however, it would also be relevant that to a significant degree, "Congress left it up to EPA to define a 'discharge associated with industrial activity.'" *American Mining Congress v. EPA*, 965 F.2d 759, 765 (9th Cir. 1992).

would be entitled to any different or additional relief under its second claim.  Thus, the second claim for relief likely would be relevant only if ERF succeeded in showing that PG&E was obligated to obtain permits, but that storm water discharges from its facilities contained no pollutants, an outcome contrary to ERF's allegations, and which PG&E does not suggest may occur.  Nevertheless, the claim will not be dismissed at this juncture.  *See Environmental Protection Information Center v. Pacific Lumber Co.*, 301 F.Supp.2d 1102, 1110 n.6 (N.D. Cal. 1992) (rejecting similar motion to dismiss, noting that the two claims "retain distinct legal viability.").

### C. Third Claim for Relief—RCRA

ERF's final claim for relief asserts a violation of RCRA, 42 U.S.C. § 6972(a)(1)(B), alleging that PG&E is a generator of solid waste within the meaning of that statute.   PG&E moves to dismiss, correctly arguing that the complaint itself contains virtually no factual allegations to support the claim, and therefore runs afoul of the rule that "[t]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, *supra*, at 1949-50.

In opposition, ERF argues that the supporting facts can be found in its notice of intent to sue letter, which it attached to the complaint and incorporated by reference.  While ERF may be correct that the contents of the letter are thereby technically part of the complaint, the result is a pleading that cannot be meaningfully evaluated to determine if the factual allegations are sufficient to state a claim.  Additionally, as characterized in ERF's opposition, its RCRA claim potentially presents a standing issue that cannot be resolved—either in ERF's favor or against it—without a more clear delineation of the contours of the alleged RCRA violation.  Accordingly, the third claim for relief will be dismissed.

## IV. CONCLUSION

The motion to dismiss is denied as to the first two claims for relief, and granted as to the third claim for relief, with leave to amend. Any amended complaint shall be filed within 20 days of the date of this order. In view of the fact that the Clean Water Act claims are going forward regardless of the ultimate disposition of the RCRA claim, the parties shall appear for a further Case Management Conference on March 10, 2011, with a supplemental joint Case Management Conference Statement to be filed one week in advance thereof. The existing limits on discovery shall remain in effect pending further order at or after the Case Management Conference.

IT IS SO ORDERED.

Dated:  2/4/11

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE