ROCKY N. UNRUH, CA Bar #84049
 runruh@schiffhardin.com
**SCHIFF HARDIN LLP**
ATTORNEYS AT LAW
ONE MARKET
SPEAR STREET TOWER, THIRTY-SECOND FLOOR
SAN FRANCISCO, CA 94105
TELEPHONE:       415.901.8700
FACSIMILE:       415.901.8701

RUSSELL B. SELMAN IL Bar # 6195396, *pro hoc vice*
 rselman@schiffhardin.com
BRADLEY S. ROCHLEN IL Bar # 6244780, *pro hoc vice*
 brochlen@schiffhardin.com
J. MICHAEL SHOWALTER IL Bar #6301455, *pro hoc vice*
 mshowalter@schiffhardin.com
**SCHIFF HARDIN LLP**
ATTORNEYS AT LAW
233 S. WACKER DR., SUITE 6600
CHICAGO, IL 60606
TELEPHONE:       312.258.5500
FACSIMILE:       312.258.5600

*Attorneys for Pacific Gas and Electric Company*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ecological Rights Foundation,<br><br>Plaintiff,<br><br>v.<br><br>Pacific Gas and Electric Company,<br><br>Defendant. | Case No.:  3:CV 10-00121 RS<br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS I AND II**<br><br>Judge:       Judge Richard G. Seeborg<br>Date Complaint Filed:  February 9, 2011<br><br>Hearing Date: Nov. 8, 2012<br>Time:            1:30 p.m. |

**To:**    Christopher A. Sproul
Environmental Advocates
5135 Anza Street
San Francisco, CA 94121
E-mail: csproul@enviroadvocates.com

William Verick
Klamath Environmental Law Center
424 First Street
Eureka, CA 95501
E-mail: wverick@igc.org

# TABLE OF CONTENTS

I.    STATEMENT OF THE MOTION ................................................................................ 1

II.   BACKGROUND AND PROCEDURAL HISTORY ........................................................ 3

      A.   ERF's Allegations ................................................................................ 3

      B.   Facts as Developed in Discovery .......................................................... 4

           1.   The Facilities ................................................................................ 4

           2.   SIC Codes ..................................................................................... 5

           3.   General Industrial Stormwater Permit .......................................... 7

      C.   Legal Posture ....................................................................................... 8

III.  ANALYSIS ................................................................................................................. 8

      A.   PG&E is a "Service" Utility .................................................................. 8

      B.   Standard of review .............................................................................. 9

      C.   CWA Citizen Suits versus CWA Regulatory Challenges ..................... 10

      D.   Stormwater Discharges are Regulated Exclusively Under the CWA and its
           Accompanying Regulations ................................................................ 11

           1.   Step 1: Is the discharge potentially listed in CWA Section 402(p)? ......... 15

           2.   Step 2: Is a discharge "industrial" and as defined in 40 C.F.R. §
                122.26(b)(14) and the relevant SIC Codes? ............................... 16

           3.   Step 3:  The SIC Code applicable to PG&E service centers is not
                industrial ..................................................................................... 20

           4.   Step 4: SIC Codes proposed by ERF are not applicable to the
                Facilities ...................................................................................... 21

      E.   ERF's Duty to Apply Claim Should be Dismissed ............................... 28

IV.   CONCLUSION ......................................................................................................... 30

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>CASES</u>

*Am. Mining Cong. v. EPA*,
    965 F.2d 759 (9th Cir. 1992)........................................................................................ passim

*Bd. of Trustees of Painesville Tp. v. City of Painesville, Ohio*,
    200 F.3d 396 (6th Cir. 1999)............................................................................................. 29

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................................................ 9

*Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*,
    467 U.S. 837 (1984)..................................................................................................... 16, 17

*Conservation Law Found. v. Hannaford Bros. Co.*,
    327 F. Supp. 2d 325 (D. Vt., 2004) *aff'd* 139 Fed. Appx. 338 (2nd Cir. 2005) .............. 13

*Decker v. Nw. Env. Def. Ctr.*,
    Sup. Ct. Case No. 11-338 (June 25, 2012)....................................................................... 14

*Del. Valley Citizens Council for Clean Air v. Davis*,
    932 F.2d 256 (3d Cir. 1991).............................................................................................. 10

*Environmental Defense Ctr. v. EPA*,
    344 F.3d 832, 843 (9th Cir. 2003)..................................................................................... 11

*Environmental Protection Information Center v. Pacific Lumber Co.*,
    469 F. Supp. 2d 803 (N.D. Cal. 2007) ........................................................................ 28, 30

*Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*,
    301 F. Supp. 2d 1102 (N.D. Cal. 2004) ...................................................................... 10, 30

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*,
    484 U.S. 49 (1987)............................................................................................................ 11

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990)........................................................................................................... 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................................................ 9

*Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
    453 U.S. 1 (1981)............................................................................................................. 29

*National Pork Producers Council v. EPA*,
    635 F.3d 738 (5th Cir. 2011)............................................................................................ 28

*Natural Resources Def. Council v. EPA*,
    673 F.2d 400 (D.C. Cir. 1982) ......................................................................................... 10

*NRDC v. Costle*,
    568 F.2d 1369 (D.C. Cir. 1977) ................................................................................. 10, 12

*NRDC v. EPA,*
    966 F.2d 1292 (9th Cir. 1992) ........................................................................... 16

*Nw. Env. Def. Ctr. v. Brown,*
    640 F.3d 1063 (9th Cir. 2011) ................................................................... passim

*Nw. Envtl. Advocates v. EPA,*
    537 F.3d 1006 (9th Cir. 2008) .......................................................................... 11

*Our Children's Earth Foundation v. U.S. EPA,*
    527 F.3d 842 (9th Cir. 2007) ........................................................................... 11

*Rainsong Co. v. Fed. Energy Regulatory Comm'n,*
    151 F.3d 1231 (9th Cir. 1998) .......................................................................... 28

*Scott v. Hammond,*
    741 F.2d 992 (7th Cir. 1984) ........................................................................... 10

*Service Oil v. EPA,*
    590 F.3d 545 (8th Cir. 2009) ............................................................ 28, 29, 30

*United States Steel Corp. v. Train,*
    556 F.2d 822 (7th Cir. 1977) ........................................................................... 10

*Waterkeeper Alliance, Inc. v. EPA,*
    399 F.3d 486 (2nd Cir. 2005) .......................................................................... 28

STATUTES

5 U.S.C. § 706 ................................................................................................................... 10

33 U.S.C. § 1251 ................................................................................................................. 1

33 U.S.C. § 1311 ............................................................................................ 11, 12, 29

33 U.S.C. § 1319 ............................................................................................................... 29

33 U.S.C. § 1342 ..................................................................................................... passim

33 U.S.C. § 1365 ..................................................................................... 4, 28, 29

33 U.S.C. § 1369 ........................................................................................................ 10, 11

Pub. L. No. 100-4, 101 Stat. 7 (1987) ........................................................................ 15

REGULATIONS

40 C.F.R. § 52.21 ......................................................................................................... 5-6

40 C.F.R. § 122 ............................................................................................................... 15

40 C.F.R. § 122.21 ..................................................................................................... 4, 29

40 C.F.R. § 122.26 ................................................................................................. passim

40 C.F.R. Subchapter N ................................................................................................. 18

iii

45 Fed. Reg. 52676 ............................................................................................. 6

53 Fed. Reg. 49432 ............................................................................................. 7

55 Fed. Reg. 47990 .......................................................................... 7, 14, 15, 17

64 Fed. Reg. 68722 ........................................................................................... 16

75 Fed. Reg. 59622 ............................................................................................. 5

REGULATORY GUIDANCE MATERIALS

EPA Industrial Fact Sheet Series for Activities
    Covered by EPA's Multi-Sector General Permit ("MSGP") ........................................... 17

Memorandum dated October 14, 1992 by Thomas Mumley of the California Regional
    Water Quality Board, San Francisco Bay Region ........................................ 21, 22

Memorandum from Elizabeth Miller Jennings to Archie Matthews of the California State
    Water Resources Control Board dated January 31, 1992 .................................... 19

Memorandum from Elizabeth Miller Jennings to Archie Matthews of the Division of
    Water Quality, State Water Resources Control Board, dated June 28, 1993 ................... 26

Memorandum from Elizabeth Miller Jennings to Bruce Fujimoto of the California State
    Water Resources Control Board dated July 21, 1997 ....................................... 19

National Pollutant Discharge Elimination General Permit for Discharges of Storm Water
    Associated with Industrial Activities (1997) California State Water Resources
    Control Board ........................................................................... passim

U.S. Department of Labor, Standard Industrial Classification Code Manual ...................... passim

United States Environmental Protection Agency NPDES Stormwater Program's Question
    and Answer Documents Volumes 1 and 2 ................................................. 18, 26

Website for Industrial Regulation ........................................................... 18

1    **Notice:**  Please take notice that on November 8, 2012 at 1:30 p.m. or as soon thereafter as

2    counsel may be heard we shall appear before the Honorable Richard Seeborg in Courtroom 3,

3    17th Floor, 4500 Golden Gate, San Francisco, CA 94102 and present the attached

4    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS I AND

5    II, at which time and place you may appear if you so desire.

6        By this Motion, Defendant Pacific Gas and Electric Company ("PG&E") seeks an order

7    dismissing plaintiff Ecological Rights Foundation ("ERF")'s claims based on the Clean Water

8    Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, Claims I and II, with prejudice, and any such relief as the

9    Court determines equitable and proper.

10   **I.**    **STATEMENT OF THE MOTION**

11       ERF brings complexity to a straight-forward Congressional, EPA and California

12   regulatory decision.  Simply put, ERF ignores EPA CWA regulations in an effort to have the

13   Court regulate facilities where EPA and California regulators have determined permits are not

14   required.  CWA permits are only required for stormwater discharges "associated with industrial

15   activity."  Congress delegated to EPA the discretion to define what "associated with industrial

16   activity" means.  EPA used Standard Industrial Classification ("SIC") Codes – a common EPA

17   practice – to determine which facilities are associated with industrial activities and which are not.

18   EPA's use of SIC Codes is both routine and permissible.

19       Pursuant to EPA regulations, PG&E's Facilities at issue in this litigation are properly

20   assigned an SIC Code in the Group 49 category as auxiliary facilities in support of the

21   transmission and distribution of electricity and gas.   Group 49 facilities are not among those

22   "establishments" deemed "associated with industrial activity." Therefore, no CWA permit is

23   required for PG&E's stormwater discharges.  Attempts by ERF to second-guess governmental

24   decisions with sampling data, RCRA-style site characterizations, or "expert" testimony are simply

25   distractions to obscure the fact that PG&E's Facilities support PG&E's primary business and do

26   not require a CWA permit for stormwater discharges.

27       In its ruling on PG&E's Motion to Dismiss the Third Amended Complaint, the Court

28   stated that "the question [about the CWA claims] boils down to whether . . . the sites must be

1  classified only under the Group 49 SIC code applicable to PG&E's enterprise as a whole, or

2  whether there is a factual and/or legal possibility that one or more other codes may apply."  (ECF

3  No. 106 at 5-6.)  At the motion to dismiss stage, ERF could plead that PG&E was subject to more

4  than one SIC code.  However, ERF has not supported its allegation with any facts.  For that

5  reason as set forth in detail below, as a matter of fact and law, federal and California regulations

6  classify PG&E's facilities **only** under Standard Industrial Classification Code 49.

7          Factually, there is no dispute that the "primary" purpose of the four PG&E facilities

8  involved in this case is solely to support PG&E's gas and electric business.  (Plaintiffs' Response

9  to PG&E First Set of Requests for Admissions to Plaintiff ["Pl.  RFA Resp."] nos. 15 – 30,

10  attached to the Showalter Declaration filed herewith as Exh. 1.)  PG&E's business or "enterprise"

11  is a SIC Code "Major Group 49 – Electric, Gas and Sanitary Services."  Each Facility in this case

12  is an "establishment" in support of the greater "enterprise" wherein PG&E operates these

13  Facilities in support its primary purpose, which falls under the Group 49 SIC Code.  Further, each

14  Facility taken individually is assigned a Group 49 SIC Code.  Thus, legally there is no basis for

15  applying multiple SIC Codes.

16          For the reasons outlined herein, PG&E moves to dismiss ERF's First and Second Counts

17  on the grounds that:

18      **A.**      The four "corporate yards" or "service centers" (collectively referred to as the

19              "Facilities") involved in this phase of litigation have, as their "primary activity,"

20              service functions intended to support PG&E's provision of gas and electric

21              services, and are thus properly classified only under a Group 49 SIC Code; and

22              that

23      **B.**      ERF's argument that there is an "absolute ban" on "unpermitted" discharges under

24              CWA fails as a matter of law.

25      **C.**      Additionally, ERF's Second Claim should be dismissed because it legally fails to

26              state a claim for which relief can be granted, since "duty to apply" claims are not

27              actionable under CWA.

28

1    **II.**    **BACKGROUND AND PROCEDURAL HISTORY**

2        On January 11, 2010, ERF filed a Complaint against PG&E for alleged violations of the

3    CWA.  PG&E responded by filing a Motion to Dismiss.  (*See* ECF No. 15.)  In April and May

4    2010, ERF either moved, or sought stipulation, to file two more Complaints, motivated in part to

5    cure defects PG&E identified in its initial Motion to Dismiss and to add a count under the

6    Resource Conservation and Recovery Act ("RCRA").  (*See* ECF Nos. 24 & 33.)

7        On August 5, 2010, after the Court ordered it to do so, ERF filed a Stipulation to File a

8    Third Amended Complaint.  (ECF No. 54.)  The Court granted the Stipulation, and ERF's Third

9    Amended Complaint was filed on August 23, 2010.  (ECF No. 66.)

10        After PG&E moved to dismiss the Third Amended Complaint, the Court dismissed the

11    Third Claim for Relief – related to RCRA – for being improperly pled.  (*See* ECF No. 106.)  ERF

12    filed a Fourth Amended Complaint on February 9, 2011, *see* ECF No. 107, which the Court

13    subsequently limited via Order.  (ECF No. 171.)

14        This case has proceeded in a phased approach, with discovery on four facilities

15    proceeding ahead of discovery on other facilities.  The Court's March 10, 2011 Case Management

16    Order provided that on or before June 28, 2011, the parties should complete all non-expert

17    discovery relating to the questions of liability, injunctive relief, and standing as to four of the 31

18    PG&E facilities at issue. (ECF No. 114).  The parties have completed extensive fact discovery

19    concerning the four PG&E facilities located at: (a) 24300 Clawiter Road, Hayward, California;

20    (b) 4801 Oakport Street, Oakland, California; (c) 2555 Myrtle Avenue, Eureka, California; and

21    (d) 1099 West 14th Street, Eureka, California (collectively "the Facilities").  (*See id.*; ECF No.

22    112.)  The parties then filed cross-motions for summary judgment on standing at the Facilities.

23    (*See* ECF Nos. 179-181.)  The Court limited ERF's standing, ordering that ERF had standing for

24    its CWA claims at the Facilities, but that ERF lacked standing to bring portions of its RCRA

25    claims.  (*See* ECF No. 192.)

26    **A.**    **ERF's Allegations**.

27        The factual background is well known to the Court.  (*See, e.g.*, ECF Nos. 106 & 171.)

28    ERF alleges that PG&E owns and operates 31 "corporation yards and service centers" "[t]o

3

1    provide service and maintenance on its electric and gas distribution system." (Compl. ¶¶ 29-31,

2    ECF No. 107, at Exh. 1.)  ERF provides no facts or description of the facilities or any description

3    of what activity is occurring at a particular facility, simply using boilerplate language as to what

4    activities PG&E is alleged to "routinely conduct" at the facilities generally.  (*Id.* ¶¶ 32 – 35.)

5         ERF alleges that stormwater is discharged from "corporation yards and service centers"

6    and that PG&E "routinely conducts numerous industrial activities" at these facilities, including

7    vehicle maintenance, light industrial activities, storage of industrial materials, and recycling.  (*Id.*

8    ¶¶ 29-45.)  ERF alleges that PG&E was required under the CWA, to secure National Pollution

9    Discharge Elimination System Permits ("NPDES") for these facilities because the above activities

10   are "industrial activities" as the term is defined by relevant federal and California state

11   authorities, and NPDES permits are required for all storm water discharges where "industrial

12   activities" take place. (*See* Compl. ¶¶ 17-22, discussing 33 U.S.C. § 1342(p)(2)(B).) Such permits

13   are implemented by the California Water Resources Control Board, and are known as "General

14   Permits."  (*See id.* ¶¶ 25-33.)

15        Because ERF alleges that PG&E has not submitted notices of intent ("NOIs") for these

16   facilities, ERF filed a citizen enforcement action under 33 U.S.C. § 1365(a)(1) seeking injunctive

17   relief and civil penalties. (*Id.* ¶¶ 68-75.) ERF's Second Count is premised on ERF's supposition

18   that PG&E's failure to apply for a permit constituted a separate violation of the CWA and federal

19   regulations included at 40 C.F.R. § 122.21(a) over and above PG&E's alleged failure to have a

20   permit.  (*See id.* ¶¶ 76-80.)

21        **B.      Facts as Developed in Discovery.**

22            **1.      The Facilities**

23        There is no dispute between the parties about the activities that occur at the Facilities

24   subject to this phase of the case.  Further, there is no dispute about the "primary purpose" of the

25   Facilities (i.e. to "advance PG&E's overall business objectives" which ERF admits is the "sale of

26   electricity and natural gas").  (Pl. RFA Resp. nos. 15 – 30.)  At each of the four Facilities, PG&E

27   conducts support activities in support of the gas and/or electric business.  (Lum Dep. 43:12-25;

28   47:25; 61:7-11; 64:21-25, attached to the Showalter Decl. filed herewith ["Showalter Decl."] as

4

Exh. 2.)  Each of the Facilities has at least some vehicles parked overnight, (Griffis Dep. 6:13-7:1; 31:24-32:24, Showalter Decl. Exh. 3; Maddock Dep. 22:5-7; 45:14-19, Showalter Decl. Exh. 4), storage of wooden poles and other materials, (Lum Dep. 44:9-12; 49:18-25; 62:23-25; 65:23-25), used materials collected for recycling (Lum Dep. 51:13-18; 62:9-14; 65:5-9; Basham Dep. 21:10-21, Showalter Decl. Exh. 5), and staging areas for field crews (Tow Dep. 24:6-12, Showalter Decl. Exh. 6; Lum Dep. 59:13-15; Risdon Dep. 40:12-22, Showalter Decl. Exh. 7; Cardoso Dep. 46:15-21 Showalter Decl. Exh. 8).  Several of the Facilities have garages for minor vehicle maintenance of PG&E's fleet, (Maddock Dep. 38:25-39:1; 49:15-18; Griffis Dep. 8:3-15), machine shops for occasional minor welding (Basham Dep. 17:22-24) and collection areas for new and used oil-filled equipment.  (Cardoso Dep. 43:13-15; Tow Dep. 12:7-10).  ERF has developed no information to dispute that these are the activities that occur and their one witness who opined on operations at the Facilities, Matt Hagemann, who has been proffered as an expert, agrees with this assessment.  (Hagemann Rep. at 2, Showalter Decl. Exh. 9).

At each Facility, all of these activities take place within the confines of the Facility, without any physical separation or boundary.  (Hagemann Dep. 131:24-132:4, Showalter Decl. Exh. 10).  Each Facility contains multiple drains to collect stormwater from various areas of the Facility.  (*See generally* PG&E Facility Maps, Showalter Decl. Exh. 11).  No sewer drain leaving the Facilities collects stormwater from just one activity, but instead collects stormwater from several areas and activities located near the drain inlets.  (*Id.*)

## 2.    SIC Codes

SIC Codes were designed by the U.S. Commerce department to categorize businesses using a four digit code.  (See SIC Code Manual excerpts at 12-18, Showalter Decl. Exh. 12.)  The SIC Codes were updated in 1987 and are still widely used by government agencies such as the EPA and the Securities & Exchange Commission.  EPA has promulgated regulations or other guidance containing SIC Codes as recently as September 28, 2010.  (*See* 75 Fed. Reg. 59622 (Sept. 28, 2010) (providing materials related to renewable fuels).)  The SIC Code Manual is a key document used in framing programs under the Clean Air Act, *see, e.g.*, 40 C.F.R. §

1   52.21(b)(1)(i)(a) & (b) in addition to CWA.  EPA has historically used it "because it is both

2   widely-known and widely used."  *See* 45 Fed. Reg. 52676, 52695 (Aug. 7, 1980).

3       SIC Codes are assigned to "establishments" which are defined as "an economic unit,

4   generally at a single physical location, where business is conducted or where services or industrial

5   operations are performed."  (SIC Code Manual at 12).  In CWA terms, "establishments" could

6   also be called "facilities."  "Establishments" which are "primarily engaged in performing

7   management or support services for other establishments of the same enterprise [business]" are

8   "auxiliaries."  (*Id.* at 13). Auxiliaries include such activities as:

9       • Warehouses and storage facilities for the benefit of the overall business;

10      • Maintenance and repair shops for maintenance and repair of machinery and equipment

11         of the same business;

12      • Automotive repair shops or storage garages for repair and storage of the business'

13         vehicles;

14      • Provision of equipment for use by the business in the field.

15      (*Id.* at 15).  The parties agree these are the activities occurring at the Facilities.  When

16   assigning an SIC Code to an auxiliary establishment, the applicable SIC Code is assigned "on the

17   basis of the primary activity of the operation establishments they serve" followed by a one-digit

18   auxiliary code.  (*Id.* at 16-17).  The auxiliary establishment is assigned an SIC Code based upon

19   the "primary" activity of the establishment that the auxiliary is supporting, not individual

20   activities at the establishment.  (*Id.*).

21      Because PG&E operates these Facilities in common for a common purpose of providing

22   electric and gas service, the primary business of PG&E, the Facilities are properly recognized

23   under SIC code for electric, gas and sanitary services – "Major Group 49."  ERF has admitted that

24   the primary purpose of the Facilities is to support PG&E's provision of electric and gas services.

25   Indeed, the SIC Code Manual expressly anticipates that multiple operations occur at

26   establishments.  The SIC Code Manual states that Group 49 services may "also include other

27   types of services, such as transportation, communications, and refrigeration."  (SIC Code Manual

28

1    at 284).  Thus, a Group 49 SIC Code appropriately characterizes all of the activities occurring at

2    the Facilities.

3         In 1990, EPA rejected comments that all "commercial" or "service" facilities should be

4    regulated under CWA stormwater permits.  For example, EPA considered whether electric

5    powerline corridors but chose to exclude them from being facilities "associated with industrial

6    activity."[1]  EPA's definition of "industrial activity" is clear and unambiguous in its *exclusion* of

7    facilities related to the provision of electric services.[2]  *See* 40 C.F.R. § 122.26(b)(14).

8                    **3.       General Industrial Stormwater Permit**

9         The California Water Resources Board (the "Board") is the state agency authorized by

10   EPA to implement CWA.  Its Industrial Storm Water General Permit ("General Permit") was

11   adopted in 1997, and requires that an operator of certain "establishments" apply for coverage

12   under the General Permit.  (*See* 1997 California Industrial General Permit, Showalter Decl. Exh.

13   13.)  The establishments required to apply are described in the General Permit using SIC Codes.

14   SIC Code Group 49 establishments are not required to get a permit under California's Industrial

15   Storm Water General Permit.  (Simpson Rep., Showalter Decl. Exh. 14, at 29:9-11.)  Mr.

16   Simpson, an expert retained by PG&E has, since the inception of California's General Permit,

17   assisted private parties and municipalities in inspecting sites and determining eligibility for

18   coverage under the General Permit.  (*Id*.)  He has worked with the California State Water

19   Resources Control Board in designing the permits. (Simpson Dep. at 218-220, Showalter Decl.

20   Exh. 15).  His experience reflects the same information as the California guidance materials on

21   the application of SIC codes to the regulations and coverage under the General Permit – PG&E's

22   Facilities are only categorized under SIC Code Group 49.  (*Id*.)  Mr. Simpson's testimony on SIC

23   code assignment and coverage under the Permit is unrebutted.

24   _____

25        [1] *Compare* 53 Fed. Reg. 49436, 49432 (Dec. 7, 1988)  (noting that EPA prefers that
     powerline corridors not be classified as being "associated with industrial activity" *and* 55 Fed.

26   Reg. 47990, 48007 (Nov. 16, 1990) (publishing EPA's final rule, which does not list powerline
     corridors as "associated with industrial activity").

27        [2] The SIC Code for the provision of electric power is 4911, the SIC Code for gas and
     electric services combined in 4932.  Much of the SIC Code Manual can be found online at

28   http://www.osha.gov/pls/imis/sic_manual.html (last visited July 31, 2012).

1    **C.   Legal Posture.**

2         Because there is no dispute on the Facilities' purpose or the activities which occur at

3    them, the sole issue is the legal relevance of these facts to the CWA's permitting program.  The

4    Court last reviewed the issues raised in this Motion in its ruling on PG&E's Motion to Dismiss

5    ERF's Third Amended Complaint.  (*See* ECF No. 106.)   In the Court's ruling, the Court noted

6    the following legal disputes between the parties:

7         • Whether SIC Codes (other than Group 49 SIC Codes, which the parties agree apply to

8              PG&E's facilities) including those that ERF included in its Complaint apply to the

9              individual PG&E facilities, *see id.* at 5; and

10        • "[W]hether there is . . . . a legal and/or factual possibility that one or more other [SIC

11             Codes] may apply," *see id.* at 6; and

12        • Whether "categories of point sources that are not expressly addressed in CWA Section

13             402(p) and its implementing regulations are thereby exempt from the permit

14             requirements," *see id.* at 3.

15   These issues will be discussed in detail below.

16   **III.   ANALYSIS**

17        **A.   PG&E is a "Service" Utility**.

18        The provision of gas and electricity to the residents of the communities served by PG&E

19   has long been recognized not as an industrial or commercial activity, but as a service.  There is no

20   factual dispute in this case that PG&E's service centers exist in order to support PG&E's

21   business, the provision of gas and electricity.  That PG&E performs many activities to "keep the

22   lights on" does not change that the Facilities exist only to support its provision of electric and gas

23   services. Under EPA's CWA definition, EPA, in its discretion, has chosen not to require NPDES

24   permits for facilities that support gas and electrical services, despite any individual activity that

25   may occur at a facility.  California, too, has chosen not to require permits NPDES permits for a

26   facility unless the "primary purpose" of that facility is "industrial" as the term is defined by

27   regulation.  There is no dispute that PG&E's service centers do not meet this "industrial" test.

28   PG&E is not "unregulated" but subject to a host of environmental laws and regulations including

8

1   the CWA.  That a NPDES stormwater permit is not required does not change that PG&E

2   complies with all aspects of the CWA and other environmental statutes such as RCRA.

3        PG&E is entitled to summary judgment on ERF's CWA claims.  PG&E's Facilities are

4   only within the "Group 49" SIC Code because SIC codes are assigned based on the "primary"

5   purpose of the Facilities.  The primary purpose of the PG&E Facilities is to support the provision

6   of utility service to PG&E ratepayers.  Legally, only facilities whose "primary purpose" is

7   industrial activity as defined by their SIC Codes, listed in 40 C.F.R. § 122.26(b)(14), require a

8   NPDES permit.  Because the Group 49 SIC Code is not listed in 40 C.F.R. § 122.26(b)(14)(ii) ,

9   (vi) , (viii) , or (xi)  neither EPA nor California regulators require PG&E to have a NPDES

10  permit.  Because neither agency requires PG&E to have a permit, ERF may not use this citizen

11  suit action to collaterally force PG&E and/or other governmental agencies to amend the purpose

12  of the CWA regulatory program.  ERF seeks to have this Court usurp the Congressionally-

13  delegated discretion given to EPA to decide what activities are industrial.

14        **B.    Standard of review.**

15        The party moving for summary judgment has the initial burden of citing to particular parts

16  of the record, including portions of the pleadings, discovery and disclosures on file, and

17  affidavits, that demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v.*

18  *Catrett*, 477 U.S. 317, 323 (1986).  When the non-moving party has the burden of proof at trial,

19  the movant need only point out "that there is an absence of evidence to support the non-moving

20  party's case."  *Id.* at 325.  If the movant meets this initial burden, the non-moving party must go

21  beyond the pleadings and – by its own affidavits or discovery – set forth specific facts showing a

22  genuine issue for trial.  *See id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

23  U.S. 574, 586-87 (1986).  If the non-moving party does not produce evidence to show a genuine

24  dispute as to a material fact, the moving party is entitled to summary judgment.  *See Celotex*, 477

25  U.S. at 323.  In ruling on a motion for summary judgment, inferences drawn from the facts are

26  viewed in the light most favorable to the non-moving party.  *See Matsushita*, 475 U.S. at 587.

27

28

**C.    CWA Citizen Suits versus CWA Regulatory Challenges.**

Citizen suits exist to allow private parties to enforce pre-existing regulatory programs, not to conduct time-barred collateral challenges to decades-old rules.  ERF cannot invalidate state and federal regulations in this proceeding because this Court lacks jurisdiction to consider rule challenges.  This is emphasized by the fact that neither EPA nor the Board is a party to this case.

Timing for rule challenges is clear.  CWA rule challenges must be initiated in a Circuit Court of Appeals within 120 days of the rule's promulgation unless "based solely on grounds which arose after such 120th day."  30 U.S.C. § 1369(b)(1).  Absent challenge, the rule becomes law.  The prohibition on collateral challenges to EPA rules is emphatic: "Action of the Administrator with respect to which review could have been obtained under [§ 1369(b)(1)] shall not be subject to judicial review in any civil or criminal proceeding for enforcement."  *See also Scott v. Hammond*, 741 F.2d 992, 995 (7th Cir. 1984) (stating also that a proper citizens' suit under CWA might arise *against EPA* to compel EPA to promulgate a substitute standard after EPA has disapproved of a state standard and the state has refused to act); *Natural Resources Def. Council v. EPA*, 673 F.2d 400, 403-04 (D.C. Cir. 1982) (holding that Courts of Appeals, and not district courts, have exclusive jurisdiction to review EPA regulations); *Del. Valley Citizens Council for Clean Air v. Davis*, 932 F.2d 256, 265 (3d Cir. 1991) (holding that the purpose of a citizen suit is to enforce EPA standards, not invalidate them).

Logically, EPA must have a role in any proceeding where its regulations are challenged.  The avenue to subject the substance of EPA's actions is through the Administrative Procedure Act ("APA").[3]  *United States Steel Corp. v. Train*, 556 U.S. 822, 836-37 (7th Cir. 1977).  **NO**

_____

[3] It is clear that ERF's Complaint is insufficient to state a claim for judicial review of agency action.  As an initial matter, the Complaint before the Court *does not even include EPA as a party* unlike all of the cases ERF has cited supporting its supposition that federal courts review and set aside portions of EPA's stormwater regulations.  (*See, e.g.*,ECF No. 81 at 9.)  *See, e.g.*, *See Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.* ["*EPIC*"], 301 F. Supp. 2d 1102, 1107-08 (N.D. Cal. 2004)  (having both EPA and the EPA Administrator as named parties); *NRDC v. Costle* ["*Costle*"], 568 F.2d 1369, 1396 (D.C. Cir. 1977) ("Costle" is EPA Administrator);  *Am. Mining Cong. v. EPA* ["*AMC*"], 965 F.2d 759, 765 (9th Cir. 1992) (EPA itself included as a named party).  A complaint seeking judicial review would allege, for example, that some agency action was arbitrary, capricious or an abuse of discretion or that a factual finding of an agency was erroneous or not supported by substantial evidence.  *See* APA, 5 U.S.C. § 706(2).

1   cases have invalidated federal regulations without the relevant agency being present in the case.

2   CWA Section 509(b)(1), not the citizens' suit provision in Section 505(a)(1), provides for

3   challenges to final EPA actions, including the promulgation of "any effluent limitation or other

4   limitation under section 1311." 33 U.S.C. § 1369(b)(1). *See Our Children's Earth Foundation v.*

5   *U.S. EPA*, 527 F.3d 842, 847-48 (9th Cir. 2007).[4]

6          Why this rule exists is clear: Citizen suits are meant to allow private parties to supplement

7   government enforcement, and not to collaterally alter the agencies' rulemakings. *Gwaltney of*

8   *Smithfield, Ltd. v. Chesapeake Bay Foundation,* 484 U.S. 49, 61 (1987) (explaining that citizen

9   suits are meant to supplement government enforcement). If ERF wants to invalidate 40 C.F.R. §

10  122.26(b)(14) , because any judicial challenge is time-barred, it would need to petition EPA or

11  the Board. It has not. Because this is not a rule challenge, the Court must apply how EPA and

12  the Board view the Facilities. The intent of EPA and the Board can be readily known by

13  guidance materials these agencies have issued for the use of the regulated community. These

14  materials will be discussed below.

15          **D.      Stormwater Discharges are Regulated Exclusively Under the CWA and its**

16                  **Accompanying Regulations.**

17          The main question to be resolved on summary judgment is whether EPA and/or the Board

18  requires PG&E's facilities to be permitted. Neither agency does. "Primary responsibility for

19  enforcement of the requirements of the [CWA] is vested in the Administrator of the EPA." *EDC*,

20  344 F.3d at 840. While the CWA and its implementing regulations are federal, the law and its

21  regulations are implemented cooperatively between state and federal regulators. CWA

22

23          [4] Section 509(b)(2) expressly provides that agency action reviewable under Section
    509(b)(1) "shall not be subject to judicial review in any civil or criminal proceeding for
24  enforcement." 33 U.S.C. § 1369(b)(2). Setting aside ERF's unsupported contention that a
    regulation can be challenged in a citizen suit against a private party, it is long-established that
25  Section 509(b)(1) provides the exclusive mechanism for challenging EPA rules excluding sources
    from the NPDES program. *See Environmental Defense Ctr. v. EPA*, 344 F.3d 832, 843 (9th Cir.
26  2003); *AMC*, 965 F.2d at 767-68; *Nw. Envtl. Advocates v. EPA*, 537 F.3d 1006, 1010 (9th Cir.
    2008). Challenges under Section 509(b)(1) must be brought in the circuit court within 120 days
27  of promulgation, "or after such date only if such application is based solely on grounds which
    arose after the 120th day." *Id.*
28

1  regulations are thus a product of federal implementation statutes, federal and state regulations,

2  and federal and state guidance materials.  Relevant sections of each are outlined below.

3        This case hinges on a tension ERF – and not EPA – has created between two provisions of

4  the CWA, even though the relevant statutory sections, and all relevant guidance materials, state

5  that no tension exists.  CWA Section 301(a) provides that

6          Except in compliance with this section and [various CWA sections

7          including Section 402], the discharge of any pollutant by any

8          person shall be unlawful.

9  33 U.S.C. § 1311(a).

10        CWA Section 402(p)(2) enumerates five categories of stormwater discharges subject to

11  the permitting program, including in pertinent part the following:

12          (B)  A discharge associated with industrial activity.

13          . . .

14          (E)  A discharge for which the Administrator [the EPA] or the

15          State, as the case may be, determines that the stormwater discharge

16          contributes to a violation of a water quality standard or is a

17          significant contributor of pollutants to waters of the United States.

18  33 U.S.C. § 1342(p)(2).  Section 402(p) was added to CWA by The Water Quality Act of 1987

19  ("WQA"), which served to overrule court decisions making the same argument now made by

20  ERF, namely that **every** discharge required a permit under the CWA.  *See Costle*, 568 F.2d at

21  1369.  In *Costle,* the court ruled that Congress had intended that NPDES permits be issued for

22  every possible point source.[5]  To overrule that line of decisions, Congress, with CWA Section

23  _____

24       [5] *See* Statement of Representative Hammerschmidt regarding why the WQA was
   necessary:

25          The new language will properly reduce the universe of permits
   required for storm water from millions to thousands without

26          reducing the protection of the environment.  We established a
   mechanism that will require permits only where necessary – rather

27          than in every instance.  Without these changes, local, State, and
   Federal officials would be inundated with an enormous permitting

28          workload even though most of the discharges would not have

1    402(p), left the majority of storm water discharges from point sources unregulated by CWA, and

2    directed the EPA to regulate only specified categories of such discharges, including, among

3    others, those "associated with industrial activity." *See* 33 U.S.C. § 1342(p)(4); *AMC*", 965 F.2d

4    at 765 ("We find that Congress left it up to EPA to define a 'discharge associated with industrial

5    activity'"). Congress also directed the EPA to identify other sources of storm water discharges

6    that warrant regulation, granting it "discretion to develop a program that distinguishes between

7    those stormwater discharges that require regulation and those that do not." *Conservation Law*

8    *Found. v. Hannaford Bros. Co.*, 327 F. Supp. 2d 325, 330 (D. Vt. 2004), *aff'd* 139 Fed. Appx.

9    338 (2nd Cir. 2005). Again, not all stormwater releases require a NPDES permit under the CWA.

10       California has expressly addressed and adopted a program which complies with federal

11   guidelines for storm water management. The "authorized state agency" under this program is the

12   Board. "Storm water associated with industrial activity" is defined by the Board in the General

13   Permit as "the discharge from any conveyance which is used for collecting and conveying storm

14   water and which is directly related to manufacturing, processing, or raw materials storage areas at

15   an industrial plant." The term does not include discharges from facilities or activities excluded

16   from the NPDES program." (See General Permit, Attachment 4 ¶ 9.)

17       The definition of "industrial activity" used in the General Permit is contained in the

18   section of the permit found at Attachment 1, "<u>FACILITIES COVERED BY THIS GENERAL</u>

19   <u>PERMIT</u>." (*Id.*) These "industrial activities" include:

20       (1) "RECYCLING FACILITIES: SICs 5015 and 5093" (Attachment 1 ¶ 6);

21       (2) "TRANSPORTATION FACILITIES: SICs 40, 41, 42 (except 4221-25), 43, 44, 45,

22   and 5171 which have vehicle maintenance shops, equipment cleaning operations, or airport

23   deicing operations" (*Id.* ¶ 8); and

24       (10) "MANUFACTURING FACILITIES WHERE INDUSTRIAL MATERIALS,

25   EQUIPMENT, OR ACTIVITIES ARE <u>EXPOSED TO STORM WATER</u>: SICs 20, 21, 22, 23,

26

27           significant environmental impacts.

28   133 Cong. Rec. H168, H170 (daily ed. Jan 8, 1987).

1    2434, 25, 265, 267, 27, 283, 285, 30, 31 (except 311), 323, 34 (except 3441), 35, 36, 37 (except

2    373), 38, 39, and 4221-4225." (*Id.* ¶ 10.)

3           This language comes directly from 40 C.F.R. § 122.26(b)(14).

4           Under this language, EPA and the Board acted consistently regarding gas and electric

5    transmission businesses because, for SIC Code purposes these businesses are classified as

6    "services."  "Services" do not conduct "industrial activities" as the term is defined in 40 C.F.R. §

7    122.26(b)(14) .  When 40 C.F.R. § 122.26(b)(14)(ii)  became final in 1990, no challenge was

8    made to EPA excluding "facilities generally classified under the Office of Management and

9    Budget Standard Industrial Classifications (SIC) as wholesale, retail, service, or commercial

10   activities" even though some commentators raised the issue prior to the regulation becoming

11   final.  (See 55 Fed. Reg. 47990 (Nov. 16, 1990).)[6]

12          The Court in *Brown* notes that part of Congress's motivation in revising CWA in 1987

13   was that:

14                  under the existing definition[,] a vast number of de minimus

15                  stormwater sources, many of which posed no environmental threat,

16                  required NPDES permits.  As part of the 1987 amendments,

17                  Congress enacted § 402(p), which gives discretion to EPA to

18                  exclude from the permitting process de minimus sources of

19                  stormwater pollution.

20   *Nw. Env. Def. Ctr. v. Brown*, 640 F.3d 1063, 1086 (9th Cir. 2011), *cert. granted sub nom. Decker*

21   *v. Nw. Env. Def. Ctr.*, Sup. Ct. Case No. 11-338 (June 25, 2012).  "Service" Businesses - to EPA

22   and the Board - were de minimus sources of pollution.

23          ERF's claims are untimely and misguided challenges to the CWA and its regulations.

24   Regulators, not courts, have exclusive jurisdiction over disputes about enforcement priorities.  As

25   the Ninth Circuit recently noted, "It is within the discretion of EPA to promulgate Phase II

26   _____

27          [6] Section 402(p)(5) contains a mechanism allowing EPA to study whether non-"industrial"
     facilities should have CWA permits.  *See id.*  If resulting studies demonstrated that such sites
     should be regulated, EPA was required to regulate them under Section 402(p)(6).  Further
28   regulations have not been promulgated.

1    regulations requiring, or not requiring, permits for such discharges." *Brown*, 640 F.3d at 1083.

2    While the Ninth Circuit has permitted "enforcement" suits against private parties without the

3    participation of EPA, the real allegations in this case are that no permitting regulations applicable

4    to the facilities have been implemented.  This is a claim against EPA, not PG&E.  It is clear that

5    "programmatic" challenges to the manner which agencies function are not within the Court's

6    discretion, particularly without the active participation of the relevant agencies.  *See Lujan v.*

7    *Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990).

8         To establish whether a facility requires a NPDES permit, and thereby could be subject to

9    an enforcement action, an operator of an establishment performs the following analysis:

10        **1.     Step 1: Is the discharge potentially listed in CWA Section 402(p)?**

11        In 1987, Congress amended the CWA to specifically deal with water pollution caused by

12   stormwater.  *See* Pub. L. No. 100-4, 101 Stat. 7 (1987).  In doing so, Congress added Section

13   402(p) to CWA, 33 U.S.C. § 1342(p), which establishes a two-phase approach to permitting of

14   point source stormwater discharges.  Section 402(p) prohibited EPA from requiring NPDES

15   permits for stormwater discharges until October 1, 1994, except for five categories of so-called

16   "Phase I" stormwater discharges.  *See* 33 U.S.C. §§ 1342(p)(1), (2).  As relevant here, one of the

17   Phase I categories is "discharge associated with industrial activity."  33 U.S.C. § 1342(p)(2).

18   Congress mandated NPDES permits for the Phase I stormwater discharges and directed EPA to

19   promulgate regulations governing them.  33 U.S.C. §§ 1342(p)(2), (4).

20        In 1990, EPA promulgated its Phase I stormwater regulations.  55 Fed. Reg. 47,990-

21   48,075 (Nov. 16, 1990) (codified in 40 C.F.R. part 122).  Congress did not define the term

22   "discharge associated with industrial activity." The Ninth Circuit has held that Congress left it up

23   to EPA to define a "discharge associated with industrial activity'."  *AMC*, 965 F.2d at 768-70.

24   EPA defined the term to exclude "discharges from facilities or activities excluded from the

25   NPDES program under [40 C.F.R. part 122.]"  40 C.F.R. § 122.26(b)(14).

26        For stormwater discharges other than those enumerated in 33 U.S.C. § 1342(p)(2), CWA

27   authorizes EPA to designate, as part of Phase II, any additional stormwater discharges "to be

28   regulated to protect water quality."  33 U.S.C. §§ 1342(p)(5) and (6).  For these Phase II

1  discharges, EPA must "establish a comprehensive program," which "may include performance

2  standards, guidelines, guidance, and management practices and treatment requirements, as

3  appropriate." *See* § 1342(p)(6). While EPA is not required to issue permits for Phase II

4  discharges, it has done so for two categories of Phase II discharges not relevant to this case. *See*

5  64 Fed. Reg. 68,722, 68,734 (Dec. 3, 1999) (codified in pertinent part at 40 C.F.R. §

6  122.26(a)(9)(i) ). It has not acted regarding "service" operations like the Facilities. EPA has also

7  reserved the authority to designate additional discharges (potentially including those from other

8  "commercial" or "service" facilities) for Phase II regulation in the future.

9          **2.**    <u>**Step 2:**</u> **Is a discharge "industrial" and as defined in 40 C.F.R. §**

10                **122.26(b)(14) and the relevant SIC Codes?**

11        PG&E's discharges are not "industrial" under EPA's presumptively valid regulations.

12  The Ninth Circuit previously held that it was "up to EPA to define a 'discharge associated with

13  industrial activity.'" *AMC*, 965 F.2d at 765. EPA's ability to define the term "industrial

14  activity" has never been seriously questioned in the decades since the relevant regulation was

15  promulgated. Without exception, cases striking down or modifying portions of regulations

16  related to Section 402(p)(2) resulted from situations where EPA conceded that a facility

17  conducted an "industrial activity" under Section 402(p)(2) but then declined to regulate anyway.[7]

18        The court reviews an agency's interpretation of a statute under *Chevron U.S.A., Inc. v.*

19  *Natural Res. Defense Council, Inc*., 467 U.S. 837, 842–43 (1984). Chevron dictates a two-step

20  process. At step one, "if, employing the traditional tools of statutory construction," the court

21  determines that "Congress has directly and unambiguously spoken to the precise question at

22  issue, then the unambiguously expressed intent of Congress controls." *Brown*, 640 F.3d at 1069

23

---

24        [7] *NRDC v. EPA*, 966 F.2d 1292, 1304-06 (9th Cir. 1992), involves EPA-created
exemptions for construction sites of less than five acres and separate treatment for the subset of

25  "light industry" identified in 40 C.F.R. § 122.26(b)(14)(ix) . *Brown* involves logging – defined as
an "industrial activity" under 40 C.F.R. § 122.26(b)(14)(ii)  by SIC Code – and a separate

26  exemption known as the "silvicultural rule." *See* 640 F.3d at 1083-84. *AMC*, 965 F.2d at 768-

27  770, dealt with mines – defined as an "industrial activity" under 40 C.F.R. § 122.26(b)(14)(iii)  –
and upheld EPA's authority to exclude certain reclaimed mines from the definition of "industrial

28  activities."

1    (citing *Chevron*, 467 U.S. at 843).  At step two, if the court determines that the statute is "silent or

2    ambiguous with respect to the specific issue," it must determine "whether the agency's

3    interpretation is based on a permissible construction of the statute.  "An agency interpretation

4    based on a permissible construction of the statute controls." *Id.* (citing *Chevron*, 467 U.S. at 844).

5          EPA defined Section 402(p)(2)'s "discharge associated with industrial activity" as part of

6    its Congressional mandate and by reference to narrative descriptions and SIC Codes.  Thus, the

7    first part of the *Chevron* test precludes further analysis.  Even if this were not the case, EPA's use

8    of SIC Codes withstands scrutiny under the second *Chevron* prong as well.  EPA commonly uses

9    SIC Codes as a part of regulations, and its use of SIC Codes, in conjunction with narrative

10   descriptions of other types of operations, is permissible.  SIC Codes are useful tools in narrowing

11   the myriad businesses potentially subject to environmental regulation into easy-to-apply

12   categories capable of being efficiently regulated.    For facilities listed in 40 C.F.R. §

13   122.26(b)(14)  by SIC Code – and not narrative description –  the listed industries were selected

14   by regulators with purpose and the list of them was intended to be exclusive.[8]

15         While the definitions contained in 40 C.F.R. § 122.26(b)(14)  are clear, EPA has issued

16   further guidance documents to assist regulators and the regulated community who is, and who is

17   not, subject to regulation.  Because these guidance documents track 40 C.F.R. § 122.26(b)(14) ,

18   they reiterate that "industrial activity" as the term is used in Section 402(p)(5) is establishment-

19   specific, and determined based on the main function a facility, and not the sum-total of all

20   subsidiary tasks ever conducted.  *See, e.g.* EPA Industrial Fact Sheet Series for Activities Covered

21   by EPA's Multi-Sector General Permit ("MSGP")[9] (providing that the establishments included in

22

23         [8] *See id.* (stating that "For the categories of industries identified in this section . . . . " and
     "The following categories of facilities are considered to be engaging in "industrial activity" for
24   the purposes of paragraph (b)(14)".); *see also* 55 Fed. Reg. 47990 ("Storm water discharges
     associated with the industrial activities identified under § 122.26(b)(14) of today's rule").  The
25   Federal Register makes clear that the list provided under this subsection is exclusive, in that it
     provides exceptions for certain subcodes within larger SIC Codes (*e.g.*, specifying that all SIC
26   Code 24 facilities, except SIC Code 2434 facilities which produce wood kitchen cabinets, are
     required to have permits).
27         [9] Located at http://cfpub1.epa.gov/npdes/stormwater/swsectors.cfm (last checked July 31,
28   2012).  A print-out of this web page is attached to the Showalter Declaration as Exh. 16.

1   a permit are created to "group similar facilities by the nature of industrial activity, type of

2   materials handled, and material management practices employed.")  The groups of establishments

3   are based on the definition of 'storm water discharge associated with industrial activity' found at

4   40 CFR § 122.26 (b)(14)(i)-(ix), (xi) and are mostly  described by an establishment's Standard

5   Industrial Classification (SIC) code."[10]

6   Key guidance materials include: U.S. EPA NPDES Storm Water Program *Question &*

7   *Answer Document Vols. 1 & 2*, relevant portions filed with the Showalter Decl. as Exh. 18, the

8   California General Industrial Permit itself, Showalter Decl. Exh. 13, and various internal Board

9   memoranda, Showalter Decl. Exhs. 19-21, Exh. 24.  Additionally, EPA has outlined its opinion

10  regarding CWA applicability in various briefs, most recently its certiorari brief in *Brown* (now

11  called *Decker*), where it concluded that *Brown* was incorrectly decided.  *See, e.g.*, Exh. 23.

12  Finally, ERF itself has filed materials in a Ninth Circuit proceeding undercutting its SIC Code

13  theories.  (*See, e.g.*, Showalter Decl. Exhs. 26-28.)

14  When EPA and California regulators promulgated these materials, they presumably

15  expected that parties could use them to make reliable determinations as to whether the parties

16  were required to be permitted.  California guidance materials provide the following decision tree:

17

18

19

20

21

22

23

24

25

26

27

28

---

[10] *See also* 40 C.F.R. Subchapter N (providing effluent guidelines and standards based on industry classification, and not discrete task); Environmental Protection Agency Effluent Limitation Guidelines); Industrial Regulations, located at http://www.epa.gov/guide/industry.html (last visited July 31, 2012).  A print-out of this webpage is Showalter Declaration Exh. 17.



*See generally* Memorandum dated October 14, 1992 by Thomas Mumley.  Cal. Regional Water Quality Board ["Mumley Memo."], San Francisco Bay Region, Showalter Decl. Exh. 19, at 3.

As discussed above, the primary activity at the site, as agreed by the Parties, is the support of PG&E's electric and gas business.  California, like the federal government, relies on the "primary" activity at a facility to determine coverage.[11]  However, California focuses on the "primary activity" at individual facilities to determine coverage, instead of the "primary" SIC code for the overall business establishment.  Here, this does not matter because PG&E itself would have a Group 49 SIC Code.[12]  Multiple SIC codes are only used at a property where there are separate and divisible "facilities" at such a property where distinct operations occur. (Simpson Rep. at 30).  ERF does not contend that such a situation occurs at the Facilities.

---

[11] Memorandum From Elizabeth Miller Jennings to Bruce Fujimoto dated June 21, 1997 at 2, Showalter Decl. Exh. 20.

[12] *See* Memorandum from Elizabeth Miller Jennings to Archie Matthews dated January 31, 1992 at 3-4, Showalter Decl. Exh. 21.

1

3.      **Step 3**:  **The SIC Code applicable to PG&E service centers is not**

2

**industrial**.

3         The Facilities' primary purpose is to support the distribution and transmission of

4 electricity and gas.  (Pl. RFA Resp. nos. 15 – 30).  ERF has developed no evidence that any other

5 activity at the Facilities is "primary."  Instead, ERF seeks to read "primary" out of the regulations

6 and the SIC code descriptions and require an SIC Code for each activity occurring on a site.[13]

7 The State of California and the local municipalities who enforce the NPDES permitting program

8 have not done so.  Indeed, these local municipalities regularly inspect PG&E's facilities and have

9 determined that these Facilities do not need a permit.  (*See* County of Alameda Inspection

10 Reports, Showalter Decl. Exhs. 23 & 24.)  ERF's allegations about multiple activities that occur

11 at the Facilities does nothing to change the purpose for the Facilities, and hence, nothing to

12 change the SIC Code which determines whether they are permitted.  Indeed, the SIC Code

13 manual expected multiple operations to occur at Facilities.

14         The SIC Code Manual states that Group 49 services may "also include other types of

15 services, such as transportation, communications, and refrigeration."  (SIC Code Manual at 284).

16 The SIC Code manual has a system in place to deal with establishments "engaged in performing

17 management or support services for other establishments of the same enterprise [business]."  (*Id.*

18 at 12).  These facilities are "auxiliary" facilities and receive the same SIC code as the overall

19 business.  (*Id.*)  Examples of such management and support services include:

20      •   Warehouses and storage facilities for the benefit of the overall business;

21      •   Maintenance and repair shops for maintenance and repair of machinery and equipment

22         of the same business;

23      •   Automotive repair shops or storage garages for repair and storage of the business'

24         vehicles;

25      •   Provision of equipment for use by the business in the field.

26

27         [13] ERF has previously argued that, following *Brown*, 40 C.F.R. § 122.26(b)(14)  should be
rendered invalid.  It is important to note that one of the issues in *Brown*, pending before the

28 Supreme Court is whether the Ninth Circuit appropriately deferred to EPA.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS I AND II
CASE NO.  3:CV 10-00121 RS

1    (Id. at 15).  These are the same activities ERF alleges are performed at the Facilities, and ERF has

2    only established that they occur in support of the primary purpose of the facilities, e.g. supporting

3    PG&E's provision of gas and electric services.

4              **4.       Step 4: SIC Codes proposed by ERF are not applicable to the**

5                        **Facilities.**

6              As was outlined above, SIC Codes rely upon "primary" activities and the Facilities

7    primary activity is not defined as "industrial" in the regulations.  The Facilities' SIC Code hinges

8    on their "primary activity," i.e. the Facilities' purpose or reason for existing.[14]  "The primary

9    purpose is determined by the principal product or groups of products produced or distributed, *or*

10   *services rendered*. . . Once the primary purpose of [the] facility is identified, *you will be able to*

11   *determine if the primary purpose is described by one of the listed SIC Codes.*"[15]

12             Even though ERF cannot dispute that Group 49 SIC Codes[16] are not listed in 40 C.F.R. §

13   122.26(b)(14)  (or the identical list found in Attachment 1 to the California General Permit), *see,*

14   *e.g.*, Compl. ¶ 32 ("PG&E operates and maintains numerous corporation yards and service

15   centers" for the primary purpose of "provid[ing] service and maintenance on its electric and gas

16   distribution system).  ERF wrongly assigns a different SIC Code for **every** activity at a Facility

17   and ignores the word "primarily" in the SIC Code definitions.

18             ERF has not developed any evidence to support such broad interpretation of the SIC

19   Code's applicability and the only testimony on the subject, from Mr. Simpson, supports PG&E's

20   position that SIC codes are based on the primary activity on the site.  All of the SIC Codes ERF

21   has ascribed to PG&E's facilities lack applicability and are addressed below.  This section will

22

23             [14] "In issuing the General Permit, the SWRCB indicated that a facility must be permitted
     if the primary activity (purpose) of the facility is described by one of the listed SIC Codes
24   (whether or not the activity is primary or auxiliary to the owner of the facility).  Thus, the
     "primary activity at the facility should be considered when applying the SIC Codes rather than the
25   primary business of the owner or operator."  Mumley Memo, Attachment 1, at 1.
             [15] (*Id.*)
26             [16] Note that some energy-related facilities are included in this list because steam electric
27   power generating facilities are included by a narrative description of their activities, and not
     through reference to their SIC Code.  (*See* Attachment 1 ¶ 7.)  The exclusion of these SIC Codes
28   demonstrates an intent by regulators to exclude the SIC Code-related facilities from regulation.

1   also show why guidance materials and logic compel the conclusion that the Facilities have one

2   SIC, and not many, another invalid theory previously advocated by ERF.

3                   **a.      The Facilities are Not Transportation Facilities**.

4           ERF alleges that the Facilities are transportation facilities with SIC codes of 4226 and

5   4231 in the transportation section of the SIC Code Manual.  Guidance materials make it clear that

6   neither applies.  The transportation SIC Code applies only where "the facility is involved in

7   providing transportation to individual customers or for other companies or establishments, or

8   provides long-distance trucking services to anyone . . . Excluded are transportation facilities

9   which only transport goods for the company or enterprise of which it is a part or only transports

10  its own employees. . . Also excluded are fuel stations, vehicle repair or service stations, and body

11  shops . . . ."  (Mumley Memo. at 7).  All evidence in this case establishes that all transportation

12  related activity at the Facilities is for PG&E internal use only and is thus specifically excluded

13  from the assignment of either transportation SIC Code.  (*See generally* discussion *infra* at 5.)

14          In addition, SIC Code 4226 is defined as "establishments **primarily** engaged in the

15  warehousing and storage of special products . . . ."  (SIC Code Manual at 272, emphasis added).

16  SIC Code 4231 is defined as "establishments **primarily** engaged in the operation of terminal

17  facilities used by highway-type property carrying vehicles.  Also included are terminals which

18  provide maintenance and service for motor vehicles. (SIC Code Manual at 272, emphasis added).

19  ERF concedes that the Facilities' primary purpose is to support the distribution and transmission

20  of electricity and gas so these SIC Codes cannot apply as a matter of law.  Further, there is no

21  evidence that these Facilities are "trucking" facilities or "terminals" that would fall under these

22  SIC Codes even if such operations were their primary purpose.

23                  **b.      The Facilities are not Light Industrial Facilities.**

24          ERF has alleged that the Facilities are light industrial facilities with SIC Codes of 3444,

25  3449, 3452, 3494, 3496, 3498, and 3499.  These sections relate to facilities "primarily engaged"

26  in the following activities:

27

28

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS I AND II
CASE NO.  3:CV 10-00121 RS

**SIC Code 3444** – "manufacturing sheet metal work for buildings . . . and manufacturing stovepipes, light tanks, and other products of sheet metal." ERF has produced no evidence of this type of work occurring at the Facilities.

**SIC Code 3449** – "manufacturing miscellaneous structural metal work, such as metal plaster bases, fabricated bar joists, and concrete reinforcing bars [and] establishments primarily engaged in custom roll forming of metal."  ERF has produced no evidence of this type of work occurring at the Facilities.

**SIC Code 3452** – "manufacturing metal bolts, nuts, screws, rivets, washers, formed and threaded wire goods, and special industrial fasteners."  ERF has produced no evidence of this type of work occurring at the Facilities.

**SIC Code 3494** – "manufacturing metal valves and pipe fittings, not elsewhere classified, such as plumbing and heating valves, and pipe fittings, flanges, and unions, except from purchased pipes" ERF has produced no evidence of this type of work occurring at the Facilities.

**SIC Code 3496** – "manufacturing miscellaneous fabricated wire products from purchased wire, such as non-insulated wire rope and cable; fencing; screening, netting, paper machine wire cloth; hangers, paper clips, kitchenware, and wire carts." ERF has produced no evidence of this type of work occurring at the Facilities.

**SIC Code 3498** – "fabricating pipe and pipe fittings from purchased metal pipes by processes such as cutting, threading, and bending." ERF has produced no evidence of this type of work occurring at the Facilities.

**SIC Code 3499** – "manufacturing fabricated metal products, not elsewhere classified, such as fire or burglary resistive steel safes and vaults and similar fire or burglary resistive products; and collapsible tubes of thin flexible metal. Also included are establishments primarily engaged in manufacturing metal boxes, metal ladders, and metal household articles, such as ice cream freezers and ironing boards." ERF has produced no evidence of this type of work occurring at the Facilities.

Notably, "light industrial" activities are all defined by primary engagement in manufacturing, something that there is no proof whatsoever that PG&E conducts.  Further, even a

23

cursory examination of these SIC Codes makes it clear that they do not apply to PG&E, and ERF

has presented no proof to the contrary.

### c. The Facilities are not Recycling Facilities.

ERF alleges that the Facilities are recycling facilities with an SIC code of 5093. SIC Code

5093 is defined as "establishments **primarily** engaged in assembling, breaking up, sorting and

wholesale distribution of scrap and waste materials." (SIC Code Manual at 301, emphasis

added). ERF cannot credibly argue that the Facilities are "primarily" engaged in this type of

recycling. Furthermore, the type of recycling at the Facilities is not what the SIC Code manual or

the regulations refer to as wholesale recycling. (Simpson Report at 30-31). Sorting and recycling

of materials that are generated by the company itself is an "upstream" activity common to all

businesses in California who are encouraged or required to undertake sustainable environmental

practices like recycling. (*Id.*) SIC Code 5093 refers to "downstream" recycling wherein

wholesale companies (like the type who take PG&E's scrap metal), process the wastes from many

companies and sell such material. (*Id.*) Sorting your own material for recycling purposes is not

"wholesale" recycling contemplated by the regulations.

### d. Single SIC Codes v. Multiple SIC Codes.

As discussed above, the Facilities do not conduct the activities which would require them

to use "industrial" SIC Codes. Using a single Group 49 SIC Code is the appropriate way to

characterize each of the PG&E facilities because the single code adequately describes the

"primary activity" occurring on, or "primary purpose" of each facility. The application notes to

the General Permit, as well as Federal guidance materials, emphasize that "Most facilities have

only one code . . . ." (*See* General Permit, Attachment 3, Page 3, Section III, Part D; *see also*

discussion *supra* n.19.) SIC Category 49 facilities:

> Include[] establishments engaged in the generation, transmission,
>
> and/or distribution of electricity or gas or steam. Such
>
> establishments may be combinations of any of the above three
>
> services and also include other types of services, such as
>
> transportation, communications, or refrigeration . . . .

1  (SIC Code 49) (emphasis added); SIC Code Manual at 15 (examples (3) – (5).)

2          ERF's laundry list of  activities which occur at the site – *e.g.*, maintaining power trucks,

3  "processing, reclaiming, and wholesale distribution of scrap and waste materials, including . . .

4  wooden utility poles associated with PG&E's electricity and natural gas transmission and

5  distribution systems," and storage of "electrical generators, transformers, cables, and metal pipes

6  . . . and other equipment and parts used in the installation and maintenance of PG&E's utility

7  poles, electric transmission lines, and natural gas distribution systems," (*See* Compl. ¶¶ 32-37) –

8  entirely consists of activities best categorized as auxiliary support functions of a Group 49 SIC

9  Code establishment and well within PG&E's core business and facility function described in

10  Paragraph 30 of the Complaint.

11          Demonstrating that activities occur at a facility is insufficient to demonstrate that it should

12  be ascribed an additional SIC Code unless the activity is the "primary" activity at a facility.[17]

13  ERF has not, and cannot demonstrate that any ancillary activity at a facility requires either a

14  different SIC Code or securing an NPDES permit.

15          Nor is demonstrating that PG&E's facilities "routinely conduct" activities which "are

16  within" other SIC Codes sufficient to illustrate that the Facilities should be classified differently.

17  S*ee, e.g.*, Compl. ¶¶ 32-33.  As the Ninth Circuit emphasized in *Brown*, 640 F.3d at 1083,

18  industries' "'associated with industrial activity' regulation are defined in accordance with

19  Standard Industrial Classifications ('SIC')."  *Brown* emphasizes that SIC Codes are applied based

20  on the guidelines, and not by criteria apparent only to the regulator.[18]  Activities that are

21  "routinely conducted" are not "primary activities," the term used by the SIC Code Manual.

22  ERF's the-regulator "knows industrial when he sees it" theory must be rejected.

23

24  _____

25          [17] "Primary" is defined as "of first rank, importance, or value."  www.merriam-
webster.com/dictionary/primary (last checked July 31, 2012).

26          [18] *See, e.g.*, Brief for the United States as amicus curiae, *Decker v. Nw. Env'l Def. Ctr.*,
No. 11-338 (May 2012), at 13 (stating that EPA's view as to how SIC Codes should be applied is

27  (a) first find the appropriate SIC Code, and (b) then ascertain whether a facility otherwise a
traditionally industrial facility like a sawmill engaged in manufacturing) [Showalter Decl. Exh.

28  25.]

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS I AND II
CASE NO.  3:CV 10-00121 RS

1    As discussed above, nowhere in the Complaint does ERF identify a category of facility

2    that requires PG&E seek an NPDES permit for the Facilities.  Indeed, based upon the description

3    in the Complaint, Paragraphs 30 through 38, ERF's admissions, and the proof developed in this

4    case, PG&E's facilities are clearly not covered in the ten categories listed in the General Permit.

5    (*See* General Permit, Attachment 1.) The service centers, as SIC Group 49 facilities, are not

6    subject to permitting.

7                                **(i)      Multiple SIC Codes**.

8         Further, it is clear that the Facilities have one SIC Code.  The California General Permit's

9    instructions state that "most facilities have only one SIC Code."  (*See* General Permit, Attachment

10   3, Page 3.)  Federal guidance materials agree:

11               **56.  If the facility has more than one industrial activity, how**

12               **many applications are required?**

13               Only one application is required per facility.  [I]f a facility

14               manufactures both metal and plastic products, the facility would

15               total receipts for each operation and the operation that generated the

16               most revenue . . . is the operation in which the facility is primarily

17               engaged.  If revenues and receipts are not available for a particular

18               facility, the number of employees or production rate may be

19               compared.  If a facility performs more than two types of operations,

20               whichever operation generates the most (not necessarily the

21               majority) revenue or employs the most personnel, is the operation

22               in which the facility is primarily engaged.

23   EPA Question & Answer Doc. Vol. I, at 18.[19]

24        There is no question that the Facilities are not a source of revenue for PG&E and ERF has

25   produced no evidence to the contrary.

26   _____

27        [19] California relies on the 1992 Question & Answer documents to interpret its own permits
     and ambit of authority.  *See, e.g.*, Memorandum from Elizabeth Miller Jennings to Archie
     Matthews of the Division of Water Quality, State Water Resources Control Board, dated June 28,
28   1993, at 3.

Certainly, limited situations exist where multiple SIC Codes are required. An exhibit ERF submitted to the Ninth Circuit in the related "pole" decision illustrates situations where more than one SIC Code might be required. (*See ERF v. PG&E*, Ninth Circuit Case No. 11-16042, Doc. No. 28-9, Showalter Decl. Exh. 26.) This chart ERF describes as "listing the facilities that are within SIC Code Group 49 that have acquired coverage under the California State Water Resources Control Board's General NPDES permit for industrial stormwater discharges for their discharges of stormwater." (*See ERF v. PG&E*, Ninth Circuit Case No. 11-16042, Doc. No. 28-2 at 6, Showalter Decl. Exh. 27.) Unlike the Facilities, each of the facilities listed on this chart conducts power generation. ERF's "examples" are wholly dissimilar to the facilities involved in this case. The facilities listed on the chart as having multiple SIC Codes generally appear to be steam power generation plants with a mixture of electrical services (generation) and operations like log processing or incineration which feed electrical generators, which are required to be permitted under 40 C.F.R. § 122.26(b)(14)(i) by a narrative description of their operations, and *not in the regulations by their SIC Code*.[20]

The facilities listed on ERF's chart follow a clear rule: Two SIC Codes are required only where a "site" is actually two distinct "facilities."[21] The facilities with two SIC Codes are generally steam power generation plants (required to have a permit because they are specifically listed in the regulations) and other functions generally either related to their fueling (logging, refuse). Others are for steam boilers are located at schools (*i.e.* UCLA & Pacific Union College.) That ERF's "multiple SIC Code" theory is discredited by an exhibit created by its attorneys in this matter provides additional evidence of why it should be rejected.

---

[20] In the same matter, ERF filed a federal EPA consent decree which discusses Group 49 SIC Codes. But, as it makes clear, the involved facility is a steam power generation plant which is regulated under a different subsection of 40 C.F.R. § 122.26(b)(14). (*See ERF v. PG&E*, Ninth Circuit Case No. 11-16042, Doc. No. 28-9, Showalter Decl. Exh. 28 ¶ 4.)

[21] "A facility is defined as 'something that is built, installed, or established to serve a particular purpose . . . . Therefore, identifying the 'purpose' is critical in defining a facility, i.e. each facility will achieve a particular end which can be described with a SIC Code." Mumley Memo, Attachment 1, at 1. "When a site contains two (or more) distinct facilities, each which is most correctly described by *designated SIC Codes*, only one NPDES permit may be necessary if the owner of the site assumes responsibility for all facilities . . . As an alternative, the operators for each facility could apply for separate permits." *Id.*

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS I AND II
CASE NO. 3:CV 10-00121 RS

1    Logical extensions of the argument provide a clear third reason.  Under a "multiple SIC

2    Code theory," Best Buy would need industrial NPDES permits because it collects used batteries

3    and other e-waste for recycling.  If EPA intended to say "anything 'industry related' no matter

4    how remote" with the regulation it could have, without providing any facility-focused examples.

5    *See Rainsong Co. v. Fed. Energy Regulatory Comm'n*, 151 F.3d 1231, 1234 (9th Cir. 1998) ("In

6    the construction of administrative regulations . . . it is presumed that every phrase serves a

7    legitimate purpose and, therefore, constructions which render regulatory provisions superfluous

8    are to be avoided.").

9    **E.     ERF's Duty to Apply Claim Should be Dismissed.**

10   ERF's Second Claim for relief is that PG&E had a "duty to apply" for a CWA permit.

11   "Duty to apply" claims are not legally actionable because the CWA provides no basis for a

12   "failure to apply" claim.

13   First, it is settled law that there is no duty to seek or obtain a permit in the absence of

14   discharges from regulated "point sources" that would require such permit.  *Service Oil v. EPA*,

15   590 F.3d 545, 551 (8th Cir. 2009) ("'unless there is a 'discharge of any pollutant,' there is no

16   violation of the Act, and . . . [no] obligat[ion] to seek or obtain an NPDES permit'") (quoting

17   *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486, 504 (2nd Cir. 2005); *Environmental Protection*

18   *Information Center v. Pacific Lumber Co.*, 469 F. Supp. 2d 803, 827 (N.D. Cal. 2007) (same));

19   *see also National Pork Producers Council v. EPA*, 635 F.3d 738, 752-53 (5th Cir. 2011) (same).

20   As such, the Second Claim for Relief therefore should be dismissed for the same reasons as the

21   first claim.

22   Next, even if the discharges at issue required a permit, the CWA and case law establish

23   that there is no private right of action or separate claim for relief under the CWA for a failure to

24   apply for an NPDES permit.  *See* 33 U.S.C. § 1365(a), (f); *Service Oil*, 590 F.3d at 551; *Pac.*

25   *Lumber Co.*, 469 F. Supp. 2d at 826-27.

26   Specifically, the CWA only confers citizens with authority to sue private defendants for

27   violations of "an effluent standard or limitation," and specifies the exclusive statutory and

28   regulatory violations upon which a citizen suit may be based.  33 U.S.C. § 1365(a), (f).  "Federal

28

1    Courts may not imply a private right of action under any provision of the Clean Water Act not

2    expressly referenced in the statute's citizen suit provision." *Bd. of Trustees of Painesville Tp. v.*

3    *City of Painesville, Ohio*, 200 F.3d 396, 399 (6th Cir. 1999) (citing *Middlesex County Sewerage*

4    *Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14-15 (1981)).  Here, ERF bases its claim for

5    relief on 40 C.F.R. § 122.21(a), which it contends sets forth the duty to apply for a permit.

6    (Compl. ¶ 54.)  That provision is not included among the enumerated statutory or regulatory

7    bases for a citizen suit, nor is it referenced in Sections 1311(a) or 1342, the two provisions of the

8    CWA that ERF contends furnish it with a right to pursue a separate "failure-to-apply" claim.

9    33 U.S.C. § 1365(f); *id.* at §§ 1311(a), 1342.

10        Consistent with the foregoing, courts have rejected the proposition that failing to apply for

11    and obtain a permit furnishes a separate claim for an unpermitted discharge.  In *Service Oil*, for

12    instance, the court reversed civil penalties assessed by the EPA that were based solely on a

13    "failure to apply for and obtain an NPDES permit."  *Service Oil*, 590 F.3d at 548.  Just as ERF

14    does here, EPA asserted that the defendant's failure to apply for a stormwater discharge permit as

15    required by 40 C.F.R. § 122.21 was a separate and distinct violation of the CWA, warranting

16    penalties above and beyond those that could be assessed for discharges alone.  *See id.*  In

17    reversing the penalties, the court explained that the CWA only authorized the EPA to assess

18    penalties "for violations of specific statutory provisions [enumerated in 33 U.S.C. § 1319(g)(1)[22]]

19    related to the core prohibition against discharging without a permit, or contrary to the terms of a

20    permit.  The agency *may not impose those penalties for violations of **other** Clean Water Act*

21    *regulatory requirements. . . ."  Id.* at 550 (emphasis added).  The court found nothing in the

22    statute supporting a separate claim for failing to apply for a permit, and further explained that

23    CWA Sections 1311 and 1342—which ERF relies on here—"confirm[] that the . . . authority to

24    assess monetary penalties . . . is limited to unlawful discharges of pollutants."  *Id.* at 550-51.[23]

_____

25        [22] Section 1319(g)(1) is a parallel to the citizen-suit provision that authorizes EPA to sue

26    for violations of specifically enumerated provisions of the CWA, including, among others,
    Sections 1311(a) and 1342.  33 U.S.C. § 1319(g)(1).

27        [23] As the court in *Service Oil* explained, by its express terms, Section 1311(a) only
    prohibits the "discharge" of pollutants, except in compliance with other specified provisions of

28    the CWA, including Section 1342.  *See Service Oil*, 590 F.3d at 550-51; 33. U.S.C. § 1311(a).

1    Similarly, in *Pacific Lumber*, private plaintiffs sued for unpermitted discharges under

2    Section 1311(a), but also brought a second set of claims under Section 1342 "for failing to apply

3    for and obtain" coverage under California's general permit for industrial stormwater and an

4    NPDES permit. *Pacific Lumber*, 468 F. Supp. 2d at 818.  Like ERF here, the plaintiffs in *Pacific*

5    *Lumber* contended that defendant had committed a separate and "individual violation for each day

6    [defendant] was without a permit," thus inflating the number of violations from thirteen (one for

7    each discharge) to over 8,500.  *Id.*  Plaintiff sought summary judgment on the Section 1342

8    claims on the basis that the defendant admitted that it had no NPDES permit during the relevant

9    period.  *Id.* at 824-27.  The court denied summary judgment, explaining that Section 1342 "does

10   not employ the language of [a] duty [to apply], rather it proscribes a timeline for the filing of

11   applications where appropriate."  *Id.* at 826.  The court further explained that Section 1342

12   "confers no independent cause of action" other than for noncompliance with an existing NPDES

13   permit.  *Id.* at 827.  Accordingly, PG&E should be awarded summary judgment on this claim.

14   **IV.**    **CONCLUSION.**

15   WHEREFORE, PG&E requests that this Court enter PG&E's Proposed Order granting it

16   summary judgment on Claims I and II for the reasons set forth herein.

17   Dated:  August 2, 2012

18   Schiff Hardin LLP

19

20   By: /s/  Russell B. Selman
                                        Russell B. Selman
21                                        Attorneys for Plaintiff

22   CH2\11409688.10

23

24

25

26

27

28   Section 1342 implements the permitting program, but affords no claim for relief "until a permit
     issues."  *Service Oil*, 590 F.3d at 551; *see also Pacific Lumber*, 468 F. Supp. 2d at 827.