1  Christopher Sproul (State Bar No. 126398)
   Jodene Isaacs (State Bar No. 226895)
2  Brian Orion (State Bar No. 239460)
   ENVIRONMENTAL ADVOCATES
3  5135 Anza Street
   San Francisco, California 94121
4  Telephone: (415) 533-3376, (510) 847-3467
   Facsimile: (415) 358-5695
5  Email: csproul@enviroadvocates.com
   Email: jisaacs@enviroadvocates.com
6  Email: borion@enviroadvocates.com

7  William Verick (State Bar No. 140972)
   Klamath Environmental Law Center
8  Fredric Evenson (State Bar No. 198059)
   Law Offices of Fredric Evenson
9  424 First Street
   Eureka, California 95501
10 Telephone: (707) 268-8900
   Facsimile: (707) 268-8901
11 Email: wverick@igc.org
   Email: ecorights@earthlink.net

12 Attorneys for Plaintiff
   ECOLOGICAL RIGHTS FOUNDATION

13

14                    UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16

17 ECOLOGICAL RIGHTS FOUNDATION,        Civil No. CV-10-00121 RS

18              Plaintiff,

19      v.                              **PLAINTIFF'S NOTICE OF MOTION
                                        AND MOTION FOR SUMMARY
20 PACIFIC GAS AND ELECTRIC COMPANY,    JUDGMENT ON CLAIM ONE;
                                        MEMORANDUM OF POINTS AND
21              Defendant.              AUTHORITIES**

22                                      Hearing date: November 8, 2012
                                        Time: 10:00 a.m.
23                                      Location: Courtroom 3, 17th Floor

24

25

26

27

28

## TABLE OF CONTENTS

I. Introduction ................................................................................................................ 1

II. Statutory and Regulatory Background ...................................................................... 1

    A. Clean Water Act ...................................................................................................... 1

    B. General Industrial Storm Water Permit .................................................................. 3

III. Statement of Facts ..................................................................................................... 3

    A. PG&E Conducts Industrial Activities at the Facilities ........................................... 3

        1. PG&E Conducts Recycling Activities at the Facilities.................................... 3

        2. PG&E Conducts Aggregates Handling and Storage at the Facilities .............. 5

        3. PG&E Conducts Transportation Activities at the Facilities ........................... 6

        4. PG&E Conducts Light Industries Activities at the Facilities ......................... 7

        5. PG&E Conducts Other Industrial Activities at the Facilities ......................... 8

    B. PG&E's Facilities Are Contaminated With Numerous Pollutants. .......................... 10

        1. PG&E's Utility Poles Leach Contaminants to Storm Water and Soils. .......... 10

        2. PG&E's Aggregate Handling Releases Contaminants to the Environment. ..... 14

    C. These Pollutants Are Discharged From the Facilities in Sediment and Storm Water. ........... 15

IV. Standard of Review .................................................................................................... 16

V. Argument .................................................................................................................... 16

    A. The CWA's Discharge Prohibitions Apply to PG&E's Facilities ........................... 16

        1. CWA § 402(p)(2)(B) Requires Permit Coverage Because PG&E is Conducting Industrial Activities at the Facilities............................................ 16

        2. The State Board Has Exercised its Discretionary CWA § 402(p)(2)(E) Authority to Designate the Facilities for NPDES Regulation ......................... 20

        3. EPA's Regulations Cannot Permissibly Exempt Industrial Storm Water Discharges from NPDES Regulation. ............................................................. 21

        4. CWA § 402(p) Does Not Exempt the Facilities from CWA § 301(a)'s Prohibition on Unpermitted Discharges............................................................ 21

    B. PG&E is Violating the CWA By Discharging Pollutants from Point Sources to Waters of the United States without an NPDES Permit. ............................................ 22

        1. PG&E Is "Discharging Pollutants" from the Facilities.................................... 22

        2. PG&E Is Discharging Pollutants from a "Point Source." ................................. 24

        3. Polluted Discharges from the Facilities Reach "Waters of the United States." ........ 24

    C. PG&E's Violations Have Occurred on Every Day With Significant Rainfall During the Relevant Time Period ................................................................................ 24

VI. Conclusion ................................................................................................................. 25

## TABLE OF AUTHORITIES

**Federal Cases**

*Am. Mining Cong. v. EPA,*
    965 F.2d 759 (9th Cir. 1992) ................................................................................. 21

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 106 S. Ct. 2505 (1986) ................................................................... 16

*British Airways Bd. v. Boeing Co.,*
    585 F.2d 946 (9th Cir. 1978) ................................................................................. 16

*City of Milwaukee v. Ill.,*
    451 U.S. 304 (1981) ................................................................................................. 1

*Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.,*
    13 F.3d 305 (9th Cir. Cal. 1993) .................................................................. 1, 22, 24

*Decker v. Northwest Envtl. Def. Ctr.,*
    2012 U.S. LEXIS 4793 (June 25, 2012) ............................................................... 21

*Envtl. Def. Ctr. v. EPA,*
    344 F.3d 832 (9th Cir. 2003) ........................................................................... 19, 20

*EPIC v. Pac. Lumber Co.,*
    301 F. Supp. 2d 1102 (N.D. Cal. 2004) ..................................................... 1, 2, 20, 21

*Hawaii's Thousand Friends v. Honolulu,*
    821 F. Supp. 1368 (D. Haw. 1993) ...................................................................... 25

*Headwaters, Inc. v. Talent Irrigation Dist.,*
    243 F.3d 526 (9th Cir. 2001) ................................................................................. 24

*League of Wilderness Defenders v. Forsgren,*
    309 F.3d 1181 (9th Cir. 2002) ............................................................................... 21

*Manzanita Park, Inc. v. Ins. Co. of N. Am.,*
    857 F.2d 549 (9th Cir. 1988) ................................................................................. 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ............................................................................................... 16

*Nishimoto v. Federman-Bachrach & Assocs.,*
    903 F.2d 709 (9th Cir. 1990) ................................................................................. 16

*Northwest Envtl. Advocates v. EPA,*
    2005 U.S. Dist. LEXIS 5373 (N.D. Cal. 2005) ................................................... 24

*Northwest Envtl. Def. Ctr. v. Brown*,
    617 F.3d 1176 (9th Cir. 2010) ........................................................................... 21

*NRDC v. Costle*,
    568 F.2d 1369 (D.C. Cir. 1977) ......................................................................... 21

*NRDC v. EPA*,
    822 F.2d 104 (D.C. Cir. 1987) ........................................................................... 1

*NRDC v. EPA*,
    966 F.2d 1292, 1304 (9th Cir. 1992) .................................................................. 21

*Pac. Coast Med. Enterprises v. Harris*,
    633 F.2d 123 (9th Cir. 1980) ............................................................................. 20

*PIRG of N.J., Inc. v. Powell Duffryn Terminals, Inc.*,
    913 F.2d 64 (3d Cir. 1990) ................................................................................ 25

*S.F. Baykeeper v. Tidewater Sand & Gravel Co.*,
    No. C 96-01531 CW, 1997 U.S. Dist. LEXIS 22602
    (N.D. Cal. September 9, 1997) .......................................................................... 24

*Trustees for Alaska v. EPA*,
    749 F.2d 549 (9th Cir. 1984) ............................................................................. 24

*U.S. v. Earth Sciences, Inc.*,
    599 F.2d 368 (10th Cir. 1979) ........................................................................... 24

*U.S. v. Smithfield Foods*,
    191 F.3d 516 (4th Cir. 1999) ............................................................................. 25

*Wash. Wilderness Coal. v. Hecla Mining Co.*,
    870 F. Supp. 983 (E.D. Wash 1994) ................................................................. 24

**Federal Statutes**

33 U.S.C. § 1251(a) ................................................................................................ *passim*

33 U.S.C. § 1311(a) ................................................................................................ 1, 2

33 U.S.C. § 1317(a)(1) ............................................................................................ 10, 22

33 U.S.C. § 1342 ..................................................................................................... 2

33 U.S.C. § 1342(b) ................................................................................................ 3

33 U.S.C. § 1342(p) ................................................................................................ *passim*

33 U.S.C. § 1342(p)(2)(B) ...................................................................................... 16

33 U.S.C. § 1362(5) ............................................................................................ 22

33 U.S.C. § 1362(6) ............................................................................................ 14

33 U.S.C. § 1362(12) .......................................................................................... 22

33 U.S.C. § 1362(14) .......................................................................................... 24

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 56(c)(2) ...................................................................................... 16

**Code of Federal Regulations**

40 C.F.R. § 122.2 .............................................................................. 22, 23, 24, 25

40 C.F.R. § 122.26(a)(9)(i)(C) & (D) ................................................................. 20

40 C.F.R. § 122.26(b)(14) ........................................................................ 2, 17, 19

40 C.F.R. § 401.15 .............................................................................................. 10

40 C.F.R. Part 423, Appendix A ................................................................... 10, 22

**Other Federal Regulations**

55 Fed. Reg. 47990 (Nov. 16, 1990) ..................................................................... 2

64 Fed. Reg. 68722 (Dec. 8, 1999) ....................................................................... 2

65 Fed. Reg. 64745 (Oct. 30, 2000) .................................................................... 12

1

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE, that Plaintiff Ecological Rights Foundation ("ERF") hereby files this Motion for Summary Judgment on Claim One pursuant to Federal Rules of Civil Procedure 7 and 56, and Local Rules 7.2, 7.4, 7.5, and 56.1. This motion will come on for hearing on November 8, 2012 at 10:00 a.m., in Courtroom 3, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102.

By this motion, Plaintiff seeks an order finding that Pacific Gas and Electric Company ("PG&E") has violated Clean Water Act ("CWA") § 301(a), 33 U.S.C. § 1311(a), by discharging pollutants into waters of the United States without a National Pollution Discharge Elimination System ("NPDES") permit at four of its service centers in Northern California: 4801 Oakport St., Oakland, CA 94601 ("Oakport Facility"); 24300 Clawiter Rd., Hayward, CA 94545 ("Clawiter Facility"); 1099 W. 14th St. (at Railroad Ave.), Eureka, CA 95501 ("West 14th Street Facility"); and 2475 Myrtle Ave., Eureka, CA 95501 ("Myrtle Facility") (collectively "the Facilities").

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

ERF brought this action to address the ongoing discharges of pollutants from thirty-one PG&E service centers in Northern California. By this motion, ERF seeks summary judgment on Claim One with respect to the four Facilities mentioned above. This motion will show that PG&E conducts numerous industrial activities at these Facilities that constitute "industrial activity" under CWA regulations, requiring NPDES permit coverage. These activities have contaminated the Facilities with various pollutants, including pentachlorophenol and dioxins from the chemically treated wooden utility poles stored at the Facilities. Samples of storm water and sediments taken from the Facilities revealed dangerously elevated levels of these and other pollutants. When it rains, these pollutants are carried in storm water into conveyances that transport them off-site and eventually into San Francisco and Humboldt Bays. Additionally, motor vehicles track pollutants from the Facilities into public streets where they are washed into the municipal separate storm sewer systems ("MS4s"), which in turn discharge to San Francisco and Humboldt Bays. Because PG&E is discharging these pollutants to waters of the United States without NPDES permit coverage, PG&E is in violation of 33 U.S.C. § 1311(a).

## II.   STATUTORY AND REGULATORY BACKGROUND

### A.   Clean Water Act

The CWA aims "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." CWA § 101(a); 33 U.S.C. § 1251(a). The CWA "establishes a comprehensive statutory system for controlling water pollution," which is "[b]uilt on a fundamental premise that the unauthorized discharge of any pollutant by any person shall be unlawful." *Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*, 301 F. Supp. 2d 1102, 1105 (N.D. Cal. 2004) ("*EPIC*") (citation and internal quotation marks omitted); *City of Milwaukee v. Ill.*, 451 U.S. 304, 310-11 (1981); *see also NRDC v. EPA*, 822 F.2d 104, 123 (D.C. Cir. 1987) ("The first principle of the statute is, as we have seen, that it is unlawful to pollute at all."); *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 309 (9th Cir. 1993). To this end, CWA section 301(a) prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with the terms of an NPDES permit issued pursuant

to CWA section 402. CWA § 301(a); 33 U.S.C. § 1311(a); CWA § 402; 33 U.S.C. § 1342; *EPIC*, 301 F. Supp. 2d at 1105.

In 1987, Congress amended the CWA to add CWA section 402(p), 33 U.S.C. § 1342(p), which set deadlines for EPA to issue NPDES permits regulating storm water discharges. CWA section 402(p)(1) established a moratorium until October 1, 1994 on EPA issuance of NPDES permits for "discharges comprised entirely of stormwater." CWA § 402(p)(2) specifically excluded from this moratorium five categories of storm water discharges, including "discharge[s] associated with industrial activity" and "discharge[s] for which the [EPA] Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." CWA § 402(p)(2)(B) & (E). CWA section 402(p)(6) further required EPA to establish a comprehensive program and issue regulations by October 1993 that designated additional storm water discharges "to be regulated to protect water quality" which had been covered by CWA section 402(p)(1)'s NPDES permit moratorium.

In response to the amendments, EPA promulgated regulations governing the issuance of NPDES permits to storm water dischargers falling within CWA section 402(p)(2)'s list of non-excluded storm water discharges in 1990 ("the Phase I Regulations"). *See* 55 Fed. Reg. 47990 (Nov. 16, 1990); *EPIC*, 301 F. Supp. 2d at 1107. In 1999, in accord with CWA section 402(p)(6)'s mandate, EPA issued additional regulations governing the issuance of NPDES permits to facilities that had not been on the CWA section 402(p)(2) list of non-excluded facilities ("the Phase II Regulations"). *See* 64 Fed. Reg. 68722 (Dec. 8, 1999); *EPIC*, 301 F. Supp. 2d at 1107.

EPA's Phase I Regulations define discharges associated with industrial activity as "the discharge from any conveyance that is used for collecting and conveying stormwater and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant." 40 C.F.R. § 122.26(b)(14). The regulations list several categories of industrial facilities that "are considered to be engaging in 'industrial activity,'" including: "Facilities involved in the recycling of materials," classified as Standard Industrial Classification ("SIC") Code 5093; facilities involved in the storage and handling of aggregate materials, including those classified under SIC Code 1442; "Transportation facilities"

classified in SIC Codes 4226 and 4231 "which have vehicle maintenance shops [or] equipment cleaning operations"; and light industry facilities classified in SIC Code group 34, which includes codes 3444, 3452, 3449, 3494, 3496, 3498, and 3499, describing facilities primarily engaged in metal fabrication activities involving cutting, grinding, welding, and assembling metal parts. *See id*.

### B. General Industrial Storm Water Permit

CWA § 402(b), 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved permit program for discharges. In California, the State Water Resources Control Board ("State Board") has issued a single, statewide General Permit applicable to all storm water discharges associated with industrial activity. *See* Declaration of Jodene Isaacs in Support of Plaintiff's Motion for Summary Judgment on Claim One ("Isaacs Decl."), Ex. 14. The General Permit lists eleven categories of industrial activity for which a permit is required, including: recycling facilities such as metal scrap yards; transportation facilities that conduct any type of vehicle maintenance; oil, gas, and mining related industries, including those handling construction sand and gravel under SIC group 14; and certain facilities (often referred to as "light industry") where industrial materials, equipment, or activities are exposed to storm water. *Id*. at PDF pg. 5, 67 ¶ 3.[1] The "light industry" category includes the metal fabrication activities described above under group 34. *Id*. at PDF pg. 68 ¶ 10.

As discussed next, PG&E conducts numerous activities that constitute "industrial activity" under EPA's regulations and the General Permit for which NPDES coverage is required.

### III. STATEMENT OF FACTS

#### A. PG&E Conducts Industrial Activities at the Facilities.

##### 1. PG&E Conducts Recycling Activities at the Facilities.

PG&E conducts wholesale metals collection, sorting, and recycling activities at all four Facilities, which are described in SIC Code 5093.[2] PG&E transports used utility poles to the Oakport

---

[1] When exhibits do not contain page numbers, the page of the PDF document is given denoted by "PDF pg." and the number, counting the exhibit cover sheet as the first page.

[2] SIC Code 5093 describes activities relating to "Scrap and Waste Materials," including "breaking up, sorting, and wholesale distribution of scrap and waste materials," such as metals, oils, and other materials. The text of all SIC Codes is available at http://www.osha.gov/pls/imis/sicsearch.html. Note that EPA has also issued a general NPDES permit regulating storm water discharges associated with

and Clawiter Facilities, where PG&E strips the poles of wood cross-arms, insulators, transformers, and associated metal parts, and sorts the metal parts into large metal recycling bins corresponding to the type of metal involved (including copper, iron, steel, aluminum, and other metals).[3] At Oakport and Clawiter, PG&E also collects, sorts, and cuts pieces of metal, including steel and copper pipe from gas department operations, before placing the metals into recycling bins. Isaacs Decl., Ex. 28 at 30:5-18, 32:4-10; *id*., Ex. 38 at 18:10-23. PG&E also collects scrap metal at the Myrtle Facility and sorts the metal into recycling bins. *See id*., Ex. 23 at 51:13-52:1; *id*., Ex. 29 at 52:14-23; *id*., Ex. 16 at 30:2-31:12; Isaacs Decl. ¶¶ 6-11. Metal from the West 14th Street Facility, including waste steel pipe, is either recycled onsite or transported to Myrtle for recycling. *Id*., Ex. 16 at 21:10-21; *id*., Ex. 32 at 141:15-143:8. After the metals are sorted into the appropriate bins, the metals are hauled off-site by a third party metals recycling company, Alco Iron and Metals, who pays PG&E for the metals based on metal type and weight. *See* Declaration of Michael Bercovich ¶¶ 4-6; Isaacs Decl., Ex. 5. From December 2005 to April 2011, PG&E as a whole generated $46.3 million in payments for the wholesale recycling of scrap metal, of which about $1.3 million was derived from the Facilities. Isaacs Decl. ¶¶ 6-11, Exs. 6-7.

Besides sorting and recycling scrap metal, PG&E also recycles other materials, including: (1) metal equipment such as transformers, switches, electric meters, and metal cables (*id*., Ex. 21 at 6:5-21 (Oakport); *id*., Ex. 26 at 9:23-10:3 (Clawiter)); (2) wood poles and pole cross-arms (*id*., Ex. 21 at 6:3-21 (Oakport); *id*., Ex. 26 at 6:18-17 (Clawiter)); and (3) other non-metal materials, like plastic and batteries

---

industrial activity, the EPA Multi-Sector General Permit ("MSGP"). While the MSGP does not apply in California, EPA has issued guidance documents or "Fact Sheets" accompanying the MSGP that express EPA's views on what are industrial facilities subject to NPDES storm water permitting requirements under CWA § 402(p)(2)(B). *See, e.g.*, EPA Industrial Fact Sheet Series for Activities Covered By EPA's MSGP, Sector N, *available at* http://www.epa.gov/npdes/pubs/sector_n_scraprecycling.

[3] For Oakport, see: Isaacs Decl., Ex. 21 at 6:22-7:2, 11:21-13:10, 5:4-6:4 (metal consists of copper, steel, and aluminum); *see generally* Isaacs Decl., Ex. 22 at 12:22-13:4; *id*., Ex. 23 at 65:5-12; *see generally* Isaacs Decl., Ex. 24 at 134:4-13. For Clawiter, see: *Id*., Ex. 26 at 6:8-7:16 (recycling of copper, steel, brass, and aluminum); *id*. at 8:14-20, 15:10-16:5 (breaking up poles for parts at Clawiter); *see generally id*., Ex. 24 at 34:18-25 (PG&E conducts recycling at Clawiter); *id*., Ex. 28 at 29:2-11 (sorting metals into recycling containers); *id*., Ex. 23 at 62:9-19 (recycling metals at Clawiter); *see also id*., Ex. 27 at 183:15-185:19, 186:4-17 (noting presence of recycling bins at Clawiter). For Myrtle and West 14th Street, see: *Id*., Ex. 32 at 141:15-142:16 (aluminum, copper, and steel recycled at Myrtle); *id*. at 143:3-8 (metals from West 14th Street taken to Myrtle for recycling).

at Oakport (*id.*, Ex. 22 at 12:22-13:4; *id.*, Ex. 24 at 132:5-23), ceramic, paper, and cardboard at Clawiter (*id.*, Ex. 26 at 6:8-7:16), and used oil filters at Myrtle. *Id.*, Ex. 29 at 52:16-23. In addition, PG&E recycles various types of automotive fluids at the Oakport, Clawiter, and Myrtle Facilities. This includes transmission fluid, motor oil, anti-freeze, and hydraulic oil. *Id.*, Ex. 36 at 63:24-64:4; *id.*, Ex. 29 at 52:21; *id.*, Ex. 24 at 133:24-25, 135:9-13). The fluids are collected and recycled by a third party vendor. *Id.*, Ex 36 at 67:9-15; *id.*, Ex. 24 at 135:6-18.

### 2. PG&E Conducts Aggregates Handling and Storage at the Facilities.

PG&E handles and prepares new and used aggregates for construction purposes at the Oakport, Clawiter, and West 14th Street Facilities, described in SIC Code 1442.[4] At Oakport, PG&E stores bags of new blacktop and concrete mix, as well as large piles of spoils, soils, sand, drain rock, and stone outside in large uncovered concrete bays in the southwest corner of the Facility. *Id.*, Ex. 25 at 47:14-48:14; *id.*, Ex. 38 at 9:12-10:12; Isaacs Decl., Ex. 35 at PDF pg. 5-7. Similarly, the Clawiter and West 14th Street Facilities house piles of new blacktop, sand, gravel, and asphalt in outdoor, uncovered storage bays. *Id.*, Ex. 27 at 171:16-173:8; *id.*, Ex. 28 at 7:14-8:8 (asphalt, crushed aggregate, and sand stored uncovered, exposed to rainfall at Clawiter); *id.*, Ex. 23 at 63:1-6; *id.*, Ex. 24 at 105:4-106:5; *id.*, Ex. 16 at 8:6-16; *id.*, Ex. 8 at PGE_SC0000449 (West 14th Street Facility map noting aggregate storage bays in the northeast corner).

PG&E uses the blacktop, crushed rock, and temporary asphalt mix to replace portions of streets and other paved surfaces in PG&E's territory that are dug up by PG&E's service crews. *Id.*, Ex. 28 at 6:20-7:20; *id.*, Ex. 24 at 106:6-9 (asphalt used to patch streets); *id.*, Ex. 25 at 47:14-48:14; *id.*, Ex. 27 at 171:16-172:19; *id.*, Ex. 16 at 8:6-21. PG&E uses the sand as a base in trenches prior to laying gas distribution pipe, as a liner to set a vault into the ground, or to back-fill trenches dug up in the field. *Id.*, Ex. 24 at 106:10-15; *id.*, Ex. 38 at 9:12-20.

When PG&E field crews are done with these construction jobs, they bring the broken up concrete and debris generated by these activities back to the facilities, where they dump them in "spoils

---

[4] SIC Code 1442 describes activities related to "Construction Sand and Gravel," including "washing, screening, or otherwise preparing sand and gravel for construction uses."

1  piles" on the ground. *Id.*, Ex. 28 at 25:3-22, 27:5-28:11 (spoil pile at Clawiter consists of an average of

2  20-100 yards of dirt and rock from gas department excavations, including around utility poles); *id.*, Ex.

3  27 at 174:25-176-22 (spoil pile at Clawiter comes from general construction projects in the field); *id.*,

4  Ex. 25 at 104:20-105:15 (spoil pile at Oakport); *id.*, Ex. 24 at 81:8-17 (used asphalt and concrete stored

5  in quadrant C-7 of Isaacs Decl., Ex. 8, the Oakport facility map, at PGE_SC000453). PG&E uses a soils

6  screening machine to sift and sort these large piles of used aggregates into smaller component parts,

7  some of which, like finer soils, PG&E then re-uses for its construction projects. *Id.*, Ex. 24 at 136:16-

8  137:4; *id.*, Ex. 25 at 106:21-108:1; *see also id.*, Ex. 24 at 80:4-9 (identifying location of soils screener);

9  Id., Ex. 35 at PDF pg. 8-9 (photos). At Oakport, the spoil pile and the uncovered aggregate bays pose a

10  risk of contaminating storm water runoff due to their proximity to a storm drain drop inlet that "feeds

11  directly to the bay." Isaacs Decl., Ex. 24 at 79:20-81:2; *id.*, Ex. 25 at 81:24-83:2.

### 3.   PG&E Conducts Transportation Activities at the Facilities.

12  PG&E provides storage, service, and maintenance for a sizable fleet of vehicles at all four

13  Facilities, described by SIC Codes 4226 and 4231.[5] Collectively, approximately 550 vehicles are

14  assigned to the Facilities and parked there on a regular basis.[6] This includes cars, trucks, trailers, vans,

15  and heavy-duty pieces of machinery like backhoes and cranes. *Id.*, Ex. 36 at 21:16-23; *id.*, Ex. 30 at

16  7:14-21. To service its vehicle fleet, PG&E maintains 70 garages across its territory, including one each

17  at Oakport, Clawiter, and Myrtle, with employees from Myrtle traveling to West 14th Street on a weekly

18  basis to perform vehicle maintenance there. *Id.*, Ex. 36 at 45:20-46:7; *id.*, Ex. 30 at 33:1-35:2. PG&E

19  employs 25 people to service the vehicle fleet at the four Facilities.[7] The combined pay for these 25

---

[5] These SIC Codes describe "terminals which provide maintenance and service for motor vehicles" (SIC
Code 4231) and the dead storage of automobiles (SIC Code 4226). *See also* EPA Industrial Fact Sheet
Series for Activities Covered By EPA's MSGP, Sector P, *available at*
http://www.epa.gov/npdes/pubs/sector_p_transportationfacilities.pdf.
[6] This includes approximately 250 vehicles assigned to Oakport (Isaacs Decl., Ex. 36 at 21:16-22:13),
260-270 vehicles at Clawiter (*id.* at 46:16-18), and 50 vehicles assigned to Myrtle. *Id.*, Ex. 30 at 6:9-7:1.
[7] PG&E has eight full-time employees in fleet services at Oakport (*id.*, Ex. 36 at 16:22-17:12), eleven
full-time employees, plus two union workers, in fleet services at Clawiter (*id.* at 11:3-12:22; *id.* at 13:24-
15:6), and four full-time employees in fleet services at Myrtle, who also serve West 14th Street. *Id.*, Ex.
30 at 11:17-20.

employees is approximately $1.6 million per year, or approximately $8 million for the five year relevant time period of this case.[8]

PG&E performs a variety of vehicle service and maintenance activities at the four Facilities. These activities include: (1) vehicle tune-ups (*id*., Ex. 36 at 34:13-17, 48:14-18; *id*., Ex. 30 at 17:20-18:17); (2) changing vehicle fluids, including motor, transmission, and hydraulic oil (*id*., Ex. 36 at 32:24-33:18, 37:22-38:5, 48:4-9; *id*., Ex. 27 at 42:5-10; *id*., Ex. 23 at 62:1-4; *id*., Ex. 30 at 15:15-25, 21:4-22:5); (3) brake maintenance, including brake inspection and replacement (*id*., Ex. 36 at 34:18-35:6, 48:19-25; *id*., Ex. 30 at 17:20-18:13, 30:23-31:20 (air brake inspection at West 14th Street), 35:20-36:4 (same)); (4) tire maintenance, including tire inspection, refilling, rotation, and replacement (*id*., Ex. 36 at 33:19-24, 34:5-9; *id*., Ex. 30 at 17:20-18:13); (5) vehicle washing (*id*., Ex. 36 at 31:15-18, 47:23-48:3); (6) smog checks on diesel vehicles (*id*. at 36:20-23); and (7) fueling vehicles with gasoline, diesel, and natural gas (*id*. at 35:7-11, 46:19-47:12; *id*., Ex. 27 at 158:2-159:2).

Beyond maintenance, PG&E also performs vehicle repairs at the Facilities. This includes an "endless" list of potential repairs (*id*., Ex. 36 at 39:8-15), such as replacing broken axles and fuel system repairs at Oakport and Clawiter (*id*. at 40:3-6, 15-19, 49:19-50:6), and replacement of transmissions, body work, fuel injection repairs, and touch-up painting at Myrtle (*id*., Ex. 30 at 23:3-24:2, 25:5-23). PG&E stores about $25,000 worth of spare parts and other inventory at the Facilities to perform these repairs. *Id*., Ex. 36 at 42:10-11, 43:9-12, 63:12-20 ($5,000 to $7,000 at Oakport); *id*. at 7-11 ($10,000 at Clawiter); *id*., Ex. 30 at 27:12-28:18 ($10,000 at Myrtle).

### 4.  PG&E Conducts Light Industrial Activities at the Facilities.

---

[8] PG&E pays its fleet services employees on an hourly basis, so this calculation is based on the hourly pay for each employee for a 40-hour week and 52 weeks per year. *See id*., Ex. 36 at 16:22-20:5 (noting job titles and hourly pay rates for workers at Oakport and Clawiter); *id*., Ex. 30 at 13:2-22 (same for Myrtle). When pay was estimated within a range, the mid-point was used in this calculation. *See id*., Ex. 36 at 18:11-13; *id*., Ex. 30 at 13:21-22. These calculations total: approximately $553,280 per year, or $2.75 million during the relevant time period (Oakport); approximately $739,120 per year, or $3.7 million during the relevant time period (Clawiter); and approximately $313,040, or $1.56 million during the relevant time period (Myrtle / West 14th Street). These calculations do not include either the $1.50 per hour night differential or the pay of the two union workers, so they likely underestimate the total pay of PG&E fleet services employees at the Facilities.

Lastly, PG&E performs light industrial activities at the Oakport, Clawiter, and Myrtle Facilities, described in SIC Codes 3444, 3452, 3449, 3494, 3496, 3498, and 3499.[9] PG&E gas department crews conduct metal fabrication at Oakport, Clawiter, and West 14th Street, including: cutting, drilling, threading, power sanding, and welding together sections of metal pipe to create gas line manifold assemblies, meter sets, and other pieces of gas distribution equipment (*id.*, Ex. 24 at 36:22-38:22; *id.*, Ex. 16 at 12:5-14:16; *id.*, Ex. 38 at 20:16-23:21); welding together pieces of metal pipe to create gas distribution lines (*id.*, Ex. 25 at 38:19-39:8 (Oakport); *id.*, Ex. 27 at 196:15-197:9 (Clawiter)); and fabricating meter guards and pipe assemblies to re-route pipelines or connect with above-ground gas meters. *Id.*, Ex. 16 at 15:20-16:13 (West 14th Street); *id.*, Ex. 28 at 33:1-18 (Clawiter).

In addition to the gas department, PG&E fleet services personnel also conduct metal fabrication by grinding pieces of metal and welding them onto PG&E vehicles to replace parts that are broken, or to fabricate new pieces of equipment, such as a holder needed to support a tool, or a cone holder for traffic cones. *Id.*, Ex. 30 at 25:24-27:4 (vehicle welding at Myrtle); *id.*, Ex. 36 at 41:5-25 (welding of vehicle parts at Oakport using metal grinder); *id.* at 50:7-52:6 (same welding at Clawiter); *id.*, Ex. 25 at 38:19-39:13 (vehicle welding at Oakport). In addition, PG&E's electric department cuts and prepares copper and aluminum wires for installation in PG&E's electric distribution grid. *Id.*, Ex. 26 at 12:6-21 (Clawiter); *id.*, Ex. 21 at 8:19-9:6 (Oakport).

### 5.      PG&E Conducts Other Industrial Activities at the Facilities.

PG&E handles and stores new and used utility poles treated with pentachlorophenol at all four Facilities. PG&E stores multiple stacks of new utility poles on a continuous basis in the southeastern portion of the Oakport Facility. Isaacs Decl., Ex. 8 at PGE_SC000453 (Oakport Facility map, quadrant D-6); Hagemann Decl. ¶¶ 13, 16; *see* Isaacs Decl., Ex. 23 at 65:23-25 (new poles stored at Oakport); *id.*,

---

[9] Collectively, these SIC Codes describe various metal working activities involving the cutting, welding, and fabrication of metal products and parts. This includes activities relating to: "fabricating pipe and pipe fittings from purchased metal pipes by processes such as cutting, threading, and bending." (SIC Code 3498); "manufacturing metal valves and pipe fittings . . . such as plumbing and heating valves . . . ." (SIC Code 3494); and "manufacturing fabricated metal products, not elsewhere classified . . . ." (SIC Code 3499). *See also* EPA Industrial Fact Sheet Series for Activities Covered By EPA's MSGP, Sector AA, *available at* http://www.epa.gov/npdes/pubs/sector_aa_fabmetal.pdf.

Ex. 22 at 18:4-12 (PG&E purchased 73 new poles from June 2010 to June 2011 for Oakport). At Clawiter, new poles are generally stacked near the northern boundary of the Facility, only a few feet away from a concrete culvert channeling storm water runoff. Isaacs Decl., Ex. 8 at PGE_SC000452 (new poles stored at quadrant E-3 to E-5); Hagemann Decl. ¶ 22; Isaacs Decl., Ex. 27 at 53:3-11 (new poles stored); *id*. at 135:16-24; *id*., Ex. 23 at 62:9-25; *id*., Ex. 35 at PDF pg. 2 (showing poles); Isaacs Decl., Ex. 23 at 140:7-141:1 (amount of poles depicted in Ex. 35 at PDF pg. 2 is typical of the amount generally stored there); Isaacs Decl., Ex. 27 at 57:21- 58:6 (poles treated with creosote and pentachlorophenol, containing dioxins); *id*., Ex. 24 at 107:21-108:18 (new poles stored in unpaved area at Clawiter for 2-3 weeks during the rainy season). PG&E also stores new pentachlorophenol-treated poles at the Myrtle and West 14th Street Facilities. *Id*., Ex. 8 at PGE_SC000451 (quadrant C-4 and C-5 of Myrtle); *id*. at PGE_SC000449 (quadrant B-6 and C-6 of West 14th Street); Hagemann Decl. ¶¶ 25, 31; Isaacs Decl., Ex. 29 at 58:14-18 (new poles at Myrtle); *id*., Ex. 23 at 49:18-50:3 (same); *id*. at 47:5-12 (new poles at West 14th Street).

When PG&E removes utility poles from service, PG&E transports the poles back to the Facilities, where they are handled and stored in treated wood waste ("TWW") bins. Hagemann Decl. ¶¶ 7, 12, 15, 20, 25, 31; Isaacs Decl., Ex. 23 at 65:17-22 (TWW stored at Oakport); *id*., Ex. 24 at 86:5-23 (same); *id*. at 90:13-20 (TWW is treated with pentachlorophenol); *id*., Ex. 27 at 50:6-53:16 (used poles at Clawiter); *id*., Ex. 29 at 58:7-13 (used poles at Myrtle); *id*., Ex. 23 at 50:11-51:4 (same). Due to the length of the poles, PG&E regularly cuts them into smaller pieces to allow them to fit into the bins. *E.g.*, id., Ex. 24 at 102:19-103:8. At times, instead of storing the poles in the bins, PG&E has stored them in large piles on the ground. *Id*., Ex. 27 at 84:11-87:13 (testifying about presence of "large amount" of used poles stacked on ground at Clawiter); *id*. at 98:9-16 (the pole pile filled "a bunch of wood pole bins" and required a few days to remove); *see also id*. at 73:11-24 (noting PG&E employees still occasionally place poles on the ground despite guidance to the contrary).

In addition to utility poles, PG&E stores electric transformers, cables, pipes, and other materials used in the maintenance of PG&E's electricity and gas distribution systems at the Facilities. *Id*. at 43:13-18 (transformers stored at Clawiter); *id*., Ex. 25 at 35:7-36:19 (presence of transformer oil, debris from

transformer spills, and other hazardous waste at Oakport); *id.*, Ex. 23 at 44:6-12 (brackets, transformers, and other construction-related materials stored at West 14th Street); *id.* at 59:10-15 (wires and transformers at West 14th Street); *id.* at 60:1-9 (same materials stored at Clawiter); *id.* at 64:21-65:4 (same at Oakport); *id.*, Ex. 29 at 28:18-22 (transformer oil handled at Myrtle). Some of these materials constitute hazardous waste. *Id.*, Ex. 33. Clawiter and Myrtle serve as consolidation points for the storage and disposal of hazardous waste generated in PG&E's service territory. *Id.*, Ex. 27 at 45:21-24 (Clawiter); *id.*, Ex. 32 at 191:16-192:25, 193:24-196:21 (Myrtle).

**B.     PG&E's Facilities Are Contaminated With Numerous Pollutants.**

**1.     PG&E's Utility Poles Leach Contaminants to Storm Water and Soils.**

To prevent utility poles from deteriorating, they are pressure-treated with a pentachlorophenol mixture containing dioxins and furans ("dioxins"), which is dissolved in a carrier fluid, typically oil, before being applied to the wood. *Id.*, Ex. 34 at PGE_SC0017255. Both pentachlorophenol and one of the relevant dioxin congeners[10] are listed in the CWA as among the "toxic pollutants . . . subject to" the CWA. 33 U.S.C. § 1317(a)(1) (incorporating list of toxic pollutants in 40 C.F.R. § 401.15). Both chemicals are also on EPA's list of priority pollutants. 40 C.F.R. Part 423, Appendix A. These chemicals are well known by regulatory agencies and toxicologists to cause cancer, immunotoxicity, birth defects, and other harm. Isaacs Decl., Ex. 17 at PGE_SC0000818; Rogers Decl. ¶ 19.[11]

PG&E is aware of the toxic characteristics of utility poles. An internal PG&E policy memorandum on the handling of treated wood waste, including used poles, notes that TWW "contains wood preservatives that are hazardous chemicals that pose a risk to human health and the environment," and harmful exposure may result from contact to skin or inhalation of sawdust or smoke. *Id.*, Ex. 9 at PGE_SC0015984; *id.* at PGE_SC0017774. Accordingly, PG&E employees must wear gloves when touching the poles and dispose of TWW in landfills with special composite liners. *Id.* at

---

[10] The term "dioxins" is generally used to refer to a group of several hundred chemical compounds with similar chemical structures and toxicological characteristics, each of which is known as a "congener."
[11] According to EPA, dioxins are anticipated to increase the risk of cancer even at background levels of exposure. Isaacs Decl., Ex. 15 at PDF pg. 2. Dioxins are known to cause birth defects, immunotoxicity, and impaired reproductive capacity at extremely low exposure levels due to persistence in the environment and subsequent bioaccumulation in animal and human tissues. *Id.*; Rogers Decl. ¶¶ 20-21.

PGE_SC0017774-75. Further, whenever PG&E employees cut utility poles, they are supposed to lay down a sheet of plastic or otherwise capture all the sawdust, wood chips, and debris and then place it in the TWW bins. *Id*. at PGE_SC0017773 & 775 (noting bins should be watertight). These special protections are required to minimize "the potential for treatment chemicals to be discharged to the environment." *Id*., Ex. 18 at PGE_SC0016084.

Notably, a utility industry study produced by PG&E in this case notes that the chemicals used to treat utility poles "can drip and leach during precipitation events from the treated wood poles and cross arms, potentially impacting site soils, groundwater, and nearby surface water bodies." *Id*., Ex. 34 at PGE_SC0017249. When utilities store poles outside on pole storage racks, "wood preservatives will drip from the poles and leach during precipitation events, potentially impacting soils beneath the poles as well as groundwater or surface water," especially when poles are located above non-permeable surfaces like pavement. *Id*. at PGE_SC0017253. For these reasons, utilities are encouraged to employ various measures to reduce these risks, including collection and treatment of storm water runoff from pole storage areas, placing poles inside or under canopies to avoid exposure to rainfall, and deploying absorbents to soak up the contaminants leaching from the poles. *Id*. at PGE_SC0017275.

Yet PG&E does not employ any of these measures at the Facilities. Instead, PG&E stores new utility poles on racks in outdoor, uncovered, paved areas—the very practice expected to result in discharge to soils and surface waters. ERF's site inspections of the Facilities revealed that the poles do in fact discharge contaminants, which are visible in storm water as an oily rainbow "sheen" that takes its appearance from the oil-based carrier fluid used to treat the poles.[12] During its site inspections, ERF observed visible "sheens" in storm water flowing from the new pole storage racks at the Clawiter, Myrtle, and West 14th Street Facilities. Hagemann Decl. ¶¶ 22, 28, 32, Exs. 4-6. Although PG&E's environmental supervisor for the two Eureka facilities saw the sheen at the Myrtle Facility, he took no action in response, stating: "I figure it's being handled." Isaacs Decl., Ex. 31 at 127:25-128:13.

---

[12] *See* Isaacs Decl., Ex. 25 at 112:23:113:9 (photos of sheens look like the "rainbow sheen I see all the time on the highway and in the parking lots," which signifies the presence of petroleum products in the water); *see also id*., Ex. 23 at 97:16-19 (over-treated poles have a "sheen" appearance).

ERF took samples of storm water containing these "sheens" and the results showed elevated levels of pentachlorophenol, dioxins, and other pollutants – well above benchmark levels set by various regulatory agencies, including EPA.[13] Hagemann Decl. ¶¶ 22, 28, 32 (HAYWTR-1 (sample of sheen in culvert next to new pole storage area at Clawiter); MYRTWTR-1 (sample of sheen flowing from new pole storage area at Myrtle); MYRTWTR-2 (sample of sheen flowing in underground storm water system at Myrtle); EURWTR-2 (sample of sheen flowing from new pole storage area at West 14th Street)); Rogers Decl. ¶¶ 7, 11, 22-37, 45 & Exs. 2-3; *see also* Hagemann Decl. ¶ 16 (OAKWTR-1 (sample of ponded water below new pole rack at Oakport)).

Like the new pole storage areas, the TWW bins are also uncovered and exposed to rainfall at the Facilities. Isaacs Decl., Ex. 27 at 76:16-77:25. Rainfall passing over the poles in the bins also gives the water a "sheen" appearance. Hagemann Decl. ¶ 32 (bin at Myrtle); *see also* Isaacs Decl., Ex. 27 at 80:5-81:22 (Hayward). Despite PG&E's policy that wood waste bins be watertight, the bins at the Facilities are not watertight, so the contaminants mobilized in the water drip onto the pavement beneath the bins. *Id.*, Ex. 27 at 78:2-79:7 (water leaks from Clawiter bin); Hagemann Decl. ¶ 32 (noting water and sawdust below bin at Myrtle).

In addition to releasing chemicals to storm water, the utility poles also leach chemicals to sediments. Samples of the sediments underneath PG&E's new utility poles showed elevated levels of pentachlorophenol, dioxins, and other pollutants. Hagemann Decl. ¶¶ 16, 22, 28, 32 (OAKSED-1 (sediment below new poles at Oakport), HAYSED-3 (sediment in culvert adjacent to new poles at Clawiter); HAYSED-4 (sediment from under new poles at Clawiter); and EURSED-1 (sediment below new poles at West 14th Street)); Rogers Decl. ¶¶ 23-26, 29, 31-32, 36 & Ex. 2.[14] The day before ERF's inspection of the West 14th Street Facility, PG&E's environmental supervisor instructed PG&E crews to

---

[13] EPA Benchmark Values are the pollutant concentrations in storm water from industrial facilities above which discharges represent a level of concern. *See* 65 Fed. Reg. 64745 (Oct. 30, 2000). Exhibits 2 and 3 to the Rogers Declaration compare ERF's sample results to relevant benchmarks.

[14] Notably, these sample results showed two specific dioxin congeners that are known to be found in pentachlorophenol-treated wood—an indication that the nearby utility poles were the source. Rogers Decl. ¶¶ 23, 29, 31. In addition, these samples also showed elevated levels of: several polynuclear aromatic hydrocarbons, including benzo[a]anthracene, benzo[a]pyrene, indeno[1,2,3-cde]pyrene, and benzo[b]fluoranthene; petroleum hydrocarbons; and arsenic. Hagemann Decl. ¶¶ 16, 22, 28, 32.

return from the field to remove sediment from underneath the stack of new utility poles at the Facility, to ensure the yard was in "tip-top shape" for the inspection. Isaacs Decl., Ex. 32 at 175:6-179:3; *Id*. at 206:6-207:11 (removal day before inspection).[15] Despite this attempted cleanup, samples of these soils after they were placed into the TWW bin still showed elevated levels of pentachlorophenol, dioxins, and other pollutants. Hagemann Decl. ¶ 28 (EURSED-2); *see* Isaacs Decl., Ex. 31 at 119:14-121:11 (sediments in dumpster sampled at West 14th Street facility were cleared from underneath new pole area). Samples of sediments in the TWW bins at other Facilities showed similar results. Hagemann Decl. ¶¶ 27, 32 (MYRTDUMPSED-1 (sediment in bin at Myrtle); MYRTDUMPSED-2 (different sediment in same bin); EURWOOD-1 (woody debris from West 14th Street)).

As noted above, PG&E has stored utility poles directly on the ground at the Facilities, despite PG&E's policy that all such poles should be placed in the TWW bins. ERF sampled the sediment and debris beneath the large pile of poles previously stored on the ground at the Clawiter Facility and the results showed elevated levels of pentachlorophenol, dioxins, and other pollutants. Hagemann Decl. ¶ 22 (HAYSED-2). PG&E environmental compliance officers confirmed that when treated wood poles are placed directly on the ground, pentachlorophenol and dioxins can leach out of the poles and pass onto the ground. Isaacs Decl., Ex. 27 at 129:22-131:12; *see also id*., Ex. 24 at 107:21-110:18 (removal of pole pile at Clawiter occurred because "[a]t that point in time we had already been advised of this lawsuit, and they didn't need to be there"; and noting that the "concern was . . . that with the pole laying directly on the ground, we did have an increased potential for contamination to soil . . . .").[16]

---

[15] This supervisor appears to have been under some pressure to clean up the West 14th Street Facility in advance of ERF's site inspection. In an email, he stated that treated wood management had become a "high profile" item at the two Eureka facilities, and that "[w]e need better house keeping at the Eureka Propane Yard and it's urgent!" Isaacs Decl., Ex. 37. The propane yard is another name for the West 14th Street Facility. *See id*., Ex. 23 at 14:5-16.

[16] The fact that poles discharge pollutants is supported by testimony relating to the issue of "over-treated" poles. An over-treated pole is a pole that is literally dripping preservative or that has visible, movable free liquid at its surface or ends. Isaacs Decl., Ex. 24 at 122:15-20. To minimize the transfer of pentachlorophenol from the over-treated poles onto the ground, PG&E will "butt-wrap the pole, the treated end of the pole, with plastic to prevent the drip," or remove it from the site. *Id*. at 122:4-12. PG&E removed one pole from the Clawiter Facility for being overly treated. *Id*. at 127:18-128:2; *see also id*., Ex. 22 at 18:24-19:10 (treatment chemicals leach from over-treated poles). While not all poles are overly treated, this shows that chemicals do leach out of the poles and into the environment.

Finally, the contaminants in utility poles are also released to the air and ground in the form of sawdust and wood chips from the cutting of utility poles. Despite PG&E's policy on cleaning sawdust from the cutting of used utility poles, during the site inspection of the Oakport Facility, ERF inspectors saw a PG&E employee cutting a utility pole with a chainsaw, sending sawdust and wood chips into the air and onto the ground, with no measures to collect the debris, which was left on the ground when the cutting was over. Hagemann Decl. ¶ 15; Isaacs Decl., Ex. 35 at PDF pg. 3-4. ERF's sampling of the sawdust showed extremely elevated levels of pentachlorophenol and dioxins. Hagemann Decl. ¶¶ 15-16 (OAKSED-2).[17] Sampling of sawdust from within a TWW bin at the Myrtle Facility showed the presence of similar contaminants. *Id*. ¶ 32 (MYRTWOOD-1).

### 2. PG&E's Aggregate Handling Releases Contaminants to the Environment.

In addition, PG&E's facilities are also contaminated with dust and particulate matter generated by PG&E's handling and storage of aggregate materials like soil, sand, gravel, and asphalt. The "primary concern" with storm water at the Oakport Facility is the area where the aggregate piles and the soils screener are located. Isaacs Decl., Ex. 24 at 80:4-9. As noted, this area houses large piles of loose aggregate material outside in uncovered areas where they are exposed to storm water. *Id*., Ex. 35 at PDF pg. 5-7. The Clawiter and West 14th Street Facilities also contain piles of aggregate, sand, and gravel, as well as a spoil pile (Clawiter), which are stored outside in uncovered areas where they are exposed to storm water. The Clawiter spoil pile comes from areas off-site and may contain chemicals that require special disposal. *See id*., Ex. 27 at 177:10-178:25; *id*., Ex. 28 at 27:5-22 (spoils excavated from around utility poles). When it rains, visible sediment is mobilized in storm water from these aggregate storage and handling areas and is discharged to surface waters. *Id*., Ex. 24 at 80:15-22, 72:18-73:6, 74:5-17; *see id*., Ex. 23 at 80:24-81:5.

### C. These Pollutants Are Discharged From the Facilities In Sediment and Storm Water.

Once entering storm water and sediments at the Facilities, pentachlorophenol, dioxins, and other pollutants are discharged from the Facilities. ERF's sampling of sediments and storm water along the

---

[17] This sample also showed elevated levels of several polynuclear aromatic hydrocarbons, including benzo[a]anthracene, benzo[b]fluoranthene, benzo[a]pyrene, and indeno[1,2,3-cde]pyrene, and elevated levels of petroleum hydrocarbons and arsenic. Hagemann Decl. ¶ 16.

flow path of storm water at each of the four Facilities, including samples at points representative of the off-site discharge of storm water from the Facilities, showed elevated levels of dioxins and other pollutants. Hagemann Decl. ¶¶ 18, 22, 28, 32 (OAKWTR-4, HAYWTR-2, EURWTR-1, and MYRTWTR-2, all showing elevated levels of pentachlorophenol, dioxins, and other pollutants at last point of access before discharge off site); Rogers ¶¶ 30, 33-35, 37 (discussing results); Hagemann Decl. ¶¶ 18, 22, 27 (HAYSED-1 (sediment from drop inlet within Clawiter storm drain system); (OAKOUTSED-1 (sediment at point of discharge of Oakport Facility to San Leandro Bay); EUROUTSED-1 (sediment at point of discharge of West 14th Street Facility to offsite wetland)); Rogers Decl. ¶¶ 23-25, 29, 31-32, 38-39 (discussing ERF sampling results revealing elevated pollutant contamination). Notably, the pollutant concentrations in ERF's samples should be considered conservative given that they were taken after "first flush" when the highest concentrations of pollutants occur and, at least for the West 14th Street Facility, after PG&E attempted to clean up the site the day before ERF's inspection. Rogers Decl. ¶¶ 27, 51; Hagemann Decl. ¶¶ 16, 22, 27-28, 32 (discussing "first flush" discharges known to contain elevated pollutant levels).[18]

In addition to being discharged in storm water and sediment flows, the pollutants are also discharged from the Facilities by tracking from PG&E's motor vehicle fleet. The Facilities are subject to intensive on-site motor vehicle traffic as PG&E uses the sites as the staging grounds for PG&E's dispersed electric and gas service activities in the field. In particular, the hundreds of vehicles in PG&E's fleet routinely drive across the Facilities where they pick up grit contaminated with dioxins and pentachlorophenol found on the Facilities and transport these pollutants around and offsite into public streets. Hagemann Decl., ¶¶ 34-35; Rogers Decl. ¶¶ 10, 21, 26, 45. During ERF's sampling of the former pole pile on the ground in the unpaved portion of the Clawiter Facility, ERF inspectors saw vehicle tracking marks indicating that the area was the subject of intensive vehicle traffic that would tend to track sediments from the unpaved area to the paved areas of the Facility where they would be picked up

---

[18] There will be some dilution in pollutant concentrations from the Facilities before the discharges reach surface waters (thought not in discharges from Oakport directly to San Francisco Bay). Even with this dilution, however, highly elevated concentrations of dioxins and likely elevated concentrations of other pollutants will still reach San Francisco and Humboldt Bays and their tributaries. Rogers Decl. ¶¶ 41-44.

in storm water and conveyed offsite through the Facility's storm sewer system. Hagemann Decl. ¶ 22

(HAYSED-2 sample discussion); Isaacs Decl., Ex. 27 at 91:17-92:16 (vehicles track dirt from unpaved

to paved areas at Clawiter); *see also* Isaacs Decl., Ex. 35 at PDF pg. 5-7 (showing tracking). None of the

Facilities use common best management practices to prevent motor vehicle tracking of pollutants,

indicating that the vehicles track pollutants around and off-site where are discharged in storm water.

## IV.   STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate

where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c)(2); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586-87(1986); *Manzanita Park, Inc. v. Ins. Co. of N. Am.*, 857 F.2d 549, 552 (9th Cir. 1988). To

defeat this motion, PG&E "must do more than simply show that there is some metaphysical doubt as to

the material facts." *Matsushita*, 475 U.S. at 586; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

252 (1986); *Nishimoto v. Federman-Bachrach & Assocs.*, 903 F.2d 709, 716 (9th Cir. 1990). PG&E

must affirmatively introduce specific facts that controvert the facts presented by ERF (*Liberty Lobby*,

477 U.S. at 248-52; *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951-52 (9th Cir. 1978)), and these

facts must show that there is a "*genuine issue for trial.*" *Matsushita*, 475 U.S. at 587 (emphasis original).

## V.   ARGUMENT

### A.   The CWA's Discharge Prohibitions Apply to PG&E's Facilities.

#### 1.   CWA § 402(p)(2)(B) Requires Permit Coverage Because PG&E is Conducting Industrial Activities at the Facilities.

Storm water discharges "associated with industrial activity" are unlawful in the absence of an

NPDES permit. *See* CWA § 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B). Such discharges have always

been subject to the discharge prohibition in CWA § 301(a) because they were excluded from the

temporary permitting moratorium contained in CWA § 402(p)(1). As noted above, EPA's Phase I

Regulations define discharges associated with industrial activity to include facilities described by SIC

Codes for recycling, transportation, light industrial, and materials handling activities. As also noted,

PG&E performs industrial activities described by these SIC Codes at the Facilities, namely: recycling

described by SIC Code 5093; vehicle service and maintenance described by SIC Codes 4226 and 4231;

light industrial activities described by SIC Codes 3444, 3452, 3449, 3494, 3496, 3498, and 3499; and the storage and handling of aggregate materials described by SIC Code 1442.

Despite performing these activities, PG&E has previously argued that it does not need NPDES coverage because it has only one company-wide classification under group 49 – describing the generation, transmission, and distribution of electricity and natural gas – which is not listed in 40 C.F.R. § 122.26(b)(14). *See* ECF No. 67 at 9-10 (Aug. 25, 2010). This argument fails for a number of reasons.

First, each of the Facilities qualifies as a separate "establishment" requiring a separate SIC Code for the primary activities occurring there. As the Court has previously noted, under the SIC Manual, an "establishment" is an "economic unit, generally at a single physical location, where business is conducted or where services or industrial operations are performed." ECF No. 106 at 4 (Feb. 4, 2011) ("Motn. to Dismiss Order") (*citing* 1987 SIC Manual (ECF No. 67-3), at PDF pg. 4). "An establishment is not necessarily identical with the enterprise (company) which may consist of one or more establishments." SIC Manual at PDF pg. 4. Within the very definition of "establishment," the SIC Manual provides an example that fits the Facilities perfectly:

> For activities such as construction, transportation, communications, electric, gas, and sanitary services, and similar physically dispersed operations, establishments are represented by those relatively permanent main or branch offices, terminals, stations, etc., that are either (1) directly responsible for supervising such activities, or (2) the base from which personnel operate to carry out these activities.

*Id*. The service centers are the bases from which PG&E personnel perform maintenance on PG&E's electric and gas grids and on the vehicles and equipment used for this maintenance activity. As described above, they are permanent facilities that house the vehicles, equipment, materials, and service functions needed to support PG&E's electricity and gas activities in the service territory. So each Facility is a separate "establishment" within the "enterprise" of PG&E.

Each establishment is assigned a SIC Code on the basis of its "primary activity," which is determined by its "principle product[s] or . . . services rendered." *Id*. at PDF pg. 7. The primary activity is determined by looking at the relative share of value added to the establishment by the given activity, which may be determined by looking at the value of production, value of receipts or revenues, value of sales, or employment on payroll. *Id*. at 7-8.

1   Based on these factors, the Facilities are "primarily engaged" in recycling, transportation, metal

2   fabrication, or aggregate handling activities. The most measurable value is derived from PG&E's

3   transportation and recycling activities. PG&E employs 25 people within the Fleet Services department at

4   the Facilities, with a combined payroll of at least $1.6 million per year, or about $8 million during the

5   five-year relevant time period.[19] In addition to payroll, the value of services performed is substantial

6   given the large number of employees involved, high volume of work performed, thousands of dollars of

7   on-hand inventory, and large size of the vehicle fleet – 550 vehicles at the four Facilities. PG&E also

8   derives substantial value from recycling activities. As noted, separate receipts on the sales of recyclable

9   materials from the Facilities total over $1.3 million for the relevant time period.

10   While less directly measurable, the aggregate handling and metal fabrication services are no less

11   valuable to PG&E. Without locations to store aggregates both before and after using them for

12   construction projects in the field, PG&E would have no way to replace the portions of streets and other

13   surfaces displaced by the digging of trenches for pipes, wires, and utility poles routinely conducted by

14   PG&E's crews. The cutting, welding, and fabrication of metal products and parts, particularly gas

15   distribution lines, assemblies, manifolds, and other equipment, plays a similarly central role in the

16   process of staging and delivering PG&E's electricity and gas services.

17   Alternatively, each activity at the Facilities should be considered a separate "establishment." The

18   SIC Manual provides:

19           Where distinct and separate economic activities are performed at a single physical
20           location (such as construction activities operated out of the same physical location
             as a lumber yard), each activity should be treated as a separate establishment
21           where: (1) no one industry description in the classification includes such
             combined activities; (2) the employment in each such economic activity is
22           significant; and (3) separate reports can be prepared on the number of employees,
             their wages and salaries, sales or receipts, and other types of establishment data.
23

24   *Id*. at PDF pg. 4. No combined SIC Code exists for all the industrial activities at the Facilities. The

25   employment in these activities is significant, as noted above with respect to the Fleet Services

26   [19] Specifically, as shown above, the facts for Fleet Services are: Oakport (8 employees, approximately
27   $553,000 in pay per year, or $2.75 million for the relevant time period); Clawiter (13 employees,
     $739,000 annually, $3.7 million for relevant time period); and Myrtle / West 14th Street (4 employees,
28   $313,000 annually, $1.56 million for relevant time period).

1  department. And as noted, separate reports can be prepared on the number of employees and their wages

2  and salaries, and on sales and receipts from the activities.

3      In either case, it is undisputed that the Facilities are not "primarily engaged" in the provision of

4  electricity and natural gas as such. The Facilities themselves neither generate electricity or natural gas

5  nor distribute that electricity or gas to PG&E's customers. Isaacs Decl., Ex. 23 at 58:20-61:6. Thus, the

6  Facilities are not classified under group 49, covering establishments primarily engaged in the generation,

7  transmission, and distribution of electricity and natural gas. Rather, the Facilities are described by the

8  SIC Codes for the aggregates handling, transportation, recycling, and light industry activities occurring

9  there. Because these SIC Codes are listed in 40 C.F.R. § 122.26(b)(14), the Facilities are considered to

10  be engaged in "industrial activity," and thus subject to NPDES regulation.

11      PG&E has previously argued that its decision to classify the Facilities under group 49 should be

12  final and determinative. No government agency authoritatively assigns SIC Codes, and in the absence of

13  this, it would be untenable to simply take PG&E's word on the matter. To allow NPDES regulation to

14  depend on a business's own self-serving SIC Code assignment would be to allow the regulated to

15  determine their own regulatory fate—something at odds with the CWA's purposes to restore the

16  integrity of the Nation's waters as well as Ninth Circuit precedent. *Envtl. Def. Ctr., Inc. v. EPA*, 344

17  F.3d 832, 855-56 (9th Cir. 2003) (holding EPA's Phase II Storm water regulations invalid because they

18  allowed regulated dischargers to determine what constituted compliance).

19      The Court has aptly noted that deciding whether a facility is a separate establishment "would

20  seem highly dependent on the purposes for which the classification is being undertaken." Motn. to

21  Dismiss Order at 5 n.4. The Court has further cautioned against too literal an interpretation of the SIC

22  system, which was not developed for the purpose of classifying businesses into those posing more or

23  less threat from the discharge of contaminated storm water. *See id.* (suggesting SIC rules "might not be

24  well-suited for determining whether or not a particular facility is engaged in 'industrial activity' for

25  purposes of the Clean Water Act."). For purposes of the CWA, the classification should take into

26  account all industrial activities, whether primary or auxiliary, which present a risk of discharging

27  pollutants to the nation's waters. It would be irrational and inconsistent with the CWA to conclude, for

28

example, that aggregate handling activities are regulated at one facility because that is the primary activity occurring there, while the very same activity at a facility next door is left unregulated simply because that facility may conduct some additional activity that is considered primary. The Court should interpret EPA's regulations in a way to avoid this inconsistency and harmonize them with the CWA. *See Pac. Coast Med. Enterprises v. Harris*, 633 F.2d 123, 131 (9th Cir. 1980) ("Agency regulations must be consistent with and in furtherance of the purposes and policies embodied in the congressional statutes which authorize them."). The Facilities should therefore fall within EPA's storm water regulations.

### 2. The State Board Has Exercised its Discretionary CWA § 402(p)(2)(E) Authority to Designate the Facilities for NPDES Regulation.

CWA § 402(p)(2)(E) grants broad authority to the States to designate additional sources of storm water runoff as requiring NPDES permits besides those listed in CWA § 402(p)(2)(A)-(D). *See EPIC*, 301 F. Supp. 2d at 1112 (noting the preamble to EPA's Phase II regulations is in accord with *Envtl. Def. Ctr.*, 344 F.3d at 840); *see also* 40 C.F.R. § 122.26(a)(9)(i)(C), (D). The State Board has exercised this authority by providing in the General Permit that "industrial activity" includes any sites where any of the enumerated SIC Code activities occur, regardless of whether the activity is primary or auxiliary to the facility operator's function. *See* Isaacs Decl., Ex. 14 at PDF pg. 4. The General Permit says:

> The General Permit is intended to cover all facilities described in Attachment 1, whether the facility is primary or is auxiliary to the facility operator's function. For example, although a school district's primary function is education, a facility that it operates for vehicle maintenance of school buses is a transportation facility that is covered by this General Permit.

*Id*. Further, the General Permit's Notice of Intent to be covered allows permit applicants to list up to three SIC Codes to describe activities at their facilities, indicating that the State Board intends dischargers to identify multiple SIC Codes when they conduct multiple industrial activities. *Id*. at PDF pg. 75. In sum, the General Permit effectively dictates that because the Facilities conduct multiple activities corresponding with SIC Codes that are required to obtain NPDES permit coverage— aggregates handling, transportation, recycling, and light industrial activities—the Facilities must be effectively determined to have multiple SIC Codes and be required to obtain NPDES coverage, regardless of whether the activities are primary or auxiliary to PG&E's function.

### 3. EPA's Regulations Cannot Permissibly Exempt Industrial Storm Water Discharges from NPDES Regulation.

"[T]he language 'discharges associated with industrial activity' is very broad." *NRDC v. EPA*, 966 F.2d 1292, 1304 (9th Cir. 1992). While EPA has some discretion to define industrial activity, if an activity is industrial in nature, "EPA is not free to create exemptions for permitting requirements for such activity." *Id.* at 1306. As discussed more fully in previous briefing, if the Court finds that EPA's regulations do not cover the plainly industrial activities at the Facilities, those regulations must be refused effect. *See* ECF No. 26 at 15-16 (Apr. 8, 2010) (discussing *NRDC v. Costle*, 568 F.2d 1369 (D.C. Cir. 1977), *Am. Mining Cong. v. EPA*, 965 F.2d 759 (9th Cir. 1992), and *EPIC*, 301 F. Supp. 2d at 1113)); *Id.* at 13-14, 18 (reciting legislative history); *see also* ECF No. 81 at 6-7 (Sept. 30, 2010) (discussing *Northwest Envtl. Def. Ctr. v. Brown*, 617 F.3d 1176 (9th Cir. 2010), cert. granted *sub nom*, *Decker v. Northwest Envtl. Def. Ctr.*, 2012 U.S. LEXIS 4793 (June 25, 2012)). In briefly passing on this issue, the Court noted that if EPA's regulations could be read as exempting such industrial activities, "*Brown* would stand as a caution against adopting such an interpretation." Motn. to Dismiss Order at 7.

### 4. CWA § 402(p) Does Not Exempt the Facilities from CWA § 301(a)'s Prohibition on Unpermitted Discharges.

CWA § 301(a) has a facially plain directive that, except as authorized by an NPDES permit, the discharge of pollutants is unlawful. *See League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1190 (9th Cir. 2002); *EPIC*, 301 F. Supp. 2d at 1113. As discussed more fully in previous briefing, CWA § 402(p) does not exempt any polluted storm water discharges from this prohibition. *See* ECF No. 26 at 9-13 (Apr. 8, 2010); ECF No. 81 at 17-19 (Sept. 30, 2010). Instead, CWA § 402(p)(1) merely created a temporary moratorium for the EPA from having *a duty to issue NPDES permits* for certain storm water discharges. *See* ECF No. 26 at 9-13. Congress' purpose in CWA § 402(p) was to ease the permitting burden on EPA, not to eviscerate the discharge prohibition of CWA § 301(a) for storm water discharges. *Id.* at 12 (citing cases). Regardless, even if an exemption existed, it lapsed in October 1994 – well before the relevant time here – as the express terms of CWA § 402(p)(1) and the legislative history of the amendments demonstrate. *Id.* at 13-16.

**B.     PG&E is Violating the CWA By Discharging Pollutants from Point Sources to Waters of the United States without an NPDES Permit.**

Having shown that the CWA's discharge prohibitions apply to the Facilities, ERF is entitled to summary judgment on Claim One because (1) PG&E is a person, (2) discharging pollutants, (3) from a point source, (4) into the navigable waters of the United States, (5) without NPDES permit authorization. *Comm. to Save the Mokelumne*, 13 F.3d at 308.[20]

**1.     PG&E Is "Discharging Pollutants" from the Facilities.**

The term "pollutant" includes chemical and industrial waste. 33 U.S.C. § 1362(6). As noted above, pentachlorophenol and one of the relevant dioxin congeners are listed on the CWA's list of "toxic pollutants . . . subject to" the CWA (33 U.S.C. § 1317(a)(1)), as well as EPA's list of priority pollutants. 40 C.F.R. Part 423, Appendix A. As described above, ERF's sampling of all four Facilities revealed that they are contaminated with elevated levels of pentachlorophenol, dioxins, and numerous other chemical wastes, including benzo[a]anthracene, benzo[a]pyrene, indeno[1,2,3-cde]pyrene, benzo[b]fluoranthene, benzo[k]fluoranthene, dibenz(a, h)anthracene, petroleum hydrocarbons, arsenic, copper, lead, zinc, and polycyclic aromatic hydrocarbons—all "pollutants" under the CWA.

These pollutants are being "discharged" from the Facilities. The "discharge" of a pollutant means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Under CWA regulations, this includes "discharges through pipes, sewers, or other conveyances owned by a State, municipality, or other person which do not lead to a treatment works." 40 C.F.R. § 122.2. ERF's sampling revealed that dioxins and other pollutants are picked up by storm water on the Facilities and transported through MS4s or directly into San Francisco and Humboldt Bays and their tributaries.

The Oakport Facility discharges directly to San Leandro Bay, which is an inlet of San Francisco Bay. Hagemann Decl., Ex. 3. A map of the Facility identifies the presence of numerous storm drain drop inlets designed to collect storm water and direct it offsite. Isaacs Decl., Ex. 8 (all 4 facility maps).

---

[20] The first and fifth elements are undisputed. The CWA's definition of "person" includes a "corporation." 33 U.S.C. § 1362(5); 40 C.F.R. §122.2. PG&E is incorporated in California. *See* California Secretary of State website, *available at* http://kepler.sos.ca.gov/ (last visited June 23, 2012). And PG&E does not contend that it has an NPDES permit for discharges from the Facilities.

PG&E's Spill Pollution Control and Countermeasure ("SPCC")[21] plan for the Oakport Facility expressly acknowledges that storm water from the Facility reaches San Leandro Bay. *Id.*, Ex. 20 at PGE_SC0000363; *id.*, Ex. 23 at 73:10-12, 185:19-196:6, 187:14-23 (depictions of storm water flows in SPCC plan are accurate); *id.* at 74:23-75:2; *see also id.*, Ex. 24 at 73:1-74:17, 80:17-22 (storm drain "feeds directly into the bay."); *id.* at 87:1-19 (storm water from TWW area drains to San Leandro Bay); *see also* Hagemann Decl. ¶ 12 (confirming discharge pathway); Rogers Decl. ¶ 21 (discussing discharge from the Facilities under various flow conditions).

The Clawiter Facility discharges into an MS4, which in turn discharges into a flood control ditch adjacent to West Street (the Alameda Flood Control Channel), which in turn flows into San Francisco Bay. Isaacs Decl., Ex. 20 at PGE_SC0000296; *id.*, Ex. 23 at 183:20-184:9 (verifying SPCC plan description), 181:12-183:9, 73:8-15; *id.*, Ex. 27 at 131:20-132:15, 137:5-140:3; Hagemann Decl. ¶ 20 (verifying discharge pathways). Likewise, the Myrtle Facility discharges into an MS4, which discharges to the Third Slough, which in turn flows into a saltwater estuary and Humboldt Bay. Isaacs Decl., Ex. 20 at PGE_SC0000227; *id.*, Ex. 23 at 186:8-188:10 (verifying SPCC plan description), *id.* at 73:8-15; Hagemann Decl. ¶ 31 (verifying discharge pathways).

The West 14th Street Facility discharges into an MS4, which in turn discharges into Humboldt Bay. Although PG&E lacks an SPCC plan for the entire West 14th Street Facility, PG&E does have an SPCC plan for an electrical substation located within the yard. It expressly acknowledges that storm water from the substation, which shares the storm sewer plumbing of the West 14th Street Facility that surrounds it, drains to Humboldt Bay. Isaacs Decl., Ex. 20 at PGE_SC0000427; *id.*, Ex. 23 at 195:10-19 (same); *see also id.*, Ex. 19 (email from PG&E employee describing need for West 14th Street Facility "to prevent major spills from entering the storm drainage system and Humboldt Bay.") (Emphasis removed.); *see also id.*, Ex. 8 at PGE_SC0000449 (Facility map noting direction of sheet flow and discharge in storm drain to West 14th Street to the north and West 15th Street to the south); *id.*, Ex. 23 at 189:7-190:16 (verifying SPCC plan description), 73:8-15; Hagemann Decl. ¶ 25 (verifying discharge

---

[21] An SPCC plan is designed to address the potential for oil spills and to prevent accidentally spilled oil from leaving the facility property.

pathways). These conclusions were verified by ERF's expert, who confirmed the discharge pathway through the use of acoustical and other testing methods. *See* Declaration of Jonathan Taylor ¶¶ 4-10.

In addition, as noted above, pollutants are also discharged from the Facilities by tracking from PG&E's motor vehicle fleet onto roadways. Once dioxin and pentachlorophenol contaminated grit is transported into public streets, it is inevitable that storm water will pick up this contaminated grit and transport the grit into municipal storm sewer systems and other conveyances that lead to San Francisco and Humboldt Bays. Hagemann Decl. ¶¶ 34-35.

### 2. PG&E Is Discharging Pollutants from a "Point Source."

As noted, the Facilities are drained by drop inlets in the pavement that connect with underground storm sewer pipes that discharge to San Francisco and Humboldt Bays. These conveyance pipes are "point sources" under the CWA. *See* 33 U.S.C. § 1362(14); *accord* 40 C.F.R. § 122.2; *see also U.S. v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir. 1979) (concept of "point source" intended to embrace "the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States.") (*cited by Trustees for Alaska v. EPA*, 749 F.2d 549, 558 (9th Cir. 1984)); *S.F. Baykeeper v. Tidewater Sand & Gravel Co.*, No. C 96-01531 CW, 1997 U.S. Dist. LEXIS 22602, at *22-23 (N.D. Cal. Sept. 9, 1997) (*quoting Wash. Wilderness Coal. v. Hecla Mining Co.*, 870 F. Supp. 983, 988 (E.D. Wash 1994)); *Comm. to Save the Mokelumne*, 13 F.3d at 308.

### 3. Polluted Discharges From the Facilities Reach "Waters of the United States."

San Francisco and Humboldt Bays, as navigable in fact marine waters, are waters of the United States. *See Northwest Envtl. Advocates v. EPA*, No. C 03-05760 SI, 2005 U.S. Dist. LEXIS 5373, at *28 (N.D. Cal. Mar. 30, 2005). The Alameda Flood Control Channel, as a tributary to San Francisco Bay, and the Third Slough, as a tributary to Humboldt Bay, are also waters of the United States. *See, e.g., Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533-34 (9th Cir. 2001) (tributaries to a water of the United States are themselves waters of the United States, even if man-made); 40 C.F.R. § 122.2.

### C. PG&E's Violations Have Occurred on Every Day With Significant Rainfall During the Relevant Time Period.

Every day that there has been significant local rainfall, PG&E has discharged polluted storm water from the Facilities. Rogers Decl. ¶¶ 47-51. Between January 11, 2005 and May 31, 2012, there

were 353 days of such rainfall at Oakport, 348 days of such rainfall at Clawiter, and 702 days of such rainfall each at West 14th Street and Myrtle. *Id*.; Isaacs Decl. ¶¶ 1-5, Exs. 1-4; Declaration of David Parker ¶¶ 14-16. Each day of a discharge of pollutants without NPDES authorization constitutes a separate CWA violation. *See U.S. v. Smithfield Foods*, 191 F.3d 516, 527 (4th Cir. 1999), *cert. denied*, 531 U.S. 813 (2000); *PIRG of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 78 & n.28 (3d Cir. 1990); *Hawaii's Thousand Friends v. Honolulu*, 821 F. Supp. 1368, 1394 (D. Haw. 1993). Accordingly, each day that PG&E has discharged pollutants from a given Facility constitutes a separate CWA violation. In sum, since January 2005, PG&E has committed a total of 1,109 CWA violations.[22]

## VI.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court grant summary judgment in Plaintiff's favor on Claim One with respect to the four Facilities at issue here.

Date: August 2, 2012                                      Respectfully submitted,

                                                         /s/ Brian Orion
                                                         Brian Orion
                                                         Attorney for Plaintiff
                                                         Ecological Rights Foundation

---

[22] Each day that motor vehicle tracking of pollutants from the Facilities into public streets where the pollutants are subsequently conveyed via MS4s into waters could be seen as a separate CWA violation. However, to simplify this motion, ERF simply asks the Court to issue declaratory judgment that such events have occurred here and constitute a violation of the CWA, without calculating the number of days of such violation.