1  Christopher Sproul (State Bar No. 126398)
   Jodene Isaacs (State Bar No. 226895)
   Brian Orion (State Bar No. 239460)
2  ENVIRONMENTAL ADVOCATES
   5135 Anza Street
3  San Francisco, California 94121
   Telephone: (415) 533-3376, (510) 847-3467
4  Facsimile: (415) 358-5695
   Email: csproul@enviroadvocates.com
5  Email: jisaacs@enviroadvocates.com
   Email: borion@enviroadvocates.com
6
   William Verick (State Bar No. 140972)
7  Klamath Environmental Law Center
   Fredric Evenson (State Bar No. 198059)
8  Law Offices of Fredric Evenson
   424 First Street
9  Eureka, California 95501
   Telephone: (707) 268-8900
10 Facsimile: (707) 268-8901
   Email: wverick@igc.org
11 Email: ecorights@earthlink.net

12 Attorneys for Plaintiff
   ECOLOGICAL RIGHTS FOUNDATION

13

14                     UNITED STATES DISTRICT COURT

15                    NORTHERN DISTRICT OF CALIFORNIA

16

17  ECOLOGICAL RIGHTS FOUNDATION,          Civil No. CV-10-00121 RS

18              Plaintiff,

19          v.                              **PLAINTIFF'S OPPOSITION TO
                                            DEFENDANT'S MOTION FOR
20  PACIFIC GAS AND ELECTRIC COMPANY,       SUMMARY JUDGMENT ON
                                            PLAINTIFF'S CLAIMS I AND II**
21
22              Defendant.                  Hearing date: November 8, 2012
                                            Time: 1:30 p.m.
23                                          Location: Courtroom 3, 17th Floor

24

25

26

27

28

**TABLE OF CONTENTS**

I.     INTRODUCTION ..........................................................................................................1

II.    ARGUMENT ...............................................................................................................2

    A.  PG&E Fails to Show the Facilities Are Immune from NPDES Regulation Under CWA § 402(p)(2)(E) As Implemented in California. ....................................................2

        1.  The General Permit is Intended to Have A Broader Scope than EPA's Regulations and Covers the Facilities Here Regardless of PG&E's Overall Business Function. .................2

        2.  PG&E Cannot Escape This Conclusion By Claiming that Only One Single SIC Code Can Be Applied to the Facilities. ..................................................................................5

        3.  PG&E's Reliance on Guidance Documents, Expert Testimony, and Exhibits Introduced in Another Case Cannot Be Used to Contradict the Plain Meaning of the General Permit.8

        4.  PG&E's Disagreement With the SIC Codes Applicable to the Facilities Conflicts With the Plain Language of the SIC Codes and the General Permit. ........................................10

    B.  PG&E Fails to Show the Facilities Are Immune from Regulation Under CWA § 402(p)(2)(B) As Implemented By EPA's Regulations. ........................................................13

        1.  PG&E Incorrectly Argues that the Facilities Are Exempt from Storm Water Regulation Because PG&E is a "Service" Utility. .................................................................13

        2.  PG&E Incorrectly Contends the Facilities Are "Auxiliaries." ........................................15

        3.  PG&E's Reliance on Guidance Materials Is Again Misplaced. ........................................18

    C.  EPA's Regulations Cannot Permissibly Exempt Industrial Storm Water Discharges from NPDES Regulation. ..................................................................................20

    D.  PG&E Fails to Show that CWA § 402(p) Trumps the General Discharge Prohibition of CWA § 301(a). ................................................................................................24

    E.  Opinion 5 in the Tim Simpson Report Is Inadmissible. ........................................................26

    F.  The Duty to Apply Claim Should Be Dismissed. ..................................................................28

III.   CONCLUSION ...........................................................................................................29

## **TABLE OF AUTHORITIES**

### **Federal Cases**

*Aguilar v. Int'l Longshoremen's Union Local #10,*
  966 F.2d 443 (9th Cir. 1992) ........................................................................28

*Am. Mining Cong. v. EPA,*
  965 F.2d 759 (9th Cir. 1992) ...................................................................22, 23

*Christensen v. Harris County,*
  529 U.S. 576 (2000) ...................................................................................8

*Conservation Law Found. v. Hannaford Bros. Constr.,*
  327 F. Supp. 2d 325 (D. Vt. 2004), *aff'd* 139 Fed. App'x 338 (2d Cir. 2005) .....................23

*Cooper v. Travelers Indem. Co.,*
  113 Fed. Appx. 198 (9th Cir. 2004) ............................................................28

*Daubert v. Merrell Dow Pharma. Inc.,*
  509 U.S. 579 (1993) .............................................................................26, 28

*Decker v. Northwest Envtl. Def. Ctr.,*
  2012 U.S. LEXIS 4793 (June 25, 2012) ......................................................14

*Diaz v. INS,*
  648 F. Supp. 638 (E.D. Cal. 1986) .........................................................8, 11

*E. Assoc. Coal Corp. v. Aetna Cas. & Sur. Co.,*
  475 F. Supp. 586 (W.D. Penn. 1979)
  *rev'd in part on other grounds,* 622 F.2d 1068 (3rd Cir. 1980) ...............................28

*Envtl. Def. Ctr. v. EPA,*
  344 F.3d 840 (9th Cir. 2001) ...................................................................22, 23

*Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.,*
  301 F. Supp. 2d 1102 (N.D. Cal. 2004) ...................................................23, 25, 26

*Kumho Tire Co. v. Carmichael,*
  526 U.S. 137 (1999) ...................................................................................26

*League of Wilderness Defenders v. Forsgren,*
  309 F.3d 1181 (9th Cir. 2002) .............................................8, 19, 21, 23, 24, 25

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ...................................................................................23

*Malat v. Riddell,*

383 U.S. 569 (1966) ...................................................................................8, 11

*Mukhtar v. Cal. State Univ., Hayward,*
    299 F.3d 1053 (9th Cir. 2002) ................................................................28

*Nat'l Pork Producers Council v. EPA,*
    635 F.3d 738 (5th Cir. 2011) ..................................................................29

*NRDC v. Costle,*
    568 F.2d 1369 (D.C. Cir. 1977) .......................................................21, 23

*NRDC v. EPA,*
    966 F.2d 1292 (9th Cir. 1992) ................................................................21

*Nw. Env. Def. Ctr. v. Brown,*
    640 F.3d 1063 (9th Cir. 2011) ...............................8, 19, 21, 23, 24, 25

*Pac. Coast Med. Enterprises v. Harris,*
    633 F.2d 123 (9th Cir. 1980) ..................................................................19

*Sharp Realty and Mgmt. LLC v. Capitol Specialty Ins. Corp.,*
    2012 U.S. Dist. LEXIS 75353 (N.D. Ala. May 31, 2012) ......................28

*Squires v. Goodwin,*
    829 F. Supp. 2d 1041 (D. Colo. 2011) ...................................................27

*U.S. v. Mead Corp.,*
    533 U.S. 218 (2001) ..................................................................................8

*WildEarth Guardians v. Pub. Serv. Co. of Colo.,*
    2012 U.S. Dist. LEXIS 262 (D. Colo. Jan. 3, 2012) ..............................28

**Federal Statutes**

33 U.S.C. § 1311(a) ........................................................................................1

33 U.S.C. § 1342(p)(4)(A) ..............................................................................1

33 U.S.C. § 1342(p)(1) ..................................................................................26

33 U.S.C. § 1342(p)(2)(B) ...............................................................................1

33 U.S.C.  § 1342(p)(2)(E) ..............................................................................2

33 U.S.C. § 1342(p)(6) ..................................................................................21

33 U.S.C. § 1369(b)(1) ..................................................................................23

**Code of Federal Regulations**

40 C.F.R. § 122.21(a) ...................................................................................................1

40 C.F.R. § 122.26(b)(14) .........................................................................3, 10, 14, 15, 20

**Other Federal Regulations**

55 Fed. Reg. 47990 (Nov. 16, 1990)...............................................................................13

53 Fed. Reg. 49436 (Dec. 7, 1998)..................................................................................13

## I. INTRODUCTION

Plaintiff Ecological Rights Foundation ("ERF") hereby files this opposition to Defendant Pacific Gas and Electric Company's ("PG&E's") Motion for Summary Judgment on Plaintiff's Claims I and II (ECF No. 196) (Aug. 2, 2012) ("PG&E Opening Brief"). In its Opening Brief, PG&E seeks summary judgment on ERF's two claims under the Clean Water Act ("CWA"): (1) Claim 1, which alleges that PG&E is in violation of CWA § 301(a), 33 U.S.C. § 1311(a), by discharging polluted storm water from four PG&E facilities located in Oakland, Hayward, and Eureka, California ("the Facilities") into waters of the United States without a National Pollutant Discharge Elimination System ("NPDES") permit; and (2) Claim 2, which alleges that PG&E is in violation of 40 C.F.R. § 122.21(a) and/or CWA § 402(p)(4)(A), 33 U.S.C. § 1342(p)(4)(A), by failing to apply for NPDES permit authorization to discharge storm water from the Facilities. *See* Fourth Amended Complaint for Declaratory and Injunctive Relief and Civil Penalties ¶¶ 68-80 (ECF No. 107) (Feb. 9, 2011) ("Complaint").

With respect to Claim 1, PG&E argues that it cannot be found to be in violation of the CWA because it is not subject to CWA regulation. PG&E argues that Congress left it up to the United States Environmental Protection Agency ("EPA") and the states to determine which storm water dischargers to regulate under the CWA, and that EPA and California regulations do not contemplate the regulation of the Facilities at issue here. Because PG&E contends that the CWA discharge prohibition does not apply to the Facilities, PG&E does not make any showing with respect to the elements of the CWA violation alleged in Claim 1, to wit, whether there was a "discharge" of a "pollutant" from a "point source" to navigable waters of the United States.

PG&E's motion should be denied because the Facilities are subject to NPDES regulation under both California's and EPA's regulations. In ERF's cross-motion for summary judgment filed on the same day as PG&E's (ECF No. 197) (Aug. 2, 2012) ("ERF Opening Brief"), ERF presented evidence to show that PG&E is liable under Claim 1 on the basis of four related legal arguments: (1) the Facilities are regulated under CWA § 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B), and EPA's regulations because they are discharging pollutants "associated with industrial activity"; (2) the Facilities are regulated under California's statewide general permit applicable to all storm water discharges associated with industrial

activity in California ("General Permit"), because the body that issued the General Permit, the California State Water Resources Control Board ("State Board"), has discretion under CWA § 402(p)(2)(E), 33 U.S.C. § 1342(p)(2)(E), to regulate sources of storm water beyond those regulated under EPA's regulations, and it has exercised this authority to require NPDES permits for the activities occurring at the Facilities; (3) EPA's regulations cannot permissibly exempt the plainly industrial activities occurring at the Facilities from the definition of "discharge associated with industrial activity," and therefore must be interpreted in a way that regulates the discharges from the Facilities; and (4) in the alternative, in creating CWA § 402(p) as part of its 1987 amendments to the CWA, Congress did not intend to create an exemption from the basic prohibition on unpermitted discharge of pollutants contained in CWA § 301(a), and accordingly, the Facilities are in violation of CWA § 301(a) even if they are not "discharges associated with industrial activity," so long as the basic elements of the CWA cause of action are met.

PG&E's Opening Brief takes issue, directly or indirectly, with each of these arguments. However, PG&E does not dispute the basic facts underlying the case. In particular, PG&E concedes that there is "no dispute between the parties about the activities that occur at the Facilities . . . ." PG&E Opening Brief at 4. While PG&E's summary of those facts (*see id*. at 4-5) is incomplete in important respects, the factual agreement of the parties shows that there is no dispute as to a material fact and ERF's claims are ripe for resolution on summary judgment.

As discussed below, PG&E's arguments on Claim 1 fail for a number of reasons so PG&E's motion should be denied on Claim 1. However, ERF concedes that Claim 2 should be dismissed on the basis of an intervening change in the law since ERF filed the Complaint. Accordingly, ERF does not oppose PG&E's motion for summary judgment on Claim 2.

## II.   ARGUMENT

### A.   PG&E Fails to Show the Facilities Are Immune from NPDES Regulation Under CWA § 402(p)(2)(E) As Implemented In California.

#### 1.   The General Permit is Intended to Have A Broader Scope than EPA's Regulations and Covers the Facilities Here Regardless of PG&E's Overall Business Function.

Much of PG&E's brief focuses on whether the Facilities are covered by EPA's regulations issued pursuant to CWA § 402(p)(2)(B) as sources of discharge "associated with industrial activity." As

discussed more fully below, EPA's regulations incorporate particular Standard Industrial Classification ("SIC") Codes set forth in 40 C.F.R. § 122.26(b)(14) to identify particular business activities that are considered to be engaged in "industrial activity" for which NPDES permit authorization to discharge polluted storm water coverage is required. Much of PG&E's argument on that point is that the Facilities have the same SIC Code as PG&E as a whole (identified as within "Major Group 49"), and because this group of SIC Codes is not listed under 40 C.F.R. § 122.26(b)(14), PG&E argues that the Facilities are not regulated. Central to PG&E's argument that the Facilities have the same SIC Code as PG&E as a whole is the argument that the Facilities qualify as "auxiliary establishments" under the SIC Manual. PG&E argues that the Facilities are within the definition of "auxiliary" establishments because they have the "purpose" of providing support to PG&E's electricity and natural gas business. As such, PG&E argues the Facilities are not regulated under EPA's regulations.

However, of the 30 pages of argument in PG&E's brief, it devotes essentially one paragraph to the separate issue of whether the Facilities are regulated under California's General Permit. As noted above, this issue is independent of the issue of whether the Facilities are covered by EPA's regulations, and provides an independent basis to find PG&E to be liable under Claim 1.

As noted in ERF's Opening Brief, CWA § 402(p)(2)(E) provides the states with authority to broaden the scope of storm water regulation beyond the specific categories of covered activity listed in CWA § 402(p)(2)(B) and 40 C.F.R. § 122.26(b)(14). ERF Opening Brief at 20. In California, the State Board exercised this authority by providing in the General Permit that coverage is required whenever the primary activities at a facility are listed within the SIC Codes contained in the General Permit's Attachment 1, *regardless of whether the activities were primary or auxiliary to the facility operator's function*. *See* Isaacs Opening Decl., Ex. 14 at PDF pg. 4 (Attachment 1 begins at PDF pg. 68). In other words, the General Permit rejected the notion that an "auxiliary" establishment could escape coverage simply because the larger enterprise of which it is part was classified by a SIC Code that was not enumerated in Attachment 1 (which tracks the list in 40 C.F.R. § 122.26(b)(14)). Instead, the primary activities on the ground at the facilities themselves would determine whether the facilities were covered under the General Permit.

The General Permit illustrated this point by providing the following example:

> The General Permit is intended to cover all facilities described in Attachment 1, whether the facility is primary or is auxiliary to the facility operator's function. For example, although a school district's primary function is education, a facility that it operates for vehicle maintenance of school buses is a transportation facility that is covered by this General Permit.

*Id*. Even though a school district may have the purpose of providing educational services, because it operates a facility that is engaged in one of the industrial activities listed in Attachment 1 (vehicle maintenance), the district must obtain General Permit coverage for the transportation facility it operates.

PG&E concedes, as it must, that the State Board intended the General Permit to apply in this fashion. PG&E Brief at 19 (stating: "California focuses on the 'primary activity' at individual facilities to determine coverage, instead of the 'primary' SIC code for the overall business establishment."). Indeed, both the General Permit and the guidance memoranda cited by PG&E are explicit on this point. *See* Showalter Declaration (ECF No. 196-1), Ex. 21 (1992 Memorandum from Elizabeth Jennings) at 4 (noting that "coverage under the permit is based upon the primary activity at the individual facility, and that the permit applies to all facilities which are described within the SICs, whether the activity is primary or auxiliary to the owner or operator of the facility."); *Id*., Ex. 20 (1997 Jennings memorandum) at 2 (noting State Board "exercised its authority to expand the scope of its permit" to "consider the primary activity at the <u>facility</u> to determine whether a permit was required."); *Id*., Ex. 19 (Mumley memorandum) at Attachment 1, at 1 (noting "the primary activity at the facility should be considered when applying the SIC codes rather than the primary business of the owner or operator.").

Thus, the Facilities are regulated under the General Permit because the primary activities occurring there are listed in Attachment 1, regardless of the primary purpose of PG&E as a whole. As noted in ERF's Opening Brief, the primary activities occurring at the Facilities are: wholesale recycling of scrap materials, described in SIC Code 5093, which accounts for the greatest source of revenue generated at the Facilities, totaling approximately $1.3 million in the five year relevant time period from December 2005 to April 2011 (ERF Opening Brief at 4); vehicle maintenance and storage activities described by SIC Codes 4226 and 4231, involving approximately 550 vehicles, $25,000 in on-hand inventory, and 25 employees with a payroll of approximately $1.6 million per year, or approximately $8

million for the relevant time period (*Id*. at 6-7); aggregates handling and storage activities described in SIC Code 1442, involving the housing and handling of large piles of new and used aggregates at the Facilities to enable them to serve as a staging area for PG&E's construction crews to dig up portions of streets in PG&E's service territory for the laying of gas pipelines and electrical lines (*Id*. at 5-6); light industrial activity described in SIC Codes 3444, 3452, 3449, 3494, 3496, 3498, and 3499, involving PG&E's production of gas line manifold assemblies, meter sets, other gas distribution equipment, gas distribution lines, meter guards, pipe assemblies, and replacement parts for PG&E vehicles, like tool and cone holders (*Id*. at 8); and other industrial activity consisting of the storage of large stacks of new and used wooden utility poles treated with pentachlorophenol and dioxin, which seeps from the poles into surface water that is discharged to the water bodies adjacent to or near the Facilities (*Id*. at 8-10). Because these activities are within the SIC Codes contained in Attachment 1, ERF has shown that the Facilities must obtain coverage under the General Permit.

## 2. PG&E Cannot Escape This Conclusion By Claiming that Only One Single SIC Code Can Be Applied to the Facilities.

PG&E concedes that there is "no dispute between the parties about the activities that occur at the Facilities . . . ." PG&E Opening Brief at 4. Despite this concession, however, PG&E still argues that the Facilities are somehow not regulated because "PG&E itself would have a Group 49 SIC Code." PG&E Brief at 19. As just noted, under the General Permit, the relevant question is not the SIC Code of PG&E as a whole, but the SIC Codes of the Facilities themselves, since the General Permit eliminates the concept of an "auxiliary" establishment.

PG&E's main argument appears to be that ERF has relied on an impermissible multiple SIC Code theory. PG&E Brief at 19. Citing guidance memoranda written by State Board staff members and EPA, PG&E argues that coverage under the General Permit is based on the "primary activity" at a given facility, not the "sum-total of all subsidiary tasks ever conducted." *Id*. at 19 n.11 & 12 (citing 1992 Jennings Memorandum and 1997 Jennings Memorandum); *Id*. at 26 (citing EPA Question & Answer Doc. Vol. I); *see also id*. at 17. Apparently, PG&E is arguing that the "primary activity" at the Facilities should dictate that the Facilities are assigned a single SIC Code under Group 49, notwithstanding the multipurpose nature of the activities at the Facilities. This argument fails for numerous reasons.

First, PG&E offers no evidence to show that the primary activity *at the Facilities themselves* falls under the Group 49 SIC Codes. The SIC Codes in Major Group 49 describe activities relating to the generation, transmission, and/or distribution of electricity and natural gas.[1] PG&E has admitted that the Facilities themselves neither generate electricity or natural gas nor distribute that electricity or gas to PG&E's customers. ERF Opening Brief at 19 (*citing* Isaacs Opening Decl., Ex. 23 at 58:20-61:6). Accordingly, the Facilities cannot be given a Group 49 SIC Code because PG&E has presented no evidence that the Facilities are in any way engaged in these activities. As discussed above, whether or not PG&E as a whole should be given a Group 49 SIC Code is irrelevant.

Second, PG&E's argument that the "primary activity" alone determines whether a facility is subject to NPDES regulation is contrary to the plain meaning of the General Permit. In California, a party subject to NPDES regulation under the General Permit submits a Notice of Intent ("NOI") to the State Board to request coverage under the General Permit. As noted in ERF's Opening Brief, the NOI form contained in the General Permit allows permit applicants to list up to three SIC Codes to describe the activities at their facilities subject to coverage under the General Permit. ERF Opening Brief at 20. Specifically, under the heading of "SIC CODE(S) OF REGULATED ACTIVITY," the NOI form lists three lines for the entry of up to three four-digit SIC Codes. *See* Showalter Decl., Ex. 13 at PDF pg. 76.

PG&E points out that the instructions for completing the NOI say: "Most facilities have only one code . . . ." PG&E Opening Brief at 24; *see also id*. at 26. However, PG&E omits the very next clause of the quoted sentence, which reads: "however, additional spaces are provided for those facilities that have more than one activity." Showalter Decl., Ex. 13 at PDF pg. 73. This demonstrates that the General Permit contemplates that for multipurpose facilities, the General Permit will apply whenever at least one of the SIC Code activities occurring at the facility is a regulated activity. Otherwise, it would have been irrational for the General Permit to allow facilities to identify multiple SIC Codes as the "regulated activity" subject to General Permit coverage.

---

[1] The Group 49 SIC Codes can be viewed at
http://www.osha.gov/pls/imis/sicsearch.html?p_sic=49&p_search= (last visited Sept. 12, 2012).

Third, this conclusion is bolstered by the fact that almost 2,000 facilities in California have in fact listed multiple SIC Codes in their applications for General Permit coverage. A review of the State Board's database of NOIs reveals that approximately 12% of all NOIs (a total of 1,935) identify multiple SIC Codes as the basis for regulation. *See* Declaration of Jodene Isaacs in Support of Plaintiff's Opposition to PG&E's Cross-Motion for Summary Judgment ¶ 2, Ex. 1 ("Isaacs Opp. Decl."). This exhibit shows that the NOIs provide a space to list the primary, secondary, and tertiary SIC Code applicable to the facility. Many of the facilities list the primary SIC Code as being an unregulated SIC Code, while listing a regulated SIC Code as the secondary or tertiary SIC Code. *See, e.g.*, *id*. at 1 (facility number 11, Mission Produce Inc., with only regulated SIC Code listed as tertiary SIC Code 4222; facility number 13, Crannell Forestry Maintenance, with only regulated SIC Code listed as secondary SIC Code 4214). This demonstrates that even though a given activity may not be considered the "primary activity" occurring at a facility, General Permit coverage is still required.

Finally, PG&E's repeated reference to "Major Group 49" as the applicable SIC classification for PG&E actually undermines its single SIC Code argument. Major Group 49 is not a SIC Code, but rather a group of 14 separate individual four-digit SIC Codes. In fact, PG&E all but concedes that at least two SIC Codes should apply to the company, one for its gas business and one for its electricity business. *See* PG&E Brief at 7, n.2 (*citing* SIC Code 4911 for the generation, transmission, and/or distribution of electric power, and SIC Code 4932 for gas service combined with other services). Given its importance in the case, the fact that PG&E never actually identifies a single SIC Code applicable to PG&E undermines its argument that no more than one single SIC Code should apply.[2]

---

[2] PG&E's caginess on this point may also be due to the fact that it is actually involved in a great deal of business activity beyond just providing electricity and gas as such. For example, PG&E's website notes that it holds itself out as providing a variety of services, including: vegetation management; building and renovation services for businesses and agriculture; design and installation of decorative street lighting; testing and analysis of electrical equipment; high voltage facility maintenance; high voltage equipment testing and repair (conducted by PG&E's "highly skilled and experienced electricians, welders, and other specialized workers"); safety training to government and municipalities; wireless cell site collocation services; and applied technology consultation services. *See* http://www.pge.com/mybusiness/customerservice/otherrequests/ (last visited September 11, 2012).

The facts on the ground at the Facilities, coupled with PG&E's own unwillingness to identify any single SIC Code that purportedly applies to the Facilities, demonstrate that the Facilities are not in fact subject to only one single SIC Code. Rather, the Facilities are the very type of multipurpose facilities for which multiple SIC Codes are appropriate, as contemplated by the General Permit. Because all of the SIC Codes that would apply to the Facilities are within the list of regulated SIC Codes contained in Attachment 1, the Facilities must obtain coverage under the General Permit.

### 3. PG&E's Reliance on Guidance Documents, Expert Testimony, and Exhibits Introduced in Another Case Cannot Be Used to Contradict the Plain Meaning of the General Permit.

To the extent that the guidance documents cited by PG&E can be read as suggesting that a facility conducting multiple industrial activities should be given a single SIC Code that reflects only the "primary activity" at the facility, they must be disregarded. Extrinsic evidence of an agency's subjective intent cannot be used to assign a meaning to the General Permit that contradicts the General Permit's plain language. *See, e.g.*, *Christensen v. Harris County*, 529 U.S. 576, 588 (2000) (courts do not defer to extrinsic evidence of an agency's interpretation of its own regulations absent some indication that the underlying regulations are ambiguous); *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1988-91 (9th Cir. 2002) (rejecting reasoning of EPA guidance documents that suggested regulatory interpretation that would conflict with the CWA); *see also Diaz v. INS*, 648 F. Supp. 638, 644 (E.D. Cal. 1986) (explaining that when construing administrative regulations, the plain meaning should ordinarily prevail and all ambiguities are to be resolved in favor of an interpretation consistent with the statutory and regulatory scheme) (*citing Malat v. Riddell*, 383 U.S. 569, 571-72 (1966)). Furthermore, the Jennings Memoranda are non-authoritative memoranda from an agency staff member who lacks authority to speak for the State Board, a politically appointed body of commissioners. The merely personal opinions of this staff member are not entitled to formal judicial deference, especially in light of their conflict with both the actual text of the General Permit and the actual practice occurring in California. *See U.S. v. Mead Corp.*, 533 U.S. 218, 228 (2001) (the level of deference given to agency

pronouncements depends on factors such as the formality of the pronouncement in issue, the agency's

care, its consistency of position, relative expertness, and to the persuasiveness of the pronouncement).[3]

Lacking support from either the text of the General Permit or actual practice, PG&E is forced to

rely on the testimony of Tim Simpson – an engineer who has been offered as an expert witness on storm

water sampling and analysis – to opine on the way in which the General Permit should be interpreted.

Specifically, PG&E offers Mr. Simpson's opinion for the proposition that multiple SIC Codes are only

used at a site where there are "separate and divisible" facilities at the site. PG&E Opening Brief at 19.

This "separate and divisible" language does not appear in the General Permit or any other legal

authority. Of course, PG&E cannot create new regulatory requirements by offering an expert witness

who claims they exist. At a minimum, as discussed more fully below, this testimony constitutes a legal

opinion for which expert testimony is not admissible. Even if the meaning of a legal requirement were

the proper subject of expert testimony, an engineer would not be qualified to offer such testimony.

PG&E argues that an exhibit introduced by ERF in briefing to the Ninth Circuit in a different

case supports its theory that no more than one SIC Code can be applied to the Facilities here. *See* PG&E

Opening Brief at 27 (arguing that the exhibit "illustrates situations where more than one SIC Code might

be applied."). This is merely reaching. The exhibit was not compiled to represent all the situations in

California in which more than one SIC Code has been assigned to facilities subject to the General

Permit. Rather, the exhibit was compiled of a subset of such facilities, those within Group 49, simply to

refute an argument made by PG&E in the other case that no Group 49 facility can ever be covered under

the General Permit – by pointing out numerous Group 49 facilities that were in fact covered by the

General Permit.[4]

---

[3] Even if it were considered authoritative on how *EPA's* storm water regulations should be interpreted, the EPA Question & Answer document would still not help PG&E. As the Question & Answer document itself points out, the State Board has authority pursuant to CWA § 402(p)(2)(E) to adopt a more expansive approach to storm water regulation than EPA and to require NPDES permit coverage for facilities that may be exempted by EPA. Showalter Decl., Ex. 18 at PDF pg. 24 ("State storm water regulations can be more expansive and cover more activities than the Federal regulations."). Accordingly, the EPA Question & Answer document provides no basis for disregarding the plain language of the General Permit.

[4] In any event, PG&E mischaracterizes the facilities listed in the exhibit. PG&E contends that the facilities listed are "wholly dissimilar" to the Facilities at issue here because the facilities listed on the

PG&E further misconstrues the exhibit in arguing that it establishes a "clear rule" that multiple SIC Codes are appropriate only when a site consists of more than one distinct "facility." PG&E Opening Brief at 27. PG&E cannot and does not offer evidence that as a factual matter each of the sites in ERF's exhibit which have multiple SIC Codes (much less the entire universe of facilities in California that have filed NOIs identifying themselves as having multiple SIC Codes) consist of more than one distinct facility and that the exhibit therefore lends any support for PG&E's "clear rule" theory. PG&E cites nothing in the SIC Manual that supports PG&E's "clear rule," and in fact, its argument appears to be based on a misreading of the guidance memorandum it cites. *Id*. at 27, n.21.[5]

### 4. PG&E's Disagreement With the SIC Codes Applicable to the Facilities Conflicts With the Plain Language of the SIC Codes and the General Permit.

PG&E disagrees with the SIC Code assignment that ERF has shown to be applicable to the Facilities. *See* PG&E Opening Brief at 22-24. First, PG&E contends that the Facilities are not transportation facilities under SIC Codes 4226 and 4231 because transportation facilities are limited to those that provide service to the third parties as opposed to a company's own employees. *Id*. at 22. Notably, PG&E's citation in support of this conclusion is not the text of the SIC Code itself, but rather a guidance memorandum written by a State Board staff member. However, the memorandum's interpretation of the SIC Codes is not entitled to deference because it conflicts with the plain language of the SIC Codes themselves. Neither SIC Code 4231 or 4226 states that it applies only to transportation

---

chart appear to be a mixture of power generation and "operations like log processing or incineration which feed electrical generators, which are required to be permitted under 40 C.F.R. § 122.26(b)(14)(i) . . . ." PG&E Brief at 27. This is inaccurate. Even a cursory review of the exhibit shows that the facilities are not limited to those involved in power generation and activities to feed the generators. As a matter of fact, the facilities include a number of activities similar to those involved in this case: terminals and service facilities for motor vehicle passenger transportation under SIC Code 4173 (*see* UCLA, page 7); trucking under SIC Code 4213 (*see* Scotia Town and Plant, page 32); automotive repair shops not elsewhere classified ("NEC") under SIC Code 7539 (*see* Pacific Union College, page 2); and refuse systems under SIC Code 4953 (*see* LA County Sanitation Dist, page 6).

[5] The cited passage of the Mumley memorandum deals with a situation in which the owner and the operator of a facility are two separate entities, and notes that, in such situations, the separate entities do not need to apply for separate permits when the owner assumes responsibility for the activities occurring at the site. *See* Mumley memorandum at Attachment 1, at 2; *Id*., Attachment III (pg. 12 of memorandum) (under heading for who is responsible for obtaining the permit). This situation does not apply here, where the Facilities are owned and operated by the same entity – PG&E.

---

offered to third parties instead of a company's employees. *See, e.g.*, SIC Code 4231 (stating it applies to "terminals which provide maintenance and service for motor vehicles.").

Furthermore, any ambiguity in the applicability of the SIC Codes should be resolved in favor of an interpretation consistent with the statutory and regulatory scheme. *Diaz*, 648 F. Supp. at 644 (*citing Malat*, 383 U.S. at 571-72). Here, the statutory scheme evinces a legislative intent to protect the nation's waters by regulating industrial sources of storm water discharge. The statutory and regulatory scheme incorporates the SIC classification system as a way of defining the scope of industrial activity subject to regulation. But, as the Court has noted, the SIC classification system "might not be well-suited for determining whether or not a particular facility is engaged in 'industrial activity' for purposes of the Clean Water Act." ECF No. 106 at 5 n.4. As such, the SIC Codes should be interpreted broadly to include all activities analogous to the activities specifically described in each SIC Code. Otherwise, the legislative intent to regulate industrial sources of storm water discharge would depend solely on the vagaries of a now-defunct economic classification system established for an entirely unrelated purpose.[6]

Second, PG&E argues that the Facilities are not light industrial facilities because "ERF has produced no evidence of [this SIC Code activity] occurring at the Facilities." PG&E Opening Brief at 23. This is plainly incorrect. ERF's evidence discussed above shows that PG&E does in fact conduct the type of metal fabrication activities listed in SIC Codes 3444, 3449, 3452, 3494, 3496, 3498, and 3499 at the Facilities. PG&E claims that these SIC Codes are "defined by primary engagement in manufacturing, something there is no proof whatsoever that PG&E conducts." PG&E cites nothing in support of this interpretation of the SIC Codes. Whether defined as "manufacturing" or not, ERF has shown that PG&E conducts the metal fabrication activities described by the SIC Codes. Any ambiguity as to the applicability should be resolved in favor of a broader interpretation.

Third, PG&E argues that the Facilities are not recycling facilities because its engineering expert Tim Simpson says that the definition of recycling means "downstream" recycling not "upstream"

---

[6] SIC Codes are the U.S. Department of Labor ("DOL")'s business and labor statistics classification system established in 1937. The DOL is now replacing the SIC classification with a new system called the North American Industry Classification System ("NAICS"). *See* http://www.bls.gov/bls/naics.htm (last visited Sept. 12, 2012).

recycling. *Id*. at 24. However, nothing in the SIC Code makes this upstream / downstream distinction. The dictionary definition of "wholesale" is "the sale of goods in quantity, as to retailers or jobbers, for resale."[7] The Facilities collect, sort, and sell scrap metal to a third party service provider (Alco Iron & Metals), who then processes the metals and sells them to refiners, smelters, and other facilities.[8] PG&E's reliance on an expert witness cannot change the fact that this constitutes "wholesale" recycling within the language of the SIC Codes.[9]

In addition, much of PG&E's argument for why individual SIC Codes do not apply rests on the contention that, even if the individual SIC Code activities occur, they are not the "primary activity" at the Facilities. As discussed above, this interpretation is contrary to the plain meaning of the General Permit, and is therefore not relevant for determining coverage. However, even if the "primary activity" were the relevant factor for determining General Permit coverage, the Facilities would still be regulated.

The SIC Manual defines "primary activity" as the "principle product[s] . . . or services rendered." Showalter Decl., Ex. 12 at 15 ("SIC Manual"). The SIC Manual notes that the "principle product or service should be determined by its relative share of value added to the establishment." *Id*. If measuring this value is infeasible, the primary activity may be determined by considering the value of production, value of sales, and employment or payroll. *Id*. at 15-16.

A number of SIC Codes could be seen as the "primary activity" at the Facilities because each of the four activities occurring at the Facilities provides unique and significant value to PG&E. To the extent that the SIC Manual defines the primary activity of a facility with reference to the revenue derived from the activity, as noted above, ERF has pointed out that materials recycling generates the most revenue of any activity occurring at the Facilities, and as such, should be seen as the primary activity occurring there.[10] Alternatively, the primary activity should be seen as vehicle maintenance since the sheer volume of activity is substantial and the value of payroll totals approximately $1.6

---

[7] http://dictionary.reference.com/browse/wholesale?s=t (last visited Sept. 12, 2012).
[8] *See* http://www.alcometals.com/scrapmetal.php (last visited Sept. 12, 2012).
[9] PG&E says nothing about the fourth activity occurring at the Facilities – the handling and storage of aggregate materials for construction purposes under SIC Code 1442.
[10] In this regard, PG&E's claim, unsupported by any evidence, that there is "no question that the Facilities are not a source of revenue for PG&E" is demonstrably false. PG&E Opening Brief at 26.

million per year, or approximately $8 million for the relevant time period. Finally, the primary activity could be seen as aggregates handling and storage or metal fabrication, since the housing of large piles of new and used aggregates at the Facilities, and the fabrication of metal distribution equipment and other parts are central functions of the Facilities in serving as staging areas for PG&E's field crews.  In any case, only *one of these four* activities could be seen as the primary activity occurring at the Facilities, meaning that in any case the Facilities would have to be assigned one of the SIC Codes corresponding to one of these activities even if PG&E were correct that a single SIC Code must be assigned to the Facilities. The SIC Codes corresponding to these activities are listed both in the State Board's Attachment 1 and in EPA's storm water regulations as covered industrial activities.

**B.      PG&E Fails to Show the Facilities Are Immune from Regulation Under CWA § 402(p)(2)(B) As Implemented By EPA's Regulations.**

**1.      PG&E Incorrectly Argues that the Facilities Are Exempt from Storm Water Regulation Because PG&E is a "Service" Utility.**

Turning to the issue of CWA § 402(p)(2)(B) and EPA's regulations, PG&E argues that the Facilities are not subject to regulation because PG&E is in the "service" business and hence not within the definition of "industrial activity" under CWA § 402(p)(2)(B). PG&E Opening Brief at 8, 14. In support of this claim, PG&E cites a passage in 55 Fed. Reg. 47990 (Nov. 16, 1990) stating that the definition of "industrial activity" excludes businesses not classified as "industrial" under the SIC classification system, including service businesses. *Id.* at 14. However, the general proposition that "service" businesses are not covered by EPA's regulations provides no support to PG&E absent some evidence that PG&E is itself a "service" business. PG&E has provided no such evidence. PG&E asserts that it has "long been recognized" as a service business, but gives no citation for this assertion. *Id.* at 8. The cited portion of the Federal Register says nothing about what qualifies as a "service" business under the SIC system, nor any indication that electricity and natural gas utilities are "service" businesses.

PG&E attempts to support this argument by pointing out that EPA excluded "powerline corridors" from the definition of "industrial activity." PG&E Motion at 7 and n.1 (*citing* 53 Fed. Reg. 49436 (Dec. 7, 1998)). It is unclear what relevance "powerline corridors" have to the present case, since PG&E's Facilities are not powerline corridors, but industrial yards where various industrial processes

like recycling, metal fabrication, vehicle maintenance, and aggregate handling take place. Far from the "clear and unambiguous" conclusion that electric services are exempt from permitting, if anything, the fact that PG&E found nothing closer to the Facilities than a "powerline corridor" in the entirety of the rulemaking record suggests that EPA did not intend to exempt facilities like the ones at issue here from storm water regulation.

PG&E cites *Northwest Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063, 1080 (9th Cir. 2011), cert. granted *sub nom*, *Decker v. Northwest Envtl. Def. Ctr.*, 2012 U.S. LEXIS 4793 (June 25, 2012), for the proposition that Congress intended to exclude "*de minimus*" discharges of storm water from the scope of CWA regulation by passing CWA § 402(p). PG&E Brief at 14. Again, this general proposition provides no support to PG&E, because PG&E offers no evidence that the Facilities are such "*de minimus*" discharges. PG&E merely asserts this, without providing any citation in support.

Contrary to PG&E's arguments, to the extent that EPA's regulations speak to the issue at all, they actually appear to anticipate that "service" activities occurring in an industrial context would fall within the storm water regulations. As discussed throughout the briefing, the regulations define "industrial activity" with reference to particular SIC Codes referenced in 40 C.F.R. § 122.26(b)(14). The SIC Manual explains that SIC Codes are assigned based on the "primary activity" occurring at a facility, which is determined with reference to the "principle product[s] or . . . *services rendered*." Opening Brief at 17 (*citing* SIC Manual at 15 (emphasis added)). The inclusion of services in the definition of "primary activity," and EPA's inclusion of "primary activity" in the definition of "industrial activity," suggests that at least some services, when industrial in nature, are considered to be "industrial activity" under the regulations. Indeed, many of the SIC Codes included within 40 C.F.R. § 122.26(b)(14) are expressly "service" activities, but are still included in the definition of "industrial activity."[11] This suggests that EPA intended to include services that arise in an industrial context within the scope of the regulations.

---

[11] *See, e.g.*, SIC Code 4141 (Local Bus Charter Service); SIC Code 4142 (Bus Charter Service, Except Local); SIC Code 4173 (Terminal and Service Facilities for Motor Vehicle Passenger Transportation); SIC Code 4215 (Courier Services, Except by Air); SIC Code 4311 (United States Postal Service); SIC Code 4499 (Water Transportation Services, Not Elsewhere Classified); SIC Code 4513 (Air Courier Services); SIC Code 4581 (Airports, Flying Fields, and Airport Terminal Services).

In addition, PG&E's "service" argument is contrary to the actual activities occurring at the Facilities. The Facilities are industrial yards full of heavy machinery like backhoes, large concrete bays full of aggregates for construction use, stacks of new utility poles, steel bins for waste disposal and recycling, vehicle maintenance garages, various equipment like transformers, and welding shops where PG&E fabricates tangible goods like gas distribution lines, meter sets, and vehicle parts for use in maintaining PG&E's electricity and natural gas system. The activities on the Facilities generate high levels of numerous pollutants that are discharged to the storm sewer system and tracked off-site by the extensive motor vehicle traffic moving on and off-site on a daily basis. PG&E's claim to be providing utility "service" to customers cannot change the fact that what is actually occurring at the Facilities is industrial in nature.[12]

## 2.   PG&E Incorrectly Contends the Facilities Are "Auxiliaries."

PG&E also argues that the Facilities are exempt from EPA's regulations because they constitute "auxiliaries" with the same SIC Code as PG&E as a whole. Because this SIC Code purportedly falls under Major Group 49, which is a group of SIC Codes not listed in 40 C.F.R. § 122.26(b)(14), PG&E contends that it is not subject to EPA's storm water regulations.

This argument fails because the Facilities do not meet the definition of "auxiliary" under the SIC Manual. The 1987 SIC Manual assigns SIC Codes to "establishments," and defines an establishment as "an economic unit, generally at a single physical location, where business is conducted or where services or industrial operations are performed." *See* Showalter Decl., Ex. 12 at 12. The SIC Manual recognizes two types of establishments: "auxiliary" establishments and "operating" establishments. Auxiliaries are defined as "establishments primarily engaged in performing management or support

---

[12] To the extent that PG&E is suggesting that utility companies are somehow exempt from the definition of "industrial activity," this argument is without merit. Nothing in EPA's regulations exempts utility companies from regulation. Indeed, many of the SIC Codes listed within 40 C.F.R. § 122.26(b)(14) are in industries that have long been subject to public utility regulation, including the airline, railroad, and motor vehicle transportation industries. *See, e.g.*, SIC Codes 4011 (Railroads, Line-Haul Operating); 4013 (Railroad Switching and Terminal Establishments); 4111 (Local and Suburban Transit); 4119 (Local Passenger Transportation, Not Elsewhere Classified); 4121 (Taxicabs); 4141 (Local Bus Charter Service); 4173 (Terminal and Service Facilities for Motor Vehicle Passenger Transportation); 4512 (Air Transportation, Scheduled); 4513 (Air Courier Services); 4522 (Air Transportation, Nonscheduled).

1   services for other establishments of the same enterprise." *Id*. at 13. The SIC Manual states: "Some

2   examples of activities commonly performed by auxiliaries are management and other general

3   administrative functions, such as accounting, data processing, and legal services; research, development,

4   and testing; and warehousing." *Id*. Where an establishment is "primarily engaged in" these types of

5   activities, it is an "auxiliary" establishment, given the same SIC Code as the operating establishments it

6   serves. *Id*. at 16.

7        PG&E argues that the Facilities are auxiliaries because the primary "purpose" of the Facilities is

8   to support PG&E's electric and gas business. For example, PG&E says that the Facilities are auxiliaries

9   because PG&E operates them "in common for a common purpose of providing electric and gas service,

10   the primary business of PG&E . . . ." PG&E Brief at 6; *see also, e.g.*, *id*.; *Id*. at 8 (alleging "no dispute

11   on the Facilities' purpose"); *Id*. at 9 (repeating "primary purpose"); *Id*. at 24 (using terms "primary

12   activity" and "primary purpose"  interchangeably); *Id*. at 21 (referring to the Facilities' "purpose or

13   reason for existing."). PG&E concludes: "ERF's allegations about multiple activities that occur at the

14   Facilities does nothing to change the purpose for the Facilities, and hence, nothing to change the SIC

15   Code which determines whether they are permitted." *Id*. at 20.

16        PG&E's argument is premised on the wrong definition of "auxiliary." The SIC Manual does not

17   define an auxiliary on the basis of its "purpose" or "reason for existing." Rather, as noted, the SIC

18   Manual defines an auxiliary as an establishment "*primarily engaged in* performing management or

19   support services for other establishments of the same enterprise." SIC Manual at 13 (emphasis added).[13]

20   This suggests that determining whether a facility meets the definition of an auxiliary requires

21   consideration of the on-the-ground activities occurring at the facility. Hence, the Facilities are not

22

23

24

25

---

26   [13] PG&E's use of the "purpose" language appears to be based on the Mumley Memorandum. *See* PG&E Brief at 21 n.4 (*citing* Mumley Memorandum, Attachment 1, at 1). The reference to the "purpose" of a

27   facility is simply an imprecise paraphrasing of the SIC Manual. Reading the passage in context shows that the memorandum is actually describing the "primary activity" occurring at a facility, not the

28   primary "purpose." *See* Mumley Memorandum, Attachment 1, at 1.

auxiliaries unless the activities that primarily occur at the sites include the support services listed as examples of auxiliary activities in the SIC Manual, regardless of their "purpose or reason for existing."[14]

As noted above, PG&E has offered nothing to document that the Facilities are "primarily engaged in" providing electricity and gas support services. PG&E's argument that this is the Facilities' "reason for existing" is not only legally irrelevant, as noted above, but also unsupported by any evidence. The only evidence about the on-the-ground activities that primarily occur at the Facilities suggests that they are "primarily engaged in" the recycling, vehicle maintenance, aggregate handling, and metal fabrication activities discussed above.

PG&E's attempt to derive support from ERF's responses to PG&E's requests for admission is unavailing. PG&E claims that ERF has admitted that the primary "purpose" of the Facilities is to support PG&E's gas and electric business. PG&E Brief at 2, 4; *see also id*. at 20. As noted, this is not the relevant inquiry. Moreover, the responses state that "*PG&E's* primary business activity is the sale of electricity and natural gas . . . ." *See* Showalter Decl., Ex. 1 (emphasis added). ERF never stated that the primary activity *at the Facilities* is the provision of electricity and natural gas.

PG&E contends that the activities at the Facilities are described by the examples of auxiliary activities provided in the SIC Manual. Specifically, PG&E cites the examples of warehousing, automotive repair, and equipment provision activities. PG&E Brief at 6; *see also id*. at 20 (noting that the SIC Manual states that Group 49 facilities "may include other types of services, such as transportation, communications, and refrigeration," which makes these "auxiliary" activities). Of these examples, the only one that appears to resemble the activities at the Facilities is the automotive repair example. PG&E has offered no evidence to show that any other examples properly characterize the activities at the Facilities. In contrast, the SIC Manual lists numerous other examples of auxiliary

---

[14] Crediting PG&E's argument would mean that any establishment with the primary "purpose" of providing support services to an enterprise would qualify as an "auxiliary." This sweeps too broadly. Every establishment of a larger enterprise has the "purpose" of providing some form of support to the enterprise of which it is part – otherwise the enterprise would have no need for the establishment in the first place. So this general "purpose" of providing support to an enterprise cannot be the standard for defining an "auxiliary," because nearly all establishments would qualify. Accordingly, the definition of an "auxiliary" looks not to the "purpose" of the establishment, but to the activities occurring there.

activity, including management and administrative activities like accounting, data processing, legal services, and research and development. PG&E has not shown that any of these activities are the primary activities at the Facilities. On the contrary, ERF has shown that the primary activities at the Facilities are the industrial activities described above. Given that the majority of the activities occurring at the Facilities are not listed in the examples of "auxiliary" activity, the Facilities should not be seen as within the definition of "auxiliary."

In addition, PG&E fails to mention that the SIC Manual specifically exempts certain establishments from being "auxiliaries" even if they would otherwise qualify. Under the heading "Exceptions and Borderlines," the SIC Manual provides that "[s]ome establishments that meet the general definition of auxiliaries are nevertheless treated as operating establishments." SIC Manual at 13. These include establishments classified under SIC Codes in Divisions B and D of the SIC classification system.[15] *Id*. Division B includes SIC Code 1442, describing the activities related to "Construction Sand and Gravel," including "washing, screening, or otherwise preparing sand and gravel for construction uses," which occur at the Facilities, as noted in ERF's Opening Brief. Division D includes the light industrial activities under SIC Codes 3444, 3452, 3449, 3494, 3496, 3498, and 3499, which collectively describe various metal working activities involving the cutting, welding, and fabrication of metal products and parts, which also occur at the Facilities. Thus, even if the Facilities are providing support services to PG&E, they are not "auxiliaries" because they should be seen as being primarily engaged in the materials handling and storage and metals fabrication activities described above.

### 3. PG&E's Reliance on Guidance Materials Is Again Misplaced.

Despite claiming that the definition of "industrial activity" in CWA § 402(p)(2)(B) is "clear and unambiguous," (*see* PG&E Brief at 7), PG&E relies heavily on guidance memoranda issued by State Board staff personnel to explain the meaning of this term. PG&E is incorrect in claiming that "the Court must apply how EPA and the Board view the Facilities. . . ." *Id*. at 11. As noted above, the Court is

---

[15] A list of the Division headings and corresponding SIC Codes is available at: http://www.osha.gov/pls/imis/sic_manual.html (last visited Sept. 6, 2012).

under no obligation to defer to the guidance materials, which conflict in certain respects with the plain language of the regulations.

In addition to the issue with the Mumley memorandum noted above,[16] the 1997 Jennings memorandum contends: "The SIC manual adopts classifications based on economic units, rather than on the actual activity conducted at the facility. Each establishment may be assigned a number designating its industrial classification. But the number refers to the primary business of the company." Showalter Decl., Ex. 21 at 3. This is incorrect. The SIC Manual makes clear that a facility receives the SIC Code of the enterprise of which it is part *only if the facility qualifies as an auxiliary establishment*. As noted, PG&E has failed to show that the Facilities are primarily engaged in support services for its electric and gas business, and nothing in the Jennings memorandum can excuse this requirement.

Moreover, far from being consistent with the CWA, the 1997 Jennings memorandum actually states that its own analysis – and the interpretation advanced by PG&E – would lead to "anomalous" results. Specifically, the memorandum notes:

> The results are anomalous, in that distinctions are based on ownership rather than on impacts to water quality, but in most instances would require specific designation by the state, pursuant to Clean Water Act Section 402(p)(2)(E), in order to cure the problem.

*Id*. The fact that PG&E's own authority says that its interpretation would lead to "anomalous" results suggests that both the memorandum and PG&E's position are contrary to the intent of the CWA. This is precisely why the Court was correct in noting that the SIC classification system "might not be well-suited for determining whether or not a particular facility is engaged in 'industrial activity' for purposes of the Clean Water Act." ECF No. 106 at 5 n.4. "Agency regulations must be consistent with and in furtherance of the purposes and policies embodied in the congressional statutes which authorize them." *See Pac. Coast Med. Enterprises v. Harris*, 633 F.2d 123, 131 (9th Cir. 1980); *see also Brown,* 640 F.3d at 1079-80, 1083-87; *Forsgren,* 309 F.3d at 1185-86. PG&E's interpretation would directly undermine the purposes of the CWA to ensure that all sources of storm water pollution are regulated. At a minimum, this demonstrates the necessity of applying the State Board's broader interpretation of the

---

[16] This refers to the Mumley memorandum's substitution of the word "purpose" for "primarily engaged in" in the definition of an "auxiliary" under the SIC Manual.

definition of "industrial activity" under CWA § 402(p)(2)(E) to find that the Facilities are regulated under the General Permit, as discussed above, even if they are not regulated under EPA's regulations.

In sum, because, one, the Facilities are not "primarily engaged in" the types of managerial support activities listed in the SIC Manual, and, two, the great majority of the activities conducted at the Facilities are not within the examples of auxiliary activities listed in the SIC Manual, the Court should find the Facilities not to be "auxiliary" establishments. Instead, the Court should classify them as operating establishments, receiving the SIC Codes of the primary activities occurring at the Facilities. Following this interpretive approach is consistent with case law directing that regulations should be read in a fashion consistent with the underlying statutes the regulations are meant to advance. *E.g., Brown,* 640 F.3d at 1079-80, 1083-87. As the Ninth Circuit has recognized, Congress plainly intended the CWA to regulate all industrial sources of storm water discharge. *Id.* at 1079.

## C.    EPA's Regulations Cannot Permissibly Exempt Industrial Storm Water Discharges from NPDES Regulation.

Should the Court find that EPA's regulation provides "auxiliary" establishments with the same SIC Codes as the enterprises of which they are a part, and that PG&E's Facilities should not be classified under those SIC Codes under a strict and literal construction of the SIC Codes and Manual, the Court should reject these narrow interpretations and instead construe EPA's storm water regulation expansively to require NPDES coverage for the Facilities as conducting activities that are analogous to the activity listed in the SIC Codes. Alternatively, this Court must refuse to give effect to 40 C.F.R. § 122.26(b)(14) as applied to PG&E's Facilities – and apply the CWA's statutory prohibition on unpermitted discharges of industrial storm water instead. *See Brown,* 640 F.3d at 1079-80 (indicating dual reliance (1) on rejecting agency's interpretation of its regulation that contradicted the CWA statute in favor of interpretation of the regulation consistent with the statute and (2) on refusing effect to the regulation). Under either approach, PG&E's Facilities would be held to require NPDES permit authorization to discharge polluted storm water.

As discussed above, PG&E conducts: recycling; automotive repair, maintenance, and storage; aggregate material processing and storage, and metal fabrication/light industrial activity that should be seen as falling within the SIC Codes listed in EPA's storm water regulation – and at a minimum at least

analogous to activities described in these SIC Codes. EPA's regulations make plain that EPA views this sort of activity as industrial. These activities are no less industrial, and pose no less threat of polluted storm water runoff, when conducted at the Facilities compared to when conducted at facilities that are not part of a larger corporate enterprise. Giving effect to the CWA's unequivocal intention to require NPDES regulation for *all* industrial discharges of storm water mandates treating like facilities alike in this context. *See Brown*, 640 F.3d at 1083-87.

The Ninth Circuit has made explicitly clear that EPA lacks authority to create exemptions from permitting requirements for storm water discharges from activities that are industrial in nature. *Brown*, 640 F.3d at 1079; *see also NRDC v. EPA,* 966 F.2d 1292, 1306 (9th Cir. 1992). As *Brown* instructs, an interpretation of an EPA regulation that would exempt from NPDES regulation an industrial point source discharger in contradiction to the CWA's statutory mandates must be rejected in favor of giving effect to the underlying statutory language, the point source discharger must be found to require an NPDES permit for its discharges, and the discharger's motion to dismiss a CWA citizen suit claim for unlawful discharge denied. 640 F.3d at 1087. Here *Brown* is amply supported by Ninth Circuit precedent.

For example, in *Forsgren,* the Forest Service argued that an EPA regulation, as interpreted by EPA guidance documents, exempted the Forest Service's spraying of pesticides from NPDES permitting requirements by defining these activities as nonpoint source discharges. 309 F.3d at 1185. The Ninth Circuit rejected this argument, making plain that when a regulatory interpretation contradicts the plain meaning of a statute it must be rejected:

> The Forest Service cannot contravene the will of Congress through its reading of administrative regulations. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."

*Id.* at 1185-86; *see also NRDC v. Costle*, 568 F.2d 1369, 1382 (D.C. Cir. 1977) (*quoting US v. City and County of S.F.*, 310 U.S. 16, 31-32 (1940) ("We cannot accept the contention that administrative rulings . . . can thwart the plain purpose of a valid law.")). As in *Brown*, PG&E's motion for summary judgment must therefore be denied.

In contending that EPA could permissibly exempt the Facilities from NPDES regulation, PG&E erroneously seeks to rely on out-of-context quotes from *Brown* concerning CWA § 402(p)(6)'s grant to EPA of the authority to designate Phase II dischargers for NPDES regulation. PG&E Brief at 14-15. CWA § 402(p)(6), 33 U.S.C. § 1342(p)(6), provides EPA the authority to determine whether additional sources other than those discharges described in 402(p)(2) – *i.e.*, sources not from industrial source or large municipalities – should be regulated. The full quote from *Brown*, which PG&E selectively edited, makes plain that Phase II discharges are from *de minimus*, *non-industrial* sources:

> Stormwater discharges from churches, schools and residential properties, through rain gutters or otherwise, and from other relatively de minimus sources, are covered under Phase II rather than Phase I. It is within the discretion of EPA to promulgate Phase II regulations requiring, or not requiring, permits for such discharges.

640 F.3d at 1063. As *Brown* instructs, any discretion EPA has under CWA § 402(p)(6) whether to regulate non-industrial sources of storm water does not extend EPA discretion whether to regulate industrial sources of storm water under CWA § 402(p)(2)(B).

PG&E also mischaracterizes *Am. Mining Cong. v. EPA*, 965 F.2d 759 (9th Cir. 1992) ("*AMC*"), as supporting a broad rule that EPA has essentially non-reviewable discretion to define what constitutes an industrial activity under CWA § 402(p)(2)(B). PG&E Brief at 13. In fact, the Ninth Circuit in *AMC* exercised review of EPA's definition of what constitutes industrial activity and found that EPA reasonably could define an abandoned mine site as an industrial activity. Nothing in *AMC* suggests that the courts cannot review EPA definitions of industrial activities for CWA § 402(p) purposes nor that they should hesitate to set aside an EPA definition excluding activity that is plainly industrial.

PG&E may also argue that the Ninth Circuit in *Envtl. Def. Ctr. v. EPA*, 344 F.3d 840, 858 (9th Cir. 2001) ("*EDC*") held that EPA has discretion to exempt industrial facilities from NPDES regulation for storm water discharges. Such an argument would ignore the critical reasoning in *EDC*. In *EDC*, the Ninth Circuit held *only* that EPA had discretion *under CWA § 402(p)(6)* whether to include in its Phase II storm water regulation certain facilities that it had omitted from its Phase I storm water regulations. *Id*. at 860. The court expressly did not reach the issue presented here, whether EPA has discretion *under CWA § 402(p)(1)* to omit industrial sources from NPDES regulation. In fact, the Ninth Circuit explicitly

expressed reservation about whether EPA could omit industrial sources from regulation under CWA §

402(p)(1) but acknowledged this issue was not before the court:

> Although we are troubled by the purely administrative basis for the distinction between facilities regulated under the Phase I Rule and the Group A facilities that remain unregulated under Phase II, EPA's choice of the Phase I standard for designation is not the issue before us. Before us is whether EPA acted arbitrarily in declining to designate the Group A sources on a nationwide basis under the Phase II Rule, and we cannot say that it did.

*EDC,* 344 F.3d at 859-60. In *Brown*, the Ninth Circuit indicated that its trouble with EPA's approach

extended to holding EPA's attempts to exempt industrial point source discharges from regulation invalid

as in conflict with CWA § 402(p)(2). 640 F.3d at1083-87.

PG&E's attempted reliance on *Conservation Law Found. v. Hannaford Bros. Constr.,* 327 F.

Supp. 2d 325, 332 (D. Vt. 2004), *aff'd* 139 Fed. App'x 338 (2d Cir. 2005), for its argument that EPA has

the discretion to exclude certain kinds of storm water from permitting requirements, is also unavailing.

*See* PG&E Brief at 13. This case, regarding storm water discharges from the parking lot of a commercial

shopping mall, is not on point as it does not involve the industrial activities subject to regulation under

CWA § 402(p)(2) at issue here; nor does this case determine that certain activities that are industrial in

nature are nonetheless exempt from permitting requirements. To the extent that this case or any other

PG&E might cite could be read as supporting that EPA has discretion to exempt *industrial* storm water

dischargers from CWA regulation, the Ninth Circuit has expressly held otherwise in *Brown*.

Finally, PG&E argues that ERF is improperly raising a collateral attack against EPA's storm

water regulation, which ERF may not do in a citizen suit against PG&E to which EPA is not a party.

PG&E Opening Brief at 10-11. PG&E argues that the exclusive means for ERF to challenge EPA's

storm water regulation would have been to have brought a Court of Appeals case within 120 days of

EPA promulgation of EPA's storm water regulations pursuant to CWA § 509(b)(1), 33 U.S.C. §

1369(b)(1), naming EPA as a party. *Id.* at 10 n.3 (*citing Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*, 301

F. Supp. 2d 1102, 1107-08 (N.D. Cal. 2004) ("*EPIC*"); *Costle*, 568 F.2d at 1396; *AMC*, 965 F.2d at 765;

*see also id.* at 15 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990) for the proposition that

"programmatic" challenges to the manner in which agencies function are not within the Court's discretion).

PG&E's reliance on these cases is misplaced. EPA does not need to be a defendant in this action. Unlike in *Lujan* and the other cases cited by PG&E, ERF is not seeking any court-ordered remedy against EPA. Instead, like in *Brown* and *Forsgren*, ERF is seeking a remedy against a point source discharger that is seeking immunity from CWA liability under an EPA regulation that, as interpreted by PG&E, contradicts the CWA. As in *Brown* or *Forsgren*, interpreting the EPA regulation as not permissibly extending such immunity is well within this Court's jurisdiction.

What ERF seeks to have the Court do here is precisely what the Ninth Circuit did in the *Brown* and *Forsgren* decisions – either to interpret an EPA regulation expansively or to decline to give effect to an EPA regulation, that at least under one interpretation, would exempt an industrial source of storm water from NPDES regulation in contradiction to the CWA statute itself. Notably, the EPA filed an *amicus* brief with the US Supreme Court urging that the Ninth Circuit properly had jurisdiction to hear the citizen challenge in *Brown* and to consider the argument that the EPA interpretation of the regulation at issue in the case is erroneous. Showalter Decl., Ex. 25 at 8-11. Just as in *Brown,* this Court has jurisdiction to hear Plaintiff's contentions that the Defendant is violating the CWA's prohibition on unpermitted discharges of polluted storm water and that EPA regulations, properly construed, do not exempt the Defendant from CWA regulation. *See also Forsgren,* 309 F.3d at 1190 (rejecting argument that the Court lacked jurisdiction because the plaintiff environmental group was challenging the defendant Forest Service's reliance on an EPA regulation that, as interpreted by EPA, would have exempted the defendant's discharges from NPDES regulation without complying with 33 U.S.C. § 1369(b), noting: "However, we do not reach the Forest Service's arguments regarding section 1369(b) because we do not invalidate the regulation. Rather, we reject the Forest Service's interpretation of the regulation and give it a construction consistent with its administrative history, case law, and the governing statute").

**D.      PG&E Fails to Show that CWA § 402(p) Trumps the General Discharge Prohibition of CWA § 301(a).**

1    Throughout the case, ERF has maintained that in establishing CWA § 402(p) as part of its 1987

2  amendments to the CWA, Congress did not intend to create an exemption from the basic prohibition on

3  unpermitted discharge of pollutants contained in CWA § 301(a). Accordingly, despite the emphasis in

4  this case on whether or not the Facilities qualify as "industrial" facilities under CWA § 402(p)(2), even

5  if they are not "industrial" in nature, the Facilities can still be in violation of CWA § 301(a) by

6  discharging pollutants to the Nation's waters without an NPDES permit.

7    PG&E disputes this argument, claiming that the 1987 amendments to the CWA were in fact

8  intended to create exceptions to the general discharge prohibition in CWA § 301(a) by exempting all

9  storm water discharges except those listed in CWA § 402(p)(2)(A)-(D), including those defined as being

10  "associated with industrial activity" under CWA § 402(p)(2)(B). In support of this argument, PG&E

11  claims that the 1987 amendments were intended to "overrule court decisions making the same argument

12  now made by ERF, namely that every discharge required a permit under the CWA." PG&E Opening

13  Brief at 12 (emphasis removed). However, PG&E's argument is contrary to the plain language of CWA

14  § 402(p) and the legislative history of the 1987 amendments.

15    CWA § 301(a) has a facially plain directive that, except as authorized by an NPDES permit, the

16  discharge of pollutants is unlawful. *See Forsgren*, 309 F.3d at 1190; *EPIC*, 301 F. Supp. 2d at 1113. As

17  discussed more fully in ERF's previous briefing, CWA § 402(p) does not exempt any polluted storm

18  water discharges from this prohibition. *See* Plaintiff's Opposition To Defendant's Motion To Dismiss

19  Plaintiff's Complaint For Lack Of Subject Matter Jurisdiction And Failure To State A Claim at 9-13

20  (ECF No. 26) (Apr. 8, 2010); Plaintiff's Opposition To Defendant's Motion To Dismiss Plaintiff's Third

21  Amended Complaint For Lack Of Subject Matter Jurisdiction And Failure To State A Claim at 17-19

22  (ECF No. 81) (Sept. 30, 2010). Instead, CWA § 402(p)(1) merely created a temporary moratorium for

23  the EPA from having *a duty to issue NPDES permits* for certain storm water discharges. *See* ECF No. 26

24  at 9-13. Congress' purpose in CWA § 402(p) was to ease the permitting burden on EPA, not to

25  eviscerate the discharge prohibition of CWA § 301(a) for storm water discharges. *Id*. at 12 (citing

26  cases).

27

28

Case law has made plain that even when EPA has not issued NPDES permits, CWA § 301(a)'s prohibition on unpermitted discharge still applies. *E.g.*, *Forsgren*, 309 F.3d at 1188 n.6 (noting the Supreme Court in *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982), upheld a ruling that aircraft were point sources requiring permits to discharge "regardless of the fact that EPA had not yet promulgated rules to govern the issuance of NPDES permits for the particular type of discharge at issue."). It follows that by merely suspending the obligation to seek and obtain an NPDES permit, Congress would not necessarily be exempting point source dischargers of storm water from CWA section 301(a)'s prohibition on discharge of pollutants from point sources.

Regardless, even if an exemption existed, it lapsed in October 1994 – well before the relevant time here – as the express terms of CWA § 402(p)(1) and the legislative history of the amendments demonstrate. ECF No. 26 at 13-16. Further, to the extent that any EPA moratorium or permit shield existed, it was only for dischargers comprised *entirely of storm water*. 33 U.S.C. § 1342(p)(1). Because PG&E's discharges contain numerous pollutants, they are not comprised entirely of storm water and do not meet fall into the regulatory exemption under CWA § 402(p)(1). *See EPIC*, 301 F. Supp. 2d at 1111 ("EPIC's complaint alleges that PALCO's Bear Creek drainage system utilizes a number of 'point sources' . . . to redirect stormwater *and pollutants* (i.e., something not 'composed entirely of stormwater;) into Bear Creek. . . . On its face, then, EPIC's complaint does not satisfy the 'entirely of stormwater' element of section 402(p)'s 'general rule' for exemption from permitting"). For these reasons, the Facilities are in violation of CWA § 301(a) by discharging polluted storm water to waters of the United States without an NPDES permit, even if they do not qualify as industrial dischargers under the language in California's or EPA's regulations.

### E.   Opinion 5 in the Tim Simpson Report Is Inadmissible.

As noted above, PG&E has offered the opinion testimony (Opinion 5) of an engineering witness, Tim Simpson that: (1) the General Permit does not cover the Facilities because there are not "separate and divisible" facilities within the Facilities for which multiple SIC Codes apply; and (2) SIC Code 5093 only applies to "downstream" recycling facilities not "upstream" recycling facilities. PG&E Opening

Brief at 19, 24. This testimony should be excluded for the failure to meet the admissibility standards for expert testimony.

Federal Rule of Evidence ("FRE") 702 allows a witness qualified as an expert by knowledge, skill, experience, training, or education to testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. *See also Daubert v. Merrell Dow Pharma. Inc*., 509 U.S. 579, 595 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999) (applying *Daubert* to non-scientific expert testimony). For expert testimony to be admissible, the expert must have the requisite skill, experience, training or education to render an opinion, which must be based upon sufficient facts and data and a methodology reliably applied to the issue at hand. *Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1047-48 (D. Colo. 2011).

Opinion 5 of Mr. Simpson's export report (ECF No. 196-15 at PDF 34-36) fails to meet the requirements of Rule 702. First, PG&E has not demonstrated Mr. Simpson is qualified to testify as an expert on SIC Code classification or interpretation by having any specific knowledge, skill, experience, training, or education relating to SIC Code Manual interpretation or application. Mr. Simpson is a geotechnical engineer with experience in site remediation and storm water monitoring, with the bulk of his experience involving the review and implementation of Best Management Practices ("BMPs")[17] for municipal and industrial storm water dischargers. *Id*. at PDF 38-42. Mr. Simpson has no background or experience in economics, statistics, or applying the terms of the 1987 SIC Manual in a regulatory context. *Id.*

Although PG&E misleadingly characterizes Mr. Simpson's as having "worked with the [State Board] in designing" the General Permit, his experience is limited to presentations pertaining to the technical feasibility of industrial discharge meeting target pollution reduction goals, not the applicability of the General Permit to particular industrial activities. ECF No. 196-16 at PDF 7-9; ECF No. 196-15 at

---

[17] BMPs are structural or engineered control devices (such as retention ponds of treatment systems) or operational procedures and practices (such as site sweeping or other "housekeeping" measures) used to treat polluted stormwater or reduce the amount of pollutants onsite that can become entrained in stormwater. *See generally* http://cfpub.epa.gov/npdes/stormwater/menuofbmps/bmp_background.cfm (last visited September 6, 2012).

PDF 45. Mr. Simpson's engineering experience does not qualify him for the task of devising new interpretations of the General Permit to assist PG&E in avoiding liability in this case.

Further, Mr. Simpson does not provide any facts upon which Opinion 5 is based. While Mr. Simpson made visual observations of the storm drain infrastructure to prepare for observing ERF's storm water sampling, that information would not be relevant for the conclusions about SIC Code assignment and interpretation offered in Opinion 5. *See* Isaacs Opp. Decl., Ex. 2 at 22:5-23:21. Tellingly, like PG&E, Mr. Simpson never states which four digit SIC code should be assigned to the Facilities, instead only offering that they are somewhere within Group 49. ECF No. 196-15 at PDF 35. Thus, contrary to the requirements of FRE 702, Mr. Simpson has not shown to have made the opinion on the basis of any reliable methodology, or to have applied that methodology or experience to the facts of this case. *Daubert*, 509 U.S. at 595. His opinions are therefore inadmissible. *See Cooper v. Travelers Indem. Co.*, 113 Fed. Appx. 198, 201 (9th Cir. 2004) (expert testimony not based on the type of data on which experts in economics would reasonably rely held inadmissible).

Second, "an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002); *see also Aguilar v. Int'l Longshoremen's Union Local #10*, 966 F.2d 443, 447 (9th Cir. 1992) (stating that "matters of law for the court's determination" are "inappropriate subjects for expert testimony"). Courts have specifically held that expert testimony on the meaning of environmental statutes and regulations is inadmissible. *See WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 2012 U.S. Dist. LEXIS 262, at *6-7 (D. Colo. Jan. 3, 2012); *Sharp Realty and Mgmt. LLC v. Capitol Specialty Ins. Corp.*, 2012 U.S. Dist. LEXIS 75353, at *33 (N.D. Ala. May 31, 2012). "There is nothing in Rule 702 which would allow an expert to interpret a legal document and substitute his judgment for that of the court." *E. Assoc. Coal Corp. v. Aetna Cas. & Sur. Co.*, 475 F. Supp. 586, 592 (W.D. Penn. 1979), *rev'd in part on other grounds*, 622 F.2d 1068 (3rd Cir. 1980).

Mr. Simpson's expert report contains improper legal conclusions with respect to the interpretation of the scope of the General Permit and the Clean Water Act – legal conclusions that go to the heart of this case. Ultimately, it is the job of PG&E's counsel to advocate their client's litigation

positions, rather than an engineer. And PG&E's counsel has objected to questioning witnesses on the relationship between SIC Codes and the CWA as calling for a "legal conclusion." Isaacs Opp. Decl., Ex. 3 at 56:21-57:7. Thus, because Mr. Simpson legal conclusions are not relevant, unsupported, and ultimately run afoul of FRE 704, they are inadmissible.

### F.   The Duty to Apply Claim Should Be Dismissed.

Due to a controlling decision issued after ERF filed its operative Complaint, ERF's Claim 2 alleging that PG&E has violated the CWA by failing to apply for an NPDES permit must be dismissed. ERF's duties to the Court compel it to point out a recently decided Fifth Circuit decision that PG&E has neglected to bring to the Court's attention. The case, holding that the failure to apply for an NPDES permit cannot be a separately actionable violation of the CWA, was issued in a case that was consolidated from a series of cases, including one in the Ninth Circuit, and is thus controlling in the Ninth Circuit. *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 751-53 (5th Cir. 2011).

### III.   CONCLUSION

For the foregoing reasons, ERF respectfully requests the Court deny PG&E's cross-motion for summary judgment on Claim 1 and dismiss ERF's Claim 2.

Date: September 13, 2012                          Respectfully submitted,

/s/ Brian Orion
Brian Orion
Attorney for Plaintiff
Ecological Rights Foundation