ROCKY N. UNRUH, CA Bar #84049
runruh@schiffhardin.com
**SCHIFF HARDIN LLP**
ATTORNEYS AT LAW
ONE MARKET
SPEAR STREET TOWER, THIRTY-SECOND FLOOR
SAN FRANCISCO, CA  94105
TELEPHONE:      415.901.8700
FACSIMILE:      415.901.8701

RUSSELL B. SELMAN IL Bar # 6195396, *pro hoc vice*
rselman@schiffhardin.com
BRADLEY S. ROCHLEN IL Bar # 6244780, *pro hoc vice*
brochlen@schiffhardin.com
J. MICHAEL SHOWALTER IL Bar #6301455, *pro hoc vice*
mshowalter@schiffhardin.com
**SCHIFF HARDIN LLP**
ATTORNEYS AT LAW
233 S. WACKER DR., SUITE 6600
CHICAGO, IL 60606
TELEPHONE:      312.258.5500
FACSIMILE:      312.258.5600

*Attorneys for Pacific Gas and Electric Company*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ecological Rights Foundation,<br><br>Plaintiff,<br><br>v.<br><br>Pacific Gas and Electric Company,<br><br>Defendant. | Case No.:  3:CV 10-00121 RS<br><br>**PG&E'S RESPONSE TO ERF'S MOTION FOR SUMMARY JUDGMENT ON CLAIM ONE**<br><br>Judge:      Judge Richard G. Seeborg<br>Date Complaint Filed:  February 9, 2011<br><br>Hearing Date: Nov. 8, 2012<br>Time:           1:30 p.m. |

# **TABLE OF CONTENTS**

I.     INTRODUCTION AND STATEMENT OF EVIDENTIARY OBJECTIONS ................. 1

II.    EVIDENTIARY ISSUES AND MOTIONS TO EXCLUDE ........................... 4

    A.   Legal Standards for use of Evidence in Summary Judgment ................................ 4

        1.   Duty to Disclose - Fed. R. Civ. P. 26 and 37 ............................................. 5

        2.   Admissibility of Expert Testimony - Fed. R. Evid. 701 – 703 .................. 5

        3.   Supplementation - Fed. R. Civ. P. 26(e) ................................................... 6

        4.   Appropriate Use of "Rebuttal" Witnesses.................................................. 7

    B.   ERF's Claims are Premised on Inadmissible Testimony........................................ 7

        1.   Matthew Hagemann is not Qualified to Testify as a Hydrologist.............. 7

        2.   Hagemann never disclosed the basis for his sampling methodology.......... 8

        3.   Hagemann Failed to Collect Representative Stormwater Samples............. 9

        4.   Hagemann provides no basis for why his methodology is "good science" which is admissible under Daubert.............................................. 11

        5.   Rogers cannot rely on Hagemann's invalid samples ................................ 12

        6.   ERF's Declarations Supporting Its "Tire-Tracking" CWA Claims Fail Because they Are Based on Speculation, not Testing or Literature .................................................................................................. 14

    C.   ERF's Motion Relies on Testimony Never Appropriately Disclosed.................... 15

        1.   Parker's Testimony Regarding "1,109 Separate CWA Claims.".............. 15

        2.   Isaac's Testimony Regarding "1,109 Separate CWA Claims.".............. 17

        3.   Rogers's Statements Regarding "1,109 Separate CWA Claims." ............ 18

        4.   Miscellaneous evidentiary objections related to Rogers......................... 19

        5.   The Testimony of Michael Bercovich was Never Disclosed.................... 20

III.   PG&E's OPPOSITION................................................................................ 21

    A.   PG&E's Facilities are Classified with a Group 49 SIC Code under CWA .......... 22

**TABLE OF CONTENTS**
(Continued)

B.      ERF Does Not Show that "Pollutants" reach "Waters of the United States" through Stormwater Run-Off ................................................................. 27

C.      ERF's Tire-Focused Claims are Wholly Speculation and Must Be Dismissed ............................................................................................ 28

D.      ERF Cannot Prove 1,109 Separate CWA Violations ........................................... 30

IV.    CONCLUSION ............................................................................................... 30

1

## TABLE OF AUTHORITIES

2

## CASES

3

*Am. Mining Cong. v. EPA*,
    965 F.2d 759, 765 (9th Cir. 1992)..................................................................................... 25

4

*Arpin v. Santa Clara Valley Transp. Agency*,
    261 F.3d 912 (9th Cir. 2001)........................................................................................... 29

5

*Beller ex rel. Beller v. U.S.*,
    221 F.R.D. 696 (D.N.M. 2003) ......................................................................................... 6

6

7

*Bragdon v. Abbot*,
    524 U.S. 624 (1998) .............................................................................................. 3, 9, 27

8

*Brumfield v. Hollins*,
    551 F.3d 322 (5th Cir. 2008)......................................................................................... 5, 8

9

10

*City of Tenakee Springs v. Clough*,
    750 F. Supp. 1406 (D. Alaska)............................................................................................ 4

11

*Colony Ins. Co. v. Kuehn*,
    No. 2:10-CV-1943, 2011 WL 4402738 (D. Nev. 2011) .................................................. 20

12

13

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*,
    402 F.3d 1092 (11th Cir.2005)....................................................................................... 14

14

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ...............................................................................................*passim*

15

16

*Decker v. Nw. Env. Def. Ctr.*,
    Case No. 11-338 (2012) ................................................................................................. 24

17

*Del. Valley Citizens Council for Clean Air v. Davis*,
    932 F.2d 256 (3d Cir. 1991)............................................................................................. 3

18

19

*Donell v. Fidelity National Title Agency of Nevada*,
    No. 2:07-CV-0001, 2012 WL 170990 (D. Nev. 2012) ................................................... 15

20

*Foster v. Arcata Assocs.*,
    772 F.2d 1453 (9th Cir.1985).......................................................................................... 30

21

22

*Gleklen v. Democratic Cong. Campaign Comm., Inc.*,
    199 F.3d 1365 (D.C. Cir. 2000) ....................................................................................... 4

23

*Hoffman v. Constr. Protective Serv., Inc.*,
    541 F.3d 1175 (9th Cir. 2008).......................................................................................... 5

24

25

*In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829 (3d Cir. 1990) ........................................... 12

26

*Keener v. United States*,
    181 F.R.D. 639 (D. Mont. 1998)....................................................................................... 7

27

28

*Luke v. Family Care & Urgent Med. Clinics,*
    323 Fed. Appx. 496 (9th Cir. 2009) ............................................................... 7, 16-17

*Lust v. Merrell Dow Pharmaceuticals, Inc.,*
    89 F.3d 594, 597 (9th Cir. 1996) ......................................................................... 27

*Metro Ford Truck Sales v. Ford Motor Co.,*
    145 F.3d 320 (5th Cir. 1998) ................................................................................ 6

*Natural Resources Def. Council v. EPA,*
    673 F.2d 400 (D.C. Cir. 1982) .............................................................................. 3

*Nelson v. City of Davis,*
    571 F.3d 924 (9th Cir. 2009) ........................................................................ *passim*

*Nguyen v. IBP, Inc.,*
    162 F.R.D. 675 (D. Kan. 1995) ............................................................................ 5

*Nilsson v. City of Mesa,*
    503 F.3d 947 (9th Cir. 2007) .............................................................................. 14

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.,*
    210 F.3d 1099, 1102 (9th Cir. 2000) .................................................................. 23

*Nw. Env. Def. Ctr. v. Brown,*
    640 F.3d 1063 (9th Cir. 2011) ............................................................................ 24

*Orr v. Bank of Am., NT & SA,*
    285 F.3d 764 (9th Cir. 2002) .............................................................................. 28

*Pfingston v. Ronan Eng'g Co.,*
    284 F.3d 999 (9th Cir. 2002) ................................................................................ 4

*Plumley v. Mockett,*
    2010 WL 8160423 (C.D. Cal. 2010) .................................................................... 7

*Rogers v. Raymark Indus.,*
    922 F.2d 1426 (9th Cir. 1991) ............................................................................ 29

*S.F. Baykeeper v. W. Bay Sanitary Dist.,*
    791 F. Supp. 2d 719 (N.D. Cal. 2011) ................................................................. 6

*Scott v. Hammond,*
    741 F.2d 992 (7th Cir. 1984) ................................................................................ 3

*Scott v. Ross,*
    140 F.3d 1275 (9th Cir. 1998) .............................................................................. 6

*Seagate Tech., Inc. v. St. Paul Fire & Marine Ins. Co.,*
    11 F. Supp. 2d 1150 (N.D. Cal. 1998) ............................................................... 23

*Skidmore v. Swift & Co.,* 323 U.S. 134 (1944) .......................................................... 3

*Stilwell v. Smith & Nephew, Inc.,* 482 F.3d 1187 (9th Cir. 2007) ............................... 11

PG&E'S RESPONSE TO ERF'S MOTION FOR SUMMARY JUDGMENT ON CLAIM ONE
CASE NO. 3:CV 10-00121 RS

*Stipe v. Shinseki*,
690 F. Supp. 2d 850 (E.D. Mo. 2010) ................................................................................ 4

*Strong v. Valdez Fine Foods*,
No. 09-CV-01278, 2011 WL 455285 (S.D. Cal. 2011) ................................................ 7, 16

*United States v. Powers*,
59 F.3d 1460 (4th Cir. 1995) ........................................................................................... 12

*United States v. Webb*,
115 F.3d 711, 719 (9th Cir. 1997) ................................................................................... 15

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
865 F.2d 1539 (9th Cir.1989) .......................................................................................... 29

*Wash. PIRG v. Pendleton Woolen Mills*,
11 F.3d 883 (9th Cir. 1993) ............................................................................................. 27

*Westberry v. Gislaved Gummi AM*,
178 F.3d 257 (4th Cir. 1999) ........................................................................................... 12

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
259 F.3d 1101 (9th Cir.2001) ...................................................................................... 5, 21

**FEDERAL STATUTES**

33 U.S.C. § 1311 ..................................................................................................................... 2

33 U.S.C. § 1342 ........................................................................................................... *passim*

33 U.S.C. § 1365 ..................................................................................................................... 3

33 U.S.C. § 1369 ....................................................................................................................

**FEDERAL REGULATIONS**

40 C.F.R. § 122.26 ....................................................................................................... *passim*

**FEDERAL RULES**

Fed. R. Civ. P. 26 ......................................................................................................... *passim*

Fed. R. Civ. P. 37 ......................................................................................................... *passim*

Fed. R. Civ. P. 56 ......................................................................................................... *passim*

Fed. R. Evid. 401 .................................................................................................................. 13

Fed. R. Evid. 402 .................................................................................................................. 13

Fed. R. Evid. 403 .................................................................................................................. 13

Fed. R. Evid. 701 .................................................................................................................... 5

1

Fed. R. Evid. 702 ........................................................................................................... 5, 18

2

Fed. R. Evid. 703 ............................................................................................................... 5

3

**FEDERAL GUIDANCE MATERIALS**

4

Standard Industrial Classification Code Manual ................................................... 23-25

5

NPDES Storm Water Sampling Guidance Document, EPA 833-8-92-001 (July 1992) ............. 10

6

Guidance Document, EPA 833-8-92-001 (July 1992) ................................................... 9

7

Industrial Stormwater Monitoring and Sampling Guide, Final Draft, EPA 832-B-09-003 (March 2009) ......................................................................................................... 9

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **I.      INTRODUCTION AND STATEMENT OF EVIDENTIARY OBJECTIONS**

2          To prevail on its Motion for Summary Judgment ("Motion"), Ecological Rights

3   Foundation ("ERF") needs to prove that Pacific Gas and Electric Company ("PG&E"): (i)

4   discharged pollutants; (ii) from a point source; (iii) into the waters of the United States; *and* (iv)

5   that PG&E was required to have a NPDES permit at the Facilities.  ERF cannot prove these

6   points.  In its Motion, ERF frames the governing law such that ERF can win without

7   demonstrating that PG&E is required to have a permit.  (*See* ECF No. 197 at 28 n.2.)  PG&E

8   explained in its opening brief that, if the Facilities are classified with a Group 49 SIC Code, it

9   wins absent a permit because its facilities are "in compliance with" CWA Section 402(p).  *See* 33

10  U.S.C. § 1311(a).

11         ERF submits proof in support of its Motion including lengthy Declarations based on:

12         • Objectionable testimony from unqualified experts;

13         • Testimony relying upon improperly collected samples that are not representative

14           of stormwater;

15         • Undisclosed "expert" testimony; and

16         • Admittedly irrelevant "benchmarks" used to calculate ecological risk – not

17           whether "pollutants" are discharged into the "waters of the United States."

18         As PG&E emphasizes in its Motion, ERF has filed an enforcement action, not a

19  rulemaking.  (ECF No. 196 at 15-16.)[1]  ERF must be held to the same standards as would an

20  enforcing agency.  In relevant part, the CWA has been unchanged since 1987 when Section

21  402(p) was added; 40 C.F.R. § 122.26(b)(14) existed in near-current form in the early 1990s;

22  most of the relevant regulatory guidance materials were issued in the mid-to-late 1990s.  (*See*

23  *generally* ECF No. 196-19 to 196-23, and 196-25.)  Rule challenges – which must be made within

24  120 days of a rule's promulgation – have been barred for fifteen years.      Beyond ERF's failure

25  to approach this case as an enforcement action, ERF's Motion is built on a series of fallacies:[2]

26  _____

    [1]      Herein, PG&E cites ECF materials to the page number assigned by ECF, as opposed to

27  the page number included in the underlying document.
    [2]      ERF's Motion is also undercut by ERF's multiple failures to disclose much of its evidence

28  and expert testimony within the time periods provided under applicable Case Management
    Orders, which are discussed in objections contained in this Response.  Evidentiary objections

1      First, ERF's Motion is premised on PG&E being able to choose whether it is regulated.

2  (*See* ECF No. 197 at 25.)  PG&E does not make the choice.  As an initial matter, from years

3  before this case to now, PG&E has been classified with a Group 49 SIC Code in its filings with

4  the Securities and Exchange Commission.[3]  The provision of gas and electric services to

5  California residents is PG&E's primary activity.  (*See* ECF No. 196-2.)  Further, the Facilities'

6  activities all support what ERF admits to be PG&E's primary activity, i.e. the provision of gas

7  and electric services.  (*See id.*)  The Facilities' activities are, therefore, classified as Group 49 SIC

8  Code, and no other.  The use of such a code is supported by a variety of federal and state

9  regulatory materials.  (*See* ECF No. 196-19, 196-20, 196-21, 196-22, and 196-25.)  And, if PG&E

10  should have a permit, regulators would notice during regular inspections and require PG&E to

11  secure permit coverage.  (*See* ECF No. 196-22, 196-23.)  They never have because PG&E is in

12  compliance with the CWA.

13      Second, under ERF's interpretation, the CWA contains an "absolute ban on the discharge

14  of any pollutant unless the discharge is in compliance with the terms of an NPDES permit issued

15  pursuant to CWA section 402."  (*See* ECF No. 197 at 1-2.)  This is an intentional distortion of

16  actual statute, CWA Section 301(a), 33 U.S.C. § 1311(a).  Section 301(a) provides that "Except in

17  compliance with this section and sections 1312, 1316, 1317, 1328, **1342**, and 1344 of this title,

18  the discharge of any pollutant . . . shall be unlawful." (emphasis added).  As PG&E has

19  previously argued, *see, e.g.*, ECF No. 196 at 17-21, since the four PG&E Facilities at issue here

20  ("Facilities") have Group 49 SIC Codes, any discharges from them do not violate CWA Section

21  301 because they are "in compliance" with CWA Section 402(p), 33 U.S.C. § 1342(p).

22      Third, ERF insinuates that the Court should act as a regulator over PG&E because EPA

23  ignored a 1994 "moratorium" on "unpermitted discharge."  (*See* ECF No. 197 at 27.)  To the

24  extent this argument is a challenge to the validity of EPA's interpretation of CWA, the challenge

25  should be against EPA, not PG&E.[4]  Until such a challenge is made, federal and state guidance

26  related to non-experts will also be discussed herein.

[3]      *See, e.g.*, Pacific Gas and Electric Co. Form 8-K, filed February 21, 2012, attached to the Showalter Decl. as Exh. 1, at 1; PG&E Corp. Form 8-K, filed May 25, 2004, Showalter Decl. Exh. 2, at 1.

[4]      Generally, parties that want to challenge the content of federal regulations must do so

1    materials and pre-existing regulatory interpretations which compel the dismissal of this case are

2    binding upon both ERF and the Court in this citizen suit.[5]

3        Fourth, ERF pretends that it has leeway to evaluate whether PG&E discharges

4    "pollutants" to the "waters of the United States" (i) using faulty samples; (ii) under a

5    methodology of its own creation; and (iii) through the application of limits ERF itself sets.  As is

6    demonstratd below, the methods the Environmental Protection Agency ("EPA") and the

7    California State Water Resources Control Board (the "Board") would use to evaluate whether a

8    party was discharging stormwater do not resemble those employed by ERF in this case.  PG&E's

9    expert, Timothy Simpson, testifies that none of Hagemann's samples followed relevant EPA

10   Guidance, which specifies how to take a reliable sample.  (*See* Simpson Decl. filed herewith at §

11   III.)  Because ERF makes no effort to show that the methods employed by ERF's consultants are

12   reliable, ERF's data must be rejected and the claims premised on the data dismissed.

13       Fifth, even if ERF had followed the appropriate guidance materials, it failed to

14   demonstrate necessary elements of its request for relief in a number of respects:

15       •   ERF's Motion is premised on ERF's demonstration that non-Group 49 SIC Codes

16          should be applied to the Facilities.  The plain meaning of the word "primary"

17          forecloses ERF's arguments that multiple activities at the Facilities could all be

18          "primary."  Even if it did not, federal and state guidance materials conclusively

19          establish that "primary" means "first and foremost" not "on occasion."

20       •   ERF cannot establish that tire-tracking resulted in discharges of pollutants to

21          waters of the United States because ERF's experts have admitted that they have no

22

23   under 33 U.S.C. § 1369, and not in a citizen suit against a private party.  *See Scott v. Hammond*,
     741 F.2d 992, 995 (7th Cir. 1984) (stating also that a proper citizens' suit under CWA might arise

24   *against EPA* to compel EPA to promulgate a substitute standard after EPA disapproved of a
     state standard and the state has refused to act); *Natural Resources Def. Council v. EPA*, 673 F.2d

25   400, 403-04 (D.C. Cir. 1982) (holding that Courts of Appeals, and not district courts, have
     exclusive jurisdiction to review EPA regulations); *Del. Valley Citizens Council for Clean Air v.*

26   *Davis*, 932 F.2d 256, 265 (3d Cir. 1991) (holding that the purpose of a citizen suit is to enforce
     EPA standards, not invalidate them).

27   [5]  As the Supreme Court has noted, "It is enough to observe that the well-reasoned views of
     the agencies implementing a statute 'constitute a body of experience and informed judgment to

28   which courts and litigants may properly resort for guidance.'" *Bragdon v. Abbot*, 524 U.S. 624,
     642 (1998) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944)).

1    evidence – only speculation – supporting this conclusion.

2    • ERF cannot establish that PG&E discharged on the 1,109 separate occasions

3    referenced in its Motion.  William Rogers, the witness whose testimony ERF relies

4    to establish its 1,109 separate claims, stated at his deposition that his only opinion

5    on the condition of the Facilities is based on when the site inspections occurred,

6    and not before.  David Parker, a hydrologist whose testimony provides the

7    remainder of the support for this claim, was disclosed only as a "rebuttal" witness

8    and cannot provide testimony needed to directly support ERF's claims.

9    Further, ERF's claim is premised on a host of inadmissible evidence; PG&E's evidentiary

10   objections related to this evidence – set forth in full below – should be upheld.  For these and

11   other reasons appearing to the Court, ERF's Motion should be denied.

12   **II.    EVIDENTIARY ISSUES AND MOTIONS TO EXCLUDE**

13   For the reasons set forth in detail below, PG&E hereby moves to exclude: (1) the

14   Declaration of Matthew Hagemann; (2) the Declaration of William J. Rogers; (3) the Declaration

15   of David Parker; (4) the Declaration of Matthew Bercovich; and (5) the Declaration of Jodene

16   Isaacs under the Federal Rules of Evidence and Civil Procedure.[6]

17   **A.    Legal Standards for use of Evidence in Summary Judgment**

18   To prevail on its motion for summary judgment, a party must submit **admissible evidence**

19   demonstrating that there is no "genuine dispute of material fact" regarding an issue.[7]  The burden

20   of showing that particular evidence is admissible is on the party proffering the evidence.[8]

---

21

22   [6]    Certain limited evidentiary objections are made in text.  PG&E's objections are listed in the Proposed Order filed herewith.

23   [7]    Fed. R. Civ. P. 56; *Stipe v. Shinseki*, 690 F. Supp. 2d 850, 856 (E.D. Mo. 2010) (holding that a court is only obligated to consider admissible evidence in evaluating a motion for summary judgment and may disregard portions of affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact).

24   [8]    *See* Fed. R. Civ. P. 56(c)(2), Notes to 2009 Amendments; *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002).  Because "[v]erdicts cannot rest on inadmissible evidence" and a grant of summary judgment is a determination on the merits of the case, the moving party's affidavits must be admissible evidence. *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000); *City of Tenakee Springs v. Clough*, 750 F. Supp. 1406, 1416 (D. Alaska), *rev'd on other grounds*, 915 F.2d 1308 (9th Cir.1990) ("Since summary judgment is a substitute for a trial on the merits, it is vital that the party opposing the motion be accorded the same evidentiary safeguards that would be applicable at trial ....").

25

26

27

28

1    **1.     Duty to Disclose - Fed. R. Civ. P. 26 and 37**

2    Rule 26 requires the disclosure of the identity of any potential expert witnesses to be

3    called at trial, and that the potential expert witness provide a written report. Fed. R. Civ. P.

4    26(a)(2)(A), (B).  Under Rule 26(a)(2)(B), an expert report must contain "(i) a complete statement

5    of all opinions the witness will express and the basis and reasons for them, (ii) the data or other

6    information considered by the witness in forming them, (iii) any exhibits that will be used to

7    summarize or support them, (iv) the witness's qualifications, including a list of all publications

8    authored in the previous ten years, (v) a list of all other cases in which, during the previous four

9    years, the witness testified as an expert at trial or deposition, and (vi) a statement of the

10   compensation to be paid for the study and testimony in the case" (formatting altered).

11   "If a party fails to designate an expert witness, Fed. R. Civ. P. 37 prohibits the party from

12   using that witness to supply evidence at a motion, hearing, or trial unless the failure was

13   substantially justified or harmless." *Brumfield v. Hollins*, 551 F.3d 322, 330 (5th Cir. 2008).

14   "The selection and retention of an expert witness is within the control of the party employing the

15   expert.  To the extent there is a disadvantage created by the expert's failure to disclose it must be

16   borne by the party retaining the expert witness." *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 681 (D.

17   Kan. 1995).  "Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove

18   harmlessness" or substantial justification. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d

19   1101, 1107 (9th Cir. 2001).  Preclusion under Rule 37 is not dependent on finding of willfulness

20   or bad faith. *Hoffman v. Constr. Protective Serv., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008).

21   **2.     Admissibility of Expert Testimony - Fed. R. Evid. 701 – 703**

22   Fed. R. Evid. 702 provides that "A witness who is qualified as an expert by knowledge,

23   skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a)

24   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

25   understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient

26   facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the

27   expert has reliably applied the principles and methods to the facts of the case."

28   Under Rule 702, the trial court acts as a gatekeeper and ensures that the proffered

1    scientific testimony meets certain standards of both relevance and reliability before it is admitted.

2    *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590, 595–97 (1993). An expert opinion is

3    reliable if it is based on proper methods and procedures rather than "subjective belief or

4    unsupported speculation." *Id.* at 590.  Under Rule 702, the party proffering expert testimony has

5    the burden of showing the admissibility of the testimony by a preponderance of the evidence.

6    *Daubert*, 509 U.S. at 592 n. 10; *S.F. Baykeeper v. W. Bay Sanitary Dist*., 791 F. Supp. 2d 719,

7    737 (N.D. Cal. 2011). The court considers four factors to determine if expert testimony will assist

8    the trier of fact: "(i) whether the expert is qualified; (ii) whether the subject matter of the

9    testimony is proper for the jury's consideration; (iii) whether the testimony conforms to a

10   generally accepted explanatory theory; and (iv) whether the probative value of the testimony

11   outweighs its prejudicial effect." *Scott v. Ross*, 140 F.3d 1275, 1285–86 (9th Cir. 1998).  Implicit

12   in the *Daubert* analysis is whether the proposed testimony "fits" the facts of the case.  *Id.* at 591-

13   92.  Moreover, proffered testimony must "assist the trier of fact to understand the evidence or

14   determine a fact is in issue."  *Id.* at 591.  Fed. R. Civ. P.  56(c) allows the Court to strike

15   unsupported portions of a motion for summary judgment.

16              **3.        Supplementation - Fed. R. Civ. P. 26(e)**

17              Under Fed. R. Civ. P. 26(e)(2), a party is under an obligation to supplement an expert

18   report to include any additions or changes prior to pretrial disclosures.  However, "'[a]lthough

19   Fed. R. Civ. P. 26(e) requires parties to 'supplement or correct' disclosure upon information later

20   acquired, that provision does not give license to sandbag one's opponent with claims and issues

21   which should have been included in the expert witness' report." *Beller ex rel. Beller v. United*

22   *States,* 221 F.R.D. 696, 701 (D.N.M. 2003) (citation omitted).

23              "The purpose of supplementary disclosure is just that-to supplement.  Such disclosures are

24   not intended to provide an extension of the expert designation and report production deadline."

25   *Metro Ford Truck Sales v. Ford Motor Co.,* 145 F.3d 320, 324 (5th Cir. 1998).

26   "'Supplementation under the Rules means correcting inaccuracies, or filling the interstices of an

27   incomplete report based on **information that was not available at the time of the initial**

28   **disclosure**.'"  *Luke v. Family Care & Urgent Med. Clinics,* 323 Fed. Appx. 496, 499 (9th Cir.

2009) (emphasis added) (quoting *Keener v. United States,* 181 F.R.D. 639, 640 (D. Mont. 1998)).[9]  Rule 26(e) does not "create a loophole" that would allow a litigant to "revise her disclosures in light of her opponent's challenges to the analysis and conclusions therein . . . after the court's deadline for doing so has passed."  *Luke*, 323 Fed. Appx. at 500.  "[A] supplemental expert report that states additional opinions or 'seeks to 'strengthen' or 'deepen' opinions expressed in the original expert report' is beyond the scope of proper supplementation and subject to exclusion under Rule 37(c)."  *Plumley v. Mockett*, 836 F.Supp.2d 1053, 1062 (C.D. Cal. 2010).

### 4.    Appropriate Use of "Rebuttal" Witnesses.

This Court's Scheduling Order specifically stated that March 1, 2012 was the deadline for ERF to disclose "any expert that it will use to support its motion for summary judgment concerning [CWA] liability . . ."  (ECF No. 190.)  ERF now attempts to rely on "rebuttal" experts (*i.e.* David Parker, William Rogers) and testimony to support its Motion.  Such reliance on "rebuttal" witnesses and testimony to support a party's case-in-chief is inappropriate under this Court's Orders and the Fed. R. Civ. P.  *See e.g., Strong v. Valdez Fine Foods*, No. 09-CV-1278, 2011 WL 455285 at *4 (S.D. Cal. 2011) (holding that plaintiff's "rebuttal" expert's "declaration and rebuttal report are not admissible to support Plaintiff's motion for summary judgment, except for rebuttal purposes.  Plaintiff's decision to designate [its expert] solely as a rebuttal expert necessarily limits how Plaintiff may utilize [his] testimony.").

### B.    ERF's Claims are Premised on Inadmissible Testimony.

### 1.    Matthew Hagemann is not Qualified to Testify as a Hydrologist.

Matthew Hageman is a hydrogeologist, which studies the movement of water below ground.  (Hagemann Dep., Showalter Decl. Exh. 5, at 12.)  Mr. Hagemann does not have significant training, and has not practiced in hydrology, the study of movement of water above ground.  (*Id.* at 19.)  PG&E's expert, Dr. Spongberg, a hydrologist, testified that "the distinction is important because estimating the mass of contaminants that may have discharged from the

---

[9]    *Keener* is instructive.  There, the court limited the expert to the opinions in his initial disclosure, finding that the claimed "supplemental disclosure" was based on the expert's failure of omission:  "the information was there to review.  He did not review it in detail before expressing his opinion."  181 F.R.D. at 641.

1  subject sites [as Mr. Hagemann attempted to do in his expert report] requires expertise in surface

2  water hydrology." (Spongberg Decl. ¶¶ 5-12.) Hagemann's lack of qualifications appear to have

3  occasioned the mistakes identified by Timothy Simpson and Dr. Spongberg. Hagemann does not

4  have expertise or experience in properly collecting representative stormwater samples, nor does

5  he have experience or expertise in calculating stormwater volume. Hagemann's lack of

6  experience appears to have led to his use of an *ad hoc* formula for stormwater instead of the

7  industry standard.[10] Hagemann also used the wrong rain water data in his expert report.

8         **2.      Hagemann never disclosed the basis for his sampling methodology.**

9         Hagemann failed to include ***any*** references to regulatory guidance materials in his opening

10  report, reply report or declaration.[11] Similarly, Hagemann's report contains no reports, published

11  or unpublished studies, or analysis documenting how amount of "pollutants" can be calculated

12  based on his sampling methodology, or how his sampling methodology relates to one EPA or

13  California regulators would use in an enforcement action. Further, Hagemann's report contains

14  no discussion or analysis supporting his expressed belief that the myriad ways he deviated from

15  standard guidance had no effect on the validity of the analysis resulting from the samples he took.

16         Fed. R. Civ. P. 37 provides the Court with discretion to exclude an expert witness whose

17  designation is not accompanied by a report in compliance with Fed. R. Civ. P. 26. *See* Fed. R.

18  Civ. P. 37(b)(2). *Brumfield*, 551 F.3d at 330. To decide whether to exclude an expert not properly

19  designated, the Court considers four factors, all of which favor excluding Hagemann's testimony.

20         "(1) the explanation for the failure to identify the witness": ERF never even attempted to

21  explain the failure to disclose the materials relied upon, despite repeated opportunities to do so:

22  his original report, rebuttal report, deposition, and summary judgment motion declaration.

23         "(2) the importance of the testimony": Hagemann's testimony is the lynch-pin to ERF's

24  case; ERF's experts admit that without it, they cannot enforce their CWA claims against PG&E.

25  While it is indisputable that citizens are statutorily authorized to enforce CWA, *see* 33 U.S.C. §

26  _____
   [10]     After Dr. Spongberg outlined the myriad problems with Mr. Hagemann's stormwater
   volume formula, ERF abandoned his calculations and attempted a "re-do" with David Parker.

27  (*See* Showalter Decl. ¶¶ 19-22.)
   [11]     Hagemann's Expert Report is attached to the Showalter Decl. filed herewith ("Showalter

28  Decl.") as Exhibit 3. The Reply Report is Showalter Decl. Exh. 4.

1365, they must enforce the statute in the same manner as would the government, and not through a matter justified solely through their own methodology. *See id.*; *accord Bragdon* 524 U.S. at 642 ("It is enough to observe that the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'").

"(3) potential prejudice in allowing the testimony": Requiring an expert functioning in an enforcement capacity to disclose their methodology is virtually the only guaranty a citizen-suit defendant has to due process. Given the substantial fines and attorneys' fees ERF will seek in this matter, requiring it to make obligated disclosures is essential.

"(4) the availability of a continuance to cure such prejudice": No continuance can "cure" ERF's failure to disclose the relevant data. Hagemann has been disclosed for months. When he was asked about the authorities upon which he relied in his deposition, he failed to provide a full list of the guidance materials which supported his sampling methodologies. (*See*, *e.g.*, Hagemann Dep. at 79:1-17 ("So I looked at general references for sampling stormwater and planning for sampling stormwater.").

The failure of Hagemann to demonstrate a reliable methodology for collecting samples is a tactic designed to prevent holding Hagemann accountable for his myriad failures.

### 3. Hagemann Failed to Collect Representative Stormwater Samples.

In this case, it is clear that Hagemann set out to take stormwater samples. (*See* Sample Analysis Plan ["SAP"] at 4) ("Sample locations for water will be chosen on the basis of the potential to provide representative samples of water quality . . . . ). EPA provides clear guidance on how to collect reliable storm water samples. *See, e.g.*, NPDES Storm Water Sampling Guidance Document, EPA 833-8-92-001 (July 1992) (attached to the Showalter Decl. filed herewith as **Exh. 18**); Industrial Stormwater Monitoring and Sampling Guide, Final Draft, EPA 832-B-09-003 (March 2009) ["2009 Guidance"] (attached to the Showalter Decl. as **Exh. 19**.)

It is also clear that Hagemann failed to follow standard practices in collecting the samples. Timothy Simpson, a civil engineer who specializes in stormwater issues, testifies that

Hagemann's samples included the following flaws, all deviations from standard sampling protocols that prevented the samples from being considered representative of stormwater:

- Collected samples of standing water (OAKWTR-1, OAKWTR-2, HAYWTR-1, HAYWTR-2, MYRTWTR-1)

- Walked in water he was sampling (OAKWTR-1, EURWTR-2)

- Otherwise cross-contaminating the sample (OAKWTR-2, HAYWTR-1, HAYWTR-2, EURWTR-1, MYRTWTR-1, MYRTWTR-2)

- Agitated sediment in water before collecting water samples (OAKWTR-1, OAKWTR-2, HAYWTR-1, EURWTR-1)

- Collected samples outside of the area stated in guidance materials (OAKWTR-2)

- Claimed tidally influenced water was actually stormwater representative of water discharging from a facility (OAKWTR-4)

- Collected water potentially impacted by off-site sources (HAYWTR-1)

- Collected samples upstream of an oil-water separator (EURWTR-1, EURWTR-2)

(*See* Simpson Decl. ¶¶ 30-41.)  Each of these actions represents a deviation from standard guidance materials and from Mr. Hagemann's self-created Sample Analysis Plans. Each deviation has the potential to introduce variables that render the sample unreliable.[12] (*E.g.*, *id.*  ¶¶ 31-32.)

Simpson noted the following deviations between Mr. Hagemann's procedures and the procedures set forth in regulatory guidance:

- Collecting non-representative samples (OAKSED-1, OAKSED-2, HAYSED-1, HAYSED-2, HAYSED-3, HAYSED-4, EURSED-1, EURSED-2, MYRTDUMPSED-1)

- Cross-contamination issues occasioned by touching sampling implements or walking in area to be sampled without decontaminating (OAKSED-1, OAKSED-2, HAYSED-1, HAYSED-2, HAYSED-3, HAYSED-4, EURSED-1, EURSED-2, MYRTDUMPSED-1)

---

[12]     Hagemann and William Rogers (in a rebuttal report, attached to the Showalter Decl. as Exh. 7) seek to flip the burden to PG&E to demonstrate that these deviations did, in fact, compromise the samples.  (*See, e.g.*, Hagemann Reply at 3; Rogers Rebuttal at 24 ("This statement is unfounded and speculation without supporting data.").  It is clear under *Daubert* that it is ERF's burden to demonstrate that its methodologies are reliable, and not PG&E's burden to demonstrate that they are unreliable.

1   (*See id*. ¶¶ 58-70.)  Hagemann does not question Simpson's observations – which were backed up

2   by photographs and videotape evidence – but instead notes that Simpson's views are "irrelevant,"

3   s*ee, e.g.*, Hagemann Reply at 6; "erroneous*," see id.*; or "trivial," *id.* at 3.

4        Hagemann reports that he collected his samples pursuant to a SAP.  (Hagemann Dep. at

5   69-70.)  It is undisputed that acknowledgements of SAP deviations are important.  (Hagemann

6   Dep. at 81.)  These notations are important because they can be used to assess the resulting

7   validity of the samples.  (*See* Simpson Decl. ¶¶ 87, 90, 93.)  While Hagemann did note minor

8   deviations from his SAP in limited instances, in most instances, he failed to note deviations

9   including: 1) collection of water samples from stagnant puddles of water; 2) collection of

10  "sediment" samples by using a trowel to scrape embedded material from asphalt; and 3)

11  homogenizing solids samples on the ground surface, instead of through a bowl as  is referenced in

12  the SAP.  (*See* Simpson Decl. ¶ 93.)   None of these deviations were noted by Hagemann in his

13  field notes.  Simpson testifies that each of these should have been noted, and that Hagemann's

14  failure to note these issues calls into question the validity of his testimony.  (*Id.* ¶¶ 86-88.)

15       **4.      Hagemann provides no basis for why his methodology is "good**

16       **science" which is admissible under *Daubert*.**

17       Under Fed. Rule of Evidence 702, the trial court acts as a gatekeeper and ensures that the

18  proffered scientific testimony meets certain standards of both relevance and reliability before it is

19  admitted.  *Daubert* 509 U.S. at 590, 595–97. An expert opinion is reliable if it is based on proper

20  methods and procedures rather than "subjective belief or unsupported speculation." *Id.* at 590.

21  The test for reliability "'is not the correctness of the expert's conclusions but the soundness of his

22  methodology.' " *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007).

23       As was discussed above, Hagemann failed to disclose the sources for his sampling

24  methodology.  (*See discussion supra* at Section II.B.2.)  Further, Hagemann provided no basis to

25  demonstrate the soundness of the methodology he followed.  (See *discussion supra* at Section

26  II.B.3.)  Given his limited hydrological background, and particular his limited background for

27  taking samples, Hagemann's sampling, and the analytical results resulting, should be excluded.

28       Further, even if Hagemann began with a reliable methodology, he failed to follow it.

11

1    Across the board, Hagemann's erratic sampling protocol, as catalogued in the Simpson

2    Declaration, presents methodologies which are "so altered as to skew the methodology itself," in

3    that Hagemann's "methodology" – if there was one – is a new procedure which itself would need

4    to be established as valid.  *Accord In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 857 (3d

5    Cir. 1990) ("If the allegation is that a reliable methodology was so altered as to skew the

6    methodology itself," [a Rule 702 challenge] would be the appropriate vehicle for evaluation.").

7    Hagemann makes no effort to demonstrate the validity of his methodology.

8              **5.      Rogers cannot rely on Hagemann's invalid samples.**

9         William Rogers, another ERF expert, testifies that sampling data or is required to establish

10   whether "pollutants" are leaving the Facilities.  (Rogers Dep., Showalter Decl. Exh. 8, at 152.)

11   Rogers's testimony is based on analytical reports of Hagemann's samples.  (Rogers Dep. 33-34.)

12   Rogers's testimony is based neither on direct evidence of chemical transport or modeling of

13   chemical transport.  (*See* Steven Ellis Decl., filed herewith, ¶¶ 7-15.)  For the reasons above,

14   PG&E submits that ERF has presented no methodologically reliable sampling evidence.

15        A key consideration in *Daubert* is whether proffered expert testimony is helpful, i.e.

16   whether it "fits" the needs of a particular case.  509 U.S. at 591-92 (stating that the second prong

17   of a *Daubert* inquiry is whether an opinion is relevant to the facts at issue); *see, e.g.*, *United*

18   *States v. Powers*, 59 F.3d 1460, 1472 (4th Cir. 1995).  Courts recognize that, when testifying on

19   complicated issues, expert witnesses have the potential to be both quite powerful, and quite

20   misleading.  *Westberry v. Gislaved Gummi AM*, 178 F.3d 257, 260-61 (4th Cir. 1999).

21        "Helpful" evidence regarding whether pollutants were "discharged" offsite would include

22   sampling data or modeling based on reliable sampling.  (Ellis Decl. ¶¶ 6, 9-12, 17.)  Much of

23   Rogers' Declaration consists of a discussion of "benchmarks." (*See, e.g.*, *id.* ¶¶ 8-37.)

24   "Benchmarks" relate to environmental risk in a RCRA setting, not whether "pollutants" are

25   "discharged" into the "waters of the United States."[13]  How Rogers' RCRA "benchmarks" are

26   _____

     [13]      Steven Ellis, a risk assessment expert retained by PG&E, discusses the origin and general
     use of Rogers's "benchmarks" in his Declaration.  (*See* Decl. of Steven Ellis, filed herewith, at ¶¶
27   15-20.)  Rogers generally agrees that benchmarks are used to evaluate risk, and not CWA issues.
     s*ee, e.g.*, ECF No. 197-14 ¶¶ 7-8 ("I have compared sample results reported by TestAmerica to
28   various benchmarks established by regulatory agencies for evaluating the level of dioxins, furans,

1  relevant to a CWA action are not clear.   Rogers admits "EPA has indicated that the benchmark

2  concentrations are not effluent limitations."  (*See* Rogers Decl. ¶ 8 n.3.)  Similarly, the

3  "benchmarks" are not background numbers, which could support an inference that any elevated

4  levels of "pollutants" in close proximity to the Facilities originated at them.  (Rogers Dep. at 156-

5  57.)  While Rogers states, that "EPA has emphasized . . . that facilities whose storm water

6  discharges exceed these benchmark values should at a minimum conduct additional monitoring

7  and evaluate whether the facilities need to install additional control measures to reduce the

8  pollutant level in their storm water discharges."  (*Id.*) (discussing a Federal Register preamble to

9  the 2000 Multi-Sector NPDES General Permit for Stormwater Associated with Industrial

10  Activity."), the whole premise of ERF's Claim One is that PG&E's facility should have a permit

11  and does not.  Neither Rogers nor Hagemann testified to having reviewed the general levels of

12  dioxin or pentachlorophenol released from geographically proximate NPDES permitted facilities,

13  or the specific levels generally included in permits.  (*See* Rogers Dep. at 173:18-174:1;

14  Hagemann Dep. at 206:1-24.)

15       Rogers' "benchmarks" cannot substitute for valid sampling or modeling and do not make

16  it more or less likely that "pollutants" reach "waters of the United States," and should be

17  excluded.[14]  ERF must demonstrate that Rogers' "benchmark" testimony is relevant to advancing

18  a claim or defense. *Daubert*, 509 U.S. at 592 n. 10; see Fed. R. Evid. 402; see also *Bourjaily*, 483

19  U.S. at 175-76. " 'Relevant evidence' means evidence having any tendency to make the existence

20  of any fact that is of consequence to the determination of the action more probable or less

21  probable than it would be without the evidence." Fed. R. Evid. 401.  It is undisputed that

22  "benchmarks" relate to risk, not CWA.  Accordingly, they have no tendency to make the

23  existence of any fact of consequence more or less probable, and Rogers's should be precluded

24  from testifying regarding them in this case under Fed. R. Evid. 401-403 and 701-703.

25  and  pentachlorophenol that pose environmental risk.")

[14]  (Ellis Decl. ¶¶ 9, 15.)  Since this case was filed, PG&E has contended that ERF is seeking
26  to make an improper "programmatic" challenge to how EPA and California regulators choose to
regulate PG&E's Facilities. (*See* ECF No. 67 at 19-23.) ERF's use of "imminent and substantial
27  endangerment" "benchmarks" not relevant to the narrow CWA issue of whether "pollutants"
reach "waters of the United States" stems from this theme and ERF's policy preference for this
28  Court modifying EPA and California regulatory decisions without these agencies' participation.

6.      **ERF's Declarations Supporting Its "Tire-Tracking" CWA Claims Fail**

**Because they Are Based on Speculation, not Testing or Literature.**

ERF's tire-related testimony is based on speculation and should be excluded under *Daubert*. "Knowledge," as the term is used regarding expert testimony, "connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. "[A] trial court may exclude expert testimony that is imprecise and unspecific, or whose factual basis is not adequately explained." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir.2005) (internal quotations omitted)).

ERF conducted no testing to demonstrate that pollutants *were* tracked from the Facilities on vehicle tires.  Hagemann testifies only that pollutants were *likely* tracked from the Facilities on vehicle tires.  (Hagemann Decl. ¶¶ 34-35.)  He says this because ERF has "no direct evidence that contamination from the sites has been tracked off site."  (Hagemann Dep. at 154.) He has "no samples of any materials that would have been tracked off site."  (*Id.*)  Indeed, he only saw tire tracks at one of the four Facilities.  (*Id.* at 156.)[15]  He never employed any "methodology" to determine the amount of "pollutants" that were tracked; he only asserts that it is "likely" that "pollutants" were based on his general impressions of the Facilities.  (*See* Hagemann Decl. ¶ 35.) Rogers, another ERF expert witness, testified that it is possible to determine the amount of pollutants on vehicle tires.  (Rogers Dep. at 91, 98.)  Indeed, even at sites where "pollutants" can be seen on pavement outside of Facilities, one would still need "methodologies to calculate the amount of [pollutants removed by] road tracking[.]" (*Id.* at 91-93.)  To compound the lack of factual evidence, Hagemann readily admitted that he had consulted no literature or documentation illustrating that tire tracks could be sufficient to spread contamination offsite.  (Hagemann Dep. at 157.)  Something more than "bald assertion" is required to establish admissibility under *Daubert*.

---

[15]      At Hayward, the only facility where Hagemann reported seeing tire tracks, Hagemann's Declaration testimony contradicts his deposition testimony where he responds to the question "Did you see any tire marks that would indicate to you contamination leaving the facility?" with "no." (*Compare* ECF No. 197-1 at 23:10-16 with Hagemann Dep. at 157:18-21.)  Generally, a party cannot create an issue of fact precluding summary judgment by signing an affidavit contradicting prior deposition testimony. *Nelson v. City of Davis*, 571 F.3d 924, 927-28 (9th Cir. 2009).  Contradictory, self-serving affidavits lacking detailed facts and supporting evidence are insufficient to create a genuine issue of material fact, as is required to avoid summary judgment. *Nilsson v. City of Mesa*, 503 F.3d 947, 952 (9th Cir. 2007).

1    Alternatively, the testimony should be excluded under Fed. R. Evid. 401-403 because

2    evidence that "pollutants" were "likely transported" from the Facilities does not "fit" with what

3    ERF is required to prove, i.e. that they *were* discharged from the Facilities **and** reached the

4    "waters of the United States."   *See Daubert*, 509 U.S. at 591-92.  No evidence of "pollutants"

5    reaching "waters of the United States" has been offered.

6        **C.    ERF's Motion Relies on Testimony Never Appropriately Disclosed.**

7            **1.    Parker's Testimony Regarding "1,109 Separate CWA Claims."**

8    Parker's testimony should be excluded on the grounds that Parker cannot be classified as a

9    "rebuttal" expert in this case; rebuttal testimony cannot be used to support a party's case-in-chief;

10   and the late-disclosed opinions and calculations contained in Parker's two addenda and

11   declaration violate the Fed. R. Civ. Procedure and this Court's prior orders.

12   ERF appears to have disclosed Parker only after ERF realized that its first disclosed expert

13   – Matthew Hagemann – was completely unqualified to offer the opinions he was tasked to

14   make.[16]  As part of this "do over" designation, ERF classifies Parker as a "rebuttal" expert;

15   however, Parker's testimony does not respond to evidence offered by PG&E.  Instead he attempts

16   to offer calculations and opinions based on methodology not previously utilized by ERF.

17   "Rebuttal" witnesses are "intended solely to contradict or rebut evidence on the same subject

18   matter identified by another party."  Fed. R. Civ. P. 26(a)(2)(D)(ii).  "The proper scope and

19   function of rebuttal is . . . refutation, which involves evidence which denies, explains, qualifies,

20   disproves, repels, or otherwise sheds light on evidence offered by the [opposing party] . . . ."

21   *United States v. Webb*, 115 F.3d 711, 719 (9th Cir. 1997).  "[R]ebuttal testimony is not an

22   opportunity to cure oversights in a party's case in chief."  *Donell v. Fidelity National Title Agency*

23   *of Nevada*, No. 2:07-cv-0001, 2012 WL 170990, at *5 (D. Nev. 2012) (internal citation omitted).

24   ERF and its attorneys plainly know what comprises "rebuttal" testimony as they have

25   previously made motions to exclude "rebuttal experts" from testifying to support an opposing

26   _____

27   [16]    Hagemann improvised an equation to predict the amount of stormwater needed to produce
a measurable "discharge" from the Facilities instead of using one of the standard equations.
Parker, in essence, appears to be disclosed to rebut Hagemann's testimony, and not PG&E

28   witness testimony.  (*See* Showalter Decl. ¶¶ 20-23.)

parties' cases-in-chief.[17]  Parker is not responding to Spongberg, whose opinion was limited to criticizing Hagemann's methodology and assumptions.  Instead, as Parker testified, he "can't tell you that [he is] trying to rebut anything.  I am just presenting the calculations as asked to me to do."  (Parker Dep., Showalter Decl. Exh. 12, at 143:11-17.)  Parker presents new testimony.

Parker should therefore not be allowed to offer testimony in this case as ERF did not properly disclose him as required by this Court's orders and the Fed. R. Civ. Procedure.  However, should the Court decide to allow Parker to provide some testimony in this matter, as a "rebuttal" expert that testimony cannot be offered to support ERF's case-in-chief.  *See, e.g. Strong v. Valdez Fine Foods*, Case No. 09-CV-01278, 2011 WL 455285, at *3 (S.D. Cal. 2011) (holding that a rebuttal expert's declaration and report could not directly support plaintiff's Rule 56 motion, except for rebuttal).  Because ERF abandoned Hagemann's earlier attempt at calculations, there is nothing for Parker to "rebut" on reply and therefore his testimony should similarly be excluded.

Even beyond the "rebuttal" issue, ERF's disclosure of and reliance on Parker's opinions and calculations violate the strict requirements of Rule 26(a)(2).  ERF has continued to have Parker testify on new issues even after his initial "rebuttal" report was issued in the guise of him "supplementing" his testimony - through two late-disclosed addenda and revisions and changes to his testimony in his declaration.

Parker admitted that the information he used as the basis for the opinions and calculations in the two addenda was available to him at the time he wrote his initial report and, therefore, the addenda do not constitute proper supplementation under Rule 26(e).  *See, e.g., Luke v. Family Care & Urgent Medical Clinics*, 323 Fed. Appx. at 499 (recognizing that "supplementation under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report based on

---

[17]     *See Humboldt Baykeeper and ERF v. Union Pac. Railroad Co.* (N.D. Cal. Case No. 3:06-cv-02560-JSW) ["*ERF* Motion"], ECF No. 349 attached as Showalter Decl. Exh. 14.  There, ERF argued that:  "By virtue of Defendants' designation of Mr. Warner solely as a rebuttal expert, Defendants have limited his testimony to rebuttal testimony only. . . . Thus, the opinions in rebuttal reports may only rebut, they may not offer new opinions."  *ERF* Motion at 2:15-22.  The problems with Parker's testimony go further than this; statements in his Declaration lead to the conclusion that he was visiting Facilities and revising his opinions after he was deposed.  (*See generally* Showalter Decl. ¶¶ 16-18.)

1    information that was not available at the time of the initial disclosure."). Regarding the

2    information and calculation in his first Addendum [Showalter Decl., Exh. 10], Parker testified

3    that he "just forgot" to put it in. (Parker Dep. at 54:13-15.) Regarding the information and

4    calculations in his Addendum No. 2 [Showalter Decl., Exh. 11], Parker testified that he just

5    "didn't believe it was important" until he was prepping for his deposition. *Id.* at 149:11-23.

6    These materials cannot be considered in support of ERF's motion for summary judgment as they

7    were produced in clear violation of Rule 26 and this court's orders.

8        Finally, Parker's Declaration contains numerous revisions to his calculations from his

9    original report and addenda. (*See* Showalter Dec. ¶¶ 16-18.) Neither ERF nor Parker provides

10   any explanation for offering revisions well past the deadline for expert disclosures and after

11   Parker's deposition in this case. Under Fed. R. Civ. P. 26 and 37, Parker must be limited to

12   providing testimony in this case that was properly disclosed in his expert report. For these

13   reasons, ERF cannot rely on the testimony of Parker to support its Motion. Without the support

14   provided by Parker's testimony, ERF has no support for its claims regarding the number of CWA

15   violations, and these claims must fail.

16            **2.    Isaac's Testimony Regarding "1,109 Separate CWA Claims."**

17       ERF may not submit expert evidence in the guise of an attorney affidavit, as it does in

18   Paragraphs 3 to 5 of the Isaacs Declaration. As ERF previously summarized, "[p]ursuant to Rules

19   26 and 37 of the Federal Rules of Civil Procedure, [improperly disclosed] expert witnesses are

20   limited to testifying at trial only as to those matters that were properly disclosed in their expert

21   reports." (*ERF* Motion, Showalter Decl. Exh. 14.)

22       The reasons why are clear. First, ERF never disclosed Jodene Isaacs as an expert witness

23   in this case, nor did she ever provide an expert report.[18] Isaacs is not qualified to serve in such a

24   capacity for the topics she presents here. ERF has not even attempted to demonstrate that Isaacs

25   has the requisite knowledge, skill, experience, training, or education to qualify as an expert on

26   stormwater runoff calculations under Fed. R. Evid. 702. That Isaacs's testimony in Paragraphs 3

27   ────────────────────
     [18]    It is worth noting that this is the second time Isaacs attempted to provide Expert

28   Testimony in this matter. (*See* ECF N. 179-1 at 3 ¶ 7, where Isaacs reviews piping diagrams in
     Eureka, California and opines about where piping leads).

─────────────────────────────────────────
17

1   to 5 of her Declaration requires "scientific, technical, or other specialized knowledge" such that

2   expert testimony is necessary is demonstrated by these issues originally being raised in Dr.

3   Parker's Addendum No. 2.[19]

4          Second, allowing ERF to funnel improperly disclosed "expert" testimony into a case

5   through attorney affidavit effectively renders disclosure obligations meaningless.  ERF never

6   disclosed Isaacs as a witness it may use to support its claims or defenses under the requirements

7   of Fed. R. Civ. P. 26(a)(1). Isaacs was never deposed, or even disclosed, as a witness here.

8          Third, Isaacs incorrectly analyzes the data in a way that renders her conclusions

9   incorrect.[20]  Isaacs's assertion of and reliance on a substantially lower level of precipitation (a

10  decrease of 33.8% from the number actually stated by Parker) resulted in Isaacs overestimating in

11  her sworn declaration to the Court the total number of days of stormwater discharge by at least 29

12  days.  For all these reasons, this Court should strike Paragraphs 1 through 5 of the Issacs

13  Declaration wherein ERF attempts to improperly channel and present the opinions and

14  calculations of Parker.

15                 **3.      Rogers's Statements Regarding "1,109 Separate CWA Claims."**

16         Rogers first offered an opinion designed only to support ERF's RCRA claim, not at issue

17  in this motion.  Rogers admitted as much.  (*See* Rogers Decl. ¶ 10.)  Now, however, Rogers has

18  offered several previously undisclosed opinions including that "PG&E's storm water discharges

19  from the Facilities since January 2005 have always contained pollutants, especially dioxins."

20  (Decl. ¶¶ 50-51.) In support of this opinion, Rogers cites various deposition materials, etc. which

21  he never reported reviewing.  That PG&E's discharges have "always contained pollutants" is

22  similarly a new opinion which has never been appropriately disclosed.

23

24  [19]     Dr. Parker's Addendum No. 2 contains spreadsheets that set forth the "dates in which runoff was expected" for each of the four facilities and included total runoff totals in inches and gallons.  Addendum 2 at 5-49.  These date spreadsheets are almost identical to the spreadsheets

25  offered by Isaacs as Exhibits 2-4 to her Declaration.  Parker's spreadsheets are voluminous and inadmissible and PG&E has not filed them with the Court.  They are available upon request.

26  [20]     Whereas Ms. Isaacs represents to the Court that a discharge will occur "anytime daily precipitation at the Hayward Airport Station exceeds 0.062", Paragraph 15 of Parker's

27  Declaration, which was cited to by Isaacs, clearly indicates that Parker opines that the precipitation would need to exceed 0.083 inches for there to be runoff at the Clawiter Facility.

28  (*See* ECF No. 197-11 ¶ 15.)

1    When Rogers was deposed, he clearly testified that he was not there to opine regarding the

2  condition of the Facility at any time prior to when Hagemann took samples and that testifying

3  about any time before they were taken would be "sheer speculation on his part." (*See* Rogers

4  Dep. at 74-77.)  Indeed, he testified that any information from the period before Hagemann's

5  samples were taken was "irrelevant" to his work. (*Id*. at 77.)  "[W]hat was [on the Facilities] in

6  2010 – [was] not really that important" to his evaluation. (*Id*. at 76.)  Rogers never reviewed

7  "historic activities" at the Facilities. (*Id*. at 164-67.)

8    Generally, a party cannot create an issue of fact precluding summary judgment by an

9  affidavit contradicting his prior deposition testimony. *Nelson*, 571 F.3d at 927-28.  Allowing

10  ERF to show Rogers new, never disclosed information which was always in the possession of

11  ERF attorneys after Rogers was deposed is unfair, and grounds for exclusion of these opinions

12  under Fed. R. Civ. P. 26 and 37.  Rogers's opinions on pre-site inspection activities should be

13  excluded.

14    **4.    Miscellaneous evidentiary objections related to Rogers.**

15    The Rogers Declaration provides testimony regarding other areas never previously

16  disclosed.  These include:

17    • Factual descriptions of the Facilities (Decl. ¶¶ 13, 16);

18    • Factual descriptions of stormwater flow at the Facilities (*Id.* ¶ 21).

19    Rogers never visited the Facilities, and should be precluded based on his lack of personal

20  knowledge from providing general factual testimony regarding them.  Fed. R. Evid. 701.

21  Rogers's testimony should be excluded from the Court's consideration on summary judgment.

22    Additionally, the Rogers Declaration contains a number of opinions and/or resources

23  which were never appropriately disclosed.  These include:

24    • The number of days the Facilities "discharged" "pollutants" for CWA purposes;

25    • How to sample from a three-stage water separator;[21] and

26

27  ────────────

[21]    More specifically, Paragraph 35 of Rogers's Declaration references CASQA's California
Stormwater BMP Handbook 1 of 6. (*See id.* n.22.)  Like several other aspects of Rogers's
28  Declaration, a discussion of this topic was not included in his disclosures or referenced it during
his lengthy deposition. (*See generally* Rogers Rep.; Rogers Reply; Rogers Dep.)

19

1       • The amount of water necessary to flush sediment from underground pipe.

2       Rogers should be precluded from testifying about these topics as he has never disclosed

3   his opinions regarding them and/or failed to demonstrate the expertise required by *Daubert*.

4               **5.      The Testimony of Michael Bercovich was Never Disclosed**

5       The Declaration of Michael Bercovich (*See* ECF No. 197-9), in-house counsel for Alco

6   Iron and Metals Company ("Alco"), is yet another example of ERF's complete disregard for its

7   obligations under the Federal Rules of Civil Procedure and this Court's orders.  The Bercovich

8   Declaration contains significant testimony regarding Alco's business dealings with PG&E and the

9   manner in which recycled scrap materials are collected by and compensated for by Alco.  (*Id.* at

10  ¶¶ 4-8.)  ERF did not disclose their intent to rely upon a representative from Alco until June 28,

11  2011, the last day to complete fact discovery.  Even then, ERF stated that it only intended "to rely

12  on a representative from Alco Iron and Metals Company for the purpose of authenticating

13  documents produced to ERF pursuant to ERF's Subpoena for Documents."  (*See* ECF No. 165 at

14  3:14-16).  **ERF did not disclose any Alco representative as providing testimony beyond the**

15  **authentication of documents**.  Further, ERF sought to depose Alco, serving a subpoena on Alco

16  without notifying PG&E, later withdrawing the subpoena, and only then notifying PG&E.

17      Rule 26(a)(1)(A) states that "a party <u>must</u>, without awaiting a discovery request, provide

18  to the other parties:  (1) the name and, if known, the address and telephone number of each

19  individual likely to have discoverable information – <u>along with the subjects of that information</u> –

20  that the disclosing party may use to support its claims or defenses, unless the use would be solely

21  for impeachment; . . ."  (emphasis added).  "The rule does not require a detailed summary of a

22  potential witness's expected testimony.  It does require at minimum, however, that the party

23  identify the specific subjects or topics on which the witness may be called to testify."  *Colony Ins.*

24  *Co. v. Kuehn*, No. 2:10-CV-1943, 2011 WL 4402738, at *3 (D. Nev. 2011) (excluding witness

25  testimony not identified in the defendants' initial disclosures).  ERF has never previously

26  disclosed any Alco employee as offering testimony on anything other than the authentication of

27  documents, let alone on the other subjects discussed in the Bercovich Declaration.

28      ERF cannot be allowed to rely on undisclosed topics in the Bercovich Declaration to

                                                20

1    support its Motion.  The burden is on ERF to prove that the failure to disclose the testimony now

2    offered by Mr. Bercovich was harmless or substantially justified; however, ERF has not offered

3    the Court any explanation at all, let alone come close to meeting its burden.  *Yeti by Molly, Ltd. v.*

4    *Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir.2001).  Therefore, this Court should strike

5    the portions of the Bercovich Declaration that go beyond mere authentication of documents.

6    **III.**    **PG&E's OPPOSITION.**

7        PG&E submits that the following issues are present before the Court along with what the

8    evidence shows:

9        (1)    *With what SIC Code are PG&E's Facilities classified under CWA regulations*:

10   PG&E's Facilities have only Group 49 SIC Codes, because all activities that occur at them are

11   direct support functions for provision of gas and electric services.  (ECF No. 196 at 20-33.)

12       (2)    *Whether ERF followed the regulatory guidance materials in taking stormwater*

13   *samples which would be binding on the relevant agencies, if the agencies were enforcing CWA*:

14   Valid stormwater samples are required to prevail in an action to enforce CWA.  While it is

15   unclear what resources Matthew Hagemann used to construct his sampling methodology, it is

16   clear that Hagemann deviated from EPA's standard methodologies in numerous instances which

17   render the analytical results of his sampling unreliable and objectionable. (*See* Section II.B.)

18       (3)    *Whether ERF can establish a CWA claim based on vehicle tire tracking even*

19   *though ERF's experts admit that they collected no evidence showing that "pollutants" were*

20   *tracked from the Facilities*: ERF's tire-tracking related claims fail because no sampling

21   demonstrates that tire-tracking has tracked "pollutants" from the Facilities.  Further, ERF does not

22   demonstrate that "pollutants" tracked from the Facilities reach relevant water bodies; and

23       (4)    *Whether the Parker / Isaacs / Rogers testimony is sufficient to establish that*

24   *PG&E committed 1,109 separate CWA violations even though it consists exclusively of evidence*

25   *and/or testimony either never disclosed or disclosed as "supplemental" to rebuttal expert*

26   *reports, and relies on factual misstatements by an ERF attorney*: ERF cannot establish that

27   PG&E committed 1,109 separate CWA violations because ERF never disclosed evidence

28   establishing the facts necessary to support such claims within the relevant time period.  Its initial

1  Expert Reports used a different methodology to establish this claim; this methodology has been

2  rejected by both PG&E and ERF's experts. Further, ERF's own expert, William Rogers, who

3  testifies that PG&E's Facilities had discharges during all rain storms during the relevant period,

4  explicitly disavowed testifying to time periods before site inspections occurred at his deposition.

5      Each of these issues is discussed in turn below.

6      **A.   PG&E's Facilities are Classified with a Group 49 SIC Code under CWA.**

7      **Because Facilities Assigned Group 49 SIC Codes are Not "Industrial" under**

8      **CWA, ERF's Summary Judgment Claim Fails.**

9      To win, ERF has the burden to establish that PG&E's service centers are "associated with

10 industrial activity" as that term is defined by the CWA and associated regulations and guidance.

11 "Associated with industrial activity," used in CWA Section 402(p), 33 U.S.C. § 1342(p), is

12 defined by 40 C.F.R. § 122.26(b)(14). It is clear that this regulation guides the scope of the

13 California permit. As recently as last year the California State Water Resources Control Board

14 rejected ERF's contentions that NPDES permits are required for facilities whose SIC Codes are

15 not specifically listed in 40 C.F.R. § 122.26(b)(14).[22] In response to the comment that "all

16 discharges which are industrial in nature are subject to the CWA NPDES permitting

17 requirements," the Board notes that "The [California] Permit only covers dischargers as defined

18 in the federal regulations. Authority to add other categories is limited to a formal designation

19 process." *See* Bd. Response at 1216.

20     PG&E's Facilities are appropriately classified with SIC Code 49. (*See generally* ECF No.

21 196.) As PG&E has argued, EPA uses the SIC Codes as they are defined in the SIC Code

22 Manual. (*Id.*) As the SIC Code Manual notes:

23         For activities such as . . . electric, gas, and sanitary services and similar

24         physically dispersed operations, establishments are represented by those

---

22     *See, e.g.*, Cal. State Water Resources Board, Response to Comments on the 2011 Draft
25  NPDES Industrial General Permit ["Bd. Response"], portions attached as Showalter Decl. Exh.
15, at lines 1216-20. It is important to note that the Board's responses in this instance are
26  directed to comments filed by the California Coastkeeper Alliance ("CCA"), of which Humboldt
Baykeeper, an ERF affiliate, is a member. *See* CCA Comment Letter to Cal. State Water Res. Bd
27  dated April 29, 2011, attached to the Showalter Decl. as Exh. 16, at 1. The specific arguments the
Board rejects are substantively identical to those advocated by ERF in this case. *See id.* at 22-26.

28

22

1    relatively permanent branch or main offices, terminals, stations, etc. that

2    are either (2) directly responsible for supervising such activities, or (2) the

3    base from which personnel operate to carry out these activities . . . .

4    (SIC Code Manual, ECF No. 196-13 at 12.)

5    The parties agree that PG&E's Facilities are "the base from which personnel operate to

6    carry out" the activities which ERF admits are the primary purpose of the Facilities (ECF 196-2 at

7    3-4).  In prior briefing, ERF also conceded this point:   "While the primary purpose of [the]

8    Facilities might not be to conduct [activities listed by SIC Code in the Permit], these activities are

9    no less industrial because they are not the Facilities' primary purpose . . . given [that] these

10   Facilities support an industrial activity: the transmission and distribution of electricity and gas."

11   ECF No. 81 at 14:3:6.  ERF acknowledges that transmission and distribution of electricity and gas

12   is the primary purpose of the Facilities (a Group 49 activity) and that the other activities they are

13   concerned with are not "primary."  Once again, ERF is more concerned with challenging the

14   regulation than with following it.  ERF attempts to argue that SIC Code Group 49 only applies to

15   facilities which "generate electricity or natural gas [or] distribute that electricity or gas to PG&E's

16   customers."  (ECF No. 197 at 25.)  However, the SIC Code is broader and applies to all aspects of

17   gas and electric service – a service activity and not industrial as ERF has argued.  (See SIC Code

18   Manual at 284, ECF No. 196-13 at 47.)

19   Because the statute, regulations and guidance do not support ERF's argument, ERF's

20   summary judgment motion is based upon a misleading and inaccurate characterization of the

21   regulations.  Not only does this flawed characterization preclude ERF being awarded summary

22   judgment, it also is insufficient to preclude PG&E being awarded it.[23]

23   Second, even had the Board not already rejected ERF's theory, ERF attempts to ignore the

24   _____

25   [23]    ERF would have the burden of proof to show PG&E's SIC Code at trial.  Where a party
     bears the burden of proof, "his showing must be sufficient for the court to hold that no reasonable
     trier of fact could find other than for the moving party." Seagate Tech., Inc. v. St. Paul Fire &

26   Marine Ins. Co., 11 F. Supp. 2d 1150, 1152 (N.D. Cal. 1998) (internal citation omitted).  The
     party who will have the burden of proof must persuade the Court judgment that it will have

27   sufficient admissible evidence to justify going to trial. Id. at 1153; Nissan Fire & Marine Ins. Co.
     v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  ERF's case on this element is premised on the

28   Court ignoring how SIC Codes are applied, and not on a meaningful factual dispute.

1    most important part of the definition of the SIC codes, *i.e.* not that an activity which occurs only

2    occasionally at a facility, but instead is based upon what activity a facility is "primarily engaged."

3    (*See* ECF No. 196 at 25-33.)  According to the SIC Code Manual itself, usually there is only one

4    SIC code for a facility, with the only exceptions being physically separate economic activities (a

5    hotel and a marina for example) as discussed in PG&E's opening brief.  However, ERF argues

6    that if an activity occurs at all, an SIC code applies.  Indeed, ERF states that the "Facilities are

7    'primarily engaged' in four different activities: recycling, transportation, metal fabrication, or

8    aggregate handling activities."  (ECF No. 197 at 24.)  Such a statement is inherently contradictory

9    and presents a logical fallacy.  Surely a facility cannot be **primarily** engaged in four activities.

10   The SIC Code Manual establishes how codes are assigned where multiple activities occur.

11        In its Motion, PG&E detailed the many ways in which ERF's attempts at assigning SIC

12   codes is incorrect.  (*See* ECF No. 196 at 21-24.)[24]  It is important to note two different, but

13   equally significant problems with ERF's SIC code arguments.  First, ERF does not apply proper

14   SIC codes, taking into account the actual definition of the SIC code.  Second, even if an SIC code

15   might potentially apply, ERF ignores the word "primary" and assigns an SIC code for every

16   activity that might ever occur at a facility,[25] not just the "primary activity."

17        One SIC Code not addressed in PG&E's opening brief is SIC Code 1442 for aggregate

18   storage.  While this is wholly inapplicable, it was not addressed because ERF's summary

19   judgment motion was the first time it was ever mentioned and should be struck for that reason.

20   Further, even a cursory glance at the SIC code itself shows how inapplicable it is.  The Group 14

21   SIC codes are within the "Mining" subdivision in a group called "Mining and Quarrying of

---

22   [24]   To prevent duplication, PG&E incorporates the arguments made in its Motion as if set

23   forth in full here.  The one issue which ERF discusses briefly in its Motion that is not discussed in PG&E's Motion is ERF's contention that CWA Section 402(p) created "a temporary moratorium for the EPA from having a duty to issue NPDES permits for certain storm water discharges."

24   (*See* ECF No. 197 at 27) (*discussing* ECF No. 26 at 9-13 *and* ECF No. 81 at 17-19.)  This issue has been briefed to this Court, where it was rejected, before, and like ERF, PG&E incorporates

25   and restates its earlier arguments.  (*See* ECF No. 83 at 16.)  If ERF's position was correct, it would have foreclosed the need for any analysis under Section 402(p) in other stormwater cases

26   like *Nw. Env. Def. Ctr. v. Brown*, 640 F.3d 1063 (9th Cir. 2011), *cert. granted sub nom*, *Decker v. Nw. Env. Def. Ctr.*, Case No. 11-338 (2012), brought since then.

27   [25]   PG&E has used Best Buy stores as facilities that would be rendered "industrial" under ERF's re-write of 40 C.F.R. § 122.26(b)(14).  (ECF No. 196 at 33.) These stores would be

28   "industrial recycling facilities" because they collect and resell some used batteries and computers.

Nonmetallic Minerals, Except Fuels." The SIC Code 1442 itself is defined as "establishments primarily engaged in operations primarily engaged in operating sand and gravel pits and dredges, and in washing, screening or otherwise preparing sand and gravel for construction uses." (*See* SIC Code Manual Excerpt addendum, attached to the Showalter Decl. as Exh. 17.) ERF presents evidence only that PG&E "stores" aggregate material at its Facilities. There is no evidence, because such activity does not happen, of any mining activity or any sand and gravel pits, nor is there any evidence that aggregates are "washed" "screened" or anything else but stored at the Facilities. As outlined in PG&E's Motion, the Facilities are what the SIC Code Manual describes as auxiliary operations, which by its very definition includes storage of materials and provision of equipment for use by the business in the field. (*See* SIC Code Manual at 15.)

The parties agree, in large part, the types of activities that occur at the Facilities; the parties disagree how these activities are characterized. Does welding approximately once a week (citation) equate to welding (light industrial) as a "primary activity"? So too with the other activities, three or four employees performing auto maintenance at a facility where dozens are employed – does this equate to a "primary activity?" To prevail on this argument, ERF must persuade the Court that its Complaint and discovery admissions do not matter. ERF admitted that the **primary** purpose of the facilities (though not the only purpose) was to maintain the transmission and distribution of electricity and gas. That admission is binding and clearly elucidates the Facilities' "primary" purpose for SIC code analyses. Certainly, California regulators think that the purpose drives the analysis. (*See* ECF No. 196 at 21-33., *supra* note 22)

The only question left, then, is whether more than one SIC Code is applicable to the Facilities. PG&E argues "no" in its Motion and will not repeat that argument. (*See* ECF No. 196 at 29-33.) In addition, ERF's method of determining "primary purpose" (or four primary purposes) is flawed. ERF boldly asserts that each complained-of activity is primary for a different reason with no context to the larger Facility.

For recycling, ERF cites objectionable material (*e.g.*, ECF No. 197-9, Decl. of Michael Bercovich) to show that PG&E receives money for its recycling. ERF terms the money "substantial" without any comparison to PG&E's overall business or any individual revenue

1   stream.  That PG&E may have received $1.3 million dollars (spread over four facilities) in five

2   years by selling its own recyclable materials (and merely recouping some of the money spent on

3   the material in the first instance) to a wholesale recycling company tells the Court nothing about

4   the materiality of that number.  Some facts that undercut the materiality:

5   • PG&E owns 141,215 miles of electric distribution lines, 18,616 miles of transmission

6     lines, 42,141 miles of natural gas distribution pipelines, and 6,438 miles of transmission

7     pipelines.

8   • PG&E has 20,000 employees and services a 70,000 mile service area.

9   (*See* PG&E website at http://www.pge.com/about/company/profile/)  In this context, what ERF

10  portrays as being "substantial" expenses are, in reality, relatively small sums related to PG&E's

11  periodical recoupment of  the larger sums it spent to install different equipment in the first place,

12  and which it was spending again to replace it.  Again, as ERF admitted in discovery, the Facilities

13  exist to further PG&E providing gas and electric services to California consumers.

14      For "transportation facilities" ERF takes a completely different – but equally incorrect –

15  approach.  Instead of comparing maintenance with recycling in terms of what it claims is revenue,

16  ERF now switches to salary.  Again, ERF combines all four facilities which obscures the fact that

17  no employees at the 14th Street Facility perform automobile maintenance.  Further, ERF provides

18  salary numbers in a vacuum.  That 25 employees may have made approximately $8 million

19  dollars in salary over a five year period tells the Court nothing about the rest of the Facility.  How

20  many other employees work at these large facilities?  What percentage of the total salary earned

21  by employees at the Facilities over 5 years does the $8 million dollars account for?

22      For light industrial and aggregate storage, ERF does not even attempt to offer information,

23  simply stating that they are "no less valuable" to PG&E.  (ECF No. 197 at 18.)  It is here,

24  however, that ERF establishes for PG&E the very argument PG&E attempts to make in its

25  Motion:  that these are auxiliary establishments.  ERF states, "without locations to store

26  aggregates . . . PG&E would have no way to replace the portions of streets and other surfaces

27  displaced by the digging of trenches . . . routinely conducted by PG&E's crews." *Id*.  ERF also

28  states, "the cutting, welding and fabrication of metal products and parts . . . plays a central role in

26

1    the process of staging and delivering PG&E's electricity and gas services." *Id*.  The activities

2    ERF here deems as "primary" are actually in service to the larger goal of the Facility: assisting in

3    the delivery of "PG&E's electricity and gas services." That Congress and EPA have not chosen to

4    require permits for these facilities upsets ERF, but does not give them a cause of action under the

5    CWA.  Accordingly, ERF's Motion should be denied.

6          **B.**       **ERF Does Not Show that "Pollutants" reach "Waters of the United States"**

7                  **through Stormwater Run-Off.**

8          CWA Section 505, 33 U.S.C. § 1365, is clearly an "enforcement provision" which is

9    designed to supplement, not replace, enforcement by regulators.  *See, e.g.*, *Wash. PIRG v.*

10   *Pendleton Woolen Mills*, 11 F.3d 883, 885 (9th Cir. 1993).  As PG&E has indicatd, *see* ECF No.

11   196 at 23-33, federal, state, and local regulators have promulgated regulations defining key CWA

12   terms and issued formal and informal guidance on how CWA is to be interpreted and enforced.

13   These guidance materials are binding on ERF and the Court. *Bragdon*, 524 U.S. at 642.

14         EPA and California regulators have issued regulatory guidance which bind agencies, as

15   well as citizen-plaintiffs like ERF, to conduct sampling under specified parameters.  *See*

16   *discussion supra*.  EPA's materials provide methodologies which, *if applied correctly*, generate

17   valid samples.  While Hagemann indicates that he "used appropriate sampling methods," *see*

18   Hagemann Reply at 2, he makes no effort to explain what those methods were, or to justify his

19   chosen methodology through reference to regulatory guidance or academic literature.  (*See*

20   *generally* Hagemann Report; Hagemann Reply; Hagemann Dep.)  Timothy Simpson watched

21   Hagemann take virtually all of the involved samples, and states explicitly that none of them were

22   valid under regulatory guidance.  (*See* Simpson Decl. ¶¶ 19-22.)

23         With this Motion, PG&E objects to the testimony of Matthew Hagemann and William

24   Rogers under *Daubert* and Fed. R. Civ. P. 26 and 37.[26]  PG&E submits that, unless *either* (a)

25   Hagemann can demonstrate that he took stormwater samples in a methodologically reliable

26   fashion; or (b) ERF has disclosed a methodology sufficient to withstand a *Daubert* challenge

27

---

[26]    *Daubert* objections can support summary judgment. *Lust v. Merrell Dow Pharms.*, *Inc.*,

28   89 F.3d 594, 597 (9th Cir. 1996) (upholding summary judgment based on *Daubert* motion).

1  which can transform Hagemann's "invalid" samples to "valid" ones, ERF's Motion must be

2  denied because ERF has not demonstrated that any quantity of "pollutants" were discharged into

3  the "waters of the United States."

4          ERF has no testimony linking the amount of "pollutants" on-site with the amount of

5  "pollutants" offsite.  Rogers admits that he cannot quantify the amount of "pollutants" that left the

6  Facilities and that he cannot quantify the total amount of "pollutants" on any of the Facilities.

7  (Rogers Dep. 23-24.)  He cannot specify the amount of sediment to leave any of the sites.  (*Id.* at

8  45.)  Instead, Rogers's "benchmarks" related to whether the Facilities may pose an "imminent

9  and substantial endangerment," a RCRA question, a separate inquiry to the one now pending

10  before the Court.  The RCRA analysis cannot serve as a proxy for the amount of "pollutants"

11  leaving the site.  The "benchmarks" are a list Rogers created and have no legal standing under

12  CWA.  (*See* Ellis Decl. ¶¶ 15-16.)  As was discussed in detail above, outside of bald assertion,

13  ERF has made no scientifically valid effort to tie on-site materials to  to whether "pollutants" are

14  discharged from the Facilities into the "waters of the United States" – the issue pending before

15  the Court at this time.  (*See* ECF No. 197 at 28.)    Accordingly, ERF's Motion should be denied.

16          **C.    ERF's Tire-Focused Claims are Wholly Speculation and Must Be Dismissed.**

17          ERF's tire-focused claims are premised entirely on speculation.  ERF's tire-focused CWA

18  claim exclusively relies on two paragraphs in the Hagemann Decl.  (ECF No. 197 at 21)

19  (*discussing* Hagemann Decl. ¶¶ 34-35.)  These Paragraphs note that it is "well-known" among

20  practitioners in the storm water pollution field that one means by which pollutants are transported

21  from particular areas is by motor vehicles.  (Hagemann Decl. ¶ 34.)  Further, Hagemann discusses

22  his "qualitative conclusion" that "motor vehicle traffic from the Facilities is likely transporting

23  dioxins, pentachlorophenol, and other pollutants into the public streets."  (*Id.* ¶ 35.)[27]

---

24  [27]      ERF may try to supplement Hagemann's scant evidence through reference to Issacs's Exh.
35. Exh. 35 consists of a series of photographs that ERF allegedly took during site inspections at

25  PG&E's Oakport, Clawiter, Myrtle, and West 14th St. Facilities. One photograph depicts tire
tracks at an unknown facility.  ERF counsel Jodene Isaacs's declaration characterizes the

26  photographs as "true and correct copies."  (Isaacs Decl. at ¶ 37.)  This Declaration is not an
adequate foundation upon which to introduce the photographs into evidence and they should be

27  accordingly excluded.  Isaacs never suggests she has personal knowledge of the photographs.
Instead, she states that the photographs are "true and correct copies of photographs taken by ERF

28  during site inspections of the Oakport, Clawiter, Myrtle, and West 14th St. Facilities."  (Isaacs

1    Hagemann's speculation is insufficient to demonstrate that PG&E has discharged

2   pollutants by tire-tracking.  First, "conclusory allegations unsupported by factual data are

3   insufficient" to prevail on summary judgment.  *Arpin v. Santa Clara Valley Transp. Agency*, 261

4   F.3d 912, 922 (9th Cir. 2001) (citation omitted).  Hagemann's "qualitative conclusion" is nothing

5   more than a "conclusory assertion."  Second, even if it were sufficient, Hagemann's conclusion

6   that pollutants "are likely" being transported "from the Facilities" is insufficient to meet ERF's

7   burden of proof in this matter, which is to show that "pollutants" **are** being discharged from the

8   Facilities into the "waters of the United States."   Third, a "quantitative" conclusion is required.

9   Experts (particularly ones presenting testimony insufficient to withstand a *Daubert* challenge)

10   cannot "eyeball" the level of hazardous substances present without supporting data and present

11   their speculation dressed as reliable evidence.  *See Rogers v. Raymark Indus.*, 922 F.2d 1426,

12   1431 (9th Cir. 1991) (excluding visual testimony proferred by an expert in an asbestos case).

13    There is no factual data to support Hagemann's conclusion.[28]  Hagemann stated that he

14   has "no direct evidence that contamination from the sites has been tracked off site."  (Hagemann

15   Dep. at 154.)  Hagemann took "no samples of any materials that would have been tracked off

16   site."  (*Id.*)  Indeed, only saw tire tracks at one of the four Facilities.  (*Id.* at 156.)  Further,

17   Hagemann readily admits that he had no literature or documentation illustrating that tire tracks

18   could be sufficient to spread contamination offsite.  (*Id.* at 157.)  While he states that he knew

19   from "experience" that tire-tracked contamination could be an issue, he had no idea of the amount

20   of material which would need to be tracked to pose a problem. (*Id.* at 159.)[29]

21   Decl. at ¶ 37.)  Where the affiant cannot actually observe or perceive that to which she testifies,
the affiant lacks personal knowledge necessary to establish admissibility.  *See Orr v. Bank of Am.,*

22   *NT & SA*, 285 F.3d 764, 777 (9th Cir. 2002) (finding attorney's affidavit used to introduce
document could not authenticate a document where attorney lacked personal knowledge of it).

23   Isaacs never states that he has personal knowledge of the photographs.  In fact, Issacs fails to
state even basic information (e.g. who took the photographs, when they were taken, or whether

24   the photographs accurately depict site conditions).  Thus, the photographs should be excluded.

25   [28]    Should the Court find that ERF has demonstrated that "pollutants" exist on-site, this
evidence would constitute a "mere scintilla" of evidence that "pollutants" had been tracked from

26   the Facilities on vehicle tires.  A "'scintilla of evidence,' or evidence that is 'merely colorable' or
'not significantly probative,' is not sufficient to present a genuine issue as to a material fact" or to

27   support an award of summary judgment.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865
F.2d 1539, 1542 (9th Cir.1989) (citation omitted).

28   [29]    The disjunction between tire-track related evidence and Hagemann's report is clear from a
review of the relevant drafts.  (Hagemann Dep. at 174-75.)  The tire-track related testimony was,

1   Hagemann's deposition testimony is binding upon him and ERF. "[I]f a party who has

2   been examined at length on deposition could raise an issue of fact simply by submitting an

3   affidavit contradicting his own prior testimony, this would greatly diminish the utility of

4   summary judgment as a procedure for screening out sham issues of fact." *See Foster v. Arcata*

5   *Assocs.*, 772 F.2d 1453, 1462 (9th Cir.1985), *cert. denied*, 475 U.S. 1048 (1986). A party cannot

6   create an issue of fact precluding summary judgment by an affidavit contradicting his prior

7   deposition testimony. *Nelson*, 571 F.3d at 927-28 (9th Cir. 2009). Accordingly, ERF's tire-

8   focused CWA claim must be rejected.

9           **D.      ERF Cannot Prove 1,109 Separate CWA Violations.**

10          As discussed in Sections II(C)(1-3) above, ERF's attempt to establish 1,109 separate

11  CWA claims, one for "[e]very day that there has been significant local rainfall," *see* ECF No. 197

12  at 30, fails for three reasons. First, Dr. Parker, ERF's expert supporting "1,109 separate

13  violations" was not disclosed until the Reply phase of litigation.[30] Second, the number 1,109 is

14  premised on sworn testimony from an Jodene Isaacs, an ERF attorney, that is demonstrably false.

15  Third, ERF cannot prove that its improper sampling in 2011 provides relevant evidence regarding

16  conditions and alleged discharges occurring years before because William Rogers, ERF's expert,

17  testified that he lacked information necessary to determine this.

18  **IV.     CONCLUSION**

19          For the reasons set forth herein, the evidentiary objections set forth in the accompanying

20  Proposed Order should be sustained, and ERF's Motion (ECF No. 197) should be denied.

21          Dated September 13, 2012

22                                          Schiff Hardin LLP

23

24                                          By:   /s/ Russell B. Selman
                                                  Attorneys for PG&E
25

26  _____

27  in full, added by one of ERF's attorneys, and not Hagemann. (*Id.* at 175.)
    [30]     *See* Section II(C)(1) above. In short, ERF originally sought to rely on Hagemann to
28  establish this testimony, but abandoned relying on him for these topics when his testimony was
    substantively demonstrated to be unreliable by PG&E.