ROCKY N. UNRUH, CA Bar #84049
  runruh@schiffhardin.com
**SCHIFF HARDIN LLP**
ATTORNEYS AT LAW
ONE MARKET
SPEAR STREET TOWER, THIRTY-SECOND FLOOR
SAN FRANCISCO, CA  94105
TELEPHONE:       415.901.8700
FACSIMILE:        415.901.8701

RUSSELL B. SELMAN IL Bar # 6195396, *pro hoc vice*
  rselman@schiffhardin.com
BRADLEY S. ROCHLEN IL Bar # 6244780, *pro hoc vice*
  brochlen@schiffhardin.com
J. MICHAEL SHOWALTER IL Bar #6301455, *pro hoc vice*
  mshowalter@schiffhardin.com
**SCHIFF HARDIN LLP**
ATTORNEYS AT LAW
233 S. WACKER DR., SUITE 6600
CHICAGO, IL 60606
TELEPHONE:       312.258.5500
FACSIMILE:        312.258.5600

*Attorneys for Pacific Gas and Electric Company*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ecological Rights Foundation, | Case No.:  3:10-CV-00121 RS |
| Plaintiff, | **PG&E'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON CLAIMS ONE AND TWO** |
| v. | |
| Pacific Gas and Electric Company, | Judge:       Judge Richard G. Seeborg |
| Defendant. | Date Complaint Filed:  February 9, 2011 |
| | Hearing Date: Nov. 8, 2012 |
| | Time:          1:30 p.m. |

## <u>TABLE OF CONTENTS</u>

I.     ERF'S INTERPRETATION OF THE GENERAL PERMIT HAS BEEN
       REJECTED BY THE RELEVANT STATE AGENCY...................................................... 4

II.    ERF DECLINES TO RESPOND TO PG&E'S ARGUMENTS THAT
       REGULATORS DETERMINED THAT "NO PERMIT WAS REQUIRED" AT
       THE FACILITIES............................................................................................................ 7

III.   PG&E IS ENTITLED TO RELY UPON THE FEDERAL AND STATE
       GUIDANCE MATERIALS WHICH BAR ERF'S CLAIMS ........................................... 7

       A.     "Primary" Means Primary, Not "Unique and Significant Value"........................ 9

       B.     The SIC Codes Listed in the Permit, which are Directly from 40 C.F.R. §
              122.26(b)(14), Have Meaning and Are Intended to be Exclusive ....................... 12

       C.     The Facilities Can Be Both "Auxiliaries" and Independently Assigned a
              Group 49 SIC Code ............................................................................................... 13

       D.     ERF Cannot Meet its Burden to Demonstrate that PG&E's Facilities are
              Regulated by Ignoring Long-Standing Regulations and Guidance Materials ...... 14

       E.     ERF Presents No Evidence that the Facilities are Divisible ................................. 15

IV.    THE FACILITIES ARE NOT "EXEMPTED" FROM REGULATION; THEY
       SIMPLY ARE NOT "INDUSTRIAL" ............................................................................... 15

V.     TIM SIMPSON DOES NOT OFFER LEGAL CONCLUSIONS; HE PROVIDES
       CONTEXT TO THE APPLICABILITY OF THE NPDES PERMITTING
       REGIME ............................................................................................................................ 17

VI.    ERF CONCEDES THAT CLAIM TWO SHOULD BE DISMISSED ............................ 20

VII.   CONCLUSION .................................................................................................................. 20

1

## TABLE OF AUTHORITIES

2

## CASES

3

*Am. Mining Congress v. EPA*,
  965 F.2d 759 (9th Cir. 1992)..................................................................... 2, 9, 13, 17

4

*Am. Title Ins. Co. v. Lacelaw Corp.*,
  861 F.2d 224 (9th Cir. 1988)................................................................................. 6

5

*Auer v. Robbins*,
  519 U.S. 452 (1997).............................................................................................. 8

6

7

*Bammerlin v. Navistar Int'l Transp. Corp.*,
  30 F.3d 898 (7th Cir.1994)................................................................................. 19

8

*Bassiri v. Xerox Corp.*,
  463 F.3d 927 (9th Cir. 2006)................................................................................ 8

9

10

*Bragdon v. Abbot*,
  524 U.S. 624 (1998).............................................................................................. 8

11

12

*Burgess v. United States*,
  553 U.S. 124 (2008)............................................................................................ 12

13

*Carus Chem. Co. v. EPA*,
  395 F.3d 434 (D.C. Cir. 2005) ......................................................................... 5, 13

14

15

*Chevron, U.S.A. Inc. v. Natural Resources Defense Council*,
  467 U.S. 837 (1984).............................................................................................. 8

16

17

*Coeur Alaska, Inc. v. Se. Alaska Conservation Council*,
  557 U.S. 261 (2009).............................................................................................. 8

18

*Conservation Law Foundation v. Hannaford Bros. Co.*,
  327 F. Supp. 2d 325 ...................................................................................... 16, 17

19

20

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)............................................................................................ 17

21

22

*Environmental Protection Info. Ctr. v. Pac. Lumber Co.*,
  301 F. Supp. 2d 1102 (N.D. Cal. 2003) ............................................................. 16

23

24

*Gompper v. VISX, Inc.*,
  298 F.3d 893 (9th Cir. 2002)................................................................................ 6

25

*Indus. Truck Ass'n, Inc. v. Henry*,
  125 F.3d 1305 (9th Cir. 1997).............................................................................. 5

26

27

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999)............................................................................................ 18

28

ii

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren,*
309 F.3d 1181 (9th Cir. 2002)........................................................................................ 16

*Marx & Co., Inc. v. Diners' Club, Inc.,*
550 F.2d 505 (2d Cir. 1977)........................................................................................... 19

*Nat'l Min. Ass'n v. MSHA,*
116 F.3d 520 (D.C. Cir. 1997) ......................................................................................... 5

*Nat'l Pork Prods. Council v. EPA* ...................................................................................... 20

*Northwest Envtl. Def. Ctr. v. Brown,*
640 F.3d 1063 (9th Cir. 2011).............................................................................. *passim*

*Pauley v. BethEnergy Mines, Inc.,*
501 U.S. 680 (1991) ....................................................................................................... 5

*Plastic Container Corp. v. Continental Plastics of Oklahoma,*
607 F.2d 885 (10th Cir. 1979) ........................................................................................ 6

*S.F. Baykeeper v. Cargill Salt Division,*
481 F.3d 700 (9th Cir. 2007)........................................................................................... 9

*Silvas v. E*Trade Mortg. Corp.,*
514 F.3d 1001 (9th Cir. 2008)......................................................................................... 8

*Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.,*
565 F.3d 545 (9th Cir. 2009)........................................................................................... 8

*Skidmore v. Swift & Co.,*
323 U.S. 134 (1944).................................................................................................... 3, 8

*Strom v. U.S.*, 641 F.3d 1051 (9th Cir. 2011) .................................................................... 8

*United States v. Hankey,*
203 F.3d 1160 (9th Cir. 2000)....................................................................................... 18

*United States v. One Heckler-Koch Rifle,*
629 F.2d 1250 (7th Cir. 1980)......................................................................................... 6

*Waltman v. King William Co. School Bd.,*
Case No. 3:10-CV-0072, 2010 WL 1006889 (E.D. Va. 2010)........................................ 16

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982)..................................................................................................... 16

*Wyckoff Co. v. EPA,*
796 F.2d 1197 (9th Cir. 1986)....................................................................................... 16

iii

*Zurich Am. Ins. Co. v. Whittier Props. Inc.*,
    356 F.3d 1132 (9th Cir. 2004).............................................................................................. 8

**FEDERAL STATUTES**

33 U.S.C. § 1342 ............................................................................................................ 12, 16

33 U.S.C. § 1365 .................................................................................................................... 9

**FEDERAL REGULATIONS**

40 C.F.R. § 122.26 ......................................................................................................... *passim*

**FEDERAL RULES**

Fed. R. Civ. P. 56 .................................................................................................................... 7

N.D. Ca. Local Rule 3-4........................................................................................................ 1

1    Does EPA or the California Storm Water Resource Control Board (the "Board") require

2    that the Pacific Gas and Electric Company ("PG&E") Facilities at issue comply with the

3    California General Industrial Stormwater Permit ("Permit")?

4    Both the regulators who regularly inspect the Facilities and PG&E say "NO." The

5    Facilities – known as corporate yards or service centers – are best classified as SIC Code Group

6    49 Facilities under a straightforward reading of the SIC Code Manual. (*See* ECF No. 196 at 25-

7    26.) While ERF defines these Facilities as "industrial in nature" or states that "unique and

8    significant" aspects of their operations are "industrial," as EPA has defined the term "industrial" –

9    i.e. in 40 C.F.R. § 122.26(b)(14) – the Facilities are not "industrial" because their "primary

10   activity" is supporting PG&E's provision of gas and electric services to California customers.[1]

11   Based on how 40 C.F.R. § 122.26(b)(14) is defined, and consistent with federal guidance, if a

12   facility's SIC Code is not listed in the regulation,[2] EPA requires no permit.

13   In its Opposition,[3] Ecological Rights Foundation's ("ERF") appears to tacitly

14   acknowledge that its legal theories cannot withstand review against the federal interpretation of

15   CWA. (*See* ECF No. 201 at 14 n.3.) However, ERF posits that "state storm water regulations

16   can be more expansive and cover more activities than they do here." (*Id.*; *see also id.* at 8

17   (indicating that the Permit contains California's broader interpretation of CWA obligations).

18   ERF's Opposition is premised on ignoring express EPA guidance and how the Board enforces the

19   CWA in California. ERF is wrong.

20   "The dog that didn't bark in the night" comes from the "Silver Blaze," Sherlock Holmes

21   story by Sir Arthur Conan Doyle. In that story, the fact that a dog did not bark during the night

22   when a race horse was removed from a stable was an important clue to solve the mystery of who

23   removed the horse from a stable.[4]

24   [1]   The Facilities are where PG&E's employees park trucks, store equipment, and meet
     before and after conducting field work to maintain gas lines and electric wires which take power
25   from where it is generated to homes and businesses where it is used. ERF has admitted as much
     in discovery and does not appear to meaningfully dispute this simple fact in its Opposition.
26   [2]   Subject to certain facilities listed by narrative descriptions not relevant to this case.
     [3]   PG&E notes that ERF's Motion and Opposition (ECF Nos. 197 & 201) both appear to be
27   in 11-point Times New Roman font which fails to comply with N.D. Cal. Local Rule 3-4(c)(2).
     [4]   "'Before deciding that question I had grasped the significance of the silence of the dog,
28   for one true inference invariably suggests others. The Simpson incident had shown me that a dog

1

ERF's Opposition centers on the premise that the SIC Codes listed in EPA regulations are inconsequential to whether facilities conduct activities which are "industrial in nature."  (*See* ECF No. 201 at 8:12-15, discussing the breadth of the Permit; *id.* at 19:20, discussing services which ERF asserts are regulated because they are "industrial in nature".)

Two data points in this case are "dogs that didn't bark in the night" which highlight the baseless nature of ERF's case and why PG&E's Motion should be granted.  PG&E submits that this evidence – never discussed in ERF's Motion or Opposition – demonstrates that ERF's statements regarding the Board's CWA interpretation lack factual basis:

- Evidence – never disclosed to PG&E in discovery – that ERF's main legal theory has been submitted to the Board and summarily rejected.  (*See* ECF No. 202-17 at 23-25; ECF No. 202-16 at 113-114);[5] and

- Inspection reports PG&E filed with its Motion where regulators attest that two of the Facilities "do[] not need coverage" for a storm water permit.  (*See* ECF No. 196-23 & 196-24.)

The remainder of ERF's Opposition is long on conjecture and short on substantiation.  Key questions never meaningfully addressed include:

- *Who is entitled to define what constitutes an "industrial activity" for CWA Section 402(p)?*  The Ninth Circuit ruled that Congress left this issue to EPA, *see Am. Mining Congress v. EPA*, 965 F.2d 759, 765 (9th Cir. 1992); ERF disagrees.  (ECF No. 201 at 25-29.)

---

was kept in the stables, and yet, though some one had been in and had fetched out a horse, he had not barked enough to arouse the two lads in the loft. Obviously the midnight visitor was someone whom the dog knew well.'" A.C. Doyle, *Silver Blaze*, The Complete Sherlock Holmes, Vol. 1 at 413, 415 (Barnes & Noble Classics 2003).

[5]     PG&E discovered these materials on the Board's webpage shortly before its Opposition to ERF's Motion for Summary Judgment was filed.  Upon discovery of these materials, PG&E brought ERF's failure to disclose them to the attention of ERF's counsel.  (*See* Showalter Decl., Exh. 1.)  ERF responded that it had no obligation to produce these materials because the entity that sent them to the Board was "a separate legal entity" to ERF.  (*See* Showalter Decl. Exh. 2.)  Given that a significant portion of this letter contains legal argument almost word-for-word identical to positions ERF advocates in this case (*compare* ECF No. 202 at 23 to ECF No. 81 at 6:15-7:22.), and ERF staff serve on the Board of one of the involved entities, it strains credulity to believe that these documents should not have been produced in discovery and disclosed by ERF to the Court.  ERF's failure to address these materials is instructive.

2

- *Can PG&E rely on federal and state guidance materials?* The Supreme Court has held for almost seventy years that parties can rely on regulatory guidance materials in litigation. *Skidmore v. Swift & Co*., 323 U.S. 134, 139-40 (1944).  ERF disagrees. (ECF No. 201 at 13-15.)

- *Can ERF invalidate federal and state regulations in a citizen suit in which the agency is not a party?*  "No," because citizen suits only supplement enforcement efforts, they cannot supplant statutory provisions like 33 U.S.C. § 1369 which require rule challenges to occur in a timely fashion after rulemakings. (*See* ECF No. 196 at 15-16.) ERF disagrees, noting that *Northwest Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063, 1080 (9th Cir. 2011) (which is set for oral argument before the Supreme Court  on December 3, 2012 on issues including this one), permits that the Court can "decline to give effect" to an EPA regulation without EPA being a party to the action (even though EPA participated in *Brown* from the outset) (See Docket, Case No. 3:06-cv-01270 (D. Or.), attached to the Showalter Decl. as Exh. 3.)

- *Is Tim Simpson presenting legal conclusions or merely depicting how EPA and the Board determine whether a facility is "industrial" in practice?*  Tim Simpson, a stormwater engineer who has worked on storm water issues for 20 years at locations throughout California, does not present legal conclusions.  Instead, Simpson only testifies as to how expert engineers in the field apply SIC Codes.  Based on the arguments presented in ERF's Opposition, this testimony is both relevant and necessary. Accordingly, Simpson's testimony is admissible.

For the reasons set forth here and in PG&E's prior briefing, PG&E submits that these questions are appropriately answered as above, warranting the grant of summary judgment to PG&E.  Finally, the parties agree that PG&E is entitled to summary judgment on ERF's second claim, which should be dismissed.

I.      **ERF'S INTERPRETATION OF THE GENERAL PERMIT HAS BEEN**
        **REJECTED BY THE RELEVANT STATE AGENCY**

ERF's Opposition relies on a false premise that the Board, through the General Industrial Permit, assign SIC Codes in a fundamentally different manner than does EPA.  (*See* ECF No. 201 at 8:12-15.)  Under ERF's faulty reasoning, facilities that are "industrial in nature" are regulated, and the list of facilities found in Attachment 1 to the Permit, entitled "FACILITIES COVERED BY THIS GENERAL PERMIT" should be ignored.  (*See* ECF No. 196 at 18-19.)

ERF seeks this Court to affirm ERF's own error despite omitting from its argument to this Court that ERF's theory was recently submitted to the Board, where it was summarily rejected. (*See* Comment Letter from Parties including Humboldt Baykeeper (a name under which ERF operates) dated April 29, 2011, *filed as* ECF No. 202-17 at 23-25.)  This letter demands:

> **The State Board should clarify that, by attaching a list of specific categories of**
> **industrial facilities that are covered under the Draft Permit, the Board is not**
> **excluding any industrial activities from the permitting requirements** . . . . The
> list of specific SIC codes and categories of facilities, which mirrors the categories
> of facilities considered to be engaging in "industrial activity" set forth in 40 C.F.R.
> § 122.26(b)(14), could be read to implicitly exempt industrial activities that are not
> in this list . . . . **[The Board] must clarify that the types of facilities covered by**
> **the Permit to include all discharges that are industrial in nature**.

(*Id.* at 23, emphasis added).

The Board unequivocally rejected this argument that ERF now presents to this Court.  The Board's rejection of ERF's comments concludes: "The Permit **only covers dischargers as defined in the federal regulations**.  Authority to add additional categories is limited to a formal designation process."  (*See* Board Comment Response No. 1216, *previously filed as* ECF No. 202-16 at 114) (emphasis added).

ERF incorrectly attempts to distinguish the way California interprets 40 C.F.R. § 122.26(b)(14) from the federal interpretation despite the Board's explicit rejection.  (*See* ECF No. 201 at 7; *id.* at 24 "[T]his demonstrates the necessity of applying the State Board's broader

1  interpretation of the definition of "industrial activity . . . .").[6]  Here, the Board states

2  unequivocally ERF is wrong – California interprets "industrial activity" consistent with 40 C.F.R.

3  § 122.26(b)(14).  The Board's interpretation of its own regulations should be deferred to by this

4  Court.  *See, e.g.*, *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 699 (1991) (deferring to

5  agency's interpretation of interim regulations as evidenced in a comment response); *Indus. Truck*

6  *Ass'n, Inc. v. Henry*, 125 F.3d 1305, 1311-12 (9th Cir. 1997) (interpreting law by reviewing

7  "regulations, preambles, interpretive statements, and responses to comments . . . ") (internal

8  citation omitted); *Carus Chem. Co. v. EPA*, 395 F.3d 434, 439 (D.C. Cir. 2005) (finding that an

9  agency's response to rulemaking comments are entitled to deference); *Nat'l Min. Ass'n v. MSHA*,

10  116 F.3d 520, 528 (D.C. Cir. 1997) (same).

11      The General Permit instructs that EPA and California interpret the regulations identically

12  on this point.  In the Notice of Intent ("NOI") Instructions which accompanies the General Permit

13  application, the State Water Resources Control Board states, "The facility operator must submit

14  an NOI for **each industrial facility that is required by U.S. Environmental Protection Agency**

15  **(U.S. EPA) regulations to obtain a storm water permit**.  The required industrial facilities are

16  listed in Attachment 1 of the General Permit and are also listed in 40 Code of Federal Regulations

17  Section 122.26(b)(14)."  (ECF No. 196-14 at 71, emphasis added).

18      Further, ERF incorrectly argues that California has not included the concept of "auxiliary"

19  establishments from the General Permit.  As seen above, that is simply not the case; in relevant

20  part, California interprets the SIC Code Manual as does EPA.  The difference, as noted in

21  PG&E's Motion, is that in California, a company cannot presumptively use the general SIC code

22  for the overall business, but must designate an SIC code specific to the primary activity at a

23  facility.  As detailed in the SIC Code Manual and in PG&E's opening brief, that *does not* mean a

24  facility cannot be classified as an auxiliary facility.  The example used by ERF (the school with a

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26  [6]      Fed. R. Civ. P. 11(b)(2) requires that a party's representations to the Court be "warranted
   by existing law or by a non-frivolous argument for extending, modifying, or reversing existing
   law or establishing new law" and Fed. R. Civ. P. 11(b)(3) requires a party's "factual contentions

27  to have evidentiary support."  It is unclear how ERF continues to advance its position that the
   Board views its CWA mandate differently than does the EPA, in light of the statements presented

28  here of which counsel for ERF were well aware.

separate bus maintenance facility) is not relevant as it contained an operation wholly separate from the overall business of the school – the education of students – at the maintenance facility. PG&E's Facilities are integral to the actual business of PG&E. As ERF conceded in its Motion for Summary Judgment, "without locations to store aggregates . . . PG&E would have no way to replace the portions of the streets and other surfaces displaced by the digging of trenches . . . routinely conducted by PG&E's crews." (ECF No. 201 at 18.) ERF also states, "the cutting, welding and fabrication of metal products and parts . . . plays a central role in the process of staging and delivering PG&E's electricity and gas services." *Id*. All of this contradicts ERF's statements that these are "primary" activities at the Facilities. The Facilities' "primary activity" is clear – maintaining the gas and electric grid PG&E operates to provide service to customers in California. (*See* ECF No. 196 at 14.). The "whole" of PG&E's Facilities equal the sum of its parts – and includes the SIC codes.

Logically, ERF concedes that the complained-of activities are not primary activities. "While the primary purpose of [the] Facilities might not be to conduct [activities listed by SIC Code in the Permit], **these activities are no less industrial because they are not the Facilities' primary purpose**." (ECF No. 81 at 14:3:6 (emphasis added).) This concession is binding on ERF and forecloses its argument that PG&E is covered by the General Permit. Factual assertions made in prior pleadings are considered admissions. *See, e.g.*, *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002). For purposes of summary judgment, courts routinely treat representations of counsel in a brief as admissions even though briefs are not pleadings or affidavits. *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988); *United States v. One Heckler-Koch Rifle*, 629 F.2d 1250, 1253 (7th Cir. 1980) (same); *Plastic Container Corp. v. Continental Plastics of Oklahoma*, 607 F.2d 885, 906 (10th Cir. 1979), *cert. denied*, 444 U.S. 1018 (1980) (same).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.     ERF DECLINES TO RESPOND TO PG&E'S ARGUMENTS THAT REGULATORS DETERMINED THAT "NO PERMIT WAS REQUIRED" AT THE FACILITIES

In its voluminous Opposition, ERF never addresses the fact that the regulators who visited the Facilities have repeatedly stated that the Facilities do not require stormwater permits.  (*See* ECF No. 196 at 25, ECF Nos. 196-23 & 196-24.)  Evidence that regulators who inspect the Facilities and found that no stormwater permits were required establishes presumptive regulatory compliance.

On its own, this evidence is persuasive, supporting the granting of PG&E's Motion although it does not address ERF's parallel argument that the Board had no authority to "exempt" PG&E's Facilities from regulation.  However, ERF's failure to address the "no permit required" documents, in combination with ERF's attempt to ignore the Board's decision, provides ample illustration that the Board's application of SIC Codes comports with PG&E's representations and the Court should deem ERF's failure to respond to these documents as a concession under Fed. R. Civ. P. 56(e).  PG&E submits that the effect of this concession should be that the Board deems that no permit is required for the Facilities.

## III.    PG&E IS ENTITLED TO RELY UPON THE FEDERAL AND STATE GUIDANCE MATERIALS WHICH BAR ERF'S CLAIMS

Much of ERF's Opposition assails PG&E's use of regulatory guidance materials with specious assertions that PG&E ignored Permit language:  according to ERF, PG&E's position is "[l]acking support from either the text of the General Permit or from actual practice."[7]  (ECF No. 201 at 14.)  "To the extent that guidance documents . . . can be read as suggesting that a facility conducting multiple industrial activities should be given a single SIC Code that reflects only the 'primary activity' at the facility, they must be disregarded."  (ECF No. 201 at 13.)

PG&E's Motion relies on words in the CWA, applicable regulations, the Permit, and uses the significant body of federal and state guidance materials which the federal and state agencies

---

[7]     This statement is factually incorrect; PG&E quotes at length from the Permit throughout its Motion.  (*See, e.g.*, ECF No. 196 at 18-19.)

7

1  have promulgated to explain and interpret the statutes they oversee.  (See ECF No. 196 at 23.)

2  The Supreme Court has noted, "It is enough to observe that the well-reasoned views of the

3  agencies implementing a statute 'constitute a body of experience and informed judgment to which

4  courts and litigants may properly resort for guidance.'" *Bragdon v. Abbot*, 524 U.S. 624, 642

5  (1998) (quoting *Skidmore*, 323 U.S. at 139-40).  PG&E has submitted these materials because

6  they provide the guideposts for why PG&E's Facilities are not required by either the Board or

7  EPA to have a permit.

8        Regulatory deference – at least as is relevant to this case – is straightforward.   Regulatory

9  deference does not mean, as ERF would have it, that Courts should step in and narrow regulations

10  it deems to be too broad.  (*See* ECF No. 201 at 25.)  When a statute is silent or unclear with

11  respect to a particular issue, courts must defer to the reasonable interpretation of the agency

12  responsible for administering the statute. When Congress leaves a gap in the statutory framework,

13  Congress implicitly has delegated policy-making authority to the agency.  *Chevron, U.S.A. Inc. v.*

14  *Natural Resources Defense Council*, 467 U.S. 837 (1984).  Further, informal, non-regulatory

15  materials are also entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997), as such

16  applies to an agency's interpretations of its own regulations.  Under *Auer*, the Ninth Circuit has

17  deferred to agency guidance materials in a variety of contexts.[8]  Deference means that EPA's

18  judgment is to be respected; it precludes ERF's suggestion that the Court re-write EPA

19  regulations and historical regulatory interpretations*, see* ECF No. 201 at 25, because these

20  materials are deemed incorrect by ERF, a private litigant.

21        In this case, the meaning of the phrase "industrial activity" was left open by Congress for

22  EPA to define.  The Ninth Circuit has already held that EPA is permitted to define "discharge

---

23  [8]      *See, e.g.*, *Bassiri v. Xerox Corp.*, 463 F.3d 927, 930 (9th Cir. 2006) (finding that DOL
24  opinion letters, interpreting scope of regulations' ERISA exemption were entitled to Auer
   deference); interpretations published in the federal register, *Siskiyou Reg'l Educ. Project v. U.S.*
25  *Forest Serv.*, 565 F.3d 545, 555 (9th Cir. 2009) (deference to forest plan directives as equivalent
   to federal regulations), *Strom v. U.S.*, 641 F.3d 1051, 1063–64 (9th Cir. 2011) (deferring to SEC
26  published interpretations of its regulations), *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1005
   (9th Cir. 2008) (deferring to OTS regulations promulgated in the federal register); amicus briefs,
27  *Zurich Am. Ins. Co. v. Whittier Props. Inc.*, 356 F.3d 1132, 1137 (9th Cir. 2004) (deferring to
   EPA's interpretation of its UST regulations as delivered in an EPA authored amicus brief), an
28  agency's "internal memorandum," *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557
   U.S. 261, 283 (2009).

1   associated with industrial activity." *See Am. Mining Congress*, 965 F.2d at 765.  EPA defined

2   "discharge associated with industrial activity" in 40 C.F.R. § 122.26(b)(14),[9] and provided further

3   clarification in documents including the 1992 EPA Question & Answer Document which has

4   been cited in PG&E's Motion.  (*See* ECF No. 196-18.)  California guidance materials include

5   various internal guidance memoranda which have circulated internally among Board staff and to

6   the broader regulatory community.  (*See* ECF No. 196-20 thorough 196-23, 196-25, and 196-30.)

7   Further guidance materials include the Board's response to comments discussed in Section II

8   above.  *Chevron* and *Auer*-like deference apply in CWA actions.  *See, e.g.*, *S.F. Baykeeper v.*

9   *Cargill Salt Division*, 481 F.3d 700, 705 (9th Cir. 2007) (deferring to EPA regulation definition

10  of "wetlands" in CWA citizen suit).

11      A.      **"Primary" Means Primary, not "Unique and Significant Value"**

12      ERF seeks to read "primary" out of the regulatory structure by presenting various

13  facilities' "secondary" and "tertiary" SIC Codes.  This is a continuation of ERF's erroneous

14  theory that facilities have as many "primary" activities as discrete actions which occur on them,

15  as determined through introducing a "unique and significant value" test of its own creation.  (*See*

16  ECF No. 196 at 25; ECF No. 201-1 ¶ 2; ECF No. 202-2.)  ERF has presented no authority that

17  "secondary" or "tertiary" SIC Codes require permits; it is undisputed that the regulations and

18  guidance materials all refer to "primary" activities and not to "unique and significant value" as a

19  material test.[10]

20

21

---

22  [9]      ERF implies that *Brown*, 640 F.3d at 1082-85, has some relevance to SIC Code issues
    pending before the Court.  The "facility" at issue in *Brown* was a logging area; the operational

23  area involved access roads.  *Id.*  Logging, having an SIC Code of 2411, is included in Section
    122.26(b)(14)(ii), which includes "Facilities classified as Standard Industrial Classifications 24

24  (except 2434) . . . ."  The issue pending before the Court now is how PG&E's Facilities should
    be treated, when their "primary" activity is clearly to service PG&E's gas and electrical grids,

25  which would be assigned an SIC Code not listed in 40 C.F.R. § 122.26(b)(14).  PG&E believes
    that *Brown* may have relevance to this case by depriving the Court of jurisdiction if the Supreme

26  Court, reviewing it as *Decker*, finds that collateral attacks of agency rulemakings cannot occur in
    actions filed under 33 U.S.C. § 1365.  *Decker* has been set for argument on Dec. 3, 2012.

27  [10]     "Unique and significant value," like "industrial in nature" are terms ERF has created.
    That ERF now uses these terms – some of which have been explicitly rejected by the Board – to

28  illustrate that ERF views this not as an enforcement action, but as an opportunity to have the
    federal courts collaterally revise federal and state regulations without agency participation.

PG&E's Facilities exist to service PG&E's gas and electric operations. As a regulated utility,[11] PG&E's revenue is generated from selling electricity and gas and not transporting its workers or recycling materials as it maintains its gas and electric grid. Trucks are stored at the Facilities to carry workers and utility equipment to repair poles and gas lines. Workers meet at the Facilities before going into the field. PG&E's equipment is maintained at the Facilities for use in gas and electric operations. This is undisputed. Instead, ERF argues that the test for applying SIC Codes is not what activities are "primary," but instead, what activities "provide unique and significant value to PG&E." (*See* ECF No. 201 at 17.) ERF's "unique and significant value" test is unmoored from any reference to the SIC Code Manual, the federal statute or regulations, the General Permit, or anything else. Further, there is nothing "unique" about the activities that occur at the Facilities; they have the same activities as other service-oriented corporate yards (e.g., telephone, cable) which are also not required to have NPDES permits. ERF's novel "unique and significant" test for SIC Codes should be swiftly rejected because it was contrived by ERF during this litigation, not by EPA or the Board.

Further, ERF provides a chart with its Opposition as part of an argument that that the Board requires facilities to secure permits based on their "secondary" or "tertiary" activities. (*See* ECF No. 201 at 12.) This argument is baseless. As discussed above, California's regulations require facilities to secure coverage based on their "primary activity." ERF's heroic 138-page chart listing a variety of present and former NPDES permitted sites, *see* ECF No. 201-2, which includes information on these sites "secondary SIC Code" and "tertiary SIC Code," fails to support its conclusion that "General Permit coverage is still required." (ECF No. 201 at 7.) As PG&E detailed in Section II, the Board has rejected ERF's "industrial in nature" theory and applies SIC Codes as described in the federal and state materials. However long, ERF's 138-page chart does not trump the Board's decision.

---

[11] ERF implies that PG&E "suggest[s] that utility companies are somehow exempt from the definition of "industrial activity." (*See* ECF No. 201 at 20 n.12.) In fact, PG&E has argued the opposite: certain electrical power generating equipment is spelled out by process (not SIC Code) in 40 C.F.R. § 122.26(b)(14), which clearly implies that EPA intended to regulate *some* PG&E facilities. (*See* ECF No. 196 at 26, 32 n.20.) EPA just chose not to regulate *these* Facilities, or other PG&E assets like power line corridors. (*See generally id.* at 21.)

10

1    There is more than ample California agency experience supporting PG&E's view: Neither

2    the permit, nor any other CWA guidance material requires that "secondary SIC Codes" or

3    "tertiary SIC Codes" supplant the primary SIC code.  If these "secondary SIC Codes" or "tertiary

4    SIC Codes" were legally material for the CWA, their use would be discussed in CWA regulations

5    and CWA guidance material.  ERF presents no evidence why their charts have listed "secondary"

6    or "tertiary" SIC Codes and makes no effort to link the listing of "secondary" or "tertiary" SIC

7    Codes with language in the General Permit or federal or state guidance material.  The ERF chart

8    wrongly avoids a detailed analysis and simply substitutes bulk for judgment.

9    At best, ERF's chart demonstrates only that certain site owners chose to list multiple SIC

10   Codes on their Notice of Intent.  It provides no evidence, legal or otherwise, of a determination on

11   the part of California regulators to regulate a broader class of sites than defined by federal

12   regulations.  Why these fields are included on the Notice of Intent is unclear; it may be that they

13   are intended to allow for statistical data collection about sites that are covered based on site

14   activities' narrative description (such as was the case with ERF's Ninth Circuit SIC Code chart,

15   filed with this Court as ECF No. 196-27), *i.e.* because these sites are "subject to effluent

16   limitation guidelines, new source review standards, or toxic pollutant effluent standards", 40

17   C.F.R. § 122.26(b)(14)(i); are RCRA "hazardous waste treatment, storage, or disposal facilities,"

18   *id.* subsection (iv); "landfills, land application sites, [or] open dumps," *id.* subsection (v); or

19   "steam electric power generating facilities, including coal handling sites," *id.* subsection (vii).

20   These fields may have been included for some other purpose.  However, there is no evidence to

21   support ERF's suggestion that they represent a conscious decision by the Board to compel Permit

22   coverage at Facilities which are specifically excluded. The wording in the General Permit is

23   consistent with PG&E's sound position.

24   Like ERF, PG&E has not investigated the industries contained in ERF's chart to

25   understand the regulatory guidance for those particular industries.  Each industry has established

26   guidance and industry practice that would lead to coverage or non-coverage under the General

27   Industrial Stormwater Permit.  What is apparent from ERF's chart is that no service industry

28   yards, be it electric, gas, telephone or cable, have applied for coverage under the Permit in

11

1  California.  ERF would have the Court believe that this is a massive oversight on behalf of an

2  entire business sector, not a Board decision followed properly by the service utility community.

3        **B.**      **The SIC Codes Listed in the Permit, which are Directly from 40 C.F.R. §**

4                **122.26(b)(14), Have Meaning and are Intended to be Exclusive**

5        To win, ERF must establish that PG&E's service centers are "associated with industrial

6  activity" as that term is defined by the CWA and associated regulations and guidance.

7  "Associated with industrial activity," used in CWA Section 402(p), 33 U.S.C. § 1342(p), is

8  defined by 40 C.F.R. § 122.26(b)(14), which provides:

9          [s]torm water discharge associated with industrial activity means

10          the discharge from any conveyance that is used for collecting and

11          conveying storm water and that is directly related to

12          manufacturing, processing, or raw materials storage areas at an

13          industrial plant.  The term does not include discharges from

14          facilities or activities excluded from the NPDES program under

15          this part 122.

16        In this case and before the Board, ERF contends that the provisions which follow 40

17  C.F.R. § 122.26(b)(14) represent mere illustrations, and are not intended as the entire list.  (*See*,

18  *e.g.*, ECF No. 197 at 23, 25; discussion *supra* in Section II.)  However, it is clear that the list

19  contained in 40 C.F.R. § 122.26(b)(14) – which describes facilities "classified as"[12] or "[f]acilities

20  under," and not ERF's preferred wording "facilities described by."  Where a regulation includes

21  the word "means," it is intended to be exhaustive, not illustrative.  *See Burgess v. United States*,

22  553 U.S. 124, 131 n.3 (2008) (explaining that "[a] term whose statutory definition declares what

23  it 'includes' is more susceptible to extension of meaning ... than where ... the definition declares

24  what a term 'means'").  This list is reprinted directly in the Permit.

25

---

26  [12]    In relevant part, the dictionary definition of "classified as" is "arranged or distributed in
classes or according to class . . . identified as belonging to a specific group or category, as to

27  which benefits or restrictions apply."  (*See* "Classified," Dictionary.com, last visited Oct. 3,
2012).  In relevant part, the word "under" means "beneath the heading or within the category of"

28  a synonym to "classify."  (*See* "Under," Dictionary.com, last visited Oct. 3, 2012).

12

1    As was stated in Section II above, California regulators have told ERF and all potentially

2  affected parties, that their use of SIC Codes is based entirely on the federal regulations.  The

3  Board states, "The Permit **only covers dischargers as defined in the federal regulations**.

4  Authority to add additional categories is limited to a formal designation process."  The vast

5  number of potentially affected parties rely on regulators' pronouncements to assess compliance.

6    Knowing this, ERF needs to convince the Court that the statute is *un*-ambiguous, even

7  though the Ninth Circuit held in *American Mining Congress* that the phrase "discharge associated

8  with industrial activity" was ambiguous and left open by Congress for EPA to define.  *See* 965

9  F.2d at 764.  Perhaps knowing that it cannot do this, ERF baldly asserts that PG&E

10 "mischaracterizes" the case or that this Court, or ERF, are more qualified than EPA to determine

11 what is "industrial" for CWA purposes.  *Chevron* states that the Court should defer in this

12 circumstance.[13]

13 **C.    The Facilities Can Be Both "Auxiliaries" and Independently Assigned a**

14 **Group 49 SIC Code**

15    PG&E agrees with ERF that the Facilities are regulated based on the "primary activity"

16 that occurs at the Facilities, not the underlying business.  (ECF No. 201 at 9.)  However, ERF's

17 assertion that the Facilities are only classified with a Group 49 SIC Codes as "auxiliaries" of

18 PG&E's larger business establishment is wrong.  (*See id.*)  The Facilities here exist to service

19 PG&E's gas and electric transmission and distribution assets.  The "primary activity" of these

20 Facilities – provision of utility services classifiable under a Group 49 SIC Code – accounts for all

21 of the Facilities' activities which ERF seeks to classify under discrete SIC Codes.  (*See* ECF No.

22 201 at 9.)  As discussed above, ERF conceded as much.

23    To clear up another red herring raised in ERF's pleadings, PG&E is a "service" business

24 under the SIC Code Manual and is classified with a Group 49 SIC Code because its activities are

25 best described by this SIC Code section.  PG&E filed the pages of the SIC Code Manual which

26 [13]    *Chevron* deference is another issue which was implicated in *Brown* and is pending before
the Supreme Court in *Decker*.  As the United States framed the issue in its amicus brief, the Ninth
27 Circuit "Erred in Failing to Defer to EPA's Interpretations of Its Regulations . . . . "  (*See Decker*
amicus brief, previously filed with the Court as ECF No. 196-26, at 18.)  *Decker* will be argued
28 on December 3, 2012.

13

1    include each of the Group 49 SIC Codes with its Motion.  (*See* ECF No. 196-13 at 47-49.)  The

2    four Facilities involved in this case service both PG&E's gas distribution grid as well as its

3    electric distribution grid.  As it has throughout this case, PG&E's Motion refers to "Group 49"

4    SIC Codes because, for the purposes of this case, it is immaterial whether they are assigned SIC

5    Code 4931 (establishments primarily engaged electric service in combination with other services,

6    with electric accounting for more than 95% of total services); SIC Code 4932 (same, but with

7    more than 95% of total services being gas); or SIC Code 4939 (same, but with no differentiation

8    by total amount of services.)  PG&E's attempt at focusing on material issues is not "caginess" as

9    ERF describes it.  (*See* ECF No. 201 at 12 n.7.).  No SIC codes that begin with a "49" require a

10   permit.

11           **D.      ERF Cannot Meet its Burden to Demonstrate that PG&E's Facilities are**

12                   **Regulated by Ignoring Long-Standing Regulations and Guidance Materials**

13           ERF's Opposition continues ERF's attempt to deny the Court the benefit of the guidance

14   materials that the governmental agencies, individuals and businesses use to determine compliance

15   with the CWA.  It is impossible, for instance, to square ERF's view of how the Facilities are

16   classified under 40 C.F.R. § 122.26(b)(14) with the EPA Storm Water Program Question &

17   Answer Document which federal and state regulators use to interpret their statutory ambit.  (*See,*

18   *e.g.*, ECF No. 196 at 31 n.19) (discussing the Question & Answer document previously filed as

19   ECF No. 196-19).  For instance:

20      •   Question 21 is "Are gas stations and automotive repair shops required to apply for an

21          NPDES storm water discharge permit?"  (*See* ECF No. 196-19 at 10.)  EPA answers,

22          "no."  (*Id.*) Were ERF's approach to be correct, the answer would be "yes" because gas

23          stations conduct "vehicle maintenance and storage activities," "light industrial activities,"

24          (metalwork incident to automobile body repairs) and "recycling activity" (related to used

25          oil, metal, and tires).  (*Accord* ECF No. 201 at 10-11.)

26      •   Question 26 of the same document asks whether "a municipal maintenance facility that is

27          <u>primarily</u> engaged in servicing garbage trucks required to apply for a permit?"  (ECF-19 at

28          11.)  EPA answers that "[t]he answer depends on the SIC code assigned to the

                                                  14

establishment." (*Id.*)  If the trucks arrive at a disposal facility owned by the municipality, then the SIC Code would be 4953 and no permit would be required.  (*Id.*)  If someone else owns the disposal facility, then the same garbage truck storage facility would be assigned SIC Code 4212, which would require a permit.  (*Id.*)

ERF ignores Ninth Circuit precedent stating that it is EPA's prerogative to define "discharge associated with industrial activity" in favor of substituting its own "industrial in nature" definition which is undefined and impossible to square with relevant authorities.

**E.     ERF Presents No Evidence that the Facilities are Divisible**

Having spent many pages recounting what SIC Code applies to PG&E's Facilities in the papers already filed, *see, e.g.*, ECF No. 196 at 21-33; ECF No. 202 at 29-34), PG&E will not belabor these issues here except to note that ERF presents no evidence of the Facilities' divisibility, which is necessary to apply multiple SIC Codes.  Two SIC Codes apply where two separate operations occur on contiguous parcels.  The classic example of this is the hotel and adjacent marina.  While they share a common property and owner, one needs a permit while the other does not.  Without evidence of divisibility, PG&E's facilities are properly designated with one Group 49 SIC Code which accounts for their provision of "any of the above three services and [including] other types of services, such as transportation, communication, or refrigeration" as the terms are used in the SIC Code Manual.

**IV.     THE FACILITIES ARE NOT "EXEMPTED" FROM REGULATION; THEY SIMPLY ARE NOT "INDUSTRIAL"**

ERF's Opposition concludes with a Hail Mary proposal for the Court to ignore twenty-plus years of regulatory development to apply ERF's preferred policy approach to stormwater regulation.  (*See* ECF No. 201 at 30-31.)  Under this approach, the 1987 changes to the CWA are ignored in favor of applying an "absolute ban on discharges" which ERF contends originates in CWA Section 301(a), 33 U.S.C. § 1311(a).

Section 402(p) forecloses claims based on Section 301(a) alone because compliance with Section 402(p) is an alternative basis for compliance with Section 301(a).  (*See* ECF No. 196 at 17.)   ERF's Opposition is premised on the theory that EPA, the Board, or PG&E "exempted" the

15

1    Facilities from regulation.  (*See* ECF No. 201 at 27-29.)   As PG&E discussed above, EPA and

2    the Board did not "exempt" the Facilities; they simply are not "industrial" under CWA Section

3    402(p).  *See Am. Mining Congress*, 965 F.2d at 765.  As PG&E has previously argued, CWA has

4    been unchanged in relevant part since Section 402(p), 33 U.S.C. § 1342(p) was added in 1987; 40

5    C.F.R. § 122.26(b)(14) existed in its current form in the early 1990s; and EPA the relevant

6    guidance materials are long-standing as well.  (*See* ECF No. 202 at 8.)  Nothing new has

7    happened here to "exempt" anything; the issue, as PG&E has argued since this case began, is that

8    ERF dislikes regulators' long-standing interpretations of CWA which are based on the addition of

9    Section 402(p).[14]

10        ERF seeks to have the Court decide a stormwater case based on non-stormwater

11   precedent; multiple relevant authorities remain unaddressed.  Two of the three cases ERF cites as

12   supporting its approach are pesticide, not stormwater, cases.  (*See* ECF No. 201 at 30-31) (citing

13   *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d

14   1181, 1183 (9th Cir. 2002) and *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)).  The third

15   case, *Environmental Protection Info. Ctr. v. Pac. Lumber Co.*, 301 F. Supp. 2d 1102, 1109 (N.D.

16   Cal. 2003) stems from a case not implicating the issues presented here, *i.e.* whether a business

17   establishment can be required to have a permit under EPA and state regulations even though EPA

18   and the state have limited permitting requirements to particular industries.  *See, e.g.*, *Brown*, 640

19   F.3d at 1083-84 (discussing SIC Code issues which would be irrelevant under ERF's theory);

20   *Conservation Law Foundation v. Hannaford Bros. Co.*, 327 F. Supp. 2d 325, 334-35 (rejecting a

21   request by an environmental group to require a business not listed in 40 C.F.R. § 122.26(b)(14) to

22   secure a permit); *Waltman v. King William Co. School Bd.*, Case No. 3:10-CV-0072, 2010 WL

23   1006889 (E.D. Va. 2010) (same).  ERF's cases provide no authority to dismantle the longstanding

24   part of CWA's structure recognized in *Brown*, *Hannaford*, and *Waltman*.

25

26
_____

27   [14]     ERF's main concern relates to pentachlorophenol treated utility poles.  (*See, e.g.*, ECF No.
     201 at 10.)  PG&E submits that there is no test at either the state or federal level which uses the
     presence of utility poles or pentachlorophenol as a criteria to evaluate whether a "discharge
28   associated with industrial activity" has occurred.

16

1    ERF asserts that EPA's interpretation of the regulatory scheme is inconsistent with

2    CWA's regulatory scheme, which "evinces an intent to protect the nation's waters by regulating

3    industrial sources of storm water discharge." (ECF No. 201 at 13 n.3 (discussing EPA's

4    "Question & Answer" Document); *id.* at 16 (containing the quotation above).) Were this to be a

5    rule challenge, EPA's interpretation of the statute would be upheld unless the statute was

6    demonstrated to be unreasonable. *See American Mining Congress*, 965 F.2d 765 (quoting

7    *Wyckoff Co. v. EPA*, 796 F.2d 1197, 1200 (9th Cir. 1986)). Because this is an enforcement

8    action, ERF has no such opportunity. Aside from formal compliance with 33 U.S.C. § 1369, at a

9    minimum, rule challenges require agency participation.

10    ERF ignores that CWA was modified by the Water Quality Act of 1987 to overrule earlier

11    decision that held that CWA required every discharge to be permitted. (*See* ECF No. 196 at 17-

12    18 n.5.) When the Water Quality Act was passed, the legislative history clearly evinces that its

13    intent was to minimize the permitting burden on local, state, and federal regulators through

14    targeting permitting requirements to appropriate parties. As has been noted, the Water Quality

15    Act gave EPA the "discretion to develop a program that distinguishes between those stormwater

16    discharges that require regulation and those that do not." *Conservation Law Found. v. Hannaford*

17    *Bros. Co.*, 327 F. Supp. 2d 325, 330 (D. Vt. 2004), *aff'd*, 139 Fed. Appx. 337 (2d Cir. 2005).

18    **V.    TIM SIMPSON DOES NOT OFFER LEGAL CONCLUSIONS; HE PROVIDES**

19    **CONTEXT TO THE APPLICABILITY OF THE NPDES PERMITTING REGIME**

20    ERF asserts that an opinion of Timothy Simpson, an engineer retained by PG&E, should

21    be excluded under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). (ECF No.

22    201 at 31-32.) Specifically, ERF contends that "PGE has not demonstrated that Mr. Simpson is

23    qualified to testify as an expert on SIC Code classification or interpretation by having any specific

24    knowledge, skill, experience, training or education relating to SIC Code Manual interpretation or

25    application." (*Id.* at 32.) Further, ERF states that Simpson "has no background or experience in

26    economics, statistics, or applying the terms of the 1987 SIC Code Manual in a regulatory

27    context." (*Id.*)

28

ERF is incorrect.  First, Simpson is qualified through training and experience to testify as an expert on stormwater issues.  (*See* Simpson Report, ECF No. 196-15, at 7-10; *see also* Simpson Decl., ECF No. 202-33 at 1-3.)  Simpson's background includes a master's degree in civil engineering he is professionally licensed as a civil engineer and a geotechnical engineer, has more than 20 years' experience working in the environmental field, and has led numerous stormwater-related studies.  (*See generally* Simpson Report at 8-10; Simpson *curriculum vitae*, ECF No. 196-15 at 38-40.)  Simpson has supervised stormwater projects for the California Department of Transportation and been retained by localities including the Cities of Anaheim, Costa Mesa, and Santa Anna and Los Angeles and Orange County, California.  (Simpson *CV* at 39.) Second, ERF's assertion that Simpson needs to have a background in economics or statistics to support his SIC Code-related testimony is legally incorrect – Simpson's experience in working more broadly on permits is enough because no regulatory guidance materials require parties to hire economists or statisticians to evaluate operations as part of the permitting process.  It is also factually incorrect because Simpson's Report and Declaration both indicate that he is experienced working with environmental statistics.  (*See* Report, ECF No. 196-15 at 8; Decl., ECF No. 202-33 at 2.)  Further, Simpson testified about statistical issues at his deposition. (*See* Simpson Dep. at 107:4-14.)

*Daubert* applies to technical testimony; it is not limited to scientific testimony.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999).  As the Court noted there, "Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from . . . specialized experience." *Id.* at 148.  The Ninth Circuit has noted that, "in considering the admissibility of testimony based on some 'other specialized knowledge,' Rule 702 generally is construed liberally."  *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (internal citation omitted).

Simpson has worked as a licensed engineer in the environmental field for nearly three decades.  He supervises compliance activities for municipalities like the City of Anaheim.  ERF's belief that Simpson would need to demonstrate expertise in economics or statistics to be capable of specifying what criteria engineers who generally determine whether facilities are required to

18

1   have NPDES permits is myopic and fails to account for the leeway courts give technical experts

2   with specialized skills the ability to provide the court with from-the-field insights which would

3   otherwise not be available.  *Accord Hankey*, 203 F.3d at 1168-69 (permitting a police officer to

4   testify broadly about gang culture and organizational membership based on from-the-field

5   observations).  Neither the regulations, the Permit, nor any available guidance materials direct

6   regulated entities to secure the services of an engineer or statistician to determine whether they

7   must secure Permit coverage.  Note that ERF has retained no expert in economics or statistics

8   here.  Accordingly, that Simpson is not an economist or statistician provides no basis to exclude

9   his testimony.  He has disclosed enough relevant experience and factual background to support

10  his testimony.

11          Further, ERF's statement that Simpson "does not provide any facts upon which Opinion 5

12  is based" is incorrect.  Simpson's Report notes:

13                  In conjunction with my work in observing the sampling performed

14                  by ERF's consultants . . . I personally inspected each site to

15                  observe the site layout, the materials stored, and the nature of the

16                  activities performed.  Based on these inspections, I observed no

17                  on-site activity that would [require] these sites to seek coverage

18                  under the General Permit.

19  (*See* Simpson Report, ECF No. 196-15 at 35.)   Further, ERF questioned Simpson regarding this

20  opinion at his Deposition at length, where he further discussed his observations during site

21  inspections.  (*See, e.g.*, Simpson Dep. at 127-128.)

22          ERF's second objection, that Simpson's testimony amounts to nothing more than legal

23  conclusions, likewise fails.  PG&E does not dispute that the meaning of federal and state

24  regulations is a question of law, not a question of fact.  *See, e.g.*, *Bammerlin v. Navistar Int'l*

25  *Transp. Corp.*, 30 F.3d 898, 900 (7th Cir.1994).  It is indisputable that PG&E has provided ample

26  evidence to the Court in terms of legal argument and citations to statutes, regulations, and various

27  federal and state guidance materials as to what the law is.  (*See* ECF No. 196 at 16-33.)

28

1    ERF contends that Simpson's testimony contains legal conclusions, and is thereby

2    inadmissible.  (*Id.* at 33.)  Simpson's testimony does not consist of legal conclusions, it instead

3    depicts how engineers who, in practice, determine whether or not facilities that potentially

4    discharge stormwater require NPDES permits.  Expert testimony describing agency processes has

5    long been permissible.  *See Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 508 (2d Cir.

6    1977).  The portions of Simpson's testimony are relevant to how SIC Codes decisions are made in

7    the field, the context in which these decisions are generally reached.  Accordingly, ERF's

8    objection to this evidence should be overturned and Simpson's testimony considered in support of

9    PG&E's Motion.

10   **VI.    ERF CONCEDES THAT CLAIM TWO SHOULD BE DISMISSED**

11   ERF concedes that its second claim should be dismissed, and judgment on this claim

12   should be entered in PG&E's favor, both for the Facilities at issue in this phase of litigation, as

13   well as all other Facilities listed in ERF's Complaint.[15]

14   **VII.   CONCLUSION**

15   For the reasons set forth herein, ERF's objections to the testimony of Timothy Simpson

16   (ECF No. 201 at 31-34) should be denied, PG&E's Motion for Summary Judgment (ECF No.

17   196) should be granted, and ERF's Motion for Summary Judgment (ECF No. 197) should be

18   denied.

19   Dated: October 4, 2012                          Schiff Hardin LLP

20

21                                                   By: /s/

22                                                        Russell B. Selman
                                                          Attorneys for Plaintiff

23

24   39562-0002
     CH2\11815218.5

25

26

27   _____
     [15]    ERF states that PG&E failed to discuss the *National Pork Producers Council v. EPA*
     decision in its Motion.  (*See* ECF No. 201 at 34) (discussing 635 F.3d 738, 751-53 (5th Cir.

28   2011)).  This case, along with cases from jurisdictions across the country uniformly rejecting
     ERF's theory, is discussed in PG&E's Motion.  (*See* ECF No. 196 at 33-35.)

20