Christopher Sproul (State Bar No. 126398)
Jodene Isaacs (State Bar No. 226895)
Brian Orion (State Bar No. 239460)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376, (510) 847-3467
Facsimile: (415) 358-5695
Email: csproul@enviroadvocates.com
Email: jisaacs@enviroadvocates.com
Email: borion@enviroadvocates.com

William Verick (State Bar No. 140972)
Klamath Environmental Law Center
Fredric Evenson (State Bar No. 198059)
Law Offices of Fredric Evenson
424 First Street
Eureka, California 95501
Telephone: (707) 268-8900
Facsimile: (707) 268-8901
Email: wverick@igc.org
Email: ecorights@earthlink.net

Attorneys for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION,<br><br>    Plaintiff,<br><br>    v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>    Defendant. | Civil No. CV-10-00121 RS<br><br>**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON CLAIM ONE**<br><br>Hearing date: November 8, 2012<br>Time: 1:30 p.m.<br>Location: Courtroom 3, 17th Floor |

1

**TABLE OF CONTENTS**

2   I.   INTRODUCTION ...................................................................................................1

3   II.   ARGUMENT ........................................................................................................1

4       A.   PG&E Fails to Rebut ERF's Showing that the Facilities Are Subject to NPDES Permitting Under EPA's Regulations and the California General Permit. ................................1

5       B.   PG&E Fails to Rebut ERF's Showing that the Facilities Are Violating the CWA By Discharging Pollutants from Point Sources to Waters of the United States. ............................3

6

7           1.   ERF's Expert Matthew Hagemann Is Qualified to Testify As An Expert in Storm Water Sampling. ..............................................................................................4

8           2.   ERF Properly Disclosed Mr. Hagemann's Opinions. ........................................4

9           3.   Mr. Hagemann's Sampling Testimony Is Valid. ..............................................6

        4.   Dr. Rogers's Benchmark Testimony Is Admissible. .........................................10

10       C.   PG&E Fails to Rebut ERF's Showing that Violations Have Occurred on Every Day With Significant Rainfall During the Relevant Time Period. ..........................................11

11

12           1.   Dr. Parker's Storm Water Runoff Testimony Is Admissible. .............................11

13               a.   Dr. Parker's Testimony Was Properly Disclosed. .....................................11

            b.   Dr. Parker's Two Addenda Were Proper Supplements to His Report. ................14

14               c.   The Revisions in Dr. Parker's Declaration Did Not Change His Conclusion on Any Material Fact. ..............................................................................16

15

16           2.   PG&E Is Guilty of the Same Type of Expert Disclosure Violations it Accuses ERF of Committing. ................................................................................16

17           3.   PG&E's Objections to Dr. Rogers's Testimony Lack Merit. ..............................17

        4.   Ms. Isaacs's Declaration Is Admissible. ........................................................18

18       D.   PG&E's "Miscellaneous" Objections to Dr. Rogers's Testimony Fail. ...........................19

19       E.   PG&E's Objections to ERF's Tire Tracking Evidence Lack Merit. ...............................19

20   III.   CONCLUSION .....................................................................................................20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## Federal Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................................3

*Barret v. Atlantic Richfield Co.*,
95 F.3d 375 (5th Cir. 1996) .....................................................................................6

*Bragdon v. Abbot*,
524 U.S. 624 (1998)...................................................................................................6

*British Airways Bd. v. Boeing Co.*,
585 F.2d 946 (9th Cir. 1978) ..................................................................................3

*Brumfield v. Hollins*,
551 F.3d 322 (5th Cir. 2008) ..................................................................................6

*Christmas v. City of Chicago*,
682 F.3d 632 (7th Cir. 2012) ...............................................................................20

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993) ...............................................................................................10

*Director, Office of Workers' Compensation Programs v. Coos Head Lumber & Plywood Co.*,
194 F.3d 1032 (9th Cir. 1998)  .....................................................................18, 20

*Donell v. Fidelity National Title Agency of Nevada*,
2012 WL 170990 (D. Nev. Jan. 20, 2012) .....................................................12, 13

*Headwaters, Inc. v. Talent Irrigation Dist.*,
243 F.3d 526 (9th Cir. 2001)  ...............................................................................14

*In re Paoli R.R. Yard PCB Litig.*,
916 F.2d 829 (3d Cir. 1990) ...................................................................................9

*Keener v. U.S.*,
181 F.R.D. 639 (D. Mont. 1998)  .........................................................................15

*Liccardi v. TIG Ins. Group*,
140 F.3d 357 (1st Cir. 1998) ...........................................................................15, 18

*Metro Ford Truck Sales v. Ford Motor Co.*,
145 F.3d 320, 325 (5th Cir. 1998) .......................................................................15

*Peals v. Terre Haute Police Dept.*,
535 F.3d 621 (7th Cir. 2008) ................................................................................11

*Plumley v. Mockett*
  836 F. Supp. 2d 1053 (C.D. Cal. 2010). ..................................................................16

*Skidmore v. Swift & Co.,*
  323 U.S. 134  (1944) .................................................................................................2

*Strong v. Valdez Fine Foods,*
  2011 WL 455285  (S.D. Cal. Feb. 4, 2011) ...........................................................13

*U.S. v. Bailey,*
  516 F. Supp. 2d 998 (D. Minn. 2007)......................................................................15

*U.S. v. Estrada-Eliverio,*
  583 F.3d 669 (9th Cir. 2010) ...................................................................................20

*U.S. v. Ganadonegro,*
  854 F. Supp. 2d 1088 (D. N.M. 2012) .....................................................................10

*U.S. v. Luschen,*
  614 F.2d 1164 (8th Cir. 1980) .................................................................................12

*U.S. v. Webb,*
  115 F.3d 711 (9th Cir. 1997) ...................................................................................12

**Federal Statutes**

33 U.S.C. § 1313 ..............................................................................................................10

33 U.S.C. § 1342 ................................................................................................................1

33 U.S.C. § 1362 ................................................................................................................3

**Code of Federal Regulations**

40 C.F.R. § 122.26(b)(14) .............................................................................................1, 2

**Federal Rules**

Fed. R. Civ. P. 26(e) .......................................................................................................14

Fed. R. Civ. P. 37(c)(1)...................................................................................................12

Fed. R. Evid. 401 ............................................................................................................10

Fed. R. Evid. 403 ............................................................................................................10

Fed. R. Evid. 901(b)(1)...................................................................................................20

I.    **INTRODUCTION**

Plaintiff Ecological Rights Foundation ("ERF") hereby files this reply in support of Plaintiff's Motion for Summary Judgment on Claim One (ECF No. 197) (Aug. 2, 2012) ("ERF Opening"). On September 13, 2012, Defendant Pacific Gas and Electric Company ("PG&E") filed its opposition brief. ECF No. 202 ("PG&E Opp."). Notably, PG&E's opposition does not actually dispute most of ERF's evidence on the merits. For example, to establish that the Facilities are discharging pollutants, ERF's Opening brief introduced numerous storm water and soil samples showing the consistent presence of extremely high levels of dioxins, pentachlorophenol, and other pollutants. To show that these pollutants reach waters of the United States, ERF introduced storm water runoff showing that the Facilities discharge storm water whenever rainfall exceeds a certain level at each Facility.

PG&E does not counter this evidence with any affirmative evidence of its own. For example, PG&E does not attempt to show that the Facilities are in fact clean and pollutant-free or that they fail to discharge storm water runoff when it rains. In fact, PG&E's expert actually agreed that the Facilities are discharging storm water whenever rainfall exceeds a certain level, providing sufficient evidence to establish this key fact even without ERF's testimony. Lacking the ability to counter ERF's proof on the merits, PG&E's case depends entirely on its attempt to have essentially all of ERF's evidence struck on the basis of various discovery objections. However, these objections fail primarily because PG&E has not even attempted to show any prejudice from the purported failures identified. Moreover, PG&E is itself guilty of the very kind of expert disclosure violations it accuses ERF of committing. Because ERF's evidence is admissible and unrebutted, ERF is entitled to summary judgment on Claim 1.

II.    **ARGUMENT**

    A.    **PG&E Fails to Rebut ERF's Showing that the Facilities Are Subject to NPDES Permitting Under EPA's Regulations and the California General Permit.**

PG&E does not contest ERF's Opening brief showing that PG&E is conducting numerous industrial activities at the Facilities. Indeed, PG&E largely concedes that the activities described in the Opening brief are occurring. Instead, PG&E claims that these activities do not meet the definition of a discharge "associated with industrial activity" under 33 U.S.C. § 1342(p)(2)(B) and 40 C.F.R. §

122.26(b)(14). ERF will not repeat the arguments made in its opposition to PG&E's cross motion for summary judgment, but will address new points raised by PG&E here.

PG&E cites the response of the California State Water Resources Control Board ("State Board") to comments presented on the amendments to the General Permit currently being considered, claiming that the State Board "rejected ERF's contentions that NPDES permits are required for facilities whose SIC Codes are not specifically listed in 40 C.F.R. § 122.26(b)(14)." PG&E Opp. at 22. This misconstrues ERF's position. ERF does not need to expand the list of SIC Codes for which coverage under the General Permit is required because PG&E's Facilities are properly characterized by the SIC Codes listed in 40 C.F.R. § 122.26(b)(14) and the General Permit's Attachment 1, as shown in ERF's Opening brief. However, to the extent the State Board's comments suggest that it has the authority to exempt sources of storm water "associated with industrial activity," that position is contrary to law and must be rejected for the reasons stated in ERF's Opening brief.[1]

PG&E argues that SIC Code 1442 describing aggregates handling and storage does not apply to the Facilities. PG&E Opp. at 24-25. PG&E is incorrect that this SIC Code allegation was not previously disclosed. *Id.* at 24. The Fourth Amended Complaint alleged the specific aggregates storage activity contemplated by the SIC Code. *See* Fourth Amended Complaint ¶ 34 (ECF No. 107) (Feb. 9, 2011). PG&E's argument that the SIC Code should not apply is based on demonstrably false assertions. PG&E Opp. at 24-25. Specifically, PG&E claims that ERF presents no evidence that soils are "screened" at the Facilities, despite the fact that ERF specifically cited such evidence. ERF Opening at 6.

PG&E argues that ERF has failed to carry its burden of SIC Code assignment by failing to show that each individual SIC Code activity is the "primary" activity at the Facilities. PG&E Opp. at 25-26. PG&E's argument is based on an incorrect understanding of ERF's burden. ERF provided evidence of the revenue, employment, and other indications of value for each of the four industrial activities at the Facility per the instructions in the SIC Manual and explained why each of these activities should be deemed the "primary" activity at the Facilities. ERF Opening at 3-10, 16-19. In response, PG&E fails to

---

[1] PG&E is wrong that "federal and state guidance materials . . . are *binding* upon ERF and the Court . . . ." PG&E Opp. at 2-3 (emphasis added). PG&E's own case, *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), itself notes that these pronouncements are not binding. *Id.* at 139.

introduce any evidence to counter ERF's showing, instead merely asking a series of rhetorical questions to "undercut the materiality" of these activities. *E.g.*, PG&E Opp. at 26. But rhetorical questions are insufficient to defeat summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-52 (1986); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951-52 (9th Cir. 1978).

PG&E argues that the testimony of Michael Bercovich is inadmissible because it was not adequately disclosed. PG&E Opp. at 20-21. As noted by PG&E, ERF disclosed that a fact witness from Alco would authenticate documents provided in response to ERF's subpoena for documents. PG&E was fully aware of ERF's subpoena to Alco and PG&E's attorneys signed a confidentiality agreement with ERF and Alco prior to Alco providing the documents. *See* ECF No. 168. ERF properly used Mr. Bercovich to authenticate documents and explain information contained therein that would otherwise be unintelligible.

### B.   PG&E Fails to Rebut ERF's Showing that the Facilities Are Violating the CWA By Discharging Pollutants from Point Sources to Waters of the United States.

PG&E does not dispute ERF's showing on most elements of ERF's CWA claim: that the dioxins, pentachlorophenol, and other chemicals found on the Facilities constitute "pollutants" under the CWA (though PG&E does dispute whether the pollutants were in fact present); that the Facilities are discharging through "point sources"; and that storm water discharged from the Facilities reaches receiving waters that constitute "waters of the United States." PG&E only disputes the showing that a "discharge of a pollutant" is occurring.

The "discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). To establish this element, ERF's Opening brief introduced storm water and soil samples taken by ERF's experts showing extremely high levels of numerous pollutants in sediments and storm water runoff across the surface of the Facilities and throughout the storm drain system, including the last point of access before off-site discharge. ERF Opening at 10-16. These sampling results showed consistently elevated levels of dioxins, pentachlorophenol, and other pollutants across all four Facilities. *Id.* Together with the evidence that the Facilities discharge storm water either directly to waters of the United States or through municipal separate storm sewer systems ("MS4s") (*id.* at 22), this evidence shows that the Facilities are discharging pollutants under the CWA.

1.    **ERF's Expert Matthew Hagemann Is Qualified to Testify As An Expert in Storm Water Sampling.**

Instead of introducing any affirmative evidence of its own, PG&E erroneously contends that testimony from ERF expert Matthew Hagemann should be excluded because Mr. Hagemann lacks expertise in (1) storm water runoff volume calculation, and (2) storm water sample collection. PG&E Opp. at 7-8. One, PG&E's criticisms of Mr. Hagemann's qualifications to calculate storm water runoff volumes from the Facilities as set forth in his expert report, while erroneous, are entirely irrelevant. ERF has not put these calculations into evidence, so there is nothing to seek to exclude here. Two, Mr. Hagemann's declaration demonstrates that his years of experience, professional certifications, education, and training in the very storm water sampling procedures he used in this case amply qualify him to render the opinions presented. ECF No. 197-1 ¶ 1 (Aug. 2, 2012) ("Hagemann Opening Decl.").

2.    **ERF Properly Disclosed Mr. Hagemann's Opinions.**

PG&E erroneously contends that Mr. Hagemann's testimony should be struck because he "never disclosed the basis for his sampling methodology." PG&E Opp. at 8. On the contrary, Mr. Hagemann's sampling methodology was fully disclosed in the quality assurance project plan ("QAPP") and sampling and analysis plans ("SAPs") for each of the four Facilities where he conducted sampling. ECF No. 202-1 ("Showalter Opp. Decl."), Ex. 3 at 3. The QAPP explained how Mr. Hagemann would take his storm water and sediment samples and how they would be analyzed. *Id*. The SAPs for each Facility listed anticipated sampling locations, pollutants of interest for testing, and the methods of sample collection and analysis to be employed. *Id*. Far from too little disclosure, such a detailed description of an expert's sampling methodology goes beyond anything that would be required in the field of storm water sampling. Reply Declaration Of Matt Hagemann In Support Of Plaintiff's Motion For Summary Judgment On Claim One ¶ 22 ("Hagemann Reply Decl."). Mr. Hagemann sent a copy of the QAPP to PG&E's lawyers prior to the sampling events in this case, and PG&E representatives participated fully in the sampling events at all four Facilities. Showalter Opp. Decl., Ex. 3 at 3.

PG&E contends that Mr. Hagemann's testimony should be struck because he did not include references to "regulatory guidance materials" in his report. PG&E Opp. at 8. This contention lacks merit. Mr. Hagemann revealed the bases of his methodology in the QAPP and SAPs described above.

PG&E cites no authority for the proposition that an expert on storm water sampling must cite regulatory guidance materials as part of his or her expert report. On the contrary, experts are permitted to rely on their skill and experience in reaching their expert opinions, rather than any particular reference materials, as Mr. Hagemann did in preparing the QAPP and SAPs here. In any event, Mr. Hagemann's report contained the exhibits and references considered in preparing his report, which included an EPA guidance document. Showalter Opp. Decl., Ex. 3 at 3 n.1 (*citing* 2002 EPA guidance for preparing QAPPs). He further explained in his deposition how EPA guidance documents supported his methodology. *See* Reply Declaration of Jodene Isaacs in Support of Plaintiff's Motion for Summary Judgment ("Isaacs Reply Decl."), Ex. 5 (Hagemann Tr. at 180:13-181:19). During his deposition, Mr. Hagemann testified that he had considered additional guidance materials not listed in his report, but he cured this by disclosing those materials in his deposition. *Id.*, Ex. 5 at 78:8-79:17; 124:24-125:9 (listing California General Permit, General Permit Fact Sheet, 2009 EPA Stormwater Sampling Guidance, and State of Washington Stormwater Sampling Guidance).

The four factor test cited by PG&E actually supports admission of Mr. Hagemann's testimony here. *See* PG&E Opp. at 8-9. Most importantly, PG&E has shown no prejudice from the lack of regulatory guidance documents listed in Mr. Hagemann's report. PG&E claims to have suffered some abstract violation of its "due process" rights (*Id.* at 9), but PG&E points to no actual surprise or inability to prepare its defense here. Indeed, PG&E fully explored the bases for Mr. Hagemann's opinions during his deposition and PG&E never requested any clarification or further information from ERF. Indeed, PG&E has submitted expert testimony to respond to the points raised by Mr. Hagemann – including discussion of the very guidance materials that Mr. Hagemann disclosed. *See* Declaration of Timothy S. Simpson Dated September 12, 2012 (ECF No. 202-33) ("Simpson Decl.") ¶¶ 23 n.1, 30 n.2, 30 n.5. In addition, PG&E notes that the "importance of the testimony" is a factor, but this factor actually cuts against excluding the evidence. Courts look at the importance of the evidence as a *mitigating* factor in reviewing motions to exclude. In other words, if the evidence is critical, there must be *more* justification

for excluding it. *Barret v. Atlantic Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996). Finally, as noted, ERF already cured the omission of regulatory guidance materials during Mr. Hagemann's deposition.[2]

### 3.    Mr. Hagemann's Sampling Testimony Is Valid.

PG&E argues that Mr. Hagemann failed to collect "representative" storm water samples because his collection and handling of the samples deviated from "standard guidance materials" and the SAPs in ways that have the "potential to introduce variables that render the sample[s] unreliable." PG&E Opp. at 9-11. PG&E's objections fail to show the sample results are invalid. Each objection is addressed in turn.

- *ERF's sampling was flawed because ERF collected samples of standing water*: This criticism ignores ERF's purpose in taking samples of standing water from interior locations on the Facilities. ERF took samples from two types of locations at the Facilities: (a) locations interior to the Facilities and (b) locations at the last accessible point before storm water flows discharge from the Facilities or the first accessible point where storm water discharges from the Facilities flow to. ERF only intended the latter to be representative of storm water discharges from the Facilities. By contrast, ERF took samples of standing water at the Facilities only for the purpose of showing that dioxins and pentachlorophenol are being transferred from utility poles and/or treated wood waste stored at the Facilities into storm water that makes contact with these sources—and that other pollutants are also present at the Facilities that may be transported off-site via storm water runoff and/or vehicle traffic. For this purpose, it was appropriate to sample standing storm water left over from rainfall events. *See* Hagemann Reply Decl. ¶ 6; Reply Declaration Of William Rogers In Support Of Plaintiff's Motion For Summary Judgment On Claim One ¶ 5 ("Rogers Reply Decl.").

---

[2] In a related point, PG&E's claim that Mr. Hagemann's report must be struck because he purportedly failed to show how his sampling methodology "relates to one EPA or California regulators would use in an enforcement action" is also mistaken. PG&E Opp. at 8; *see also id.* at 9. There is no authority for this novel theory. PG&E cites *Bragdon v. Abbot*, 524 U.S. 624, 642 (1998), but this involved an action brought under the Americans With Disabilities Act, and the Court merely noted it had discretion to consider the views of regulatory agencies for purposes of statutory interpretation. *Id.* at 642. And nothing in *Brumfield v. Hollins*, 551 F.3d 322, 330 (5th Cir. 2008) supports this claim (*see* PG&E Opp. at 8), as that case involved a party's total failure to designate an expert witness.

- *Mr. Hagemann walked in the water he was sampling*: PG&E apparently contends that this agitated sediments in the water and potentially introduced cross-contamination into the samples. However, ERF's samplers exercised care not to stomp heavy footed through sampled areas and any incidental foot contact with sampled puddled areas (for example to reach center areas of puddles) would tend to have only trivial impact on stirring up bottom sediments. Any minor agitation of sediments in sampled puddles would only have mimicked similar agitation caused by rainfall, sheet flow erosion, and PG&E vehicle and worker foot traffic. There is no evidence that ERF's samplers contaminated samples by walking on the periphery of areas sampled. Hagemann Reply Decl. ¶ 10; Rogers Reply Decl. ¶ 8.

- *Mr. Hagemann cross-contaminated the samples he took*: For the reasons stated above, "walking in sampled areas" did not cross-contaminate samples. In addition, ERF exercised care to decontaminate all sampling devices and then bag the devices to preserve their decontaminated condition before arriving at the sites. Hagemann Reply Decl. ¶ 12; Rogers Reply Decl. ¶ 23. Thus, any "cross-contamination" of sampling equipment with pollutants occurring during sampling could only have come from pollutants present on the Facilities. This would be of little importance for samples taken from the interior of the Facilities as these samples were, as noted, only intended to yield information about whether there are sources of dioxins and other pollutants on the Facilities. Furthermore, none of the alleged instances of cross-contamination identified by the Simpson Declaration would have any meaningful impact on the levels of pollutants detected in the samples or in the validity of the samples.[3] Hagemann Reply Decl. ¶¶ 12, 15, 18, 26; Rogers Reply Decl. ¶¶ 7, 8, 11, 16, 17.

- *Mr. Hagemann agitated sediment in water before collecting water samples*: One, PG&E cannot contend that agitation influenced any of the four samples representative of off-site discharge: MYRTWTR-2, EURWTR-1, OAKWTR-4, and HAYWTR-2. Two, while PG&E complains that agitation affected samples taken from the interior of the Facility, even if the specific levels in these samples were artificially high (which is not the case), these samples would still confirm the transfer of

---

[3] For example, the complaint that the sampling pole ERF used had some rust on it and was covered by duct taping, plastic casing and may have contained galvanized parts is irrelevant. Mr. Simpson does not and cannot contend these factors impacted the sample results. Duct tape, plastic casing and galvanized metal are not potential sources of dioxins or pentachlorophenol nor likely sources of any other pollutants of concern in ERF's sample results. Hagemann Reply Decl. ¶ 12; Rogers Reply Decl. ¶¶ 12.

1   pollutants to puddled water and sediments on the Facilities, as was their purpose. Finally, as noted,

2   agitation of puddled water from rainfall, wind, sheet flow, and motor vehicle traffic all tend to stir up

3   ponded water on the Facilities under normal operating conditions there, and any incidental contact from

4   boots or sampling equipment would tend to have only trivial impact on stirring up bottom sediments.

5   Hagemann Reply Decl. ¶ 10; Rogers Reply Decl. ¶¶ 9, 16.

6       • *Mr. Hagemann collected samples outside of the area stated in guidance materials*: This

7   appears to merely repeat the complaint that it was inappropriate for ERF to sample standing water from

8   interior locations at the Facilities rather than flowing water at the point of discharge. As discussed

9   above, ERF did take one sample at each of the four Facilities at points representative of flowing storm

10  water discharge, and the remainder of ERF's samples were taken for a different purpose.

11      • *Mr. Hagemann collected samples of water that was influenced by tidal backflow*: PG&E

12  claims that the OAKWTR-2 and OAKWTR-4 samples were exposed to tidal flows from San Leandro

13  Bay, and thus, ERF was sampling a mixture of tidal water and storm water from the Oakport Facility.

14  However, ERF took specific conductance measurements at the time of its sampling demonstrating that

15  its samples were fresh water, *i.e.*, storm water from the Facilities rather than a mixture of freshwater and

16  salt water from San Leandro Bay. Hagemann Reply Decl. ¶ 9; Rogers Reply Decl. ¶ 10.

17      • *Mr. Hagemann collected samples of water that was potentially impacted by off-site sources*:

18  PG&E apparently is contending that the HAYWTR-1 sample should be disregarded because it was

19  collected from an area that receives run-on from a neighboring facility. However, the neighboring

20  facility, an asphalt contractor, does not appear to store utility poles or other wood waste treated with

21  pentachlorophenol and is thus not a likely source of the dioxins and pentachlorophenol detected in this

22  sample. Moreover, there was no evidence of any substantial run-on from this neighboring facility

23  presented by PG&E. In fact the converse is true. Hagemann Reply Decl. ¶ 14.

24      • *Mr. Hagemann collected samples upstream of an oil-water separator*: ERF took the

25  EURWTR-1 sample from the second bay of a three-stage oil water separator at the West 14th Street

26  Facility. This was the last accessible point to take a sample of storm water before it left the Facility.

27  Hagemann Opening Decl. ¶ 28. Even though the sample was taken immediately up gradient of the third

28

chamber of an oil water separator, the sample still demonstrated that pollutants are being discharged from the West 14th Street Facility in elevated levels. Oil water separators achieve slight, if any, removal of nutrients, metals and organic pollutants other than free petroleum products. Even if removed, such sediments become re-suspended during storm events. While the third chamber of the oil water separator might have provided some minimal removal of dioxins and other pollutants in the EURWTR-1 sample, it is unlikely to have significantly lowered the levels of dioxins, and virtually certain to not have reduced those levels to zero. Rogers Reply Decl. ¶ 10.

- *Mr. Hagemann collected sediment samples by scraping embedded material from asphalt*: One, asphalt does not contain the pollutants targeted in ERF's sampling efforts so any asphalt incidentally gathered by the scraping would not have skewed the results. Two, the minimal force used in the sampling was no greater than the force exerted by large motor vehicles driving over paved areas or even sheet flow from repeated storm events. Finally, even abrasive scraping would not affect the usefulness of the interior samples, which were intended merely to demonstrate the presence of pollutants in sediments located at the Facilities. Hagemann Reply Decl.  ¶ 11.

- *Mr. Hagemann homogenized solids samples on the ground surface, instead of through a bowl as is referenced in the SAP*: Homogenizing the sample on asphalt did not introduce any bias in the sample as asphalt does not contain the pollutants targeted.[4][5] Rogers Reply Decl. ¶ 22.

---

[4] In addition to Mr. Hagemann's sampling results, ERF's photographs and evidence of oily "sheens" on the Facilities provide an independent basis to find that pollutants are present and being discharged from the Facilities. ERF Opening at 11-12.

[5] PG&E baselessly argues that Mr. Hagemann deviated from the SAPs in such a way that he essentially attempted to create a new sampling methodology that would need to be independently validated. *See* PG&E Opp. at 11-12. In even preparing a SAP, Mr. Hagemann took an added quality assurance precaution that went beyond the industry and regulatory norm for storm water compliance sampling. Hagemann Reply Decl. ¶ 22. Moreover, EPA guidance specifies that it is appropriate to deviate from a SAP to respond to unanticipated field conditions, and Mr. Hagemann's deviations merely represent sensible adaptations in the field. Rogers Reply Decl. ¶ 26.

PG&E's citation to *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829 (3d Cir. 1990) is not on point. In that case, an expert had combined the results of different epidemiological studies done by other scientists and re-analyzed the data in a "meta-analysis" to determine if the combined data revealed different results than the original studies. *Id*. at 856. This says nothing about whether deviations from a SAP constitute a new analysis requiring independent validation. The Third Circuit reversed the district court's exclusion of the evidence, noting: "The Federal Rules of Evidence embody a strong and

1

### 4.    Dr. Rogers's Benchmark Testimony Is Admissible.

2      PG&E objects to the testimony of ERF's expert William Rogers. As relevant to the "discharge of

3  a pollutant" issue, PG&E objects to the comparison made by Dr. Rogers of the levels of pollutants seen

4  in ERF's sampling results with relevant benchmarks set by EPA and California regulators to protect

5  water quality, claiming this would only be relevant to the issue of the environmental risk caused by the

6  Facilities under ERF's Resource Conservation and Recovery Act claim, not whether pollutants are being

7  discharged from the Facilities. *See* PG&E Opp. at 12-13.

8      This testimony was introduced to show that the levels of pollutants being discharged from the

9  Facilities are significant in relationship to relevant regulatory benchmarks set to protect water quality.

10  *See* ECF No. 197-14 (Aug. 2, 2012) ("Rogers Opening Decl.") ¶ 10. These benchmarks include the

11  California Toxics Rule, which are water quality standards promulgated pursuant to CWA § 303, 33

12  U.S.C. § 1313, and EPA's benchmarks for storm water discharges issued by EPA in conjunction with its

13  multisector general NPDES Permit for discharges of storm water from industrial sources. Contrary to

14  PG&E's claim that such benchmarks have no relevance under the CWA, both of these standards are

15  routinely used in CWA contexts. Rogers Reply Decl. ¶¶ 36-37.

16      Notably, PG&E's objection seems to presume that any discharge of any pollutant is unlawful

17  under the CWA, even without a showing of environmental harm. ERF agrees. However, the evidence

18  here is still relevant because establishing that the levels of discharge are significant in light of relevant

19  regulatory standards negates any conceivable argument that the pollutants were measured at levels so

20  insignificant that the Court should find no discharges of pollutants occurred. *See Daubert v. Merrell*

21  *Dow Pharms*., 509 U.S. 579, 587 (1993) (noting liberal relevancy standards of Fed. R. Evid. 401). The

22  fact that the evidence also shows the Facilities pose a significant risk to the environment is no basis for

23  exclusion absent a showing of both unfair prejudice and that such prejudice would substantially

24  outweigh the probative value of the evidence. *See* Fed. R. Evid. 403; *U.S. v. Ganadonegro*, 854 F. Supp.

25  2d 1088, 1127 (D. N.M. 2012) (denying objection absent this showing).

26

27  _____

undeniable preference for admitting any evidence having some potential for assisting the trier of fact and
28  for dealing with the risk of error through the adversary process." *Id*. at 857 (internal quotation omitted).

C.   **PG&E Fails to Rebut ERF's Showing that Violations Have Occurred on Every Day With Significant Rainfall During the Relevant Time Period.**

1.   **Dr. Parker's Storm Water Runoff Testimony Is Admissible.**

a.   **Dr. Parker's Testimony Was Properly Disclosed.**

ERF's Opening brief showed that the Facilities discharge polluted storm water during rainfall events of a certain magnitude. ERF Opening at 24-25. In support, ERF submitted Dr. David Parker's testimony, which calculated the level of rainfall that would generate storm water runoff from the Facilities and identified the appropriate rainfall data. ECF No. 197-11 (Aug. 2, 2012) ("Parker Decl.") ¶¶ 14-16. PG&E argues that Dr. Parker's expert report was submitted at the time for rebuttal reports, but presented new information not responding to PG&E's experts, and thus should be struck as providing new opinions after the time for disclosing opening reports under the Court's scheduling order. PG&E Opp. at 15-16. Alternatively, PG&E argues that the testimony can only be considered for rebuttal purposes, not in support of ERF's case-in-chief. *Id.* at 16. These arguments fail for three reasons.

First, Dr. Parker's testimony was properly disclosed on the deadline for rebuttal reports because it rebuts points raised by PG&E's experts. On March 1, 2012, ERF disclosed the opening Hagemann report, which included an estimate of the volume of runoff that would occur at the Facilities. *See* Showalter Opp. Decl., Ex. 3 at 27-29. In response, PG&E designated its expert, Dr. Martin Spongberg, whose counter report contended that Mr. Hagemann's methodology was incorrect and overestimated runoff volume whenever rainfall was less than 1.45 inches. *See* Isaacs Reply Decl., Ex. 7 at 7-8. In turn, ERF designated Dr. Parker to respond to this criticism. Dr. Spongberg had not quantified the extent to which Mr. Hagemann had allegedly overestimated runoff volume. So, Dr. Parker calculated the volume of runoff resulting from both Mr. Hagemann's methodology and the one advocated by Dr. Spongberg (the "SCS Method"), to determine that while Mr. Hagemann's methodology estimated greater runoff than Dr. Spongberg's, Mr. Hagemann's estimates were within the bounds of reasonableness. *See* Showalter Opp. Decl., Ex. 9 at 10, Table 2. This was proper rebuttal testimony. *See Peals v. Terre Haute Police Dept.*, 535 F.3d 621, 630 (7th Cir. 2008) (rebuttal evidence is used to "contradict, impeach or diffuse the impact of evidence offered by an adverse party.").

In addition, Dr. Parker's report also rebutted a point made in the report of PG&E's expert Dr. Stephen Ellis. As noted, ERF's opening report from Dr. Rogers compared the levels of pollutants being discharged from the Facilities with relevant regulatory benchmarks. *See* Rogers Opening Decl. ¶ 10. In response, Dr. Ellis testified that to conclude that certain benchmarks were exceeded, Dr. Rogers would have needed to consider the dilution of runoff in receiving waters. *See* Isaacs Reply Decl. ¶ 8, Ex 3 at 7. Accordingly, ERF submitted Dr. Parker's testimony regarding the dilution of runoff from the Facilities at the point it reaches receiving waters. *See* Showalter Opp. Decl., Ex. 9 at 5-8. Dr. Rogers then relied on this testimony in concluding that PG&E's discharges will still exceed relevant benchmarks even accounting for dilution. *See* Rogers Opening Decl. ¶¶ 41-44, 51; *Id.*, Ex. 4.

PG&E is incorrect in claiming that such rebuttal testimony cannot be used to support ERF's case-in-chief. PG&E Opp. at 16. PG&E's own cases are to the contrary. *See Donell v. Fidelity National Title Agency of Nevada*, 2:07-cv-0001, 2012 WL 170990, at *5 (D. Nev. Jan. 20, 2012) ("the fact that testimony would have been more proper for the case-in-chief does not preclude the testimony if it is proper both in the case-in-chief and in rebuttal.") (*citing U.S. v. Luschen*, 614 F.2d 1164, 1170 (8th Cir. 1980)). In *Luschen*, after both sides had rested, the court permitted the government to re-open its case to allow its expert to run a new test using the methodologies suggested by the defendant's experts, and to use that rebuttal testimony as part of its case-in-chief. *Id.* at 1168. Likewise, ERF's rebuttal testimony, produced in response to PG&E's claim that ERF's experts had not followed the appropriate methodologies or had reached invalid conclusions, is admissible in support of ERF's case-in-chief.

Second, even if portions of Dr. Parker's testimony go beyond merely rebutting points made by PG&E's experts, that is no basis for striking the testimony. The cases cited by PG&E actually support the admission of the evidence. For example, in *U.S. v. Webb*, 115 F.3d 711 (9th Cir. 1997), the Ninth Circuit affirmed the admission of evidence from an expert that was disclosed late and whose testimony was not "rebutting" any testimony the opposing party had offered. *Id.* at 711, 713, 719 n.5. Accordingly, Dr. Parker's testimony would be admissible even if it did not "rebut" any evidence offered by PG&E.

Furthermore, any failure to disclose the opening testimony was harmless. *See* Fed. R. Civ. P. 37(c)(1). PG&E attempts to rely on other cases in which late-disclosed expert rebuttal testimony was

excluded. PG&E Opp. at 15-16. However, those cases excluded the evidence after finding that admission would prejudice the opposing party because the late-disclosed testimony was in conflict with the opposing party's expert. *See Donell*, 2012 WL 170990, at *5 (finding admission would not be harmless); *Strong v. Valdez Fine Foods*, Case No. 09 CV 01278 MMA (JMA), 2011 WL 455285, at *3 (S.D. Cal. Feb. 4, 2011) (excluding expert testimony where proponent failed to show the late disclosure was harmless). Here, the evidence offered by Dr. Parker is actually consistent with the testimony of PG&E's corresponding witness Dr. Spongberg. Notably, both Dr. Parker and Dr. Spongberg used the same methodology for calculating the amount of runoff from the Facilities. Isaacs Reply Decl., Ex. 2 (Spongberg Tr. at 133:14-134:12). Critically, Dr. Spongberg agreed with the ultimate conclusion that the Facilities discharge storm water during rainfall events. *Id*. at 128:25-129:6. In fact, Dr. Spongberg even had an opinion on the level of rainfall that would trigger discharges from all four Facilities, stating they would discharge during "relatively small storms, on the order of a tenth of an inch" for at least portions of each Facility, with larger storms producing more runoff. *Id*. at 129:7-130:24. Granted, Dr. Parker finds that discharges would occur at slightly lower rainfall levels. But the experts agree that the Facilities are in fact discharging storm water – at least on every day when 0.10 inches of rainfall occurs. Thus, the testimony of Dr. Parker, which merely extends the testimony of Dr. Spongberg, will not cause any prejudice to PG&E beyond that which was caused by the testimony of its own expert witness.

Finally, the agreement of the parties' experts indicates that ERF would be entitled to summary judgment even on the basis of Dr. Spongberg's testimony alone. Dr. Spongberg's testimony that the Facilities are discharging storm water whenever rainfall hits 0.10 inches establishes the material fact that the Facilities are discharging storm water. Coupled with ERF's rainfall data and unrebutted sampling evidence showing the presence of pollutants in storm water at the Facilities, there is no dispute that the "discharge of a pollutant" is occurring. Accordingly, ERF is entitled to summary judgment on liability.[6]

---

[6] To the extent that the experts disagree on the amount of rainfall needed to cause a discharge, that would go to the issue of how many days of polluted discharge occurred for purposes of calculating the number of PG&E's CWA violations. While ERF did introduce evidence on this point in its Opening brief, the Court's scheduling order allows the parties to conduct further expert discovery going to these remedial issues at a later phase of the case. ECF No. 178 at 2 (Oct. 13, 2011) (expert disclosures on issues relating to remedy for CWA claims are due 10 weeks after a ruling on CWA claims).

**b.    Dr. Parker's Two Addenda Were Proper Supplements to His Report.**

Next, PG&E is incorrect in claiming that Dr. Parker's two addenda should be struck as improper supplementation under Fed. R. Civ. P. 26(e). PG&E Opp. at 16-17. After ERF produced Dr. Parker's report on April 26, 2012, it produced two addenda in advance of Dr. Parker's scheduled deposition on May 22, 2012. Addendum 1, produced on May 17, 2012, was needed to clarify a point made in Dr. Parker's report. That report had calculated the runoff volume from the Facilities and compared it with the runoff volume from the entire watershed of which the Facilities are part, to determine the extent to which runoff from the Facilities is diluted by runoff elsewhere at the point that storm water from the Facilities reaches receiving waters. *See* Showalter Opp. Decl., Ex. 9 at 1 (objective No. 1).

With respect to the Clawiter Facility, the report had calculated the dilution ratio, but further noted that: "The dilution would be even less at the point where the runoff from the Clawiter Road facility enters the Alameda Flood Control Channel." *Id*. at 7. After submitting the April 26, 2012 report, ERF felt it was appropriate to supplement this opinion with additional calculations since the Alameda Flood Control Channel, as a tributary to waters of the United States, is itself a water of the United States, and hence the relevant receiving water for CWA purposes. *See Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533-34 (9th Cir. 2001). Addendum 1 therefore included calculations to support the dilution ratio for runoff from the Clawiter Facility at the point it reaches the Alameda Flood Control Channel and provided watershed maps and spreadsheets in support.[7] *See* Showalter Opp. Decl., Ex. 10.

Addendum 2 was produced on May 18, 2012 to explain certain data contained in Exhibits B and C to Dr. Parker's April 26, 2012 report. Objective 2 in Dr. Parker's report was to respond to PG&E's expert Dr. Spongberg, who, as noted, had criticized Mr. Hagemann's method of calculating runoff. *See* Showalter Opp. Decl., Ex. 9 at 1. And as noted, Dr. Parker made a series of calculations to compare Mr. Hagemann's methodology and the SCS Method employed by Dr. Spongberg. In so doing, Dr. Parker calculated the amount of discharge at each Facility for each day during the relevant time period. This

---

[7] Strictly speaking, the ratio of storm water runoff from the Facilities to the runoff from the watersheds of which they are part is not necessary to establish ERF's CWA claim. As noted above, any pollutant discharges, whether diluted or not, are sufficient to establish a CWA violation. However, the dilution testimony is relevant to the conclusion that discharges of pollutants are in fact occurring after accounting for the anticipated dilution caused by runoff from the rest of the watershed.

1   data was presented in Exhibits B and C. Addendum 2 presented this data in a more specific way than it

2   was presented in Exhibits B and C, by listing each day when a discharge occurred and the amount of that

3   discharge (in both inches and gallons) and removing the other information. *See* Showalter Opp. Decl.,

4   Ex. 11 at Table 4A, 4B, 4C, and 4D. The addendum also noted the minimum rainfall level that would

5   trigger a discharge from each Facility, again a fact contained in Exhibits B and C. *See id*. at 3-4. These

6   aspects of Addendum 2 were merely reworking Exhibits B and C from the original report.

7        Dr. Parker's April 26, 2012 report had not calculated runoff volume for the Oakport Facility.

8   This was not relevant for purposes of Dr. Parker's objective 1 – calculating the dilution ratio – because

9   the Oakport Facility discharges directly to San Leandro Bay and is therefore not diluted by rainfall in the

10  surrounding watershed. Parker Decl. ¶ 3. Addendum 2 did calculate the level of rainfall that would

11  trigger a discharge from the Oakport Facility and tally the days of discharge from that facility. However,

12  this information constitutes proper supplementation. Supplementation is allowed – indeed required – "if

13  the party learns that the response is in some material respect incomplete or incorrect and the other party

14  is unaware of the new or corrective information . . . ." *Liccardi v. TIG Ins. Group*, 140 F.3d 357, 363

15  (1st Cir. 1998) (noting focus on preclusion request is on surprise and prejudice). PG&E cannot – and

16  does not – claim any surprise or prejudice from the supplementation. The information in the addendum

17  involved Dr. Parker's application of the method of calculating storm water runoff discussed at length in

18  his April 26th report, and adopted by PG&E's own expert, to the Oakport Facility. The underlying

19  rainfall data used for making these calculations was included in Exhibit B to the April 26th report.

20  Showalter Opp. Decl., Ex. 12 (Parker Tr. at 59:14 to 60:1). The addenda were provided to PG&E in

21  advance of Dr. Parker's deposition and well within the expert disclosure period, and PG&E questioned

22  Dr. Parker about them during his deposition. *See U.S. v. Bailey*, 516 F. Supp. 2d 998, 1011 (D. Minn.

23  2007) (denying motion to strike supplemental report where moving party failed to identify prejudice

24  because it had report before deposition and hearing on motion for summary judgment).[8]

---

25  [8] PG&E's reliance on *Keener v. U.S.*, 181 F.R.D. 639 (D. Mont. 1998) is misplaced. There, the court
26  noted that proper supplementation is required when a party learns that earlier disclosures are inaccurate
    or incomplete. *Id*. at 640-41. Here, that is the very basis of ERF's addenda – to correct omissions in Dr.
27  Parker's opening report. *Metro Ford Truck Sales v. Ford Motor Co*., 145 F.3d 320 (5th Cir. 1998) is also
    not on point. *Id*. at 325 (first expert report disclosed several months after close of expert discovery).

c.      **The Revisions in Dr. Parker's Declaration Did Not Change His Conclusion on Any Material Fact.**

Finally, PG&E claims that Dr. Parker's declaration "contains numerous revisions to his calculations from his original report and addenda" that were not properly disclosed. PG&E Opp. at 17 (*citing* Showalter Opp. Decl. ¶¶ 16-18). However, none of these revisions changed Dr. Parker's conclusions on any material fact. First, after being shown photographs of the soil surface of the Clawiter Facility during his deposition, Dr. Parker visited the Facility and determined that the soil was a more compacted variety than he had previously understood. Parker Decl. ¶ 12. Because soil type is one a factor that influences the "curve number" variable in the runoff calculation, Dr. Parker's declaration noted that he would use a slightly revised curve number in making a determination of runoff from the Clawiter Facility. *Id.* (noting curve number of 97). However, Dr. Parker did not actually apply the revised curve number in making the runoff calculations in the declaration. Instead, he used the same curve number used in his report to avoid the kind of allegation PG&E makes here. *See id.* ¶ 28 (applying curve number 96). Hence, the revision did not alter Dr. Parker's conclusion on the level of rainfall that would cause a discharge or the number of days of such discharge at the Clawiter Facility.

Second, after having been questioned about his selection of the curve number that would apply to the watershed drainage area around each Facility (needed to determine the watershed discharge volume for purposes of calculating dilution ratios), Dr. Parker reviewed the soil survey data he had previously considered in forming his opinions and determined that the underlying soil type was a more compacted variety than previously understood. *Id.* ¶¶ 22, 25, 28. While this was a revision made in the declaration, it resulted in no prejudice to PG&E, since the change actually resulted in a greater amount of runoff from the watershed, and corresponding higher dilution in PG&E's discharge.[9]

2.      **PG&E Is Guilty of the Same Type of Expert Disclosure Violations It Accuses ERF of Committing.**

---

[9] The lack of prejudice distinguishes this case from the ones cited by PG&E. *See Plumley v. Mockett*, 836 F. Supp. 2d 1053, 1062, 1064 (C.D. Cal. 2010) (holding new information not harmless where it was "integral" to the party's arguments and went to an essential element of the case that the disclosing party had entirely failed to address in its expert report).

PG&E committed three violations of the expert disclosure deadlines contained in the Court's scheduling order. First, PG&E failed to disclose the calculations that its expert Dr. Spongberg conducted in reaching the opinions expressed in his report until after the rebuttal report deadline. After repeatedly denying the existence of any documents reflecting these calculations, PG&E belatedly produced a spreadsheet of the calculations three days before Dr. Spongberg's deposition. Isaacs Reply Decl. ¶ 5. Second, during the deposition of Dr. Spongberg, ERF discovered that Dr. Spongberg had taken photographs of one of the Facilities during a site inspection, but PG&E had not produced these photographs with Dr. Spongberg's expert report as required by Fed. R. Civ. P. 26. Instead, PG&E produced the photographs in the middle of the deposition, leaving ERF little opportunity to make use of them. *Id*. ¶ 7. Third, PG&E failed to timely produce all photographs relied upon by Mr. Simpson, instead providing them three weeks after the designated date. *Id*. ¶ 6. PG&E's own lack of clean hands in the disclosure of expert materials supports the denial of its motions to strike ERF's testimony here.

### 3.    PG&E's Objections to Dr. Rogers's Testimony Lack Merit.

PG&E seeks to strike paragraphs 50-51 in the Rogers Opening Declaration on the grounds that his expert reports did not disclose the opinions contained therein. PG&E Opp. at 18-19. First, PG&E incorrectly claims that Dr. Rogers did not disclose his opinion in paragraph 50 that storm water discharges from the Facilities since January 2005 have always contained pollutants that reach San Francisco or Humboldt Bays. PG&E ignores that Dr. Rogers's opening report states that runoff from the Facilities transports pollutants into Humboldt and San Francisco Bays and that the persistence of the relevant pollutants indicates that they would serve as a source of pollutant loading when they ultimately reach those receiving waters. Showalter Opp. Decl., Ex. 6 at 13-14. Additionally, in Dr. Rogers's rebuttal report, he explained that Dr. Parker's dilution modeling showed that pollutants discharged in storm water from the Clawiter, West 14th Street, and Myrtle Avenue Facilities would still reach receiving waters despite any dilution in storm water that would occur. Showalter Opp. Decl., Ex. 7 at 7. In both instances, Dr. Rogers did not place any time limitations on his conclusions that pollutants in

1  storm water discharges from the Facilities would reach San Francisco or Humboldt Bays. In context, he

2  was indicating that conditions on the Facilities would lead to perpetual discharge of pollutants.[10]

3       Second, PG&E argues that Dr. Rogers failed to disclose his opinion in paragraph 51 that these

4  conclusions are supported by various sources, including Google Earth photos, and deposition testimony

5  of several PG&E witnesses, ERF's sampling results, and Dr. Parker's dilution analysis. This testimony

6  merely refers to information well within PG&E's own knowledge. PG&E claims no surprise and neither

7  presents any counter evidence nor any evidence of prejudice from the timing of ERF's disclosure. The

8  Court should therefor consider this evidence in making a summary judgment determination rather than

9  holding a trial on issues that PG&E does not actually dispute. *See Liccardi*, 140 F.3d at 363.[11]

10           **4.      Ms. Isaacs's Declaration Is Admissible.**

11      PG&E's objection to the testimony of ERF attorney Jodene Isaacs should be denied. *See* PG&E

12  Opp. at 17. As noted, Dr. Parker identified the rainfall amount that would trigger runoff from each

13  Facility and the rainfall data sets to use in evaluating each Facility. Ms. Isaacs merely reviewed the

14  rainfall data provided by Dr. Parker and counted the number of times the rainfall amount exceeded the

15  level Dr. Parker said causes discharge. However, PG&E is correct in noting that the Isaacs Opening

16  Declaration contained typographical errors that led to a misstatement of the number of days of

17  discharge. Ms. Isaacs inadvertently used the runoff trigger level for the Oakport Facility (0.062 inches)

18  in place of the one for the Clawiter Facility (0.083 inches). This error has been corrected. Isaacs Reply

19

20  [10] PG&E's reliance on Dr. Rogers's deposition testimony is misplaced. Dr. Rogers was merely testifying
21  that ERF lacked any sampling data on which to base a statement about the level of pollutants found on
    the sites in the past. He did not discuss whether other information could be looked at, such as the
22  testimony of PG&E's own witnesses, to draw conclusions about whether present discharges were likely
    similar to past discharges. Showalter Opp. Decl., Ex. 8 (Rogers Tr. at 74-77).
23  [11] However, even without Dr. Rogers's testimony, the Court has in evidence the same information relied
24  upon by Dr. Rogers: ERF's sample results; Google Earth photos showing utility poles stored at the
    Facilities; deposition testimony of several PG&E witnesses corroborating the existence of stored utility
25  poles at the Facilities and the lack of any measures to reduce pollutant runoff from these poles; and Dr.
    Parker's dilution analysis showing that storm water runoff from the Facilities will not be so dilute as to
26  no longer contain pollutants. From this the Court should conclude that storm water runoff from the
    Facilities for the past several years has more probably than not contained elevated levels of pollutants
27  that have reached waters. *See Director, Office of Workers' Comp. Programs v. Coos Head Lumber &
    Plywood Co.*, 194 F.3d 1032, 1035 (9th Cir. 1998).
28

Decl. ¶¶ 2-3, Ex. 1. In addition, the overall number of days of discharge cited in the Opening brief – 1,109 – is also incorrect.[12] ERF asks the court to find that the Facilities have discharged storm water in violation of the CWA 2,073 times, in accordance with the attached Revised Proposed Order.

### D.   PG&E's "Miscellaneous" Objections to Dr. Rogers's Testimony Fail.

PG&E's claim that the "factual descriptions of the Facilities" were not disclosed in Dr. Rogers's report (PG&E Opp. at 19) is incorrect. *Compare* Rogers Opening Decl. ¶ 13 *with* Showalter Opp. Decl., Ex. 6 at 9; *compare* Rogers Opening Decl. ¶ 16 *with* Showalter Opp. Decl., Ex. 6 at 10. Further, while PG&E objects to the "descriptions of stormwater flow at the Facilities" contained in Dr. Rogers's report (PG&E Opp. at 19), these are non-controversial points amply demonstrated throughout the record in this case. *See* ERF Opening at 22-24. PG&E erroneously contends that Dr. Rogers failed to disclose his opinions concerning whether it was proper for Mr. Hagemann to take a sample within a three-stage oil water separator. PG&E Opp. at 19. Dr. Rogers's rebuttal report defended Mr. Hagemann's taking the EURWTR-1 sample at the West 14th St. Facility from within an oil water separator (Showalter Opp. Decl., Ex. 7 at 27-28), and he was questioned about this at his deposition. Isaacs Reply Decl., Ex. 6 (Rogers Tr. at 222:20-224:4). PG&E's claim that Dr. Rogers failed to disclose testimony on "the amount of water necessary to flush sediment from underground pipe" is incorrect. *See* PG&E Opp. at 20. While his reports did not refer to the velocity needed to flush sediment from pipes, Dr. Rogers stated that flow velocities in such pipes were high. *See* Showalter Opp. Decl., Ex. 7 at 7. The fact that flows in the MS4s were sufficient to discharge pollutants with no meaningful degradation was properly disclosed.

### E.   PG&E's Objections to ERF's Tire Tracking Evidence Lack Merit.

PG&E contends that evidence that pollutants were likely discharged from the Facilities when vehicle traffic from the Facilities tracked pollutants into streets where storm water runoff then transported the pollutants into waters does not fit what ERF is required to prove and should be excluded. PG&E Opp. at 15. PG&E contends that the only admissible evidence would be that which

---

[12] As set forth in the Opening brief, from January 11, 2005 to May 31, 2012, there were 353 days of discharge at Oakport, and 702 days each at West 14th Street and Myrtle Avenue. Opening Brief at 24-25. The Clawiter total was stated as 348, but the corrected total is 316. This constitutes a total of 2,073 days of discharge.

1    shows to a certainty that pollutants "*were* discharged from the Facilities" and reached waters. *Id.* PG&E

2    ignores that ERF need only show to a preponderance of the evidence – that it is more likely than not –

3    that vehicle traffic has tracked pollutants from the Facilities into waters. *See, e.g.*, *Christmas v. City of*

4    *Chicago*, 682 F.3d 632, 637-38 (7th Cir. 2012); *Coos Head Lumber*, 194 F.3d at 1035. Moreover,

5    PG&E's contention that Mr. Hagemann's testimony should be excluded because he did not directly

6    measure or observe vehicles tracking pollutants off-site ignores that is entirely permissible to present

7    circumstantial evidence from which reasonable conclusions can be inferred. *Coos Head Lumber*, 194

8    F.3d at 1035. Mr. Hagemann reasonably testified that he inferred from his observations that grit on the

9    Facilities is heavily contaminated with dioxins and other pollutants and that the Facilities appeared to

10   have intensive motor vehicle traffic that is inevitably transporting pollutants off-site into public streets

11   where storm water itransports them into waters.[13] Hagemann Opening Decl. ¶¶ 22, 35.

12   **III.    CONCLUSION**

13        For the foregoing reasons, ERF respectfully requests the Court grant ERF's motion for summary

14   judgment on Claim 1.

15   Date: October 4, 2012                          Respectfully submitted,

16

17                                                  /s/ Brian Orion
                                                    Brian Orion
18                                                  Attorney for Plaintiff
                                                    Ecological Rights Foundation

19

20

21

22

23

24

25   ─────────────────────────

26   [13] PG&E incorrectly contends that Ms. Isaacs fails to properly authenticate the photographs depicting
     tire tracking at the Facilities. *See* PG&E Opp. at 28 n.27. Ms. Isaacs testified under penalty of perjury
27   that she has personal knowledge of the facts stated in her declaration. Isaacs Opening Decl. ¶ 1. Contrary
     to PG&E's suggestion, Fed. R. Evid. 901(b)(1) does not require detailed information about the time a
28   photo was taken or by whom. *See U.S. v. Estrada-Eliverio*, 583 F.3d 669, 672 (9th Cir. 2010).