JASON R. FLANDERS (SBN 238007)
AQUA TERRA AERIS LAW GROUP, LLP
490 43rd Street, Suite 108
Oakland, CA 94609
Tel: (916) 202-3018
Email: jrf@atalawgroup.com

FREDRIC EVENSON (SBN. 198059)
ECOLOGY LAW CENTER
P.O. Box 1000
Santa Cruz, CA 95061
Tel: (831) 454-8216
Email: evenson@ecologylaw.com

CHRISTOPHER ALAN SPROUL (SBN 126398)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, CA 94121
Tel: (415) 533-3376
Email: csproul@enviroadvocates.com

J. TOM BOER (SBN 199563)
JTBoer@hunton.com
HUNTON ANDREWS KURTH LLP
50 California Street
Suite 1700
San Francisco, CA  94111
Telephone: (415) 975-3700
Facsimile: (415) 975-3701

DIANA P. MARTIN (SBN 149755)
MartinDP@hunton.com
HUNTON ANDREWS KURTH LLP
550 South Hope Street
Suite 2000
Los Angeles, CA  90071
Telephone: (213) 532-2162
Facsimile: (213) 312-4759

Attorneys for Plaintiff
*Ecological Rights Foundation*

Attorneys for Defendant
*Pacific Gas and Electric Company*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION, a California non-profit incorporation,<br><br>Plaintiff,<br><br>vs.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Defendant. | Case No.  3:10-cv-00121-RS<br><br>**STIPULATION TO ENTER CONSENT DECREE AND DISMISS PLAINTIFF'S CLAIMS WITH PREJUDICE; [~~PROPOSED~~] ORDER ENTERING CONSENT DECREE, GRANTING DISMISSAL OF CLAIMS WITH PREJUDICE**<br><br>**(Resource Conservation and Recovery Act 42 U.S.C. §§ 6901 *et seq.*)** |

-1-

WHEREAS, on November 8, 2009 and April 9, 2010, Plaintiff Ecological Rights Foundation ("ERF" or "Plaintiff") served Pacific Gas and Electric Company ("PG&E" or "Defendant") with Notices of Violations and Intent to File Suit ("Notices").

WHEREAS, ERF represents that it has notified the State of California and U.S. Environmental Protection Agency of this Action pursuant to 42 U.S.C. § 6972(b), on February 9, 2010 ("Notice Letter").

WHEREAS, on February 9, 2011, ERF filed a Fourth Amended Complaint against Defendant in this Court ("Complaint") (Dkt. 107). Said Complaint incorporates by reference all of the allegations contained in ERF's Notices.

WHEREAS, on February 18, 2015, this Court entered a final judgment against ERF, dismissing all claims in the Fourth Amended Complaint against PG&E with prejudice (Dkt. No. 235) and, on March 7, 2015, ERF filed a Notice of Appeal to the Ninth Circuit Court of Appeals (Dkt. No. 236).

WHEREAS, on November 2, 2017, the United States Court of Appeals for the Ninth Circuit filed its Opinion in the matter (Dkt. No. 239), affirming in part, reversing in part, and remanding to this Court for further adjudication, and its Mandate issued on November 24, 2017 (Dkt. No. 241).

WHEREAS, following remand to this Court, ERF and PG&E have engaged in vigorous and extensive settlement negotiations in an effort to resolve the claims remaining in this matter without further adjudication. The settlement effort has been overseen by Chief Magistrate Judge Joseph C. Spero, consistent with this Court's Notice of Settlement Conference and Settlement Conference Order (Dkt. 259).

WHEREAS, ERF and PG&E (the "settling parties"), through their authorized representatives and without either adjudication of ERF's claims remaining on remand, or admission by PG&E of any alleged violation or other wrongdoing, have chosen to resolve in full by way of Consent Decree the allegations of ERF remaining in this matter following remand from the Ninth Circuit and as set forth in the Notices and/or the Complaint. The settling parties recognize that resolution of this matter via Consent Decree will conserve judicial resources and avoid the costs and uncertainties of further litigation. A copy of the Consent Decree entered into by and between ERF and PG&E is attached hereto as Exhibit 1.

WHEREAS, the settling parties jointly represent that the Consent Decree is fair, reasonable, and equitable, and does not violate the law or public policy.

NOW THEREFORE, IT IS HEREBY STIPULATED and agreed to that the settling parties request an order from this Court (1) dismissing with prejudice ERF's claims as to PG&E, as set forth in the Notice and Complaint, and (2) concurrently entering the Consent Decree and retaining jurisdiction over this matter for purposes of dispute resolution and enforcement of the Consent Decree.

Respectfully submitted,

Dated: September 7, 2018          Aqua Terra Aeris Law Group


                                 By:    /s/ Jason R. Flanders
                                        Jason R. Flanders
                                        Attorney for Plaintiff
                                        ECOLOGICAL RIGHTS FOUNDATION


Dated: September 7, 2018          Hunton Andrews Kurth LLP


                                 By:    /s/ J. Tom Boer
                                        J. Tom Boer
                                        Attorney for Defendant
                                        PACIFIC GAS AND ELECTRIC
                                        COMPANY

///

### [~~PROPOSED~~] ORDER

Good cause appearing, and the parties having stipulated and agreed, IT IS HEREBY

ORDERED that pursuant to Federal Rule of Civil Procedure 41(a)(2), ECOLOGICAL RIGHTS

FOUNDATION's claims as to PACIFIC GAS AND ELECTRIC COMPANY, as set forth in the

Notices and/or Complaint, are dismissed with prejudice; and, concurrently, the parties' Consent

Decree, attached hereto as Exhibit 1, is entered and the Court shall retain jurisdiction over this

matter for purposes of dispute resolution and enforcement of the Consent Decree until

termination of the Consent Decree as set forth therein.

PURSUANT TO STIPULATION, IT IS SO ORDERED.


Dated:   9/7            , 2018

                                 _____
                                 Hon. Richard Seeborg
                                 United States District Judge

# Exhibit 1

Christopher Alan Sproul (SBN 126398)
csproul@enviroadvocates.com
**Environmental Advocates**
5135 Anza Street
San Francisco, CA 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695

Fredric Evenson (SBN 198059)
evenson@ecologylaw.com
**Ecology Law Center**
P.O. Box 1000
Santa Cruz, CA 95061
Telephone: (831) 454-8216

Jason R. Flanders (SBN 238007)
jrf@atalawgroup.com
**Aqua Terra Aeris Law Group**
490 43rd Street, Suite 108
Oakland, CA 94609
Telephone: (916) 202-3018

Attorneys for Plaintiff
Ecological Rights Foundation

J. Tom Boer (SBN 199563)
JTBoer@hunton.com
**Hunton Andrews Kurth LLP**
50 California Street
Suite 1700
San Francisco, CA 94111
Telephone: (415) 975-3700
Facsimile: (415) 975-3701

Diana P. Martin (SBN 149755)
MartinDP@hunton.com
**Hunton Andrews Kurth LLP**
550 South Hope Street
Suite 2000
Los Angeles, CA 90071
Telephone: (213) 532-2162
Facsimile: (213) 312-4759

Attorneys for Defendant
Pacific Gas and Electric Company

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION, a California non-profit association,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Defendant. | Civil Case No.: 3:10-cv-00121-RS<br><br>**CONSENT DECREE**<br><br>**(Resource Conservation and Recovery Act 42 U.S.C. §§ 6901 *et seq.*)** |

## RECITALS

1.    This Consent Decree is entered into by and between Plaintiff Ecological Rights Foundation ("ERF") and Defendant Pacific Gas and Electric Company ("PG&E").

2.    On or about February 9, 2011, ERF filed a fourth amended complaint ("Complaint") against PG&E in the United States District Court for the Northern District of California ("District Court") (referred to as "the Action").

3.    ERF's Complaint alleges that PG&E has contributed or is contributing to the past or present handling, storage, treatment, transportation or disposal of pentachlorophenol and dioxins, that may present an imminent and substantial endangerment to health or the environment, at service center facilities located throughout northern California ("Facilities," and individually referred to as a "Facility" in this Consent Decree). The Facilities covered by this Consent Decree are identified in Exhibit A.

4.    ERF represents that it has notified the State of California and U.S. Environmental Protection Agency of this Action pursuant to 42 U.S.C. § 6972(b), on February 9, 2010 ("Notice Letter").

5.    PG&E denies the occurrence of the violations alleged in the Notice Letter and the Complaint (that are subject to the Action), and denies that its Facilities (or operations thereon) are causing or otherwise contributing to an imminent and substantial endangerment.  PG&E does not admit any liability arising out of the allegations or occurrences alleged in the Notice Letter or the Complaint and maintains that it has complied at all times with all applicable provisions of RCRA.

6.    The Parties enter into this Consent Decree in an effort to efficiently and cost-effectively resolve the Action.  The terms in this Consent Decree are negotiated solely for the purpose of this settlement and are not an admission by either Party as to: (i) the applicability of any law or regulation, (ii) the basis for and/or applicability of any Stormwater Evaluation Level (as defined below) for any purpose other than for use within the scope of this negotiated settlement, and/or (iii) any independent legal requirement for the use of any best management practice, sampling technique or frequency, and/or the installation of any infrastructure or deployment of any treatment technologies.

7.      ERF and PG&E acknowledge that this Consent Decree has been negotiated by the Parties in good faith, will avoid the continued expense, uncertainty, and time of litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

**Now, therefore, the Parties agree as follows:**

## I.      DISMISSAL AND JURISDICTION

8.      <u>Dismissal</u>.  Within ten (10) calendar days of the Effective Date, as defined in Paragraph 45, the parties shall file with the District Court a Stipulation and Order that shall provide that the Complaint and all claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2) concurrently with the District Court's retention of jurisdiction for the enforcement of this Consent Decree as provided herein (the date of entry of the Order to dismiss shall be referred to herein as the "Court Approval Date").

9.      <u>Venue and Continuing Jurisdiction</u>.  For purposes of this Consent Decree only, the Parties stipulate that venue is proper in the District Court and neither Party contests the exercise of jurisdiction by the District Court for purpose of overseeing implementation of the Consent Decree, any dispute resolution or enforcement pursuant to Paragraph 40, or in response to any motion to modify the Consent Decree pursuant to Federal Rule of Civil Procedure 60.

## II.      WORK TO BE PERFORMED

### Preparation of Stormwater Maps for Relevant Portions of Each Facility

10.      For each Facility, PG&E shall prepare a map identifying all locations where treated wood utility poles or other treated-wood products, such as cross-arms and Treated Wood Waste ("TWW"), are stored, cut, or otherwise maintained (collectively, "Pole Areas") and identify the corresponding locations where stormwater runoff from these areas is collected and discharged, including drop inlets, sumps, and/or catch basins receiving stormwater and subsequent discharge points (the "Pole Areas Stormwater Map"). PG&E shall complete preparation of the Pole Areas Stormwater Maps on the following schedule: (i) maps for the Year 1 Pilot Program Facilities, as defined in Paragraph 18, shall be completed no later than 60 calendar days after the Effective Date; (ii) maps for an additional ten (10) Facilities chosen at PG&E's discretion shall be completed no later than 6 months after the Effective Date; and (iii) maps for the remaining Facilities shall be completed no later than on the first anniversary of the Effective Date and before the

beginning of the second wet season (defined as the period between October 1 to May 31 of each year) ("Wet Season"). For each of the Facilities, the Pole Areas Stormwater Maps shall identify the anticipated sampling point(s) for storm water runoff from Pole Areas to be used in connection with sampling pursuant to this settlement (subject to revision following implementation of BMPs at any particular Facility as may be reported in each annual report) and, as additional BMPs are rolled out at each relevant Facility, the Pole Areas Stormwater Map shall be updated, prior to October 1 of any year, to include identified sampling point(s) for storm water runoff from Pole Areas to be used in connection with this settlement. The Pole Areas Stormwater Map for each Facility shall also identify if stormwater from the Pole Areas drains offsite to a municipal separate storm sewer system ("MS4").

## Facility Management, Housekeeping BMPs, and Training

11.     In furtherance of the goal of meeting the Stormwater Evaluation Levels identified in Table 1, PG&E shall implement the following stormwater source control measures and best management practices ("Housekeeping BMPs") at each Facility's Pole Areas:

12.     <u>Site Sweeping and Cleaning Plan for the Facilities</u>. The Site Sweeping and Cleaning Plans shall specify that: (i) sweeping and cleaning will be performed on a reasonable, as needed basis to minimize tracking and dispersal of pollutants within the paved portion of the Pole Areas to address visual accumulation of dust or debris; (ii) on an annual basis before the start of the wet season, PG&E shall conduct an inspection of the Pole Areas at each Facility and, to the extent warranted by the inspection, perform additional site cleaning as needed; (iii) PG&E shall not discharge any waste fluids or solid wastes generated by sweeping or other site cleaning in Pole Areas to storm drain inlets or waterways; and (iv) PG&E shall collect and dispose of all wastes generated during cleaning and sweeping in Pole Areas in a manner that complies with all local, state, and federal laws. To the extent that alternative BMPs, including but not limited to structural improvements and/or installation of treatment technologies, are demonstrated to be effective in reducing concentrations below Stormwater Evaluation Levels identified in Table 1, PG&E may discontinue some, or all, of the sweeping BMPs specified in this Paragraph.

13.     <u>TWW Sawdust Collection & Management Policy</u>. When cutting treated wood poles, treated pole segments, or TWW at a Facility, PG&E will attempt to capture the sawdust and debris. PG&E will make reasonable efforts to place plastic tarps underneath TWW to be sawed up in any outdoor location at a

Facility to collect sawdust from sawing operations. PG&E will sweep, vacuum and/or otherwise clean the plastic tarps after sawing operations to remove any sawdust or debris that falls on the plastic tarps and ensure that sawdust or debris collected from the tarps is placed within containers for proper off-site disposal. Following cleaning, PG&E will make reasonable efforts to reuse plastic tarps to minimize waste generation. PG&E will store TWW sawdust in covered TWW bins.

14.     <u>Storm Drain Inlet Inspection and Cleaning</u>. Annually, prior to October 1, PG&E shall inspect the storm drain inlets receiving drainage from the Pole Areas at each Facility. During this inspection, PG&E shall clean as needed each drain inlet using a vacuum or other effective cleaning device/method in order to remove dusts and solids that have entered the storm drain inlets receiving drainage from the Pole Areas. As necessary, PG&E shall clean out sediments collected in the drain inlet at the Facilities following significant storm events and shall properly dispose of any dust, sediment, or other pollutants removed from storm drain inlets or catch basins. PG&E shall inspect the drain inlets receiving drainage from the Pole Areas at each Facility during the Wet Season at least monthly and properly remove and dispose of any dust, sediment, or other pollutants identified in the storm drain that could materially affect their functioning.

15.     <u>Inspection of Paved Areas</u>. PG&E shall inspect the paved portion of the Pole Areas at each Facility on an annual basis and implement repairs or replacement of pavement on an as-needed basis to eliminate material cracks that could trap pollutants and/or to maintain storm water drainage from Pole Areas within designed or designated flow paths. PG&E shall prepare and maintain a log of the Storm Drain Inlet/Catch Basin Inspections, and Maintenance and Cleaning at the Facilities.

16.     <u>Training</u>. At least annually, and prior to the wet season following the hiring of new employees directly involved in storm water management, inspection or cleaning in Pole Areas at the Facilities, PG&E shall conduct training to explain the requirements of the settlement agreement to the extent applicable to such employee. Training shall focus on the employee's role in implementing various settlement agreement measures including, for example, implementation of BMPs, sweeping, or facility inspections. If necessary, training shall be conducted bilingually (i.e., Spanish/English or other pertinent language) to the extent that an employee is not reasonably able to comprehend training in English.

**BMP Pilot Test Program**

17.     PG&E shall implement a pilot test program ("Pilot Program") to identify one or more treatment and/or structural BMPs that can be deployed to multiple Facilities and are reasonably expected to attain the Stormwater Evaluation Levels from stormwater discharged from Pole Areas.  As described in the following paragraphs, PG&E anticipates that the Pilot Program will take two or three years from the Effective Date to reach completion.

18.     In the first year of the Pilot Program, beginning on the Effective Date, PG&E shall construct and initiate testing of the following BMPs in the Pole Areas of the three facilities identified below: (i) geogrid filled with engineered media mixture placed directly under the pole storage racks. The media blend may consist of a mix of fine filter sand, zeolite, and granulated activated carbon or some mix materially similar to these materials; (ii) a reactive core mat, manufactured by CETCO or other similar product by an alternative manufacturer, placed below poles in a manner anticipated to intercept potential drippings; (iii) a drop inlet filter, incorporating a treatment media, intercepting stormwater from the Pole Area.  PG&E shall deploy at least one of these technologies to each of the following three facilities no later than ninety (90) days after the Court Approval Date: (i) Oakport; (ii) Hayward; and (iii) San Carlos.  In addition, during the first year of the Pilot Program, PG&E shall monitor the stormwater discharged from the recently engineered Pole Area at the Auburn Facility. Collectively, the four facilities referenced in this paragraph shall be identified as the "Year 1 Pilot Program Facilities."

19.     In the second year of the Pilot Program, beginning on the first anniversary of the Effective Date, PG&E shall continue pilot testing at the Year 1 Pilot Program Facilities and shall deploy further treatment and/or structural BMPs to four additional Facilities chosen at PG&E's sole discretion and not included in the Year 1 Pilot Program Facilities.  Collectively, these four additional facilities, combined with the Year 1 Pilot Program Facilities, shall be identified as the "Year 2 Pilot Program Facilities."  PG&E shall identify the Year 2 Pilot Program Facilities in the Year 1 Pilot Program Report, as defined in Paragraph 35.A.  PG&E shall deploy a combination of treatment and structural BMPs in the Pole Areas at the Year 2 Pilot Program Facilities including those technologies described in

Paragraph 18 as may be supplemented, or replaced, by any additional treatment or structural BMPs identified in the Year 1 Pilot Program Report.

20. If, in the Year 2 Pilot Program Report, as defined in Paragraph 35.B, PG&E reasonably concludes that one or more treatment and/or structural BMPs tested during the Year 2 Pilot Program are reasonably expected to obtain Stormwater Evaluation Levels from stormwater discharged from Pole Areas at the Facilities, or make material progress in obtaining Stormwater Evaluation Levels from stormwater discharged from Pole Areas at the Facilities, PG&E shall proceed to implement the BMP roll-out process described in Paragraph 21. If, alternatively, in the Year 2 Pilot Program Report PG&E concludes, at its sole discretion, that an additional year of pilot testing is required to further evaluate treatment and/or structural BMPs, PG&E shall conduct a third year of the Pilot Program at the eight Year 2 Pilot Program Facilities to test those BMPs identified by PG&E in the Year 2 Pilot Program Report. If conducted by PG&E, the third year of the Pilot Program shall commence on the second anniversary of the Effective Date.

21. BMP Roll-Out Process following two-year Pilot Program. If PG&E ends the Pilot Program after completion of the Year 2 Pilot Program Report, PG&E shall roll-out one or more of the demonstrated treatment and/or structural BMPs, as shall be described in the Year 2 Pilot Program Report and consistent with PG&E's review and evaluation of the Pilot Program BMPs in that report (the "Roll-Out BMPs") to the remaining Facilities on the schedule provided in this Paragraph, except as otherwise stated in this Paragraph. PG&E shall implement the Roll-Out BMPs at four additional Facilities each year until all of the subject Facilities have either received the Roll-Out BMPs, are individually terminated from this Consent Decree pursuant to Paragraph 47, or have alternative treatment, structural, and/or housekeeping BMPs implemented consistent with a description provided by PG&E in the Year 2 Pilot Program Report or a future annual report specific to such Facility (the "Alternative BMPs").

22. BMP Roll-Out Process following three-year Pilot Program. If PG&E proceeds with a third year of the Pilot Program, PG&E shall roll-out one or more of the demonstrated treatment and/or structural BMPs as described in the Year 3 Pilot Program Report consistent with PG&E's review and evaluation of the Pilot Program BMPs (the "Roll-Out BMPs"), to the remaining Facilities except as otherwise stated in this Paragraph. PG&E shall implement the Roll-Out BMPs at five additional

Facilities a year until all of the subject Facilities have either received the Roll-Out BMPs, are individually terminated from this Consent Decree pursuant to Paragraph 47, or have alternative treatment, structural, and/or housekeeping BMPs implemented consistent with a description provided by PG&E in the Year 3 Pilot Program Report or a future annual report specific to such Facility (the "Alternative BMPs").

## Stormwater Evaluation Levels

23.     Stormwater Evaluation Levels.

A.     The Pilot Program, along with all BMPs, capital improvements, and the deployment of treatment technologies, shall be designed with the goal of attaining the following evaluation levels ("the Stormwater Evaluation Levels") prior to the release of stormwater from the Pole Area at each Facility:

### TABLE 1 – Stormwater Evaluation Levels

| Parameter | Evaluation Level |
|---|---|
| Pentachlorophenol | 7.9 ug/L |
| 2,3,7,8 TCDD (Dioxin & Furans) TEQ | $2.8 \times 10^{-8}$ ug/L |

B.     BMPs shall be designed and implemented in an effort to achieve Stormwater Evaluation Levels in runoff from the Pole Areas during an 85th percentile, 24-hour storm event, as determined from local, historical rainfall records or such other calculation or practice routinely used by industry in California.

C.     The Parties recognize that the effort to achieve Stormwater Evaluation Levels via the Pilot Program and at each Facility subject to this Decree may be an iterative process and an exceedance above an applicable Stormwater Evaluation Level shall not be a *per se* violation of this Consent Decree.

24.     Calculation and Application of Dilution Factors for MS4 Stormwater Discharges.

A.     A dilution factor shall be calculated, pursuant to Paragraph 24.B and applied for those Facilities that discharge stormwater from Pole Areas to an MS4.  The applicable Stormwater Evaluation

Levels for Pole Area discharge to an MS4 shall be calculated by multiplying the applicable, Facility-specific dilution factor times the Stormwater Evaluation Levels identified in Paragraph 23.A.

B. Dilution factors shall be calculated consistent with industry standard and practice and shall incorporate the following steps: (i) estimate runoff volume from the Pole Area at the specific Facility; (ii) estimate runoff volume for the stormwater drainage basin or sub-basin for the MS4 outfall that includes the Facility; (iii) calculate the ratio of total runoff volume for the surrounding stormwater drainage basin relative to the total runoff volume from Pole Area at the relevant Facility. Stated via equation, the dilution factor shall be calculated as follows:

$$Dilution\ factor = \frac{Stormwater\ Drainage\ Basin\ Area\ Runoff\ Volume}{Pole\ Area\ Runoff\ Volume}$$

Calculation of the runoff volumes, used in determining a dilution factor, shall account for the imperviousness and soil infiltration characteristics of the relevant Pole Area and the associated stormwater drainage basin surrounding the relevant Facility. The size of the stormwater drainage basin surrounding the Facility may be estimated via the use of publicly available information, including maps, topography, and visual information.

25. <u>Optional Report(s) Regarding Background Concentrations of Dioxin</u>. If 2,3,7,8 TCDD (Dioxin & Furans) toxic equivalency ("TEQ") remains elevated above the Stormwater Evaluation Level at a specific Facility (i) after implementation of Housekeeping BMPs, and (ii) for two wet seasons following implementation of Roll-Out BMPs and/or Alternative BMPs, PG&E, at its sole discretion, may opt to direct a third-party consultant to provide a technical report to ERF evaluating whether, and to what extent, off-site background concentrations of dioxin and furans may be influencing on-site concentrations used for the calculation of the 2,3,7,8 TCDD (Dioxin & Furans) TEQ required by this Consent Decree. Such technical report shall consider the impact of any dioxin and/or furans present in pentachlorophenol discharged from the Pole Area during the relevant sampling periods, shall evaluate off-site sources and concentrations of dioxin and furans in the vicinity of the Facility and, based upon the data analysis in the report, may propose whether an alternative Stormwater Evaluation Level for the 2,3,7,8 TCDD (Dioxin & Furans) TEQ is appropriate due to impacts from off-site sources on

contaminant levels present at the Facility and, if so, shall identify the appropriate alternative Stormwater Evaluation Level for 2,3,7,8 TCDD (Dioxin & Furans) TEQ for the specific Facility subject to the report. Upon receipt of the technical report, ERF shall have twenty-one (21) days to provide a notice of disagreement with the alternative Stormwater Evaluation Level for 2,3,7,8 TCDD (Dioxin & Furans) TEQ. If ERF objects to the alternative Stormwater Evaluation Level, the Parties shall resolve their differences as follows:

A. Unless the Parties mutually agree otherwise, the Parties shall schedule an informal meet-and-confer to occur within fourteen (14) days of ERF's notice of disagreement (or such other date as mutually agreed upon) to discuss the proposed alternative Stormwater Evaluation Level and seek to reach an acceptable resolution of any disagreement.

B. If the informal process does not result in a resolution, either Party may trigger a Technical Peer Review Process by providing written notice to the other Party within seven (7) days of the conclusion of the informal meet-and-confer process or an agreement not to meet-and-confer. The Technical Peer Review Process shall be performed by three consultants, at PG&E's expense, selected as follows: (i) a consultant selected by ERF; (ii) a consultant selected by PG&E; and (iii) a consultant mutually selected by the two other consultants (the "Panel"). PG&E's agreement to pay each consultant is conditioned upon the consultant charging a reasonable market rate for California for the type and scope of work being performed pursuant to this Decree. Each consultant on the Panel shall have relevant experience in dioxin issues and shall have an advanced degree reasonably related to the relevant issues, such as engineering, chemistry, geology, hydrogeology, or other similar field. The Panel shall review the technical report and proposed alternative Stormwater Evaluation Level and shall, by majority vote, either approve the alternative Stormwater Evaluation Level or recommend a new alternative Stormwater Evaluation Level. Unless an alternative schedule is mutually agreed by the Parties, the Panel shall provide the Parties with a written report supporting their decision within sixty (60) days of the selection of all three consultants. During the technical review process, the Panel shall be able to request reasonable information from the Parties (provided that it is in the reasonable possession or control of the Party and does not require additional sampling or other field work, or seek privileged information) relevant to its analysis. If the Panel requests any such information, the request shall be

1 provided to both Parties and both Parties shall have the opportunity to provide responsive information.

2 The Panel (and the individual panelists) shall not, however, have any *ex parte* communications with the

3 Parties prior to completing its written report.

### III. SAMPLING, ACCESS, AND DATA

5       26.   <u>Sampling Location and Frequency During the Wet Season</u>. At Facilities subject to

6 sampling pursuant to Paragraph 27, PG&E shall undertake best efforts to collect and analyze samples

7 from Qualifying Storm Events[1] ("QSEs") during each Wet Season prior to the Termination Date, as

8 provided below. PG&E shall take samples at the discharge point(s) from the Pole Area as identified in

9 the Pole Areas Stormwater Maps for each relevant Facility subject to sampling. For each sample

10 obtained, PG&E shall adhere to preservation methods and holding time limits for the subject

11 constituents that are consistent with industry standards.

12       27.   <u>Sampling Schedule</u>. PG&E shall conduct sampling at the following Facilities on the

13 following schedule:

14           A. <u>Year 1 Pilot Program</u>. PG&E shall collect and analyze samples from at least four (4)

15           QSEs at each of the four Year 1 Pilot Program Facilities during the first Wet Season

16           following the Effective Date after BMPs provided by this Consent Decree have been

17           implemented.

18           B. <u>Year 2 Pilot Program</u>. PG&E shall collect and analyze samples from at least four (4)

19           QSEs at each of the eight Year 2 Pilot Program Facilities during the second Wet Season

20           following the Effective Date.

21           C. <u>Year 3 Pilot Test, if applicable</u>. PG&E shall collect and analyze samples from at least

22           four (4) QSEs at each of the eight Year 3 Pilot Program Facilities, if PG&E elects to

23           proceed with a third year of the pilot program, during the third Wet Season following the

24           Effective Date.

25           D. <u>Sampling After Pilot Test Complete</u>. After completion of the two or three year Pilot

26           Program, PG&E shall identify, in each subsequent annual report, four representative

---

[1] A Qualifying Storm Event (QSE) is a precipitation event that produces a discharge from the Pole Area at a Facility during regular business hours. The Parties recognize that some Facilities in the arid regions of Northern California may not have the requisite number of QSEs in a Wet Season.

Facilities for sampling in each remaining Wet Season. In identifying the Representative Facilities, PG&E will take into account various criteria to ensure the selected facilities reasonably reflect the diversity of Facilities subject to this Consent Decree, including for example: (i) number of poles stored; (ii) size of relevant Pole Area; (iii) weather, including annual rainfall; (iv) whether TWW is present at the Facility; (v) the characteristics of prior Representative Facilities where data has been collected under the terms of the Consent Decree; and/or (vi) such other factors as may reasonably support the effort to sample at a diverse collection of Facilities or under a diverse set of conditions. PG&E shall collect and analyze samples from at least three (3) QSEs from each of the Representative Facilities. PG&E shall also conduct such sampling at any Facility that has Alternative BMPs unless coverage of the Facility under the Consent Decree is terminated pursuant to Section VIII.

28.     <u>Sampling Parameters</u>. All samples shall be analyzed for pentachlorophenol, polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans, by a laboratory accredited by the State of California. Samples must be unfiltered and analyzed by EPA Method 1613 for tetra through octa chlorinated dibenzo dioxins and furans.

29.     <u>Calculation of 2,3,7,8 TCDD (Dioxin & Furans) TEQ for Comparison to Stormwater Evaluation Levels</u>. Using sampling data for stormwater from the Pole Areas, PG&E shall calculate a 2,3,7,8 TCDD (Dioxin & Furans) TEQ using the equation and the toxicity equivalency factors and bioaccumulaton equivalency factors provided in Exhibit B to this Consent Decree. In calculating the TEQ sum, constituents reported as ND (not detected) or DNQ (detected, not quantifiable) by the laboratory will have concentrations set equal to zero. The calculated TEQ shall be used for comparisons to the Stormwater Evaluation Level.

30.     <u>Inspections During The Term Of This Consent Decree</u>. PG&E shall permit representatives of ERF to perform two physical inspections of a Facility subject to this Consent Decree during each calendar year between the Effective Date and the Termination Date. This inspection shall be performed by ERF's counsel and consultants and may include sampling, photographing, and/or videotaping. ERF shall allow PG&E to collect split samples of any sampling and shall provide PG&E

with a copy of all sampling reports, photographs, and/or video no later than seven (7) calendar days after the inspection, except for sampling reports, which shall be provided to PG&E no later than seven (7) days after receipt of such reports by ERF from a laboratory. ERF shall provide at least three (3) business days advance notice of such physical inspection, except that PG&E shall have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with business operations or the safety of individuals. In such case, PG&E shall specify at least three (3) dates within the two (2) weeks thereafter upon which a physical inspection by ERF may proceed. With the exception of actions required to comply with any applicable laws and regulations, or due to any work planned by PG&E prior to receipt of notice from ERF requesting an inspection and subject to written notification of such work provided by PG&E to ERF prior to the beginning of the requested inspection, PG&E shall not make any material alterations to Facility conditions within the Pole Areas during the period between receiving ERF's advance notice requesting an inspection and the start of ERF's inspection. Nothing herein shall be construed to prevent PG&E from continuing to implement any BMPs consistent with the terms of this Consent Decree during the period prior to an inspection by ERF or at any other time.

31.     Neither Party shall withhold, from the other Party, any data that is collected for the purpose of implementing, complying with, or overseeing compliance with this Consent Decree, that consists of sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering raw data, or any data incorporated into any report required or allowed by this Consent Decree.  This Paragraph, however, in no way waives the attorney-client privilege or the attorney work product doctrine as to advice and communication about such information provided to either Party or as may otherwise be applicable.

32.     The Parties shall preserve all documents and information (including raw data and laboratory reports) relating to the work performed under this Consent Decree, or oversight of compliance with this Consent Decree, until the Termination Date.

33.     <u>Confidential Information</u>.

A.     Each Party recognizes that this Decree requires the Parties to exchange certain information pertaining to the implementation, compliance with, or oversight of the terms in the Consent

Decree including, but not limited to reports, maps, figures, photographs/video, data, and communications related to or generated in connection with the following provisions and that identifies PG&E and/or could be reasonably attributed to PG&E or this Consent Decree: (i) Paragraph 10 (Pole Area Stormwater Maps); (ii) information and documentation related to PG&E's specific implementation of any Housekeeping BMPs, Roll-Out BMPs, and/or Alternative BMPs; (iii) Paragraph 24 (dilution factors); (iv) Paragraph 25 (dioxin background reports); (v) Section III (sampling); (vi) Paragraph 30 (inspections); (vii) Section IV (annual reports); (viii) Paragraph 40 (dispute resolution); and/or (ix) Paragraph 47 (termination) (collectively, "Confidential Information").

B.      ERF may provide anonymized information to third parties, provided that use of such data is independent of any claims (or potential claims) against PG&E, and the scope of information disclosed is limited to information about the level of reduction of parameters listed in Table 1 achieved by individual BMPs or collections of BMPs.  In the event ERF provides such data to any third party, it shall provide a copy of the anonymized information to PG&E contemporaneously with delivering the information to any third party.

C.      The Parties agree that, subject to the exceptions in this Paragraph, Confidential Information shall only be used by a Party for the purpose of implementing, complying with, or overseeing the terms of this Consent Decree (which shall include sharing such Confidential Information with counsel, consultants, experts, laboratories, and contractors, or similar entities, provided that they are acting on behalf of a Party for the purpose of implementing, complying with, or overseeing this Consent Decree).   The Parties shall (i) keep all Confidential Information, and all information and evaluations derived from such Confidential Information, in confidence using a reasonable degree of care to prevent disclosure to unauthorized third-parties; (ii) limit use of Confidential Information as specified in this Paragraph; (iii) only reproduce or disseminate Confidential Information of the other Party to the extent necessary and as permitted by this Consent Decree; and (iv) promptly inform the other Party, in writing, of any unpermitted release or sharing of Confidential Information.

D.      The obligations of confidentiality with respect to Confidential Information shall not apply to any such Confidential Information which (i) is publicly known or later made public through no wrongful or negligent act of the receiving and/or disclosing Party; (ii) is received free of restriction on

disclosure from another source having the right to so furnish the Confidential Information; (iii) is used or disclosed in connection with enforcement of this Consent Decree; (iv) is approved for release in writing by the Parties; or (v) is required to be disclosed by operation of law.

## IV.    ANNUAL REPORTING

34.    <u>Timing for Annual Reports</u>.  Annual reports required by this Section shall be provided to ERF not later than July 15 of each year following the Effective Date.

35.    <u>Contents and Schedule for Submission of Annual Reports</u>.  PG&E shall prepare the following annual reports pursuant to this Consent Decree:

A. *Year 1 Pilot Program Report*.  This report shall be prepared by July 15 of the year following the Effective Date of this Consent Decree.  Consistent with Section II, this report will summarize the efficacy of the housekeeping, treatment, and structural BMPs implemented during the Year 1 Pilot Program, associated sampling collected pursuant to Section III, and PG&E's plans for what housekeeping, treatment, and structural BMPs will be implemented in the Year 2 Pilot Program.

B. *Year 2 Pilot Program Report*.  This report shall be prepared by July 15 of the second year following the Effective Date of this Consent Decree.  Consistent with Section II, this report will summarize the efficacy of housekeeping, treatment and structural BMPs implemented during the Year 2 Pilot Program, associated sampling collected pursuant to Section III.  Depending upon whether PG&E elects to conduct a third year of the Pilot Program, the report will either (i) provide a summary of PG&E's plans for what housekeeping, treatment, and structural BMPs will be implemented in the Year 3 Pilot Program, or alternatively (ii) identify the selection, location, and schedule for the Roll-Out BMPs that will be implemented the following year and, if applicable, any Alternative BMPs.

C. *If applicable, Year 3 Pilot Program Report*.  If PG&E elected to proceed with a third year of the Pilot Test, this report shall be prepared by July 15 of the third year following the Effective Date of this Consent Decree.  Consistent with Section II, this report will summarize the efficacy of housekeeping, treatment, and structural BMPs implemented during the Year 3 Pilot Program, associated sampling collected pursuant to Section III, and will identify the selection, location, and schedule for the Roll-Out BMPs that will be implemented the following year and, if applicable, any Alternative BMPs.

D.  *Annual Reports following Pilot Test*.  Following completion of the Pilot Program, PG&E shall prepare an annual report for each year remaining in the Consent Decree term prior to the Termination Date.  The annual report shall include:

(i) the status of implementation of Roll-Out BMPs and/or Alternative BMPs during the past year;

(ii) an explanation for the basis for the use or installation of any Alternative BMPs, including the basis for the expectation that the Alternative BMPs will be effective for achieving Stormwater Evaluation Levels;

(iii) identification of those Facilities where PG&E will implement Roll-Out BMPs and/or Alternative BMPs during the coming year, description of the schedule and the specific BMPs to be implemented, and identification of those Facilities that will change BMPs in place from the prior year and an explanation for the basis for the change;

(iv) a list of the four Representative Facilities selected by PG&E for sampling during the next Wet Season along with the criteria used to identify the Representative Facilities; and

(v) a summary of all of the sampling conducted during the prior year and copies of laboratory reports for such sampling.

E.  Laboratory Reports.  Laboratory results, for samples collected pursuant to the requirements of this Consent Decree, shall be provided to ERF in the annual reports required by this Section.

F.  Analysis of Sampling Data and Response Actions.  If any samples taken pursuant to this Consent Decree exceed a Stormwater Evaluation Level, or if PG&E fails to collect and analyze samples from the minimum requisite QSEs (provided the requisite QSEs occur at the Facility), then PG&E shall include a written statement in the applicable annual report discussing the exceedance(s) and/or inability or failure to collect and analyze samples from requisite QSEs, the likely cause and/or source of the exceedance(s), additional measures that will be taken to address and eliminate future exceedances and/or failures to collect required samples, and a schedule for the implementation of

additional measures which, to the extent reasonably feasible, shall be implemented prior to the following Wet Season.

36.     Certification.  Annual reports submitted by PG&E pursuant to this Consent Decree shall be certified by substantially as follows:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to be the best of my knowledge and belief, true, accurate, and complete.

37.     Informal Meet and Confer Regarding Annual Reports.  Upon request by either Party, ERF and PG&E agree to informally meet and confer, separate from the dispute resolution process described elsewhere in this Consent Decree, regarding the information in any annual report.

## V.     REIMBURSEMENT OF LITIGATION AND OVERSIGHT COSTS

38.     Reimbursement of Litigation Costs.  To effectuate settlement, and without any admission of fact or law, PG&E agrees to reimburse ERF the amount of $1,950,000 to defray ERF's claimed investigative, expert, consultant, and attorneys' fees and costs incurred through the Court Approval Date, including all costs incurred as a result of investigating the activities at the Facilities, preparing the Notice Letter and Complaint, litigating this matter before the trial court and court of appeal, and negotiating a resolution of this action.  Such payment shall be made payable to "Environmental Advocates" and remitted to the firm within sixty (60) calendar days after the Court Approval Date.  ERF shall provide a W-9 tax form for Environmental Advocates to PG&E no later than fourteen (14) days after the Effective Date.

39.     Oversight Costs.  Within sixty (60) calendar days of the Court Approval Date, PG&E shall pay ERF the sum of one-hundred thousand dollars ($100,000).  Payment by PG&E shall be made by check or wire transfer consistent with payment instructions to be provided by ERF no later than fourteen (14) calendar days after the Effective Date.  ERF shall provide PG&E with a W-9 tax form at the time it provides payment instructions.  The amounts paid to ERF pursuant to this paragraph shall be the sole payment made by PG&E to ERF for oversight of this Consent Decree between the Effective Date and the Termination Date, excepting any fees and cost incurred in any judicial dispute resolution as

provided for in this Decree. ERF otherwise releases any and all additional claims for oversight costs prior to the Termination Date and covenants not to sue or otherwise pursue any judicial action to recover or seek additional oversight costs.

## VI. DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE

40. If a dispute under this Consent Decree arises, or either Party believes that a breach of this Consent Decree has occurred, prior to the Termination Date, the Parties shall make best efforts to meet and confer within fourteen (14) calendar days, or as soon as reasonably achievable thereafter, of receiving written notification from the other Party of a request for a meeting to determine whether a breach has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute. Each Party shall be responsible for its own attorneys' fees and costs during the meet and confer dispute resolution process. If the Parties fail to meet and confer, or the meet-and-confer does not resolve the issue, after (i) at least seven (7) calendar days have passed after the meet-and-confer occurred or (ii) fourteen (14) calendar days after either Party received written notification of a request for dispute resolution, whichever is earlier, either Party shall be entitled to file a motion with the District Court for the limited purposes of enforcement of the terms of this Consent Decree or resolution of any dispute otherwise arising under the terms of this Consent Decree. In any judicial dispute resolution proceeding between the Parties in connection with this Consent Decree and consistent with this Paragraph, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs in such proceeding from the other Party pursuant to the standards set forth by 42 U.S.C. § 6972(e) and associated applicable case law.

## VII. WAIVER, RELEASE, AND COVENANT

41. ERF's Waiver and Release. Upon the Effective Date of this Consent Decree, ERF, on its own behalf and on behalf of its members, subsidiaries, successors, assigns, directors, officers, agents, attorneys, representatives, and employees, releases PG&E and its officers, directors, employees, shareholders, parents, subsidiaries, predecessors, successors, and assigns, and affiliates, and each of their agents, attorneys, consultants, and other representatives, including those named in the Notice Letter and/or Complaint, (each a "Released Defendant Party") from, and waives all claims which arise from the Notice Letter and/or Complaint, including, without limitation, all claims for injunctive relief,

damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed, for the alleged failure of PG&E to comply with the federal Resource Conservation and Recovery Act, at the Facilities, up to the Termination Date.

42. <u>PG&E's Waiver and Release</u>. PG&E, on its own behalf and on behalf of any Released Defendant Party under its control, releases ERF (and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of its successors and assigns, and its agents, attorneys, and other representative) from, and waives all claims which arise from the Notice Letter and/or Complaint, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with the Notice Letter and/or Complaint up to the Termination Date.

43. <u>ERF's Covenant Not to Sue</u>. Except for the enforcement of this Consent Decree, beginning on the Effective Date and terminating on the Termination Date, ERF agrees that neither ERF, its officers, executive staff, members of its governing board nor any organization under the control of ERF, its officers, executive staff, or members of its governing board, will serve any 60-day Notice Letter or file any lawsuit against PG&E under any federal, State or local environmental laws in connection with the subject matter of this Consent Decree, and the Action, for the Facilities, including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum, incurred or claimed or which could have been claimed related thereto. Any such 60-day Notice Letter or lawsuit filed by ERF after the Termination Date shall not include any such claims for such actions up to and including the Termination Date.

44. The Parties acknowledge that they are familiar with section 1542 of the California Civil Code, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

While ERF asserts that California Civil Code section 1542 applies to general releases only, and that the

release in Paragraph 41 above is a limited release, the Parties hereby waive and relinquish any rights or benefits they may have under California Civil Code section 1542 with respect to any other claims against each other arising from, or related to, the allegations and claims as set forth in the Notice Letter and/or the Complaint, up to and including the Effective Date of this Consent Decree.

## VIII.   EFFECTIVE DATE AND PARTIAL OR FULL TERMINATION

45.     This Consent Decree shall be effective upon mutual execution by all Parties (the "Effective Date").

46.     Notwithstanding any requirement or term of this Consent Decree, the Consent Decree shall terminate August 1, 2026 (the "Termination Date").

47.     Prior to the Termination Date, the requirements of this Consent Decree shall terminate as to any Facility if one or more of the following is documented in an annual report prepared by PG&E consistent with Section IV, unless and until any dispute resolution pursuant to Section VI of the Consent Decree, regarding such early termination, is resolved:

A.  PG&E implements structural improvements at a Facility that result in no exposure of poles or TWW to rainwater, e.g., placing roofing over the relevant portions of the Pole Area or construction of equivalent or more comprehensive facilities.

B.  PG&E implements improvements at a Facility consisting of infiltration basins and/or drainage swales that result in the complete on-site storage and infiltration of stormwater runoff from Pole Areas during at least a 85th percentile, 24 hour storm event for the geographic area of the Facility.

C.  PG&E ceases all pole and TWW storage, cutting, and maintenance at a Facility and, as appropriate, sweeps, cleans, and power-washes the former Pole Area.  In such a case, the requirements of the Consent Decree shall terminate for that Facility during the period that there is no pole or TWW storage, cutting, or maintenance at the Facility.  In the event that pole storage or TWW storage is restarted at the Facility by PG&E prior to the Termination Date, the terms of this Consent Decree shall once again apply to the Facility.

D.  PG&E closes the Facility and, as appropriate, sweeps, cleans, and power-washes the former Pole Area.  In the event that the Facility is reopened prior to the Termination Date, the terms of this Consent Decree shall once again apply to the Facility.

E.  If (i) one full Wet Season including at least four (4) stormwater samples from the Pole Area of a Facility, consistent with the requirements of Section III, show that all sampled concentrations of pentachlorophenol and dioxins are equal to or below the Stormwater Evaluation Levels; or (ii) in the event that there are not four (4) QSEs measured in a single wet season, that at least four (4) consecutive stormwater samples from the Pole Area of a Facility, taken over two Wet Seasons, show that all sampled concentrations of pentachlorophenol and dioxins are equal to or below the Stormwater Evaluation Levels.

### IX.    MISCELLANEOUS PROVISIONS

48.    The Parties enter into this Consent Decree for the purpose of avoiding prolonged and costly litigation. Nothing in this Consent Decree shall be construed as, and PG&E expressly does not intend to imply, an admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Decree constitute or be construed as an admission by PG&E of any fact, finding, conclusion, issue of law, or violation of law. However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Consent Decree.

49.    *Force Majeure*.  No Party shall be considered to be in default in the performance of any of its obligations when a failure to perform is due to a "Force Majeure."  A Force Majeure event is any circumstances beyond the Party's control, including, without limitation, any act of God, war, fire, earthquake, flood, and restraint by court order or public authority. A Force Majeure event does not include normal inclement weather or inability to pay. Any Party seeking to rely upon this paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid, and which by exercise of due diligence has been unable to overcome, the Force Majeure.

50.    The terms of this Consent Decree shall be binding on all parties and their employees, officers, agents, divisions, subsidiaries, parent corporations, affiliates, successors in interest including subsequent purchasers, and assignees.

51.    The Consent Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document. An executed copy of this Consent Decree shall be valid as an original.

52.    In the event that any one of the provisions of this Consent Decree is held by a court to be

unenforceable, the validity of the enforceable provisions shall not be adversely affected.

53.      The language in all parts of this Consent Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning. This Consent Decree shall be construed pursuant to California law, without regard to conflict of law principles.

54.      The undersigned are authorized to execute this Consent Decree on behalf of their respective Parties and have read, understood and agreed to be bound by all of the terms and conditions of this Consent Decree.

55.      All Consent Decrees, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Decree are contained herein. This Consent Decree and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Consent Decree, unless otherwise expressly provided for therein.

56.      Notices. Any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to ERF pursuant to this Consent Decree shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

> Fredric Evenson
> Ecology Law Center
> PO Box 1000
> Santa Cruz, CA 95061-1000
> evenson@ecologylaw.com

With copies sent to:

> Jason R. Flanders
> Aqua Terra Aeris Law Group
> 490 43rd St.
> Oakland, CA 94609
> jrf@atalawgroup.com

Any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to PG&E pursuant to this Consent Decree shall be sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

PG&E Law Department
Attn: Director of Litigation
P.O. Box 7442
San Francisco, CA 94120

With copies sent to:

J. Tom Boer
Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111
jtboer@hunton.com

Each Party shall promptly notify the other of any change in the above-listed contact information.

57.     Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

58.     If for any reason the District Court should decline to approve this Consent Decree in the form presented, the Parties shall use their best efforts to work together to modify the Consent Decree within thirty (30) calendar days so that it is acceptable to the District Court. If the Parties are unable to modify this Consent Decree in a mutually acceptable manner, this Consent Decree shall become null and void.

59.     This Consent Decree shall be deemed to have been drafted equally by the Parties, and shall not be interpreted for or against any Party on the ground that any such Party drafted it.  Each of the Parties agrees that it has been represented by independent counsel of its choice during the negotiation of this Consent Decree and has had the opportunity to review the provisions of the Decree with its independent counsel in advance of execution.

60.     The headings and captions used in the Consent Decree are for reference purposes only and shall not have any effect on the interpretation of the Decree

61.     This Consent Decree and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Consent Decree, and supersede any and all prior and contemporaneous Consent Decrees, negotiations, correspondence, understandings and communications of the Parties, whether oral or written, respecting the matters covered by this Consent Decree. This Consent Decree may be amended or modified only by a writing signed by the Parties or their authorized representatives.

Ecological Rights Foundation

*Ecological Rights Foundation*

Date: AUGUST 30, 2018

*by James Lamport, EXEC. DIR.*

By: James Lamport, Executive Director


Pacific Gas and Electric Company


Date:_____

By:


Approved as to Form

Date: Aug. 30, 2018

AQUA TERRA AERIS LAW GROUP


By: Jason R. Flanders

Attorney for Plaintiff ERF


Date:_____

HUNTON ANDREWS KURTH


By: J. Tom Boer

Attorney for Defendant PG&E

Ecological Rights Foundation

Date:_____

By:    James Lamport, Executive Director


Pacific Gas and Electric Company

Date: 8|30|18

By:    Andrew Williams
       Vice President


Approved as to Form

Date:_____                    AQUA TERRA AERIS LAW GROUP


                                         _____

By:    Jason R. Flanders
       Attorney for Plaintiff ERF


Date: 8|30|18                            HUNTON ANDREWS KURTH


                                         _____

By:    J. Tom Boer
       Attorney for Defendant PG&E

Approved as to Form

Meg Pietrasz
PG&E Law Dept.

---

24                          Consent Decree – ERF v. PG&E

**EXHIBIT A**
**Facilities List**

| | Facility Name | Facility Address |
|---|---|---|
| 1 | Auburn SC | 341 Sacramento St., Auburn, CA |
| 2 | Bakersfield SC | 4201 Arrow St., Bakersfield, CA |
| 3 | Concord SC | 1030 Detroit Ave., Concord, CA |
| 4 | Cupertino SC | 10900 N. Blaney Ave., Cupertino, CA |
| 5 | Colma SC | 450 Eastmoor Ave., Daly City, CA |
| 6 | Davis SC | 316 L Street, Davis, CA |
| 7 | Del Mar Sub Maint. HQ | 3930 Sierra College Blvd., Loomis, CA |
| 8 | Dinuba SC | 8058 Union Drive, Dinuba, CA |
| 9 | Emeryville | 4525 Hollis St., Oakland, CA |
| 10 | Eureka SC | 2555 Myrtle Ave., Eureka, CA |
| 11 | Eureka Propane Plant | 1099 W. 14th Street, Eureka, CA |
| 12 | Hayward SC | 24300 Clawiter Rd., Hayward, CA |
| 13 | Livermore SC | 3797 1st St., Livermore, CA |
| 14 | Marysville SC | 18 7th St., Marysville, CA |
| 15 | Merced SC | 560 W 15th St., Merced, CA |
| 16 | Milpitas Gas Terminal | 66 Ranch Drive, Milpitas, CA |
| 17 | Modesto SC | 1524 N. Carpenter Rd., Modesto, CA |
| 18 | Monterey SC | 2311 Garden Rd. Monterey, CA |

| | Facility Name | Facility Address |
|---|---|---|
| 19 | Newman SC | 309 Merced St., Newman, CA |
| 20 | Oakdale SC | 811 West J St., Oakdale, CA |
| 21 | Oakland SC | 4801 Oakport Street, Oakland, CA |
| 22 | O'Neil GC Yard | 25051 O'Neil Ave., Hayward, CA |
| 23 | Placerville SC | 4636 Missouri Flat Rd., Placerville, CA |
| 24 | Redding SC | 3600 Meadow View Dr., Redding, CA |
| 25 | Sacramento SC | 5555 Florin Perkins Rd., Sacramento, CA |
| 26 | San Carlos SC | 275 Industrial Rd., San Carlos, CA |
| 27 | Metcalf GC Yard | 100 Metcalf Rd., San Jose, CA |
| 28 | Cinnabar SC | 308 Stockton Ave., San Jose, CA |
| 29 | Stockton SC | 4040 West Lane, Stockton, CA |
| 30 | Vacaville SC | 158 Peabody Rd., Vacaville, CA |
| 31 | Willows SC | 310 East Wood St., Willows, CA |

# EXHIBIT B

## Algorithm and Calculation of 2,3,7,8 TCDD (Dioxin & Furans) TEQ
## for Comparison to Stormwater Evaluation Levels

Pursuant to Consent Decree Paragraph 29, TEQs for the 2,3,7,8-TCDD (Dioxin & Furans) in stormwater shall be calculated using the following equation:

$$\text{Dioxin-TEQ} = \Sigma(C_x \times TEF_x \times BEF_x)$$
where:

$C_x$ = concentration of dioxin or furan congener x
$TEF_x$ = TEF for congener x
$BEF_x$ = BEF for congener x

For the purposes of this calculation, the following toxicity equivalency factors (TEFs) and Bioaccumulation Equivalency Factors (BEFs) shall be used:

**Table: Toxicity Equivalency Factors and Bioaccumulation Equivalency Factors**

| Dioxin or Furan Congener | Toxicity Equivalency Factor (TEF) | Bioaccumulation Equivalency Factor (BEF) |
|---|---|---|
| 2,3,7,8-tetra CDD | 1.0 | 1.0 |
| 1,2,3,7,8-penta CDD | 1.0 | 0.9 |
| 1,2,3,4,7,8-hexa CDD | 0.1 | 0.3 |
| 1,2,3,6,7,8-hexa CDD | 0.1 | 0.1 |
| 1,2,3,7,8,9-hexa CDD | 0.1 | 0.1 |
| 1,2,3,4,6,7,8-hepta CDD | 0.01 | 0.05 |
| Octa CDD | 0.0001 | 0.01 |
| 2,3,7,8-tetra CDF | 0.1 | 0.8 |
| 1,2,3,7,8-penta CDF | 0.05 | 0.2 |
| 2,3,4,7,8-penta CDF | 0.5 | 1.6 |
| 1,2,3,4,7,8-hexa CDF | 0.1 | 0.08 |
| 1,2,3,6,7,8-hexa CDF | 0.1 | 0.2 |
| 1,2,3,7,8,9-hexa CDF | 0.1 | 0.6 |
| 2,3,4,6,7,8-hexa CDF | 0.1 | 0.7 |
| 1,2,3,4,6,7,8-hepta CDF | 0.01 | 0.01 |
| 1,2,3,4,7,8,9-hepta CDF | 0.01 | 0.4 |
| Octa CDF | 0.0001 | 0.02 |